No. 21-12355

# In the United States Court of Appeals for the Eleventh Circuit

NETCHOICE LLC, ET AL.,

*Plaintiffs–Appellees*,

v.

ATTORNEY GENERAL, STATE OF FLORIDA, ET AL.,

*Defendants–Appellants.*

## OPENING BRIEF OF APPELLANTS

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NO. 4:21-CV-220-RH-MAF

Henry C. Whitaker
*Solicitor General*
Daniel W. Bell
*Chief Deputy Solicitor General*
Evan Ezray
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
Henry.Whitaker@myfloridalegal.com
Daniel.bell@myfloridalegal.com
Evan.Ezray@myfloridalegal.com

*Attorneys for Defendants-Appellants
Ashley Moody, in her official capacity
as Attorney General of Florida; Joni
Alexis Poitier, in her official capacity as
Commissioner of the Florida Elections
Commission; Jason Todd Allen, in his*

Charles J. Cooper
David H. Thompson
Brian W. Barnes
Joseph O. Masterman
John W. Tienken
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jmasterman@cooperkirk.com
jtienken@cooperkirk.com

James W. Uthmeier
*General Counsel*
Raymond F. Treadwell
*Chief Deputy General Counsel*
EXECUTIVE OFFICE OF GOVERNOR

*official capacity as Commissioner of the*          RON DESANTIS
*Florida Elections Commission; John*          Office of the General Counsel
*Martin Hayes, in his official capacity as*          The Capitol, PL-05
*Commissioner of the Florida Elections*          Tallahassee, FL 32399
*Commission; and Kymberlee Curry*          (850) 717-9310
*Smith, in her official capacity as*          James.Uthmeier@eog.myflorida.com
*Commissioner of the Florida Elections*          Ray.Treadwell@eog.myflorida.com
*Commission*

*Attorneys for Defendant-Appellant*
*Patrick Gillespie, in his official*
*capacity as Deputy Secretary of*
*Business Operations of the Florida*
*Department of Management Services*

*Counsel for Defendants-Appellants*

*NetChoice v. Attorney General*
*State of Florida*, 21-12355

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1. Allen, Jason Todd, *Defendant/Appellant*

2. Allen, Kenneth Winn, *Attorney for Plaintiffs/Appellees*

3. American Civil Liberties Union of Florida, *Amicus Curiae*

4. American Civil Liberties Union, *Amicus Curiae*

5. Authors Guild Inc., *Amicus Curiae*

6. Barnes, Brian W., *Attorney for Defendant/Appellant*

7. Bassett, Glenn Allen, *Attorney for Defendants/Appellants*

8. Bell, Daniel William, *Attorney for Defendants/Appellants*

9. Blacklock, Evelyn, *Attorney for Plaintiffs/Appellees*

10. Burhans Jr., Glenn T., *Attorney for Plaintiff/Appellee*

11. Carome, Patrick J., *Attorney for Amicus Curiae*

12. Center for Democracy and Technology, *Amicus Curiae*

13. Chamber of Progress, *Amicus Curiae*

14. Clark, Christopher Roy, *Attorney for Plaintiff/Appellee*

15. Clement, Paul D., *Attorney for Plaintiffs/Appellees*

*NetChoice v. Attorney General State of Florida*, 21-12355

16.     Computer & Communications Industry Association, *Plaintiff*

17.     Connected Commerce Council, *Amicus Curiae*

18.     Consumer Technology Association, *Amicus Curiae*

19.     Cooper, Charles J., *Attorney for Defendant/Appellant*

20.     Cooper & Kirk, PLLC, *Attorneys for Defendant/Appellant*

21.     DLA Piper US LLP, *Attorneys for Plaintiff/Appellee*

22.     Eisenstein, Ilana Hope, *Attorney for Plaintiff/Appellee*

23.     Electronic Frontier Foundation, *Amicus Curiae*

24.     Engine Advocacy, *Amicus Curiae*

25.     Esparza, Servando, *Declarant*

26.     Fabens-Lassen, Ben, *Attorney for Plaintiff/Appellee*

27.     Florida Department of Management Services, *Defendant/Appellant*

28.     Florida Elections Commission, *Defendant/Appellant*

29.     Florida Office of the Attorney General, *Attorneys for Defendants/Appellants*

30.     Gillespie, Patrick, *Defendant/Appellant*

31.     Goldstein, Leonid, *Amicus Curiae*

32.     Green, Jonathan Allen, *Attorney for Plaintiff/Appellee*

33.     Greene, David Allen, *Attorney for Amicus Curiae*

34.     Hayes, John Martin, *Defendant/Appellant*

*NetChoice v. Attorney General*
*State of Florida*, 21-12355

35.  Hinkle, Judge Robert L., *District Court Judge*

36.  Holtzblatt, Ari, *Attorney for Amicus Curiae*

37.  Homer, Bonner, *Attorneys for Amicus Curiae*

38.  Homer, Peter Winslow, *Attorney for Amicus Curiae*

39.  Hopkins, Christopher, *Attorney for Amici Curiae*

40.  Information Technology & Innovation Foundation, *Amicus Curiae*

41.  Internet Association, *Amicus Curiae*

42.  Johnson, Steffen N., *Attorney for Plaintiff/Appellee*

43.  Karanjia, Peter, *Attorney for Plaintiff/Appellee*

44.  Kilby, Douglas Lamar, *Attorney for Plaintiff/Appellee*

45.  Kirkland & Ellis LLP, *Attorneys for Plaintiffs/Appellees*

46.  Mackey, Aaron, *Attorney for Amicus Curiae*

47.  Masterman, Joseph, *Attorney for Defendant/Appellant*

48.  McDonald Hopkins LLC, *Attorneys for Amicus Curiae*

49.  Media Law Resource Center Inc, *Amicus Curiae*

50.  Mitchell, Kasdin M., *Attorney for Plaintiffs/Appellees*

51.  Moody, Ashley B., *Defendant/Appellant*

52.  Morrison, Danielle T., *Attorney for Plaintiff/Appellee*

53.  National Black Justice Coalition, *Amicus Curiae*

54.  NetChoice LLC, *Plaintiff*

*NetChoice v. Attorney General*
*State of Florida*, 21-12355

55.    Oprison, Christopher George, *Attorney for Plaintiff/Appellee*

56.    Opsahl, Kurt, *Attorney for Amicus Curiae*

57.    Pavlovic, Corinne, *Declarant*

58.    Pen American Center Inc., *Amicus Curiae*

59.    Phillips, Joseph Trumon, *Attorney for Plaintiff/Appellee*

60.    Poitier, Joni Alexis, *Defendant/Appellant*

61.    Potts, Neil, *Declarant*

62.    Progressive Policy Institute, *Amicus Curiae*

63.    Protect Democracy Project, Inc., *Amicus Curiae*

64.    Reporters Committee For Freedom of the Press, *Amicus Curiae*

65.    Rumenap, Stacie D., *Declarant*

66.    Schruers, Matthew, *Declarant*

67.    Shullman, Deanna K, *Attorney for Amici Curiae*

68.    Shullman, Fugate PLLC, *Attorneys for Amici Curiae*

69.    Siekkinen, Nury Agudo, *Attorney for Amici Curiae*

70.    Smith, Kymberlee Curry, *Defendant/Appellant*

71.    Smitha, Bridget Kellogg, *Attorney for Plaintiff/Appellee*

72.    Stearns Weaver Miller Alhadeff & Sitterson, P.A., *Attorneys for Plaintiff/Appellee*

73.    Szabo, Carl, *Declarant*

74. Szoka, Berin Michael, *Attorney for Amicus Curiae*

75. TechFreedom, *Amicus Curiae*

76. Technet, *Amicus Curiae*

77. Thompson, David H., *Attorney for Defendant/Appellant*

78. Tienken, John W., *Attorney for Defendant/Appellant*

79. Treadwell, Raymond Frederick, *Attorney for Defendant/Appellant*

80. Uthmeier, James William, *Attorney for Defendant/Appellant*

81. Veitch, Alexandra, *Declarant*

82. Walters Law Group, *Attorneys for Amicus Curiae*

83. Walters, Lawrence G, *Attorney for Amicus Curiae*

84. Washington Center for Technology Policy Inclusion, *Amicus Curiae*

85. Whitaker, Henry C., *Attorney for Defendants/Appellants*

86. White, Lauren Gallo, *Attorney for Plaintiff/Appellee*

87. Willen, Brian M., *Attorney for Plaintiff/Appellee*

88. Wilmer Cutler Pickering Hale and Dorr LLP, *Attorneys for Amicus Curiae*

89. Wilson Sonsini Goodrich & Rosati, P.C., *Attorneys for Plaintiff/Appellee*

90. Winship, Blaine H., *Attorney for Defendants/Appellants*

91. Wolfson, Paul R., *Attorney for Amicus Curiae*

92. Xi, James, *Attorney for Plaintiffs/Appellees*

93.   Yang, Meng Jia, *Attorney for Plaintiff/Appellee*

94.   ZwillGen, *Attorneys for Amici Curiae*

95.   Undisclosed members of Appellees

Apart from undisclosed members of Appellees, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

*NetChoice v. Attorney General*
*State of Florida*, 21-12355

Dated: September 7, 2021

/s/ Henry C. Whitaker
Henry C. Whitaker
*Solicitor General*
Daniel W. Bell
*Chief Deputy Solicitor General*
Evan Ezray
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
Henry.Whitaker@myfloridalegal.com
Daniel.bell@myfloridalegal.com
Evan.Ezray@myfloridalegal.com

*Attorneys for Defendants-Appellants*
*Ashley Moody, in her official capacity as*
*Attorney General of Florida; Joni Alexis*
*Poitier, in her official capacity as*
*Commissioner of the Florida Elections*
*Commission; Jason Todd Allen, in his*
*official capacity as Commissioner of the*
*Florida Elections Commission; John*
*Martin Hayes, in his official capacity as*
*Commissioner of the Florida Elections*
*Commission; and Kymberlee Curry*
*Smith, in her official capacity as*
*Commissioner of the Florida Elections*
*Commission*

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
David H. Thompson
Brian W. Barnes
Joseph O. Masterman
John W. Tienken
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jmasterman@cooperkirk.com
jtienken@cooperkirk.com

James W. Uthmeier
*General Counsel*
Raymond F. Treadwell
*Chief Deputy General Counsel*
EXECUTIVE OFFICE OF GOVERNOR RON
DESANTIS
Office of the General Counsel
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
James.Uthmeier@eog.myflorida.com
Ray.Treadwell@eog.myflorida.com

*Attorneys for Defendant-Appellant*
*Patrick Gillespie, in his official capacity*
*as Deputy Secretary of Business*
*Operations of the Florida Department of*
*Management Services*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal concerns important questions of constitutional law and federal preemption: whether the district court erred in preliminarily enjoining portions of S.B. 7072, Florida's first-of-its-kind law to protect consumers from arbitrary censorship by social media platforms, because of limitations imposed by the First Amendment and Section 230 of the Communications Decency Act. This Court's answer to these questions will have far reaching effects in determining whether and how the State can regulate these platforms and their unprecedented power over the free flow of information and ideas in the United States. Appellants believe oral argument would assist the Court in deciding the consequential issues presented by this appeal.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT .....................................................2

STATEMENT OF ISSUES................................................................3

STATEMENT OF THE CASE ............................................................3

    I.     Social Media Platforms' Efforts To Limit Public Discourse. ..............3

    II.    Senate Bill 7072.................................................................4

    III.   Procedural History. ..............................................................7

STANDARD OF REVIEW ................................................................7

SUMMARY OF ARGUMENT ...........................................................8

ARGUMENT .................................................................................10

I.    Plaintiffs Are Unlikely To Succeed on the Merits of Their Claim that
Section 230 Preempts the Act. ....................................................10

II.   Plaintiffs Are Unlikely To Succeed on the Merits of Their Facial First
Amendment Challenge................................................................18

    A.    The Act's hosting regulations do not implicate the First
Amendment. ......................................................................20

         1.    The First Amendment does not categorically prohibit the
government from requiring social media platforms to host
user speech........................................................... 21

              *i.*    *Ability to Speak*............................................24

              *ii.*   *Risk of Listener Confusion* .............................28

       *iii.*    *Unified Speech Product* ................................. 29

    2.    The Act's hosting regulations permissibly reflect Florida's decision to treat social media platforms as common carriers. ...34

    3.    The consistency provision is a permissible regulation of platforms' conduct towards their users. ...................................39

  B.    The Act's regulation of when platforms may add an addendum to user posts is constitutional. ...............................................42

  C.    The Act's notice and disclosure requirements are constitutional. ......43

  D.    The District Court's remaining First Amendment grounds for entering the preliminary injunction lack merit.................................48

    1.    The District Court erred in concluding that the Act is infected with viewpoint discrimination.................................................48

    2.    The District Court erred when it concluded that the Act impermissibly targets large companies....................................50

III.    Any Provisions of the Act that Might Be Preempted or Unconstitutional Are Severable. .....................................................................................51

IV.    Plaintiffs Lack All Other Prerequisites for a Preliminary Injunction. ..........53

CONCLUSION ..................................................................................................54

## TABLE OF AUTHORITIES

**Cases**                                                                                                                      **Page**

*Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987) ............................50, 51

*Artistic Ent., Inc. v. City of Warner Robins*, 223 F.3d 1306 (11th Cir. 2000) ........49

*Assoc. Press v. United States*, 326 U.S. 1 (1945) ...........................................40, 41

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ..........................................18

*Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020) ..............53

*Bd. of Educ. of Westside Cmty. Schs. (Dist.66) v. Mergens*,
    496 U.S. 226 (1990)........................................................................................29

*Biden v. Knight First Amend. Inst.*, 141 S. Ct. 1220 (2021)........... 34, 35, 36, 37, 45

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011).............................................53

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983).....................................45

*Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016),
    *aff'd*, 700 F. App'x 588 (9th Cir. June 6, 2017) ................................................27

*Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001) ......................................16

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984)..........................43

*Conroy v. Aniskoff*, 507 U.S. 511 (1993)..............................................................49

*CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832 (9th Cir. 2019)........46

*Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235 (11th Cir. 2015)........................44

*Darnaa, LLC v. Google, Inc.*, 2016 WL 6540452 (N.D. Cal. Nov. 2, 2016)..........14

*Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996)...39

*Domen v. Vimeo, Inc.*, 2021 WL 3072778 (2d Cir. July 21, 2021) ........................13

*Domen v. Vimeo, Inc.*, 991 F.3d 66 (2d Cir. 2021) ................................................13

*Emerson v. Hillsborough Cnty.*, 312 So. 3d 451 (Fla. 2021) .................................52

*e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029
    (M.D. Fla. Feb. 8, 2017) ............................................................................ 13, 18

*Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017).....................41

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
    521 F.3d 1157 (9th Cir. 2008)........................................................................12

*Farmers Educ. & Co-op Union of Am. v. WDAY, Inc.*, 360 U.S. 525 (1959)...38, 39

*FCC v. Midwest Video Corp.*, 440 U.S. 689 (1979) ..............................................34

*FCC v. Pacifica Found.*, 438 U.S. 726 (1978) ......................................................16

*Frisby v. Shultz*, 487 U.S. 474 (1988) ..................................................................48

*GCM Partners, LLC v. Hipaaline Ltd.*, 2020 WL 6867207 (N.D. Ill. Nov. 23, 2020) ..............................................................................................................14

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ................................40

*Gonzalez v. Governor of Ga.*, 978 F.3d 1266 (11th Cir. 2020).....................7, 8, 54

*Hannegan v. Esquire, Inc.*, 327 U.S. 146 (1946)...................................................39

*Hill v. Colorado*, 530 U.S. 703 (2000) ............................................................48, 49

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ...................................................41

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557 (1995) ................................................................................................*passim*

*In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015) ...................................................49

*Int'l Food & Beverage Sys. v. City of Fort Lauderdale*, 794 F.2d 1520 (11th Cir. 1986) ..............................................................................................49

*Malwarebytes, Inc v. Enigma Software Grp. USA, LLC.*, 141 S. Ct. 13 (2020) ....13, 18

*Maryland v. King*, 567 U.S. 1301 (2012) .............................................................54

*Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) ......................24, 25, 30

*Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229 (2010).......44, 46

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983)....................................................................................50, 51

*Morton v. Twitter, Inc.*, 2021 WL 1181753 (C.D. Cal. Feb. 19, 2021)............26, 27

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601 (D.C. Cir. 1976) ........36

*Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)..........46

*Nat'l Numismatic Certification, LLC. v. eBay, Inc.*, 2008 WL 2704404 (M.D. Fla. July 8, 2008)....................................................................................16

*National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018)....................................................................................19

*NCTA -- The Internet & Television Ass'n v. Frey*, 7 F.4th 1 (1st Cir. Aug. 3, 2021) ....................................................................................10

*Nev. Comm'n on Ethics v. Corrigan*, 564 U.S. 117 (2011)....................................43

*Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Ca.*, 475 U.S. 1 (1986) .......30, 31

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017)...................................4, 37

*Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422 (1859) ...............................................35, 36

*Phelps-Roper v. City of Manchester*, 545 F.3d 685 (8th Cir. 2008)......................49

*PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980)............... 21, 22, 25, 31

*Puente Ariz. v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016) .........................................10

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...................................................41

*Railway Employees' Department v. Hanson*, 351 U.S. 225 (1956).......................17

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819 (1995) .............29

*Rossignol v. Voorhaar*, 316 F.3d 516 (4th Cir. 2003).............................................17

*Rumsfeld v. FAIR, Inc.*, 547 U.S. 47 (2006) ...................................................*passim*

*Runyon v. McCrary*, 427 U.S. 160 (1976) .............................................................41

*Shively v. Bowlby*, 152 U.S. 1 (1894) ....................................................................35

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) ......................................7, 53, 54

*Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710
     (N.Y. Sup. Ct. May 24, 1995) ........................................................................12

*Turner Broadcasting Sys. v. FCC*, 512 U.S. 622 (1994)...........................2, 36, 51

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016).....................35, 36, 39

*United States v. O'Brien*, 391 U.S. 367 (1968) .......................................48, 49, 50

*United States v. Stevens*, 559 U.S. 460 (2010)......................................................19

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ........................................................41

*Wollschlaeger v. Governor, Florida*, 848 F.3d 1293 (11th Cir. 2017)..................19

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
     471 U.S. 626 (1985)..................................................................... 44, 45, 46, 47

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997) ................................13, 18

## Statutes

47 U.S.C.

§ 230(c) ...................................................................................... 10, 11

§ 230(c)(1) ...................................................................................11, 18

§ 230(c)(2) ................................................... 11, 13, 14, 15, 18

§ 230(c)(2)(A)...................................................................... 13, 14, 15

§ 230(e)(3) .........................................................................................11

§ 312(a)(7) .........................................................................................39

§ 315(a) ..............................................................................................38

§ 315(b) ..............................................................................................39

Fla. Stat.

§ 106.072(2) ...................................................... 6, 7, 21, 33, 34

§ 501.2041 ...........................................................................................7

§ 501.2041(1)(b) ..........................................................................5, 42

§ 501.2041(1)(c) ..........................................................................5, 15

§ 501.2041(1)(d) ................................................................................6

§ 501.2041(1)(e) ..............................................................................20

§ 501.2041(1)(f) ................................................................................5

§ 501.2041(1)(g) ................................................................................4

§ 501.2041(1)(g)(4) ........................................................................45

§ 501.2041(2)(a) ..................................................................4, 21, 43

§ 501.2041(2)(b) ................................................................5, 21, 40

§ 501.2041(2)(c) ................................................................5, 43, 44

§ 501.2041(2)(d) ..............................................................................43

§ 501.2041(2)(d)(1) ..........................................................................5

§ 501.2041(2)(e) ..........................................................................5, 43

§ 501.2041(2)(h) ..............................................................6, 21, 33, 34

§ 501.2041(2)(j) ..............................................................6, 21, 33

§ 501.2041(a)....................................................................................33

§ 501.2041(b) ........................................................................................33

S.B. 7072
    § 1(5) ...............................................................................................34
    § 1(6) ...............................................................................................34
    § 1(11) .............................................................................................50
    § 6......................................................................................... 51, 52

## Additional Authorities

Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(c)(2)*, 1 J. OF FREE
    SPEECH L. 175 (2021) ......................................................................16

Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network
    Neutrality, and Section 230*, 22 YALE J. L. & TECH. 391 (2020)......................37

Benjamin C. Zipursky, *Online Defamation, Legal Concepts, and the Good
    Samaritan*, 51 VAL. U. L. REV. 1 (2016) ....................................12, 13

Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. OF
    FREE SPEECH L. 377 (2021)...............................................................31

Genevieve Lakier, *The Non-First Amendment Law of Freedom of Speech*,
    134 HARV. L. REV. 2299 (2021).................................... 35, 36, 38, 39

Gennie Gebhart, *Who Has Your Back? Censorship Edition 2019*, ELECTRONIC
    FRONTIER FOUNDATION (June 12, 2019), https://bit.ly/3kRhwG5 ....................47

Postage Rates for Periodicals: A Narrative History, USPS, available at
    https://bit.ly/38y8tnC ........................................................................39

The Santa Clara Principles on Transparency and Accountability in Content
    Moderation, https://santaclaraprinciples.org.......................................47

Tim Wu, *Machine Speech*, 161 U. PA. L. REV. 1495 (2013) ..................................26

**INTRODUCTION**

Over the last fifteen years, social media has transformed how Americans express themselves and consume information. The rise of this new medium of communication has enabled individual speakers to reach audiences directly and on a scale that was never before possible. But this development has also led to an unprecedented concentration of power in the hands of a few company executives, as network effects prompt an ever-growing number of users to assemble on a handful of dominant platforms.

Large media companies with the power to influence public debate are nothing new. But what makes social media platforms different is their ability to shape public discourse not by promoting their own messages but by *silencing* voices they deem to be harmful. Unlike traditional newspapers, social media companies generally run their platforms to provide a conduit for the speech of others, and the bottleneck position that comes with control of these platforms brings with it a remarkable power to censor. From preventing the distribution of contested claims about COVID-19 to suppressing news coverage of the business dealings of the President's son, the platforms have, in recent months, exhibited a growing willingness to exercise this power. Whether and how such power ought to be regulated is among the most consequential and controversial policy issues in America today.

1

The plaintiffs in this case are two trade associations for social media platforms that want the courts to shut down the policy debate over this issue. In Plaintiffs' view, the First Amendment and a federal statute passed more than a decade before the platforms began their incredible rise, Section 230 of the Communications Decency Act, leave the States with no choice but to stand by and hope the platforms will exercise their unprecedented censorship power wisely. Florida disagrees, and passed S.B. 7072 to protect its consumers from arbitrary censorship. Nonetheless, the District Court accepted Plaintiffs' meager view of state power and enjoined much of Florida's law. But, "[t]he First Amendment's command that the government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas." *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622, 657 (1994). Florida's law is consistent with Section 230 as well as the First Amendment, and the injunction should be reversed.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331. The District Court entered the preliminary injunction on June 30, 2021. Defendants filed a timely notice of appeal on July 12, 2021. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

**STATEMENT OF ISSUES**

1.      Whether, in a pre-enforcement facial challenge, Plaintiffs have established a likelihood of success on the merits of their claim that 47 U.S.C. § 230 preempts all possible applications of S.B. 7072.

2.      Whether Plaintiffs, in a pre-enforcement facial challenge, have established a likelihood of success on the merits of their claim that S.B. 7072 violates the First Amendment.

3.      Whether the District Court abused its discretion in determining that irreparable injury, the balance of hardships, and the public interest weighed in favor of issuing a preliminary injunction against enforcement of S.B. 7072.

**STATEMENT OF THE CASE**

**I.      Social Media Platforms' Efforts To Limit Public Discourse.**

The record in this appeal leaves no question that social media platforms arbitrarily discriminate against disfavored speakers, including speakers in Florida. The record is replete with unrebutted examples of platforms suppressing user content for arbitrary reasons. *E.g.*, App.891 (Doc.106-1 at 802) (Facebook censoring *The Babylon Bee*, a Florida-based media company, for obviously satirical content). When caught, platforms frequently cast these decisions off as "mistakes." *E.g.*, App.1693 (Doc.106-5 at 201). But systematic examinations show that platforms apply their content standards differently to content and speakers that express

3

different views but are otherwise similarly situated, all while publicly claiming to apply those standards fairly. *See* App.999, 1007, 1183 (Doc.106-2 at 14, 22; Doc.106-3 at 17). There are many examples in the Appendix, and even that list is hardly exhaustive.

## II.    Senate Bill 7072.

Undoubtedly, social media is "the modern public square." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). In S.B. 7072 (the "Act"), Florida has taken the lead in preventing "social media platforms"[1] from abusing their power over the public square. The Act does this by mandating disclosure to ensure that consumers know and understand how platforms regulate speech. Accordingly, the Act requires covered platforms to "publish the standards . . . used for determining how to censor, deplatform, and shadow ban." FLA. STAT. § 501.2041(2)(a).[2] And

---

[1] The Act defines "social media platform" as "any information service, system, Internet search engine, or access software provider" that, among other things, "enables computer access by multiple users to a computer server," "[d]oes business in the state," and has either "annual gross revenues in excess of $100 million" or "at least 100 million monthly individual platform participants globally." FLA. STAT. § 501.2041(1)(g). The District Court erroneously posited that this definition "also applies to systems nobody would refer to as social media." App.1700 (Doc.113 at 5). But even if the District Court was right, it correctly observed that this issue "makes no difference" to the questions presented here. *Id.*

[2] The Act defines "censor" as "any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. The term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform."

platforms are required to notify users when censoring, deplatforming, or shadow banning users or their posts, *id.* § 501.2041(2)(d)(1). Platforms must also inform users of forthcoming changes to "user rules, terms, and agreements," which may not be made more than once every 30 days. *Id.* § 501.2041(2)(c). And Platforms must allow users to see how many other users have viewed their posts, so that users can determine for themselves whether they have been censored or shadow banned. *Id.* § 501.2041(2)(e).

Related to all this disclosure, the Act requires that platforms apply their own content moderation rules consistently. This ensures that the disclosed rules are actually the rules applied by the platforms. Under the Act, a platform is generally free to adopt content- and viewpoint-discriminatory standards. It simply must apply whatever censorship, deplatforming, and shadow banning standards it adopts "in a consistent manner among its users." *Id.* § 501.2041(2)(b).

In general, the "hosting" function of social media platforms entails storing posts on a platform and distributing those posts to other users who affirmatively seek them out. Thus, when a social media platform provides users the ability to have their

---

Deplatform "means the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days." And shadow ban "means action by a social media platform, through any means, whether the action is determined by a natural person or an algorithm, to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform." *See* FLA. STAT. § 501.2041(1)(b), (c), (f).

own pages or own feeds, the platform is serving as a host to users' posts. For instance, a user can post her speeches, her photos, and her videos to her Facebook page, and other users can visit her page. The Act restricts platform control over these "hosting" functions for users likely to have uniquely important contributions to the public square—qualified political candidates and journalistic enterprises. In particular, the Act provides that platforms "may not willfully deplatform" users who are qualified candidates for political office in Florida. *Id.* § 106.072(2). Platforms also may not deplatform a "journalistic enterprise based on the content of its publication or broadcast," with "journalistic enterprise" defined based on, among other things, the number of words or other content the entity publishes and the number of viewers or subscribers it receives. *Id.* § 501.2041(1)(d), (2)(j).

Finally, to ensure that these "hosting" provisions are effective, and that journalistic enterprises remain free to communicate on a platform, the Act prohibits censorship and shadow banning of journalistic enterprises based on what they say, *id.* § 501.2041(1)(d), (2)(j), and ensures that qualified candidates remain visible by prohibiting the use of algorithms to shadow ban material posted by or about candidates during the campaign, *id.* § 501.2041(2)(h).[3]

---

[3] The Act also regulates "post prioritization." But, as explained below, issues raised by those provisions are ill-suited to resolution on this preliminary record, and therefore, Defendants do not challenge the injunction as to them at this stage.

### III.    Procedural History.

Plaintiffs—two associations of internet companies, *see* App.34 (Doc. 1) ¶¶ 20 n.23, 32–34—challenged S.B. 7072 days after it was enacted and before it was scheduled to take effect. Plaintiffs sought a preliminary injunction, arguing that they were likely to succeed on three of their several claims, namely that S.B. 7072 is preempted by Section 230, violates the First Amendment, and is unconstitutionally vague. *See* Doc.30 at 18–49. Leaving little time for discovery, the District Court required a response to the preliminary injunction motion in about two weeks. It held a hearing on the motion a week later. Two days later, the District Court enjoined Defendants from enforcing any provision of §§ 106.072 or 501.2041 on preemption and First Amendment grounds. *See* App.1725 (Doc. 113 at 30). Defendants timely appealed.

### STANDARD OF REVIEW

"In this Circuit, a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quotation marks omitted). Those prerequisites are that "(1) [the movant] has a substantial likelihood of success on the merits; (2) it will suffer an irreparable injury unless the injunction is granted; (3) the harm from the threatened injury outweighs the harm the injunction would cause the opposing party;

7

and (4) the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). This Court "review[s] the grant of a preliminary injunction for abuse of discretion," and "any underlying legal conclusions *de novo*." *Id*. at 1270. "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, . . . or makes findings of fact that are clearly erroneous." *Id*. (quotation marks omitted).

## SUMMARY OF ARGUMENT

I.    Plaintiffs are unlikely to succeed on the merits of their claim that any provision of the Act is facially preempted by 47 U.S.C. § 230. As the District Court tacitly acknowledged, the only part of that statute that could possibly preempt the Act is Section 230(c)(2). But that provision serves only to absolve platforms of liability when they remove in good faith content that is "objectionable" within the meaning of Section 230(c)(2). That leaves myriad ways in which the Act can apply consistently with Section 230(c)(2). For example, the Act and Section 230 can peacefully coexist when a social media platform fails to act in "good faith," when the Act does not regulate the removal or restriction of content, or when a platform removes unobjectionable material.

II.    Plaintiffs are also unlikely to succeed on their claim that the Act violates the First Amendment on its face. Most of the Act is directed at ensuring that

social media platforms host content in a transparent fashion. For example, the Act requires non-controversial, factual disclosures, and disclosure requirements have long coexisted with the First Amendment. Even the portions of the Act that regulate the manner in which platforms host speech are consistent with the First Amendment. When properly analyzed separately from the Act's other provisions—and from the extraneous legislative statements on which the District Court primarily relied—these requirements parallel other hosting regulations that the Supreme Court has held are consistent with the First Amendment. *E.g.*, *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 63 (2006). The Act's hosting regulations prevent the platforms from silencing others. They leave platforms free to speak for themselves, create no risk that a user's speech will be mistakenly attributed to the platforms, and intrude on no unified speech product of any platform. These requirements are little different from traditional regulation of common carriers that has long been thought consistent with the First Amendment.

III.    Even if Plaintiffs' claims were likely to succeed against any of the Act's provisions, the District Court's wholesale injunction of enforcement of the Act would still be unjustified. Under the Act's severability clause and under established

severability principles, any constitutional problems arising from a given provision would require enjoining enforcement of that provision, not the entire Act.

IV.    The other injunctive factors—irreparable injury, balance of the equities, and the public interest—also do not justify enjoining enforcement of the Act's hosting regulations at this preliminary stage. These requirements neither curtail Plaintiffs' speech nor prevent them from monitoring abuses of their platforms. Therefore, the only parties facing irreparable injury are the State of Florida and the Floridians whose interests the enjoined requirements serve.

## ARGUMENT

## I.    Plaintiffs Are Unlikely To Succeed on the Merits of Their Claim that Section 230 Preempts the Act.

In this "facial preemption challenge," Plaintiffs bear "the burden to establish . . . that no set of circumstances exists under which the [statute] would be valid." *NCTA -- The Internet & Television Ass'n v. Frey*, 7 F.4th 1, at *12 (1st Cir. Aug. 3, 2021); *see also Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016). Plaintiffs cannot carry that burden. Section 230 expressly preserves state regulatory power, and there are many circumstances when the Act can be applied consistently with Section 230.

Section 230(c) offers "[p]rotection for 'Good Samaritan' blocking and screening of offensive material." 47 U.S.C. § 230(c). As relevant here, subsection (c)(1) states that "[n]o provider . . . of an interactive computer service" (including

10

platforms covered by S.B. 7072) "shall be treated as the publisher or speaker of any information provided by" a user. *Id.* § 230(c)(1). Subsection (c)(2) states in turn that platforms may not "be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the [platform] considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Id.* § 230(c)(2).

As the District Court observed, Section 230 "does not preempt the field" of internet-content regulation. App.1710 (Doc.113 at 15). Congress expressly *preserved* states' authority to "enforc[e] any State law that is consistent with" Section 230(c). 47 U.S.C. § 230(e)(3). In conformity with that provision and the well-established presumption against preemption, the rest of Section 230 should be construed in a manner that allows federal and state law in this area to coexist.

A.    The District Court's error begins with a fundamental misunderstanding of Section 230. To the District Court, subsection 230(c)(2) preempts any state law that regulates a "social media platform's restriction of access to posted material." App.1711 (Doc.113 at 16). Applying that test, the court concluded that subsection 230(c)(2) preempted the Act's prohibition on deplatforming candidates, the Act's private right of action, the Act's requirement that platforms act consistently when they engage in content moderation, and the Act's notice requirements. *Id.* at 15–16. But most of those provisions have little to do with whether a platform risks liability

11

for restricting access to material on its site and, in any event, (c)(2), the provision the District Court relied on exclusively to conclude the Act is preempted, does not field-preempt laws related to restricting access to material on the internet. Instead, it offers immunity from liability only when platforms remove or restrict objectionable material in good faith.

Some background is helpful. Section 230 was intended to overrule a state trial-court opinion, *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which, in contrast to S.B. 7072, had imposed liability on an interactive computer service for leaving user-generated content up on its platform rather than for taking it down. *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1163 & n.12 (9th Cir. 2008) (noting that overruling *Stratton Oakmont* was "the principal or perhaps the only purpose" expressed in the legislative history). The platform in *Stratton Oakmont* was treated as the publisher of defamatory statements that it did not remove because it had removed other offensive content. *See* 1995 WL 323710, at **3–4. In response, Congress provided (via subsection (c)(1)) that platforms have no affirmative duty to censor and clarified (via subsection (c)(2)) that they do not assume such a duty by undertaking certain forms of Good Samaritan content moderation. *See* Benjamin C. Zipursky, *Online Defamation, Legal Concepts, and the Good Samaritan*, 51 Val.

U. L. REV. 1, 35–39 (2016); *see also Malwarebytes, Inc v. Enigma Software Grp. USA, LLC.*, 141 S. Ct. 13, 15 (2020).

B. Consistent with this history, subsection 230(c)(2) does not endow platforms with broad authority "to self-regulate" free from government interference, as the District Court suggested. App.1709 (Doc.113 at 14). Indeed, the court cited no other cases locating such authority in that provision.[4] Instead, (c)(2) provides a defense only against liability that is imposed "on account of" a platform's "good faith" decision to censor certain types of content: namely, content that the platform "considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." 47 U.S.C. § 230(c)(2)(A). That text leaves at least three broad areas where the Act can be applied without offending subsection 230(c)(2).

*First*, and most important to this preliminary appeal, subsection 230(c)(2) protects only "good faith" actions. That standard is fact-specific: depending on the facts, platforms may act in good faith, or they may not. *E.g.*, *e-ventures Worldwide, LLC v. Google, Inc.*, 2017 WL 2210029, at *3 (M.D. Fla. Feb. 8, 2017) (denying motion to dismiss on § 230 grounds because of dispute of fact on platform's good

---

[4] The court cited one case locating such authority in subsection (c)(1), which was also incorrect, *see Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), and another merely holding that a particular moderation decision was in good faith, *Domen v. Vimeo, Inc.*, 991 F.3d 66, 73 (2d Cir. 2021). In a superseding opinion, that court emphasized that "[o]ur decision should not be read to confer immunity on providers acting in circumstances far afield from the facts of this case." *Domen v. Vimeo, Inc.*, 2021 WL 3072778, at *6 (2d Cir. July 21, 2021).

faith); *Darnaa, LLC v. Google, Inc.*, 2016 WL 6540452, at *9 (N.D. Cal. Nov. 2, 2016) (same). In the context of this pre-enforcement facial challenge, the possibility of such factual dispute is reason enough to reject Plaintiffs' blunderbuss contention that Section 230(c)(2) preempts the Act. The tentativeness of the opinion below, which could go only so far as to say that good-faith discrimination against candidates "can happen" and that good-faith mistakes "may occur," shows that Plaintiffs' facial preemption claim fails. App.1710 (Doc. 113 at 15).

In finding some provisions of the Act preempted despite the need for platforms to act in good faith to receive Section 230 protection, the District Court reasoned that "even a mistaken application of standards may occur in good faith." *Id.* Perhaps, if the mistake is not pretextual. *See GCM Partners, LLC v. Hipaaline Ltd.*, 2020 WL 6867207, at *13 (N.D. Ill. Nov. 23, 2020) ("mistake" might be pretextual). But whatever can be said about a platform's mistakes, the District Court did not (and could not) determine that platforms always, or even mostly, make them in good faith. And when they do not, nothing in (c)(2) is inconsistent with any provision of the Act. So, it cannot be preempted wholesale.

*Second*, subsection 230(c)(2) limits liability only for actions that "restrict access to or availability of material." 47 U.S.C. § 230(c)(2)(A). But much of the Act does nothing of the sort. For example, the consistency provision and the notice requirements do not regulate content moderation at all. Platforms remain fully able

to remove content they believe to be obscene, lewd, etc., as long as they apply the same content standards to everyone and provide notice to those they censor. Put in terms of the text of (c)(2), the consistency and notice provisions do not seek to hold platforms liable for their decisions to "restrict access to or availability of material." And therefore, the provisions are not preempted.

So too with respect to deplatforming. Under the Act, "deplatform" means "to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days." FLA. STAT. § 501.2041(1)(c). Deplatforming thus restricts *who* can access a platform; it does not necessarily "restrict access to or availability of *material*" on the platform. 47 U.S.C. § 230(c)(2)(A) (emphasis added). Accordingly, deplatforming also falls outside the scope of (c)(2).

*Third*, subsection 230(c)(2) provides immunity only when a platform removes content that it "considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Read in isolation—as the District Court did—the word "objectionable" might arguably include all content with which a platform simply disagrees. But that reading cannot be right. After all, if Section 230 meant to grant platforms immunity to remove any material whatsoever, then the terms "obscene, lewd, lascivious, filthy, excessively violent, harassing" would be surplusage. After all, if the term "objectionable" conveyed blanket censorship

15

authority, Congress would not have needed to provide specific immunity for "good faith" moderation of specific content.

Instead, the statutory language must be read in context, with the phrase "otherwise objectionable" drawing meaning from the remainder of the list. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (applying the *ejusdem generis* canon of interpretation); *Nat'l Numismatic Certification, LLC. v. eBay, Inc.*, 2008 WL 2704404, at \*25 (M.D. Fla. July 8, 2008). And the commonality in the list is that each of the preceding terms—"obscene, lewd, lascivious, filthy, excessively violent, harassing"—describe content-based categories of speech. None of (c)(2)'s specific speech categories is viewpoint-based, and nothing in the broader act of which Section 230 was a part suggests that Congress thought telecommunications regulations could discriminate against disfavored political viewpoints. *See generally* Adam Candeub & Eugene Volokh, *Interpreting 47 U.S.C. § 230(c)(2)*, 1 J. OF FREE SPEECH L. 175, 180–86 (2021); *FCC v. Pacifica Found.*, 438 U.S. 726, 745–46 (1978) (upholding regulation of indecency in broadcast media in part because it was viewpoint-neutral). Accordingly, at least when platforms engage in viewpoint- rather than content-based censorship, the censored speech is not "otherwise objectionable" within the meaning of (c)(2).

In sum, in many situations the Act can be applied consistently with subsection 230(c)(2). True, there may be cases when, as applied, a claim under the Act is

inconsistent with Section 230. But that is not a proper basis for categorically enjoining enforcement of the Act in this facial pre-enforcement challenge.

C.     Section 230 does not preempt S.B. 7072 for an additional reason: facial preemption of the Act would raise serious constitutional concerns. Even if platforms are not state actors, federal preemption of a state statute is undoubtedly state action. In *Railway Employees' Department v. Hanson*, the Supreme Court found that "justiciable questions under the First and Fifth Amendments were presented" where a federal statute preempted a state law entitling workers not to join a union as a condition of employment, since "the federal statute is the source of the power and authority by which any private rights are lost or sacrificed." 351 U.S. 225, 231–32 (1956). This application of the state action doctrine is reinforced by the history of the First Amendment, which was drafted against the backdrop "of censorship carried out by private organizations with complicated ties to the state apparatus and compelling motives to suppress speech unfavorable to the Crown." *Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003). Section 230's preemptive effect is therefore subject to First Amendment scrutiny.

If Section 230 were read broadly to immunize online platforms from regulation aimed at preventing them from stifling debate in the marketplace of ideas, it would raise serious constitutional difficulties. Those difficulties can be avoided by

rejecting a capacious reading of Section 230 that would preempt the Act in every application.

D.      Although the District Court erred in its application of (c)(2), it was correct not to endorse the overbroad reading of (c)(1) that Plaintiffs proposed and some other courts have adopted. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102, 1105 (9th Cir. 2009); *Zeran*, 129 F.3d at 330. Subsection (c)(1) prevents platforms from being "treated" as the "publisher or speaker" of the user-generated content they host; it does not limit the platforms' liability for removing content. 47 U.S.C. § 230(c)(1). Reading (c)(1) more expansively to provide immunity for *screening* content—the subject of subsection (c)(2)—"eviscerate[s]" the narrower protection of subsection (c)(2) and renders it superfluous, among other problems. *Malwarebytes, Inc.*, 141 S. Ct. at 16 (statement of Thomas, J.); *see also id.* at 15–18; *e-ventures Worldwide*, 2017 WL 2210029, at *3.

## II.      Plaintiffs Are Unlikely To Succeed on the Merits of Their Facial First Amendment Challenge.

The District Court erred in its First Amendment analysis by failing to separately analyze each of the specific provisions of the Act. The court below relied on allegations related to some provisions, mixed with case law supposedly applicable to others, and found the resulting mishmash sufficient to establish

likelihood of success on the merits.[5] But the extraordinary remedy of a preliminary injunction, particularly one predicated on a pre-enforcement facial constitutional challenge, is not dispensed in gross. As both the Supreme Court and this Court have recognized, a party seeking to preliminarily enjoin the enforcement of provisions of state law must show that the *specific* requirements that allegedly cause them irreparable injury are likely inconsistent with federal law. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2370, 2376 (2018) (considering "licensed notice" and "unlicensed notice" requirements separately under the First Amendment); *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1307, 1317 (11th Cir. 2017) (en banc) (considering record-keeping, inquiry, and anti-harassment provisions apart from anti-discrimination provision under the First Amendment).

Moreover, to invalidate a law on its face under the First Amendment, Plaintiffs must show (1) that "no set of circumstances exists under which [the law] would be valid," or (2) that the law is overbroad, meaning that "a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations omitted). To that end,

---

[5] The District Court enjoined enforcement of some provisions without even mentioning them. For example, the District Court never addressed Section 2(4), which requires disclosure of in-kind contributions that social media platforms make to campaigns. Nor did the District Court analyze Section 4(2)(i), which allows deplatformed users to access their own information for a 60-day period. The District Court erred in enjoining these provisions without analysis.

this Court's constitutional analysis must disaggregate the Act's specific requirements and analyze each on its own terms under this demanding standard. Once focus is directed to the specific provisions of the Act, it becomes apparent that Plaintiffs are unlikely to prevail on the merits of their facial First Amendment challenge.

The scope of this interlocutory appeal is important to the First Amendment analysis this Court must undertake. Although Defendants maintain that the entire Act is constitutional and should be upheld at final judgment, Defendants only ask in this appeal that the Court vacate the preliminary injunction as to certain key provisions of the Act. Specifically, at this stage, Defendants do not ask the Court to lift the preliminary injunction as to provisions of the Act that regulate so-called "post-prioritization." *See* FLA. STAT. § 501.2041(1)(e). The constitutionality of those provisions will best be assessed after discovery yields a more complete record than could be assembled in the limited time the District Court permitted for briefing the preliminary injunction.

## A.    The Act's hosting regulations do not implicate the First Amendment.

Some of the Act's most significant provisions regulate social media platform's hosting function—that is, they require social media platforms to host certain user-generated material or else regulate how social media platforms may decide to remove or restrict access to user-generated material. Specifically, the Act

prohibits social media platforms from censoring, shadow banning, or deplatforming a journalistic enterprise based upon the content of its posts. FLA. STAT. § 501.2041(2)(j). The Act also prohibits deplatforming candidates, *id.* § 106.072(2), and using algorithms to shadow ban posts by or about candidates during their campaigns, *id.* § 501.2041(2)(h). The platforms are free to censor, shadow ban, or deplatform all other users, but they may do so only in accordance with standards the platforms announce in advance and apply in a consistent manner, *id.* § 501.2041(2)(a),(b). A common thread running through all these provisions is that they regulate the manner in which platforms decide which user-generated content to remove or make inaccessible. These regulations of platforms' hosting function do not implicate the protections of the First Amendment for several independent reasons.

### 1. The First Amendment does not categorically prohibit the government from requiring social media platforms to host user speech.

Analysis of the Act's hosting regulations should begin with a recognition that the First Amendment does not categorically prohibit the government from requiring someone "to host or accommodate another speaker's message." *FAIR*, 547 U.S. at 63. In *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), the Court held that the First Amendment was no obstacle to a California mandate that the owner of a shopping center allow petitioners to collect signatures and distribute handbills on

shopping center property—even if the shopping center had a policy against such expressive activity. *Id.* at 86–88. Reaffirming *PruneYard*'s central holding, in *FAIR* the Court unanimously found no First Amendment right against Congress's mandate in the Solomon Amendment that law schools "afford equal access to military recruiters." *FAIR*, 547 U.S. at 60–68. Chief Justice Roberts explained, "[a]s a general matter, the [law] regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60 (emphasis in original).

The Act's hosting regulations are less intrusive than the law upheld in *FAIR*. By limiting deplatforming, censorship, and shadow banning, the Act protects an author's ability to post on social media platforms and for other users to affirmatively seek out those posts. These aspects of the law mimic the hosting obligation in *FAIR*, which allowed students who wished to affirmatively seek out military recruiters to do so, regardless of whether the law school agreed with what the military recruiters said. Like providing a table at a recruiting event, requiring that the social media posts of users remain accessible to those wishing to view them does not violate the First Amendment rights of the host. The Act's hosting regulations require less than the Solomon Amendment in *FAIR*. After all, the Solomon Amendment required law schools to affirmatively speak—law schools could be required to "send e-mails or post notices on bulletin boards on an employer's behalf." *FAIR*, 547 U.S. at 61. The

same is not true of the Act's hosting regulations, which merely require that platforms refrain from affirmatively squelching user posts under limited circumstances.

The Act's hosting regulations also parallel the Solomon Amendment in another respect: they not only limit the ability of platforms to exclude third-party speech but also ensure that once a platform is required to host speech, the platform cannot effectively drown out that speech or distort the message of certain speakers. The Solomon Amendment demanded that law schools host military recruiters, and that military recruiters be given the "most favorable access" granted to a nonmilitary recruiter. *FAIR*, 547 U.S. at 55. That equal access requirement prevented the law schools from nominally allowing the military recruiters' access to campus, but then making the military recruiters inaccessible to students by, for example, shunting the military off to the undergraduate campus. *Id.* at 53. Thus, in upholding the Solomon Amendment in *FAIR*, the Supreme Court upheld both compelled hosting and rules to make the compelled hosting effective. The Act's censorship and shadow banning protections function just the same as the equal access requirement in *FAIR*: they demand that once a platform hosts speech, the platform must also make that speech accessible.

Without ever meaningfully addressing *FAIR*, Plaintiffs insisted, and the District Court agreed, that the Act is unconstitutional because it regulates editorial judgments akin to the constitutionally protected decisions of a newspaper about

which editorials to run. *See Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). That is, Plaintiffs argued that the Act interferes with their own speech. But in key respects, newspapers are unlike social media platforms making decisions about which users to deplatform, censor, or shadow ban. Newspapers (1) do not publicly disclaim responsibility for the articles they publish, (2) are highly selective about the material they include, (3) have limited space due to the physical product they produce, and (4) curate articles to create a unified speech product that conveys a coherent message or offers perspectives on one or more overarching themes.

The Supreme Court's precedents provide three guiding principles to assess whether speech hosting requirements impermissibly interfere with hosts' speech: (i) the ability of the host to speak and dissociate from hosted speakers; (ii) the risk that listeners will mistakenly attribute the hosted speech to the host; and (iii) whether the host curates the speech of others to create its own unified speech product. All these principles confirm that the Act's hosting regulations do not interfere with any speech by the platforms and therefore do not on their face violate the First Amendment.

### i.    *Ability to Speak*

Like the laws upheld in *FAIR* and *Pruneyard*, the hosting regulations here do not meaningfully "interfere[] with any message" the platforms would otherwise communicate. *FAIR*, 547 U.S. at 64. As the Supreme Court explained in *FAIR*,

"[n]othing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies." 547 U.S. at 65. The owner of the shopping center in *PruneYard* could likewise "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand." 447 U.S. at 87. By contrast, the same could not be said about parades, which lacked a "customary practice whereby private sponsors disavow any identity of viewpoint between themselves and the selected participants." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 576 (1995) (quotation marks omitted). Nor was such distancing practical on the editorial page of a newspaper or in an envelope of a quarterly utility newsletter sent in the mail to customers. In both of those instances, the limitations of the host's physical medium meant the hosted speech took up scarce space that "could be devoted to other material the newspaper" and utility operator "may have preferred to print." *FAIR*, 547 U.S. at 64 (quoting *Tornillo*, 418 U.S. at 256, and citing *Pacific Gas*, 475 U.S. at 16–18 (plurality op.)).

The Act's hosting regulations generally leave social media platforms free to speak on their own behalf and make clear their own views. Social media platforms are free to tell the public at large that hosted users "are communicating their own messages by virtue of state law." *PruneYard*, 447 U.S. at 87. And social media

platforms remain free to speak with their own voice on any issue, both on their own platforms and outside them.

The ability of social media platforms to dissociate themselves from their users' speech is not merely theoretical. Social media platforms have made it their "customary practice" to expressly disclaim responsibility for the user content they host. *Hurley*, 515 U.S. at 576. Facebook states in Section 4.3 of its Terms of Service: "We do not control or direct what people and others do or say, and we are not responsible for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content)." App.633 (Doc.106-1 at 544). Section 3 of Twitter's terms of service provides similarly: "We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any opinions expressed via the Services . . . We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content." App.650 (Doc.106-1 at 561); *see* Tim Wu, *Machine Speech*, 161 U. PA. L. REV. 1495, 1505 (2013) (observing that Twitter "does not usually enjoy much First Amendment protection" because "the company does not . . . take responsibility for the creative choices of its users"). Social media platforms frequently invoke these disclaimers to obtain dismissal of lawsuits seeking to hold them liable for their users' posts. *E.g.*, *Morton v. Twitter,*

*Inc.*, 2021 WL 1181753 (C.D. Cal. Feb. 19, 2021); *Caraccioli v. Facebook, Inc.*, 167 F. Supp. 3d 1056 (N.D. Cal. 2016), *aff'd*, 700 F. App'x 588 (9th Cir. June 6, 2017). And the disclaimers make explicit what every reasonable user already understands: the platforms do not consider themselves responsible for the content posted by their users.

Unlike traditional newspapers, social media platforms, because of the technology they use, have in essence an unlimited ability to respond with their own speech to counter any hosted user speech with which they disagree. In other words, concerns that in some situations it is impracticable for a host to dissociate itself from hosted speech are nonexistent here. *Compare Hurley*, 515 U.S. at 576, *with FAIR*, 547 U.S. at 64. Social media platforms have long disclaimed responsibility for the speech of their users, and the Act's hosting regulations do nothing to prevent them from continuing to do so.

### ii.    *Risk of Listener Confusion*

The Supreme Court's compelled speech cases also give significant weight to the extent to which a reasonable listener would (mis)identify the hosted speaker's views with those of the host. *FAIR*, 547 U.S. at 65. For example, in *Hurley*, the Supreme Court found that each individual presentation in a parade would be "perceived by spectators as part of the whole," such that there was a risk of identifying each presentation as part of the "parade's overall message." *Id.* at 576–

27

77. By contrast, in *PruneYard* "there was little likelihood that the views of those engaging in the expressive activities would be identified with the owner" of the shopping center. *FAIR*, 547 U.S. at 65. Or in *FAIR* with the law schools hosting military recruiters. *Id.*

There is no interference with a host's speech when observers "can appreciate the difference" between speakers whom a host endorses and speakers whom a host "permits because legally required to do so, pursuant to an equal access policy." *FAIR*, 547 U.S. at 65. Under the Act's hosting regulations, a reasonable user of a typical social media platform would not identify the views expressed on the platform as those of the platform itself. As Facebook CEO Mark Zuckerberg explained in a 2019 speech, his platform is focused on "giving everyone a voice" by ensuring that "[p]eople no longer have to rely on traditional gatekeepers in politics or media to make their voices heard." App.1035 (Doc.106-2 at 50). Mr. Zuckerberg did not claim that all the posts that Facebook hosts are aggregated through his company's content moderation practices to become Facebook's voice. Instead, the many hosted voices remain distinct on the platform. And when users view this content on Facebook and other platforms, they are normally "apprised of the identity of the" speaker, *Hurley*, 515 U.S. at 576, by usernames and other identifying information signifying that it is the user, not the platform, speaking. Long before Twitter banned Donald Trump from its platform, even the most naïve observers understood that the

28

former President's controversial tweets were not the speech of Twitter itself. To be a marketplace for the ideas of others is the very *raison d'être* of social media platforms.

Regardless of whether a social media platform applauds or rejects the speech it hosts, no reasonable user thinks that the platform is the entity speaking when he or she views other users' posts. *Cf. Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 841 (1995) (rejecting misattribution fear as implausible). After all, "the proposition that" social media platforms "do not endorse everything they fail to censor is not complicated." *Bd. of Educ. of Westside Cmty. Schs. (Dist.66) v. Mergens*, 496 U.S. 226, 250 (1990) (plurality opinion). And any "fear of a mistaken inference of endorsement" by a social media platform "is largely self-imposed, because" the platform "itself has control over any impressions it gives its" users. *Mergens*, 496 U.S. at 251 (plurality opinion); *accord id.*, at 268 (Marshall, J., concurring in judgment).

### iii.    Unified Speech Product

Finally, in cases in which a host aggregates the speech of others, the Supreme Court's compelled speech precedents place significant weight on whether a mandate to host a third party's speech interferes with the host's ability to present speech that "comports with" or "contribute[s] something to a common theme." *Hurley*, 515 U.S. at 574, 576; *accord FAIR*, 547 U.S. at 63–64. Mandates to accommodate speech in

a parade, *id.* at 566, a utility newsletter, *Pacific Gas & Elec. Co. v. Pub. Util. Comm'n of Ca.*, 475 U.S. 1, 20–21 (1986) (plurality op.); *id.*, at 25 (Marshall, J., concurring in judgment), or a newspaper, *Tornillo*, 418 U.S. at 258, were found to be unconstitutional. In each instance, the hosted speech combined to form a unified speech product where each unit of hosted speech "affects the message conveyed," thus "alter[ing] the expressive content" of the whole. *Hurley*, 515 U.S. at 572–73.

The analysis is different when a mandate is imposed on an entity that does not produce a unified speech product. Although the law schools in *FAIR* intended to "send[] the message" that they found something wrong with the military's policies, the general activity involved—providing recruiting services to law students— "lack[ed] the expressive quality of a parade, a newsletter, or the editorial page of a newspaper; [the school's] accommodation of a military recruiter's message is not compelled speech because the accommodation does not sufficiently interfere with any message of the school." *FAIR*, 547 U.S. at 64–65.

As the Supreme Court explained in *Hurley*, the distinction turns on whether "each unit's expression . . . is perceived by spectators as part of the whole." *Hurley*, 515 U.S. at 580. Thus, when a host's product "consists of individual, unrelated segments that happen to be transmitted together for individual selection by members of the audience," there can be no compelled speech. *Hurley*, 515 U.S. at 580.

At least generally—which is all that matters in the context of this pre-enforcement facial challenge—social media companies cannot be said to produce a unified speech product like a newspaper. As "could . . . be said of recruiting in various law school rooms in [*FAIR*], or the leafleters' and signature gatherers' speech in various places at the mall in *PruneYard*," the posts hosted by typical social media platforms are "individual, unrelated segments that happen to be [hosted] together." Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. OF FREE SPEECH L. 377, 426 (2021). "Twitter letting people go to individual pages . . . , Facebook letting people go to individual Facebook pages, YouTube letting people view individual videos, and the like" in no way contributes to a "common theme" or "overall message." *Id.* There is no common theme in the material that a social media platform merely hosts and allows users to access. Indeed, "[s]omething well north of 99% of the content that makes it onto a social media site never gets reviewed" by the platform's employees at all, much less curated to send a message on behalf of the platform. App.1715 (Doc.113 at 20).

Like the PruneYard mall but on a scale unimaginable just decades ago, social media platforms are "open to the public to come and go as they please." *PruneYard*, 447 U.S. at 74, 77–78, 87 (noting that the Pruneyard mall welcomed some 25,000 patrons a day). In fact, these platforms are, "almost by definition, peculiarly public in nature." *Pacific Gas*, 475 U.S. at 12 n.8; *see also id.* at 22 (Marshall, J.,

concurring). And in the lively cacophony of online exchange on these platforms, billions of individuals discuss, post, and share unceasingly about innumerable topics—the only commonality is the happenstance of daily life.

The fact that social media platforms may wish to express their disagreement with various speakers by declining to host them does not transform their conduct into a unified speech product. As in *FAIR*, the specific conduct these platforms use to deplatform, censor, or shadow ban particular users, presumably to avoid "be[ing] viewed as sending the message that they see nothing wrong with the [user's content]," does not change the fact that the mere hosting of user-generated material lacks the expressive quality necessary to make this material the platform's own "speech." *FAIR*, 547 U.S. at 64–65. Thus, while the hosting function of social media platforms undoubtedly implicates vast amounts of speech protected by the First Amendment, it is the speech of users, not the platforms themselves.

The District Court therefore erred in concluding the Act to be "about as content-based as it gets" and applying strict scrutiny to the entire law on the basis of provisions of the act that attach significance to the identity of the *user* who speaks on a platform or even based on the nature of the content a *user* may post on a platform, rather than focusing on whether the restrictions interfere with the *platform*'s own speech. App.1719 (Doc.113 at 24). The Court in *FAIR* did not conclude the law was content-based, even though the hosting mandate at issue gave

a right of access to military recruiters "and not someone else." *Id. FAIR* teaches that, far from subjecting hosting mandates to searching constitutional scrutiny, the First Amendment affords the government substantial latitude in regulating the manner in which private entities with massive power to stifle speech in the public square may refuse to host speech.

* * *

It follows from what has been said that it would not offend the First Amendment for Florida to mandate that social media platforms host the speech of third parties. But the Act does not go that far. The Act places modest limits on social media platforms' hosting function—limiting how and why platforms may remove or restrict users and user-generated speech—while largely leaving it to the platforms themselves to decide which speech to host and which content moderation policies to adopt. Under the Act, platforms are generally free to censor, shadow ban, and deplatform ordinary users for any reason, provided that they do so in accordance with previously announced content moderation policies and in a consistent manner. FLA. STAT. § 501.2041(a), (b). Journalistic enterprises can be censored, shadow banned, or deplatformed for reasons unrelated to the content of their speech. *Id.* § 501.2041(2)(j). And nothing in the Act prohibits platforms from censoring candidates; platforms are only restricted in their ability to deplatform candidates or to use algorithms to shadow ban posts by or about them during their campaigns. *Id.*

33

§§ 106.072(2), 501.2041(2)(h). The Act's hosting regulations thus fall comfortably within the scope of permissible government regulation recognized in *FAIR* and the Supreme Court's other hosted speech precedents.

### 2. The Act's hosting regulations permissibly reflect Florida's decision to treat social media platforms as common carriers.

In issuing its preliminary injunction, the District Court failed to address the Florida Legislature's determination that social media platforms should be treated as "common carriers." This omission further reflects the District Court's erroneous decision to not specifically analyze the Act's individual requirements. After all, a firm can "operate as a common carrier with respect to a portion of its service only." *FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 n.9 (1979). Thus, the validity of common carrier treatment can depend on the specific services offered by a firm and the specific regulations of those services. At the very least, the Act's regulation of social media platforms' hosting function permissibly treats social media platforms as common carriers.

In Section 1 of the Act, the Florida Legislature found that "[s]ocial media platforms have become as important for conveying public opinion as public utilities are for supporting modern society," and they "hold a unique place in preserving First Amendment protections for all Floridians and should be treated similarly to common carriers." S.B. 7072 § 1(5), 1(6). In fact, "[i]n many ways, digital platforms that hold themselves out to the public resemble traditional common carriers." *Biden v. Knight*

*First Amend. Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring). "The basic characteristic of common carriage is the requirement to hold oneself out to serve the public indiscriminately." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 740 (D.C. Cir. 2016) (cleaned up). And the businesses regulated by the Act generally hold themselves out as platforms that all the world may join.

For centuries, companies "clothed and superinduced with a *jus publicum*" or public trust, *Shively v. Bowlby*, 152 U.S. 1, 12 (1894), have been subjected to "special regulations" on account of their public concern and at times (but not always) their "substantial market power." *Knight*, 141 S. Ct. at 1222–23 (Thomas, J., concurring). While common carrier status began with those physically transporting wares, this doctrine was long ago extended to carriers of communications. As the California Supreme Court wrote in declaring a telegraph operator to be a common carrier, "[t]he rules of law which govern the liability of telegraph companies are not new. They are old rules applied to new circumstances. Such companies hold themselves out to the public as engaged in a particular branch of business, in which the interests of the public are deeply concerned." *Parks v. Alta Cal. Tel. Co.*, 13 Cal. 422, 424 (1859). It was more than just these new firms' business role that justified common carrier treatment. In fact, "an important motivation behind many of these laws, including the early ones, was the belief that they were necessary to ensure the unconstrained public sphere that a democratic society requires." Genevieve Lakier*,

*The Non-First Amendment Law of Freedom of Speech*, 134 HARV. L. REV. 2299, 2319–20 (2021).

The common law has since provided a template for legislative designation of certain telephonic and internet companies to be classified as common carriers. *See Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 533 F.2d 601, 608–09 (D.C. Cir. 1976); *U.S. Telecom Ass'n*, 825 F.3d at 710–11. In fact, an amalgam of "legislative, judicial, and, in a few cases, executive-branch activity has produced . . . a body of law that, notwithstanding the controversies that have sometimes attended its implementation, imposes speech-facilitating or nondiscrimination duties on *virtually every technology* of mass communication in the contemporary public sphere, with the important, and marked, exception of internet content providers." Lakier, *supra*, 134 HARV. L. REV. at 2330 (emphasis added). That is, until Florida's first-of-its-kind consumer protection statute. "[I]t stands to reason that if Congress may demand that telephone companies operate as common carriers," Florida "can ask the same of" social media platforms. *Knight*, 141 S. Ct. at 1226 (Thomas J., concurring) (quoting *Turner Broad. Sys.*, 512 U.S. at 684 (op. of O'Connor, J.)).

The Florida Legislature permissibly determined that the "old rules" applicable to common carriers should be applied to the "new circumstances" of social media, in particular with respect to the platforms' hosting function. *See Parks*, 13 Cal. at 424. The social media platforms covered by the Act's hosting regulations have

significant market power within their domains, and they hold themselves out to the public when trafficking in important public goods—namely, the speech of others. *See* Adam Candeub, *Bargaining for Free Speech: Common Carriage, Network Neutrality, and Section 230*, 22 YALE J. L. & TECH. 391, 399 (2020). Some of Plaintiffs' members "have dominant market share," and there is evidence that these entities' large user bases create "substantial barriers to entry." *Knight*, 141 S. Ct. at 1224 (Thomas, J., concurring). "Certain features of digital markets—such as network effects, switching costs, the self-reinforcing advantages of data, and increasing returns to scale—make them prone to winner-take-all economics" and thus these markets often "'tip' in favor of one or two large companies." App.212 (Doc.106-1 at 123).

Like telegraph and telephone lines of the past, social media platforms can exert "enormous control over speech." *Knight*, 141 S. Ct. at 1224. This power is all the more significant given how important social media platforms are to communication in today's America. As the Supreme Court has observed, "the vast democratic forums of the Internet, and social media in particular" have become "the most important places . . . for the exchange of views." *Packingham*, 137 S. Ct. at 1735, 1743 (cleaned up). According to the Pew Research Center, 71% of Americans get news from social media. App.636 (Doc.106-1 at 547). It is not surprising then

37

that news publishers feel "increasingly beholden" to digital platforms. App.192 (Doc.106-1 at 103).

Section 230 further reinforces the reasonableness of treating social media platforms as common carriers. There is no doubt that Section 230 helped clear the path for the development of this industry—as the government did generations ago when it used eminent domain to help establish railroads and telegraphs. The recipients of this publicly conferred benefit can justifiably be regulated in serving all comers.

At bottom, the Act's hosting regulations impose the traditional obligations of common carriers. And the Act's particular obligations upon platforms concerning candidates and journalistic enterprises—far from being evidence of content-based discrimination—are well within the ken of similar responsibilities placed on common carriers. For instance, the Act's deplatforming and shadow banning limitations for candidates during the pendency of their campaigns embodies a long tradition of ensuring common carriers afford those aspiring to elective office "an opportunity to persuade others of the merits of their views." Lakier, *supra*, 134 HARV. L. REV. at 2318. Federal law has long mandated that broadcasters that host speech by political candidates likewise "afford equal opportunities to all other such candidates for that office in the use of such broadcasting station." 47 U.S.C. § 315(a); *Farmers Educ. & Co-op Union of Am. v. WDAY, Inc.*, 360 U.S. 525 (1959) (holding

38

that § 315(a) does not allow broadcasters to censor even false statements); *see also* 47 U.S.C. § 312(a)(7), 315(b). And the viewpoint-neutral obligation to host journalistic enterprises is a preference with roots to the very beginning of the Nation itself: from the Post Office Act of 1792 until the end of congressional regulation of postage rates in 1970, Congress provided preferential postage rates for newspapers, a preference denied to many other publications. *See generally* Postage Rates for Periodicals: A Narrative History, USPS, available at https://bit.ly/38y8tnC; *see also* Lakier, *supra*, 134 HARV. L. REV. at 2311; *Hannegan v. Esquire, Inc.*, 327 U.S. 146, 154–56 (1946).

The broad standard to serve the public indiscriminately leads to the conclusion that there is an "absence of any First Amendment concern" with the Act's hosting regulations. *U.S. Telecom Ass'n*, 825 F.3d at 740; *see also Denver Area Educ. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727, 739 (1996) (plurality op.) (noting the "relatively weak" "speech interests" of "common carriers"). After all, there is "the understanding that such entities, insofar as they are subject to equal access mandates, merely facilitate the transmission of the speech of others rather than engage in speech in their own right." *U.S. Telecom Ass'n*, 825 F.3d at 741.

### 3. The consistency provision is a permissible regulation of platforms' conduct towards their users.

Even if the Court rejects everything that has been said so far about the Act's hosting regulations, it should still uphold the provision of the Act that requires

platforms to apply their pre-announced content moderation standards in a "consistent manner." FLA. STAT. § 501.2041(2)(b). This provision regulates conduct, not speech, because it leaves platforms free to adopt whatever rules-based content moderation policies they want. Suppose that a platform, like the law schools in *FAIR*, wished to ban speech in support of military recruiting. Unlike the Solomon Amendment, nothing in the consistency provision would prohibit such a ban. All the consistency provision requires is that if a social media platform creates such a rule, the platform must not arbitrarily ban military recruiting speech of one user but decide not to ban the same military recruiting speech of another. This provision thus regulates the manner in which social media platforms apply their content moderation policies but leaves the substance of those policies—and any message communicated through them—entirely up to the platforms themselves.

The Supreme Court has long held that regulations of conduct generally do not transgress the First Amendment even when they incidentally burden speech. After all, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). That social media platforms traffic in the speech of others does not call for an exception to this well-established principle. *Cf. Assoc. Press v. United States*, 326 U.S. 1, 20 (1945)

40

(applying the Sherman Act to the Associated Press); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct"); *Giboney*, 336 U.S. at 502.

Here, the consistency mandate regulates the manner in which social media platforms treat their users, ensuring that users who invest substantial time and resources in developing a social media presence cannot be arbitrarily censored, shadow banned, or deplatformed in violation of the platform's own stated rules. The consistency mandate is indifferent to the content moderation policy the social media platform chooses—it does not "interfere[] with freedom to [moderate] as and how one's reason or one's interest dictates." *Assoc. Press*, 564 U.S. at 20 n.18. This required consistency has at most an "incidental" effect on social media platforms' alleged expressive conduct. *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150 (2017). The "primary effect" is on the platforms' conduct toward users. *Id.* Hence, it is a constitutional regulation of conduct. Indeed, the type of conduct mandated by the Act—treating like users alike—is of a piece with the numerous anti-discrimination laws that the Supreme Court has upheld against First Amendment challenges. *E.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984); *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976).

41

**B.    The Act's regulation of when platforms may add an addendum to user posts is constitutional.**

Most of the Act's censorship definition is just a hosting regulation—the Act restricts the ability of platforms to "delete, regulate, restrict, edit, alter inhibit the publication or republication of, suspend the right to post, [or] remove" certain user-generated material. FLA. STAT. § 501.2041(1)(b). The Act does, however, go further and regulate the ability of platforms to "post an addendum to any content" posted by a journalistic enterprise or other user. *Id.* That regulation ensures that journalists have meaningful access to the platform by preventing platforms from interfering with their speech. By posting addenda, platforms effectively distort or obstruct the journalist's message, and if platforms could post endless addenda, they could black out the message altogether in a wall of contrary speech. The First Amendment does not stand in the way of preventing that kind of empty access. Consider, for example, if a law school responded to *FAIR* by having a faculty member sit in the military recruiter's room and repeatedly interject with a counterpoint to every statement by the recruiter or loudly jeer students who met with the military for the full duration of the meeting such that the military recruiter could not actually communicate her message. That type of response (although certainly protected by the First Amendment outside of the military recruiter's room) would make the requirement to host the military an empty one.

True enough, the First Amendment would not permit Florida to silence a platform's own speech. But the limited restriction on appending addenda to the speech of *others* does nothing of the sort. Platforms remain free to speak in virtually any way they want—the only thing they cannot do is drown out a journalistic enterprise's own speech. In that respect, the addendum provision mirrors a permissible time, place, and manner restriction: it restricts the location where a platform can speak while leaving open ample alternative avenues for a platform's own speech. *E.g.*, *Nev. Comm'n on Ethics v. Corrigan*, 564 U.S. 117, 121–22 (2011) (holding permissible a prohibition on "advocating" the passage or failure of legislation during a legislative debate if conflict-of-interest laws would prevent the legislator from voting on the matter); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294–98 (1984).

### C.    The Act's notice and disclosure requirements are constitutional.

In addition to regulating platforms' content moderation decisions, the Act also requires platforms to make certain disclosures about those decisions—namely, to disclose the rules they apply when deciding which content to censor, *see* FLA. STAT. §§ 501.2041(2)(a), (c), and to provide users with after-the-fact notice of censorship decisions, *see id.* § 501.2041(2)(d). The Act also requires that users be given, on request, data on the number of people who view their posts. *Id.* § 501.2041(2)(e). The mandated disclosures require only that platforms engage in uncontroversial

43

commercial speech truthfully informing users of the services the platforms provide.

They easily survive First Amendment scrutiny.[6]

The First Amendment protects commercial speech "principally" because of "the value to consumers of the information such speech provides." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). Because commercial speech's value lies in its truth, the Court has permitted laws that require commercial speakers to disclose factually true, non-controversial information about their products or services. *E.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 248-253 (2010); *Dana's R.R. Supply v. Att'y Gen.*, 807 F.3d 1235, 1250 (11th Cir. 2015).

For example, in *Zauderer*, the Supreme Court rejected a First Amendment challenge to a requirement that legal advertising disclose certain costs that clients might incur. *See* 471 U.S. at 650–53. The Court recognized the significant "differences between disclosure requirements and outright prohibitions on speech." *Id.* at 650. The Court reasoned that disclosure requirements are substantially less onerous because they do not prevent businesses "from conveying information to the public," but "only require[] them to provide somewhat more information than they

---

[6] The Act also prohibits platforms from changing their rules more often than once every 30 days. FLA. STAT. § 501.2041(2)(c). That rule gives teeth to the other disclosure requirements—if platforms could change their rules endlessly, then they could make the requirement that consumers understand the rules meaningless by constantly moving the target.

might otherwise be inclined to present." *Id.* Because a business's interest in providing less truthful information to consumers is minimal, the Court concluded that mandatory disclosure rules are permissible if they "are reasonably related to the [government's] interest in preventing deception of consumers." *Id.* at 651.

The notice requirements in the Act operate much like the notice requirements in *Zauderer*. For one, like in *Zauderer*, the Act targets commercial speech—specifically, the speech that occurs when a platform solicits users to sign up for or keep using the platform. The large platforms regulated by the Act, *see* FLA. STAT. § 501.2041(1)(g)(4) (outlining revenue and user thresholds), are in the business of gaining and keeping users; indeed, "digital platforms derive much of their value from network size." *Knight*, 141 S. Ct. at 1224 (Thomas, J., concurring). And, to a large extent, users join a platform so that they can speak and consume other users' speech. Accordingly, the exchange where a platform allows a user to speak on its site is a commercial transaction in which the platform provides the user a forum and in return the platform receives a user (whom the platform often markets to advertisers). And thus, communication about what speech the platforms will allow is commercial speech because it (1) proposes the terms of a commercial transaction with the user, (2) refers to the specific product the platform offers, and (3) arises from the platform's economic motivation to enlist or retain a user. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983).

45

Next, just as in *Zauderer*, the Act addresses the risk of consumer confusion by demanding that platforms provide "an accurate statement" of their rules and content moderation decisions. *Milavetz*, 559 U.S. at 250. And like *Zauderer*, the notices required by the Act are not controversial; they do not force the platforms to "convey a message fundamentally at odds" with their missions. *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019). Thus, the disclosures are far afield from those at issue in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), which mandated clinics "disclose information about *state*-sponsored services." *Id.* at 2372. In contrast, the Act's notice provisions simply require disclosure of the platforms' *own* rules and facts about their *own* content moderation decisions. These "accurate," non-controversial disclosures, like the disclosures in *Zauderer*, are "intended to combat the problem of inherently misleading commercial" conduct, namely platforms enforcing content moderation policies that are not disclosed to consumers. *Milavetz*, 559 U.S. at 250. At a minimum, the State's determination that consumers might be misled without disclosure is "reasonable enough to support a requirement that information regarding [content moderation] be disclosed." *Zauderer*, 471 U.S. at 653. Finally, as in *Zauderer*, the notice requirements do not prevent platforms "from conveying any additional information" they might wish to present. *Milavetz*, 559 U.S. at 250. So

long as a platform complies with the Act, it can describe or discuss its moderation policies in whatever way it chooses.

The District Court did not address *Zauderer*. Rather, it summarily enjoined the enforcement of each of the Act's notice requirements because it believed "some," although not all, "of the disclosure provisions seem designed not to achieve any governmental interest but to impose the maximum available burden on the social media platforms." App.1723 (Doc.113 at 28). Even putting aside that a finding that some disclosure provisions are overly burdensome is not a reason to strike down all the provisions in all their applications, the District Court's burden analysis was incorrect. Asking platforms to give information about their content moderation policies to consumers is not "intrinsically burdensome." *Zauderer*, 471 U.S. at 653 n.15. Indeed, many of Plaintiffs' own members, including Facebook, Twitter, and YouTube have endorsed industry-wide calls to "provide notice to each user whose content is taken down or account is suspended about the reason for the removal or suspension" and to offer "detailed guidance to the community about what content is prohibited."[7]

---

[7] *See* The Santa Clara Principles on Transparency and Accountability in Content Moderation, https://santaclaraprinciples.org; Gennie Gebhart, *Who Has Your Back? Censorship Edition 2019*, ELECTRONIC FRONTIER FOUNDATION (June 12, 2019), https://bit.ly/3kRhwG5.

**D.    The District Court's remaining First Amendment grounds for entering the preliminary injunction lack merit.**

**1.    The District Court erred in concluding that the Act is infected with viewpoint discrimination.**

The District Court also went seriously astray when it relied on scattered statements in the legislative history to determine that provisions of the Act that are neutral on their face were enacted for an impermissible purpose in violation of the First Amendment.

In *United States v. O'Brien*, the Supreme Court treated as content-neutral a prohibition against burning draft cards despite being presented with legislative history more provocative than anything present here. *See* Br. for David Paul O'Brien at 16–21, *United States v. O'Brien*, 391 U.S. 367 (1968) (Nos. 232, 233) (quoting legislator statements that the law was needed to counteract "Beatniks," "mobs of so-called 'students,'" and "Communist 'stooges'"). In refusing to treat legislative history as a basis for deeming the law to be content based, the Court explained that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." 391 U.S. at 384. Similarly, the Court in *Frisby v. Shultz* upheld a ban on residential picketing, 487 U.S. 474, 476 (1988), even though it was "enacted in response to the activities of antiabortion protestors who wanted to protest at the home of a particular doctor to persuade him and others that they viewed his practice of performing abortions to be murder." *Hill v.*

*Colorado*, 530 U.S. 703, 725 (2000); *see also Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment) ("We are governed by laws, not by the intentions of legislators.").

This Court's precedents are even clearer in rejecting the use of legislative history to impute a content-discriminatory intent to laws that are neutral on their face: "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015); *see also Artistic Ent., Inc. v. City of Warner Robins*, 223 F.3d 1306, 1309 (11th Cir. 2000); *Int'l Food & Beverage Sys. v. City of Fort Lauderdale*, 794 F.2d 1520, 1525 (11th Cir. 1986). In First Amendment cases, "[t]he plain meaning of the text controls, and the legislature's specific motivation for passing a law is not relevant, so long as the provision is neutral on its face." *Phelps-Roper v. City of Manchester*, 545 F.3d 685, 691 (8th Cir. 2008) (en banc) (cleaned up).

The District Court's opinion exemplifies the "hazard[s]" of applying the First Amendment based on a legislature's perceived "motives or purposes." *O'Brien*, 391 U.S. at 383. The District Court agreed with Plaintiffs that "the actual motivation for [the Act] was hostility to the social media platforms' perceived liberal viewpoint," App.1719 (Doc.113 at 24), and based its conclusions on this ground. Yet the Act's legislative findings and substantive provisions are scrupulously neutral with respect

49

to political viewpoint. The findings speak of "protect[ing] Floridians"—all of them—and the Act does so regardless of the views they wish to express. S.B. 7072 § 1(11). Florida did not lose its "undoubted power" to adopt S.B. 7072 simply because a lawmaker failed to make what the District Court might have considered "a 'wiser' speech." *O'Brien*, 391 U.S. at 384.

### 2. The District Court erred when it concluded that the Act impermissibly targets large companies.

The District Court also concluded that, coupled with legislative remarks, the "statutory definition of 'social media platform'" suggests an intent to discriminate against "large entities." App.1720 (Doc.113 at 25); *see also supra* n.1. To the extent the court's statements in this regard imply an equal-protection violation, they are entirely dicta: Plaintiffs did not seek a preliminary injunction based on their equal-protection claim.

Nor is the statutory definition "sufficient, standing alone, to subject these statutes to strict scrutiny" under the First Amendment. App.1721 (Doc.113 at 26). In the two cases the District Court cited for that proposition, the challenged laws applied to a small handful of entities—in contrast to the several that meet the Act's definition of "social media platform," as seen in Plaintiffs' memberships alone. *Compare Minn. Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 n.15 (1983) (only two Minnesota newspaper publishers paid significant taxes under the challenged law), *and*, *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229

n.4 (1987) (only one to three Arkansas magazines paid the challenged tax), *with* App.34 (Doc.1) ¶ 20 n.23 (Plaintiffs' member entities allegedly subject to the Act). More importantly, neither *Minneapolis Star* nor *Arkansas Writers' Project* used strict scrutiny solely because the challenged laws applied to limited entities, but because this "differential treatment . . . suggest[ed] that the goal of the regulation [was] not unrelated to suppression of expression." *Minneapolis Star & Tribune Co.*, 460 U.S. at 585; *see Ark. Writers' Project, Inc.*, 481 U.S. at 229 ("[A] magazine's tax status [under the challenged law] depends entirely on its *content*."). These two cases are therefore relevant only in their refusal to do what the District Court did here: "impugn the motives" of the legislature that passed the challenged law. *Minneapolis Star & Tribune Co.*, 460 U.S. at 592.[8]

## III.    Any Provisions of the Act that Might Be Preempted or Unconstitutional Are Severable.

The Act's severability clause provides that

If any provision of this act or the application thereof to any person or circumstance is held invalid, the invalidity *shall not affect* other provisions or applications of the act which can be given effect without

---

[8] The District Court also erred in concluding that the Act could not survive intermediate scrutiny under *Turner Broadcasting Sys. v. FCC*, 512 U.S. 622 (1994). Since that argument depends on an evidentiary record that Defendants were not permitted to develop below, we do not raise that specific issue in this appeal.

the invalid provision or application, and to this end the provisions of
this act are declared severable.

S.B. 7072 § 6 (emphasis added). The "cardinal principle of severability analysis" for
Florida statutes is that "[t]he severability of a statutory provision is determined by
its relation to the *overall legislative intent* of the statute of which it is a part, and
whether the statute, less the invalid provisions, can still accomplish this intent."
*Emerson v. Hillsborough Cnty.*, 312 So. 3d 451, 460 (Fla. 2021) (quotation marks
omitted; emphasis in original). Even in the absence of a severability clause, the
"burden" is "on the challenging party to establish that the measure is *not* severable."
*Id*. (quotation marks omitted; emphasis added).

Here, the "overall legislative intent of the statute" is to preserve the speech
rights of social media users. The Act's provisions can "accomplish this intent"
independently of one another. For example, if the Act's regulation of the ability of a
platform to add an addendum to user posts were unconstitutional, only that portion
of the Act's definition of "censor" should be severed from the remainder of the
definition. The resulting statute might not accomplish the legislature's goals as fully
as intended, but the legislature also intended that the "invalidity" of some provisions
"shall not effect other provisions" that still "can be given effect." S.B. 7072 § 6.

The District Court mentioned severability only briefly, in discussing the Act's
"exclusion for social-media providers under common ownership with a large Florida
theme park." App.1721 (Doc.113 at 26) (discussing § 501.2041(1)(g)(4)). The court

52

thought it "at least questionable" that, to the extent this exclusion creates First Amendment issues, it would be severable given that "the Legislature adopted it" despite those issues. *Id.* But that is of course true in *any* severability case. In this case, the legislature also adopted a provision asking courts to sever any invalid provision. And it is no "stretch to say the severability clause allows a court to impose [the Act's] burdens on the statutorily excluded entities"—in other words, to level up rather than level down protections for social media users. *Id.* That is exactly what the Supreme Court did in *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020) (plurality op.) (invalidating an exception from a robocall restriction as content-based and severing it rather than invalidating the entire restriction).

The District Court's decision to enjoin enforcement of §§ 106.072 and 501.2041 on account of certain provisions, and refusal to consider those provisions severable from the rest of the Act, was therefore another error. If Plaintiffs' facial preemption and First Amendment claims were likely to succeed against any particular provisions, those claims would support at most only a partial injunction.

## IV.    Plaintiffs Lack All Other Prerequisites for a Preliminary Injunction.

Plaintiffs' failure to show a likelihood of success against the relevant provisions is fatal by itself. *See Bloedorn v. Grube*, 631 F.3d 1218, 1242 (11th Cir. 2011). Yet even if they had, "[a] showing of irreparable injury is the sine qua non of

injunctive relief," and Plaintiffs have failed to show it. *Siegel*, 234 F.3d at 1176 (quotation marks omitted). The provisions at issue pose no danger to Plaintiffs' First Amendment rights. Plaintiffs may still monitor their platforms while applying content standards in a consistent manner, generating notices when screening certain user content, and complying with the Act's other provisions.

The remaining factors "merge when . . . the government is the opposing party." *Gonzalez*, 978 F.3d at 1271 (cleaned up). Both favor the State here. The *State* is irreparably injured when its laws are enjoined. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And the *public* suffers an irreparable injury in the absence of the Act's protections against platforms' well-documented discrimination against disfavored speakers. Whatever burdens Plaintiffs might bear are far exceeded by the public benefits of free expression from political candidates, journalistic enterprises, and ordinary Floridians of all stripes.

## CONCLUSION

Apart from the portions of the preliminary injunction that prohibit enforcement of the Act's regulation of "post-prioritization," the preliminary injunction should be reversed.

Dated: September 7, 2021

Respectfully submitted,

/s/ Henry C. Whitaker
Henry C. Whitaker
*Solicitor General*
Daniel W. Bell
*Chief Deputy Solicitor General*
Evan Ezray
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
Henry.Whitaker@myfloridalegal.com
Daniel.bell@myfloridalegal.com
Evan.Ezray@myfloridalegal.com

*Attorneys for Defendants-Appellants
Ashley Moody, in her official capacity as
Attorney General of Florida; Joni Alexis
Poitier, in her official capacity as
Commissioner of the Florida Elections
Commission; Jason Todd Allen, in his
official capacity as Commissioner of the
Florida Elections Commission; John
Martin Hayes, in his official capacity as
Commissioner of the Florida Elections
Commission; and Kymberlee Curry
Smith, in her official capacity as
Commissioner of the Florida Elections
Commission*

/s/ Charles J. Cooper
Charles J. Cooper
David H. Thompson
Brian W. Barnes
Joseph O. Masterman
John W. Tienken
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jmasterman@cooperkirk.com
jtienken@cooperkirk.com

James W. Uthmeier
*General Counsel*
Raymond F. Treadwell
*Chief Deputy General Counsel*
EXECUTIVE OFFICE OF GOVERNOR RON
DESANTIS
Office of the General Counsel
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
James.Uthmeier@eog.myflorida.com
Ray.Treadwell@eog.myflorida.com

*Attorneys for Defendant-Appellant
Patrick Gillespie, in his official capacity
as Deputy Secretary of Business
Operations of the Florida Department of
Management Services*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,999 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: September 7, 2021                    /s/ Charles J. Cooper
                                           Charles J. Cooper
                                           *Counsel for Defendant-Appellant*
                                           *Patrick Gillespie, in his official*
                                           *capacity as Deputy Secretary of*
                                           *Business Operations of the Florida*
                                           *Department of Management Services*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on September 7, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 7, 2021

/s/ Charles J. Cooper
Charles J. Cooper
*Counsel for Defendant-Appellant*
*Patrick Gillespie, in his official*
*capacity as Deputy Secretary of*
*Business Operations of the Florida*
*Department of Management Services*