No. 21-12355

# In the United States Court of Appeals for the Eleventh Circuit

NetChoice LLC, et al.,

*Plaintiffs-Appellees,*

*v.*

Attorney General, State of Florida, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of Florida

**BRIEF OF THE STATES OF TEXAS, ALABAMA, ALASKA
ARIZONA, ARKANSAS, KENTUCKY, MISSISSIPPI,
MISSOURI, MONTANA, AND SOUTH CAROLINA AS
AMICI CURIAE IN SUPPORT OF DEFENDANTS-
APPELLANTS**

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

Judd E. Stone II
Solicitor General

William F. Cole
Assistant Solicitor General
William.Cole@oag.texas.gov

*Attorneys for Amici Curiae*

# Certificate of Interested Persons

No. 21-12355

NetChoice LLC, et al.,

*Plaintiffs-Appellees*,

*v.*

Attorney General, State of Florida, et al.,

*Defendants-Appellants.*

Amici Curiae certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1, and Eleventh Circuit Rules 26.1-1, 28-1(b), and 29-2:

1. Allen, Jason Todd, *Defendant/Appellant*

2. Allen, Kenneth Winn, *Attorney for Plaintiffs/Appellees*

3. American Civil Liberties Union of Florida, *Amicus Curiae*

4. American Civil Liberties Union, *Amicus Curiae*

5. Authors Guild Inc., *Amicus Curiae*

6. Barnes, Brian W., *Attorney for Defendant/Appellant*

7. Bassett, Glenn Allen, *Attorney for Defendants/Appellants*

8. Bell, Daniel William, *Attorney for Defendants/Appellants*

9. Blacklock, Evelyn, *Attorney for Plaintiffs/Appellee*

10. Brnovich, Mark, *Attorney for Amicus Curiae State of Arizona*

11. Burhans Jr., Glenn T., *Attorney for Plaintiff/Appellee*

12. Cameron, Daniel, *Attorney for Amicus Curiae State of Kentucky*

13. Carome, Patrick J., *Attorney for Amicus Curiae*

14. Center for Democracy and Technology, *Amicus Curiae*

15. Chamber of Progress, *Amicus Curiae*

16. Clark, Christopher Roy, *Attorney for Plaintiff/Appellee*

17. Clement, Paul D., *Attorney for Plaintiffs/Appellees*

18. Cole, William F., *Attorney for Amicus Curiae State of Texas*

19. Computer & Communications Industry Association, *Plaintiff*

20. Connected Commerce Council, *Amicus Curiae*

21. Consumer Technology Association, *Amicus Curiae*

22. Cooper, Charles J., *Attorney for Defendant/Appellant*

23. Cooper & Kirk, PLLC, *Attorneys for Defendant/Appellant*

24. DLA Piper US LLP, *Attorneys for Plaintiff/Appellee*

25. Eisenstein, Ilana Hope, *Attorney for Plaintiff/Appellee*

26. Electronic Frontier Foundation, *Amicus Curiae*

27. Engine Advocacy, *Amicus Curiae*

28. Esparza, Servando, *Declarant*

29. Fabens-Lassen, Ben, *Attorney for Plaintiff/Appellee*

30. Fitch, Lynn, *Attorney for Amicus Curiae State of Mississippi*

31. Florida Department of Management Services, *Defendant/Appellant*

32. Florida Elections Commission, *Defendant/Appellant*

33. Florida Office of the Attorney General, *Attorneys for Defendants/Appellants*

34. Gillespie, Patrick, *Defendant/Appellant*

35. Goldstein, Leonid, *Amicus Curiae*

36. Green, Jonathan Allen, *Attorney for Plaintiff/Appellee*

37. Greene, David Allen, *Attorney for Amicus Curiae*

38. Hayes, John Martin, *Defendant/Appellant*

39. Hinkle, Judge Robert L., *District Court Judge*

40. Holtzblatt, Ari, *Attorney for Amicus Curiae*

41. Homer, Bonner, *Attorneys for Amicus Curiae*

42. Homer, Peter Winslow, *Attorney for Amicus Curiae*

43. Hopkins, Christopher, *Attorney for Amici Curiae*

44. Information Technology & Innovation Foundation, *Amicus Curiae*

45. Internet Association, *Amicus Curiae*

46. Johnson, Steffen N., *Attorney for Plaintiff/Appellee*

47. Karanjia, Peter, *Attorney for Plaintiff/Appellee*

48. Kilby, Douglas Lamar, *Attorney for Plaintiff/Appellee*

49. Kirkland & Ellis LLP, *Attorneys for Plaintiffs/Appellees*

50. Knudsen, Austin, *Attorney for Amicus Curiae State of Montana*

51. Mackey, Aaron, *Attorney for Amicus Curiae*

52. Marshall, Steve, *Attorney for Amicus Curiae State of Alabama*

53. Masterman, Joseph, *Attorney for Defendant/Appellant*

54. McDonald Hopkins LLC, *Attorneys for Amicus Curiae*

55. Media Law Resource Center Inc, *Amicus Curiae*

56. Mitchell, Kasdin M., *Attorney for Plaintiffs/Appellees*

57. Moody, Ashley B., *Defendant/Appellant*

58. Morrison, Danielle T., *Attorney for Plaintiff/Appellee*

59. National Black Justice Coalition, *Amicus Curiae*

60. NetChoice LLC, *Plaintiff*

61. Oprison, Christopher George, *Attorney for Plaintiff/Appellee*

62. Opsahl, Kurt, *Attorney for Amicus Curiae*

63. Pavlovic, Corinne, *Declarant*

64. Paxton, Warren Kenneth, *Attorney for Amicus Curiae State of Texas*

65. Pen American Center Inc., *Amicus Curiae*

66. Phillips, Joseph Trumon, *Attorney for Plaintiff/Appellee*

67. Poitier, Joni Alexis, *Defendant/Appellant*

68. Potts, Neil, *Declarant*

69. Progressive Policy Institute, *Amicus Curiae*

70. Protect Democracy Project, Inc., *Amicus Curiae*

71. Reporters Committee For Freedom of the Press, *Amicus Curiae*

72. Rumenap, Stacie D., *Declarant*

73. Rutledge, Leslie, *Attorney for Amicus Curiae State of Arkansas*

74. Schmitt, Eric, *Attorney for Amicus Curiae State of Missouri*

75. Schruers, Matthew, *Declarant*

76. Shullman, Deanna K, *Attorney for Amici Curiae*

77. Shullman, Fugate PLLC, *Attorneys for Amici Curiae*

78. Siekkinen, Nury Agudo, *Attorney for Amici Curiae*

79. Smith, Kymberlee Curry, *Defendant/Appellant*

80. Smitha, Bridget Kellogg, *Attorney for Plaintiff/Appellee*

81. Stearns Weaver Miller Alhadeff & Sitterson, P.A., *Attorneys for Plaintiff/Appellee*

82. Stone, Judd E. II, *Attorney for Amicus Curiae State of Texas*

83. Szabo, Carl, *Declarant*

84. Szoka, Berin Michael, *Attorney for Amicus Curiae*

85. Taylor, Treg, *Attorney for Amicus Curiae State of Alaska*

86. TechFreedom, *Amicus Curiae*

87. Technet, *Amicus Curiae*

88. Thompson, David H., *Attorney for Defendant/Appellant*

89. Tienken, John W., *Attorney for Defendant/Appellant*

90. Treadwell, Raymond Frederick, *Attorney for Defendant/Appellant*

91. Uthmeier, James William, *Attorney for Defendant/Appellant*

92. Veitch, Alexandra, *Declarant*

93. Walters Law Group, *Attorneys for Amicus Curiae*

94. Walters, Lawrence G, *Attorney for Amicus Curiae*

95. Washington Center for Technology Policy Inclusion, *Amicus Curiae*

96. Webster, Brent, *Attorney for Amicus Curiae State of Texas*

97. Whitaker, Henry C., *Attorney for Defendants/Appellants*

98. White, Lauren Gallo, *Attorney for Plaintiff/Appellee*

99. Willen, Brian M., *Attorney for Plaintiff/Appellee*

100.  Wilmer Cutler Pickering Hale & Dorr LLP, *Attorneys for Amicus Curiae*

101.  Wilson, Alan, *Attorney for Amicus Curiae South Carolina*

102.  Winship, Blaine H., *Attorney for Defendants/Appellants*

103.  Wolfson, Paul R., *Attorney for Amicus Curiae*

104.  Xi, James, *Attorney for Plaintiffs/Appellees*

105. Yang, Meng Jia, *Attorney for Plaintiff/Appellee*

106. ZwillGen, *Attorneys for Amici Curiae*

107. Undisclosed members of Appellees

Apart from undisclosed members of Appellees, no publicly traded company or corporate has an interest in the outcome of this case or appeal.

/s/ William F. Cole
WILLIAM F. COLE
*Counsel of Record for*
*Amici Curiae*

# Table of Contents

Page

Certificate of Interested Persons ...............................................................i

Table of Authorities ..............................................................................viii

Interests of Amici Curiae .........................................................................1

Argument..................................................................................................3

    I.   S.B. 7072's Neutrality and Disclosure Provisions Do Not
Regulate Protected First Amendment Activity. ........................................3

        A.  Social Media Platforms' Content-Moderation Practices Are
Conduct, Not Speech...........................................................5

        B.  Social Media Platforms' Content-Moderation Practices Are
Not "Inherently Expressive" Conduct. ................................6

    II.  S.B. 7072's Neutrality and Disclosure Provisions Do Not Impose
Content-Based Restrictions. ...................................................12

    III.  States Have a Compelling Interest in Ensuring their Citizens
Enjoy Access to the Free Flow of Information and Ideas. .........................18

Conclusion.............................................................................................21

Certificate of Compliance .....................................................................22

Certificate of Service..............................................................................22

# Table of Authorities

Page(s)

**Cases:**

*Citizens United v. F.E.C.*,
558 U.S. 310 (2010) ........................................................... 15

*Coral Springs Street Sys., Inc. v. City of Sunrise*,
371 F.3d 1320 (11th Cir. 2004) ........................................ 14

*Exxon Mobile Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) ........................................................... 17

*Fly Fish, Inc. v. City of Cocoa Beach*,
337 F.3d 1301 (11th Cir. 2003) ........................................ 12

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ................................................ 11

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
901 F.3d 1235 (11th Cir. 2018) .................................... 6, 11

*Garcia v. United States*,
469 U.S. 70 (1984) ............................................................. 17

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021) ............................................... 11

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981) ........................................................... 13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
515 U.S. 557 (1995) ................................................. 4, 6, 8, 9

*Members of City Council of L.A. v. Taxpayers for Vincent*,
466 U.S. 789 (1984) ........................................................... 13

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ........................................................ 8, 9

*Nat. Socialist Party of Am. v. Skokie*,
432 U.S. 43 (1997) ............................................................... 4

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S.1 (1986) .............................................................. 8, 9

*Packingham v. North Carolina*,
137 S. Ct. 1730 (2017) ................................................... 1, 19

*Police Dep't of Chi. v. Mosley*,
408 U.S. 92 (1972) ............................................................... 4

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ........................................................ 4, 12, 13, 14, 16, 17, 18

*Rumsfeld v. Forum of Acad. & Institutional Rights, Inc.*,
  547 U.S. 47 (2006) ............................................................ 4, 5, 6, 8, 9, 10

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ................................................................................4

*Spence v. Washington*,
  418 U.S. 405 (1974) ................................................................................6

*Stromberg v. California*,
  283 U.S. 359 (1931) ................................................................................4

*Texas v. Johnson*,
  491 U.S. 397 (1989) ................................................................................6

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969) ................................................................................4

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994) ................................................ 11, 13, 14, 15, 16, 18, 20

*United States v. Midwest Video Corp.*,
  406 U.S. 649 (1972) ..............................................................................19

*United States v. O'Brien.*,
  391 U.S. 367 (1968) ........................................................................ 16, 17

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ..............................................................................16

*West Va. Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943) ................................................................................4

**Constitutional Provisions, Statutes, and Legislative Materials:**

U.S. Const. amend. I ........................ 3, 4, 5, 6, 8, 9, 12, 15, 16, 17, 18, 19

Fla. Stat.:
  § 501.2041(1)(b) ..............................................................................2
  § 501.2041(1)(c) ..............................................................................2
  § 501.2041(1)(f) ..............................................................................2
  § 501.2041(2)(a) .......................................................... 2, 4, 10, 13, 19
  § 501.2041(2)(b) .............................................................. 2, 5, 10, 13
  § 501.2041(2)(d) ..............................................................................2
  § 501.2041(2)(d)(1) ................................................................ 4, 10, 19
  § 501.2041(2)(e) .................................................................. 4, 10, 13, 19

Tex. Bus. & Com. Code:

§ 120.051 ........................................................................................... 2

§ 120.103(a) ....................................................................................... 2

Tex. Civ. Prac. & Rem. Code §143a.002 ............................................ 2

S.B. 7072, 27th Leg., 1st Reg. Sess. (Fla. 2021) (enacted) ................... 19

Act of Sept. 2, 2021, 87th Leg., 2d C.S., H.B. 20 ............................... 1, 2

**Other Authorities:**

*Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Joint Hearing Before H. Comm. on Energy & Com.*, 117th Cong. 8 (2021) (statement of Sundar Pichai, CEO, Alphabet, Inc.) ................... 8

*Facebook, Google and Twitter: Examining the Content Filtering Practices of Social Media Giants: Hearing Before H. Comm. on the Judiciary*, 115th Cong. 2 (2018) (statement of Nick Pickles, Senior Strategist, Public Policy, Twitter, Inc.) ................................................................................ 7

Will Feuer, *TikTok Says it Doesn't Censor Content, but a User was Just Locked Out After a Viral Post Criticizing China*, CNBC (Nov. 26, 2019), https://tinyurl.com/t2ajzjb5 ................................................................ 8

Hearing, *Free Speech & Social Media: H. Comm. on Sci. & Tech.*, 2021 Leg. (Ga. May 20, 2021) ............................................................................ 1

Matthew P. Hooker, *Censorship, Free Speech & Facebook: Applying the First Amendment to Social Media Platforms Via the Public Function Exception*, 15 Wash. J. L. Tech. & Arts 36 (2019) ............................................... 20

Jennifer Huddleston & Liam Fulling, *Examining State Tech Policy Actions in 2021*, Am. Action Forum (July 21, 2021), https://tinyurl.com/2vhftt42 ........... 1

News Release, Office of Ron DeSantis, 46th Governor of Florida, Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech (May 24, 2021), https://tinyurl.com/2a49nbc2 ......................................16, 18

Mike Snider, *Facebook's Mark Zuckerberg Says the Social Network Should Not be 'Censoring Politicians,'* USA Today (Dec. 2, 2019), https://tinyurl.com/4ae66m9a ............................................................... 8

*Social Media Censorship Complaint Form*, Ala. Attorney Gens. Office, https://tinyurl.com/nb8rpz3j (last accessed Sept. 14, 2021) ............................ 1

*Social Media Complaint Form*, Attorney Gen. Jeff Landry, La. Dep't of Justice, https://tinyurl.com/338meu8h (last accessed Sept. 14, 2021) ............... 1

Brian Stelter, *Twitter's Jack Dorsey: 'We are not' discriminating against any political viewpoint*, CNN (Aug. 20, 2018), https://tinyurl.com/fe8jw9e8 ..........7

*Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before Subcomm. on the Const. of the S. Comm. on the Judiciary*, 116th Cong. 1 (2019) (responses to questions for the record for Carlos Monje, Jr., Director of Public Policy & Philanthropy, U.S. & Canada, Twitter, Inc.)...............7

## Interests of Amici Curiae

The States have a strong interest in ensuring that their citizens enjoy access to the free flow of information and ideas in "the modern public square" that is the social media marketplace. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). But the social-media ecosystem, run by an increasingly small number of large companies who function as the gatekeepers of online content, threatens the States' ability to meet this salutary goal. That marketplace is susceptible to well-documented arbitrariness, censorship, and other forms of editorial abuse at the hands of these gatekeepers, many of which are members of Plaintiffs' trade associations. *See, e.g.*, App.891-1693 (collecting examples).

To remedy this situation, many States are examining this problem and have been considering legislation that aims to restore order and fairness to the social-media market. *See, e .g.*, Hearing, *Free Speech & Social Media: H. Comm. on Sci. & Tech.*, 2021 Leg. (Ga. May 20, 2021); *Social Media Censorship Complaint Form*, Ala. Attorney Gens. Office, https://tinyurl.com/nb8rpz3j (last accessed Sept. 14, 2021); *Social Media Complaint Form*, Attorney Gen. Jeff Landry, La. Dep't of Justice, https://tinyurl.com/338meu8h (last accessed Sept. 14, 2021). By one count, "[a]t least 30 state legislatures have introduced some form of a content-moderation bill in this [past] legislative session." Jennifer Huddleston & Liam Fulling, *Examining State Tech Policy Actions in 2021*, Am. Action Forum (July 21, 2021), https://tinyurl.com/2vhftt42.

Some States have already enacted such legislation. Texas, for example, recently passed, and Governor Abbott signed into law, H.B. 20. *See* Act of Sept. 2, 2021, 87th

Leg., 2d C.S., H.B. 20 (to be codified at Tex. Civ. Prac. & Rem. Code §143a.002). That law forbids social media platforms to "censor a user, a user's expression, or a user's ability to receive the expression of another person based on" viewpoint or geographic location. Tex. Civ. Prac. & Rem. Code § 143a.002 (to be codified per H.B. 20, supra, § 7). It also requires social media platforms to provide written notice to users if their content is removed, explain the reason for that removal, and publicly disclose their content moderation practices. Tex. Bus. & Com. Code §§ 120.051, 120.103(a) (to be codified per H.B. 20, supra, § 2).

Texas is not alone. Florida's S.B. 7072—the law at issue in this appeal—contains similar provisions to Texas's H.B. 20. A neutrality provision requires social media platforms to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." Fla. Stat. § 501.2041(2)(b).[1] And disclosure provisions require social media platforms to "publish the standards . . . used for determining how to censor, deplatform, and shadow ban," *id.* § 501.2041(2)(a), and to notify users when they are censored, deplatformed, or shadow banned, *id.* § 501.2041(2)(d).

---

[1] "Censor" is defined as "any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user." Fla. Stat. § 501.2041(1)(b). "Deplatform" is defined as "the action or practice by a social media platform to permanently delete or ban a user or to temporarily delete or ban a user from the social media platform for more than 14 days." *Id.* § 501.2041(1)(c). And a "shadow ban" is "action by a social media platform . . . to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform." *Id.* § 501.2041(1)(f).

These provisions of S.B. 7072—along with many of that bill's other provisions—were preliminarily enjoined by the district court in this case, in part on the ground that S.B. 7072 implements content-based restrictions on speech that violate the First Amendment. But the district court's First Amendment analysis is riddled with errors. It veered off course from the outset by concluding that S.B. 7072 regulates speech, when that law instead regulates conduct that is unprotected by the First Amendment: social media platforms' arbitrary application of their content moderation policies. The district court also mistook S.B. 7072 for a content-based law and subjected it to strict scrutiny when the law is in fact content-neutral and therefore subject to more deferential constitutional review. Finally, in assessing the governmental interest in S.B. 7072, the court completely ignored the States' long-established compelling interest in ensuring that its citizens have access to the free flow of information and ideas.

If the district court's faulty analysis is not corrected by this Court, the errant legal theories it endorsed could be adopted by other courts around the country and imperil similar laws such as Texas's H.B. 20 and those that may soon be enacted into law throughout the country. The States thus have a keen interest in this case, and they submit this brief to aid the Court in resolving these novel constitutional issues.

## ARGUMENT

### I. S.B. 7072's Neutrality and Disclosure Provisions Do Not Regulate Protected First Amendment Activity.

The First Amendment's Free Speech Clause forbids the government to "restrict expression because of its message, its ideas, its subject matter, or its content."

*Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)). This prohibition extends not only to laws "telling people what they must say," but also to certain "conduct that is inherently expressive." *Rumsfeld v. Forum of Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61, 66 (2006) (*"FAIR"*). The Supreme Court has recognized such conduct as including saluting a flag (and refusing to do so), *West Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), wearing an armband to protest a war, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505-06 (1969), displaying a red flag, *Stromberg v. California*, 283 U.S. 359, 369 (1931), and even "[m]arching, walking, or parading" in uniforms displaying the swastika, *Nat. Socialist Party of Am. v. Skokie*, 432 U.S. 43, 43 (1997). *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

Aside from these core First Amendment activities, however, the Free Speech Clause allows States to legislate with a freer hand. As relevant here, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). And in this case, S.B. 7072's neutrality and disclosure provisions, *see* Fla. Stat. § 501.2041(2)(a), (2)(d)(1), (2)(e), do not run afoul of the First Amendment. These statutory requirements regulate conduct—the disjointed and arbitrary manner in which Plaintiffs' members apply content-moderation standards. At most, these provisions impose an incidental burden on speech. And for that reason, the district court erred in applying the First Amendment to Florida's S.B.7072.

4

## A. Social Media Platforms' Content-Moderation Practices Are Conduct, Not Speech.

Nothing in S.B. 7072's neutrality and disclosure provisions regulates the speech of Plaintiffs or the members of their trade associations—they "neither limit[] what [Plaintiffs or their members] may say nor require[] them to say anything." *FAIR*, 547 U.S. at 60. Instead, at most these provisions regulate the *conduct* of Plaintiffs and their members: their arbitrary and blunderbuss content-moderation policies. *See, e.g.*, Fla. Stat. § 501.2041(2)(b) ("[a] social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform").

The Supreme Court's decision in *FAIR* is instructive. There the Court considered whether a congressional statute requiring institutions of higher education to allow military recruiters on their campuses comported with the First Amendment. *FAIR*, 547 U.S. at 51. In holding that it did, the Court reasoned that the statute "regulates conduct, not speech." *Id.* at 60. That was because the statute "affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* The same is true here. Like the law-school plaintiffs at issue in *FAIR*, here Plaintiffs' members "remain free . . . to express whatever views they may have." *Id.* S.B. 7072's neutrality and disclosure provisions, therefore, only affect what Plaintiffs' members "*do*" in the context of content moderation, "not what they may or may not *say*." *Id.*

### B. Social Media Platforms' Content-Moderation Practices Are Not "Inherently Expressive" Conduct.

Even if a particular law does not regulate speech as such, certain "inherently expressive" conduct may nonetheless qualify for First Amendment protection. *Id.* at 66-67 (citing *Texas v. Johnson*, 491 U.S. 397, 406 (1989)). To determine whether such conduct is "sufficiently expressive" to merit First Amendment protection, this Court considers: "(1) whether '[a]n intent to convey a particularized message was present;' and (2) whether 'in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it.'" *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quoting *Spence v. Washington*, 418 U.S. 405, 410-11 (1974)). Plaintiffs' members' content moderation practices do not satisfy either element.

**1.** Plaintiffs' attempt to cloak their preference for arbitrary censorship, deplatforming, and shadow banning in the First Amendment falters from the first step: neither Plaintiffs nor the district court has ever identified a "particularized message" that Plaintiffs or its members wish to present. *Id.* While "a narrow, succinctly articulable message is not a condition of constitutional protection," *Hurley*, 515 U.S. at 569, there must be *some* message that the speaker "inten[ds] to convey," *cf. Fort Lauderdale Food*, 901 F.3d at 1240 (identifying one message intended to be conveyed as "society can end hunger and poverty if we redirect our collective resources from the military and war"). " No such message has been identified here.

Far from identifying a message that they wish to convey through arbitrary application of their content-moderation policies, Plaintiffs' members have repeatedly—

and very publicly—abjured the notion that they are expressing any message, articulating a viewpoint, or conveying a political ideology while engaged in content moderation. Consider the example of Twitter. Its CEO, Jack Dorsey, has explained: "Are we doing something according to political ideology or viewpoints? We are not. Period . . . . We do not look at content with regards to political viewpoint or ideology. We look at behavior." Brian Stelter, *Twitter's Jack Dorsey: 'We are not' discriminating against any political viewpoint*, CNN (Aug. 20, 2018), https://tinyurl.com/fe8jw9e8 (insisting that policies "look at content" not speech). The company has assured a committee of the U.S. House of Representatives that its rules "are not based on ideology or a particular set of beliefs" but instead "based on behavioral contexts." *Facebook, Google and Twitter: Examining the Content Filtering Practices of Social Media Giants: Hearing Before H. Comm. on the Judiciary*, 115th Cong. 2 (2018) (statement of Nick Pickles, Senior Strategist, Public Policy, Twitter, Inc.). And it has likewise informed a subcommittee of the United States Senate that "Twitter does not use political viewpoints, perspectives, or party affiliation to make any decisions, whether related to automatically ranking content on our service or how we develop or enforce our rules." *Stifling Free Speech: Technological Censorship and the Public Discourse: Hearing Before Subcomm. on the Const. of the S. Comm. on the Judiciary*, 116th Cong. 1 (2019) (responses to questions for the record for Carlos Monje, Jr., Director of Public Policy & Philanthropy, U.S. & Canada, Twitter, Inc.).

Twitter is not alone. Facebook CEO Mark Zuckerberg has stated that Facebook would not "take down political advertisements on the social network even if the ads contain false information" and that to do so would be "an infringement on free

speech." Mike Snider, *Facebook's Mark Zuckerberg Says the Social Network Should Not be 'Censoring Politicians*,' USA Today (Dec. 2, 2019), https://tinyurl.com/4ae66m9a. Similarly, Alphabet CEO Sundar Pichai testified before Congress that Alphabet's companies, like Google and YouTube, "strive to have clear and transparent policies and enforce them without regard to political party or point of view." *Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation: Joint Hearing Before H. Comm. on Energy & Com.*, 117th Cong. 8 (2021) (statement of Sundar Pichai, CEO, Alphabet, Inc.). And representatives from TikTok have emphatically stated that the company "does not moderate content due to political sensitivities." Will Feuer, *TikTok Says it Doesn't Censor Content, but a User was Just Locked Out After a Viral Post Criticizing China*, CNBC (Nov. 26, 2019), https://tinyurl.com/t2ajzjb5.

Despite a dearth of evidence supporting the notion that Plaintiffs or their members intend to convey a message, the district court resisted this conclusion by characterizing their arbitrary content-moderation policies as the "exercise [of] editorial judgment" in "ideologically sensitive cases," and by citing three purportedly analogous cases that limit the government's ability to force one speaker to host or accommodate another speaker's message. App.1716 (citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974), *Hurley*, 515 U.S. at 557, and *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S.1 (1986)).

The key flaw in the district court's analysis is that the First Amendment violation in those three cases "resulted from the fact that the complaining speaker's *own message* was affected by the speech it was forced to accommodate." *FAIR*, 547 U.S.

at 63 (emphasis added). Here, by contrast, Plaintiffs' members have disclaimed the intent to express a message in conjunction with their hosting of user-generated content. *Supra* at 6-8. For that reason, S.B. 7072's neutrality and disclosure provisions are nothing like a statutory requirement that a newspaper's *editorial page* afford a political candidate equal space to reply to criticism levied by the paper's editors. *Tornillo*, 418 U.S. at 243-45. They are not comparable to forcing the organizers of a St. Patrick's Day Parade—which is an inherently expressive activity—to include participants whose own activity would detract from the "particularized message" that the parade organizers want to convey about "what merits celebration on that day." *Hurley*, 515 U.S. at 569, 574. And they are far afield of a regulatory requirement that a utility company include a third party's newsletter alongside its own newsletters, which were sent to customers and which had been long used to disseminate "political editorials, feature stories on matters of public interest, tips on energy conservation, and straightforward information about utility services and bills." *Pac. Gas & Elec.*, 475 U.S. at 5-7. Put simply, Plaintiffs' conduct "lack[s] the expressive quality of a parade, a newsletter, or the editorial page of a newspaper." *FAIR*, 547 U.S. at 64.

Instead of *Tornillo*, *Hurley*, and *Pacific Gas & Electric*, the circumstances of this case are analogous to the Supreme Court's more recent decision in *FAIR*. There, the Court upheld against a First Amendment challenge a congressional statute requiring institutions of higher education to allow military recruiters on their campuses. *Id*. at 51. In response to arguments by an association of law schools that the statute violated the First Amendment because it was tantamount to compelling their speech, the

Court held that the statute "regulates conduct, not speech." *Id.* at 60. The Court observed that the statute at issue "does not dictate the content of the speech at all" and that any burden on the plaintiffs' speech was "plainly incidental to the . . . regulation of conduct." *Id.* at 62. After all, "the schools are not speaking when they host interviews and recruiting receptions." *Id.* at 64. And "send[ing] e-mails and post[ing] notices on behalf of the military" is the type of "incidental" burden on speech that is a "far cry" from what the Court has held abridges a party's right to free speech. *Id.* at 61-62.

The same is true here. S.B. 7072's neutrality and disclosure provisions do not regulate, much less dictate the content of, the "speech" of Plaintiffs or their members; they only regulate "conduct"—arbitrary application of content moderation policies. *See* Fla. Stat. § 501.2041(2)(b) ("[a] social media platform must apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform"). Moreover, social media platforms like Facebook and Twitter are not themselves speaking when they provide a platform for hosting the speech of their users. *See FAIR*, 547 U.S. at 64. And the requirements that Plaintiffs' members apply any deplatforming, censorship, and shadow banning in an evenhanded manner and provide disclosures to affected users, Fla. Stat. § 501.2041(2)(a), (2)(d)(1), (2)(e), are akin to the "incidental" burden on speech visited upon the law schools in *FAIR* who had to send e-mails and post notices about military recruiting.

**2.** For similar reasons, Plaintiffs cannot show that "the surrounding circumstances would lead the reasonable observer to view the conduct as conveying some

sort of message." *Fort Lauderdale Food*, 901 F.3d at 1242. At least with regard to platforms like Facebook and Twitter, which claim only to seek to connect their billions of users with one another, the "likelihood" that any "message would be understood by those who viewed it" is nonexistent. *Id.* at 1240. When an individual uses Google or Bing to search for instructions on how to change a tire, he or she is not expecting the results returned to convey some message from Google or Bing, and, unsurprisingly, does not see one.

This conclusion is consistent with the nature of social-media platforms. Courts of Appeals agree that, generally, social media sites "use[] features and functions, including algorithms, to analyze user posts and recommend other user groups." *Gonzalez v. Google LLC*, 2 F.4th 871, 894 (9th Cir. 2021) (cleaned up). Those "functions—recommendations and notifications—were tools meant to facilitate the communication and content of others, and not content in and of themselves." *Id.* (cleaned up). When a social media provider treats speakers the same and "employ[s] neutral tools," they are simply "match[ing] what [they] know[] about users based on their historical actions and send[ing] third-party content to users that [they] anticipate[] they will prefer." *Id.* at 894-95. For that reason, courts routinely reject claims that speech by users of the social-media sites is indistinguishable from the speech of the platform itself. *See id.* (rejecting at the pleading stage an argument that Google "creat[es] and develop[s]" ISIS content that appears on YouTube); *Force v. Facebook, Inc.*, 934 F.3d 53, 76–78 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 2761 (2020) (rejecting claim that Facebook "'develop[s]' the content of the Facebook postings by Hamas"); *cf. Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 655 (1994) ("Given

cable's long history of serving as a conduit for broadcast signals, there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator."). This Court should do the same.

## II. S.B. 7072's Neutrality and Disclosure Provisions Do Not Impose Content-Based Restrictions.

The district court's conclusion that S.B. 7072's neutrality and disclosure and provisions violate the First Amendment is erroneous for a second reason: those provisions are not content-based regulations subject to strict scrutiny. *Contra* App.1718-19. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. But because S.B. 7072's neutrality and disclosure provisions are content-*neutral*, the district court should have never applied strict scrutiny. *See Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1305 (11th Cir. 2003) (content-neutral laws are "entitled to a deferential, or intermediate, level of constitutional scrutiny").

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Some laws are facially content-based, "defining regulated speech by particular subject matter" or "by its function or purpose." *Id.* Others are facially content-neutral but will be considered "content-based" either because they "cannot be 'justified without reference to the content of the regulated speech'" or because they

"were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* at 164. Still others are truly content-neutral: "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral." *Turner*, 512 U.S. at 643; *see also Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984) (ordinance prohibiting the posting of signs on public property "is neutral—indeed it is silent—concerning any speaker's point of view"); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 649 (1981) (State fair regulation requiring that sales and solicitations take place at designated locations "applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds").

In this case, S.B. 7072's neutrality and disclosure requirements are content neutral. Fla. Stat. § 501.2041(2)(b). These regulations do not "draw distinctions based on the message a speaker conveys," *Reed*, 576 U.S. at 163, but instead are "silent . . . concerning any speaker's point of view," *Taxpayers for Vincent*, 466 U.S. at 804. The neutrality provision, for example, requires a social media platform to "apply censorship, deplatforming, and shadow banning standards *in a consistent manner* among its users on the platform." Fla. Stat. § 501.2041(2)(b) (emphasis added). Likewise, the disclosure provisions merely require social media platforms to "publish the standards . . . used for determining how to censor, deplatform, and shadow ban," *id.* § 501.2041(2)(a), and to notify users when they are censored, deplatformed, or shadow banned, *id.* § 501.2041(2)(e).

These provisions are quintessential content-neutral regulations: they "confer benefits or impose burdens on speech without reference to the ideas or views

expressed." *Turner*, 512 U.S. at 643. And "[n]othing in [them] imposes a restriction, penalty, or burden by reason of the views" that the social media platform "has selected or will select." *Id.* at 644. After all, these provisions neither forbid nor encourage social media platforms to censor, deplatform, or shadow ban—they merely require those companies to apply content-moderation standards in a consistent way and provide notice to users who are subjected to such censorship, deplatforming, or shadow banning. In other words, these provisions can be applied—indeed, are written to be applied—"without reference to the content of [any] regulated speech." *Reed*, 576 U.S. at 164.

The district court did not single out the neutrality or disclosure provisions as content-based, but it nevertheless concluded that every subsection of section 540.2041 was content-based and must be enjoined.[2] It appears to have done so for two reasons. First, it concluded that the statute's definition of "social media platform" only makes S.B. 7072 applicable to companies with $100 million in revenues or 100 million monthly participants, and this is a "tell for content discrimination." App.1720. Second, the district court inferred from statements of legislators that the "actual motivation for this legislation was hostility to social media platforms'

---

[2] Though the district court pointed to other provisions of S.B. 7072 besides its neutrality and disclosure provisions to establish that the law as a whole is content-based, App.1719, an analysis of those provisions are outside the scope of this brief. To the extent that this Court believes that other provisions of S.B. 7072 are unconstitutional, the constitutionally sound provisions—like the neutrality and disclosure requirements—should be severed. *See Coral Springs Street Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004) ("Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones.").

perceived liberal viewpoint." App.1719. Neither of these rationales can justify the district court's sweeping, overbroad injunction.

**1.** In support of the conclusion that S.B. 7072 is content-based in toto because it only regulates large social media platforms, the district court relied principally on a single statement from *Citizens United v. Federal Election Commission* that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content." 558 U.S. 310, 340 (2010); *see* App.1720-21. But this solitary statement, plucked out of context, has no application here. In the immediately preceding sentence, the Supreme Court makes clear that laws drawing distinctions among speakers are constitutionally suspect not in the abstract but only when the effect is to "allow[] speech by some [speakers] but not others." *Citizens United*, 558 U.S. at 340; *see also Turner*, 512 U.S. at 658 ("speaker-based laws demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)"). Yet S.B. 7072's definition of "social media platform" hardly "allow[s] speech by some but not others." *Citizens United*, 558 U.S. at 340. It merely defines the class of entities who may be subject to the law's restrictions. Nor do S.B. 7072's neutrality and disclosure provisions restrict the speech of some parties and not others; as described above, they merely require even-handed application of content-moderation standards and disclosure to users affected by their application. *Supra* at 13-14.

The flaw in the district court's reasoning is laid bare by consideration of the Supreme Court's decision in *Turner*. There the Supreme Court upheld against a First Amendment challenge FCC regulations requiring "cable operators to carry the

15

signals of a specified number of local broadcast television stations." *Turner*, 512 U.S. at 630. The Court concluded that the must-carry provisions were content-neutral even though they only applied to cable operators with more than 300 subscribers. *Id.* at 644 ("the rules impose obligations upon all operators, save those with fewer than 300 subscribers"). The fact that the FCC's must-carry rules drew distinctions among cable operators by size simply did not raise an issue of constitutional import. The same is true here.

**2.** The district court also erred by justifying its decision to enjoin S.B. 7072 in its entirety by speculating that "the actual motivation for this legislation was hostility to the social media platforms' perceived liberal viewpoint." App.1719. To be sure, facially-neutral laws may be deemed content-based when they are "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). But here, the district court's attempt to divine such a legislative purpose from statements of legislators that were collected in a press release by Governor DeSantis's office is flawed as both a legal and factual matter. *See* News Release, Office of Ron DeSantis, 46th Governor of Florida, Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech (May 24, 2021), https://tinyurl.com/2a49nbc2.

Legally, this argument is foreclosed by *United States v. O'Brien*. There, the Supreme Court rejected the plaintiff's attempt to mine the legislative history of a federal statute, challenged on First Amendment grounds, that prohibited the burning of draft cards. 391 U.S. 367, 383-86 (1968). In concluding that such a free-floating

inquiry into legislative purpose had no proper place in the First Amendment analysis, the Court held that "[i]nquiries into congressional motives or purposes are a hazardous matter" particularly where a court is "asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *Id.* at 383-84. That is because "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Id.*at 384; *see also Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[j]udicial investigation of legislative history has a tendency to become . . . an exercise in looking over a crowd and picking out your friends"); *Garcia v. United States*, 469 U.S. 70, 76 (1984) ("We have eschewed reliance on the passing comments of one Member, and casual statements from the floor debates." (cleaned up)).

Factually, even if snippets of statements made by a handful of legislators constituted legally competent evidence of the collective intent of all of Florida's 160 legislators—and they do not—those statements do not show an intent to regulate content "because of disagreement with the message [the speech] conveys." *Reed*, 576 U.S. at 164. Far from "suppress[ing] disfavored speech," *id.* at 167, these legislators' statements evince a desire to *expand* the range of ideas hosted on social media platforms. Were it otherwise, one would expect to see statements from legislators extoling the law's ability to squelch disfavored political viewpoints. But the opposite is true. For example, the Lieutenant Governor is quoted as praising the law's purpose of reversing the trend of "silenc[ing], intimidat[ing], and wip[ing] out dissenting voices" and restoring the "virtual public square as a place where information and

ideas can flow freely." News Release, *supra* at 16. The Senate President noted that the law would safeguard the "right to express opposing views" and forestall "unfair and arbitrary discrimination on social media platforms." *Id.* The Speaker of the House lauded S.B. 7072's purpose of "protect[ing] the free speech of Floridians and demand[ing] transparency" from social medial platforms. *Id.* And Senator Rodrigues explained that S.B. 7072 will help to instill "fair[ness] and transparen[cy]" in the practices of social media platforms—"regardless of our political ideology." *Id.*

Evidence of censorious intent these statements are not. The district court thus clearly erred in pointing to statements of legislators *exalting* the benefits of unbiased content moderation and the free flow of ideas to support the notion that S.B. 7072 was somehow intended to facilitate viewpoint discrimination.

## III. States Have a Compelling Interest in Ensuring their Citizens Enjoy Access to the Free Flow of Information and Ideas.

The district court further erred by giving short shrift to the compelling interest that Florida is seeking to advance through S.B. 7072—namely, ensuring that its citizens enjoy access to the free flow of information and ideas, unencumbered by arbitrary and erratic censorship, deplatforming, and shadow banning. The district court perfunctorily asserted that "levelling the playing field—promoting speech on one side of an issue or restricting speech on the other—is not a legitimate state interest." App.1722. But that is flatly inconsistent with the Supreme Court's recognition that "assuring that the public has access to a multiplicity of information sources is a governmental purpose *of the highest order*, for it promotes values central to the First Amendment." *Turner*, 512 U.S. at 663 (emphasis added). Indeed, the Court has long

observed that "the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public." *United States v. Midwest Video Corp.*, 406 U.S. 649, 668 n.27 (1972) (plurality op.).

S.B. 7072 is directed precisely to vindicating this governmental interest. The bill's legislative findings recognize that social media platforms "have transformed into the new public town square" and "hold a unique place in preserving first amendment protections for all Floridians." S.B. 7072, 27th Leg., 1st Reg. Sess. (Fla. 2021) (enacted). Despite this, the Legislature notes, social media platforms have "unfairly censored, shadow banned, deplatformed, and applied post-prioritization algorithms to Floridians." *Id.* As a result, and because "[t]he state has a substantial interest in protecting its residents from inconsistent and unfair actions by social media platforms," S.B. 7072 enacts a variety of provisions designed to secure Floridians' right to access "public opinion" through the free flow of ideas. *Id.* As discussed, included among these statutory protections are S.B. 7072's neutrality provision—aimed at ensuring that social media platforms apply content-moderation policies consistently—and its disclosure provisions—aimed at informing users when they are subjected to censorship, deplatforming, or shadow banning. Fla. Stat. § 501.2041(2)(a), (2)(d)(1), (2)(e).

Safeguarding this interest is particularly urgent in the context of social media platforms, which have become "the modern public square." *Packingham*, 137 S. Ct. at 1737. Unlike a traditional newspaper, and more akin to a cable operator, social media platforms "exercise[] . . . great[] control over access to the relevant medium" and possess the power "to obstruct readers' access to" information and even

"prevent" the distribution of certain information that they do not like. *Turner*, 512 U.S. at 656. Thus, "[b]y virtue of its ownership of the essential pathway," a social media platform "can . . . silence the voice of competing speakers with a mere flick of the switch." *Id.* "The potential for abuse of this private power over a central avenue of communication cannot be overlooked." *Id.* at 657; *see also* Matthew P. Hooker, *Censorship, Free Speech & Facebook: Applying the First Amendment to Social Media Platforms Via the Public Function Exception*, 15 Wash. J. L. Tech. & Arts 36, 43-44 (2019) (collecting examples of "arbitrary" application of content-moderation policies by social media platforms). Accordingly, "[t]he First Amendment's command that government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas." *Turner*, 512 U.S. at 657.

## Conclusion

The Court should reverse the district court's order preliminarily enjoining the neutrality and disclosure provisions of S.B. 7072.

Respectfully submitted.

Steve Marshall
Attorney General of Alabama

Treg Taylor
Attorney General of Alaska

Mark Brnovich
Attorney General of Arizona

Leslie Rutledge
Attorney General of Arkansas

Daniel Cameron
Attorney General of Kentucky

Lynn Fitch
Attorney General of Mississippi

Eric Schmitt
Attorney General of Missouri

Austin Knudsen
Attorney General of Montana

Alan Wilson
Attorney General of South Carolina

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Judd E. Stone II
Solicitor General

/s/ William F. Cole
William F. Cole
Assistant Solicitor General
William.Cole@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Attorneys for Amici Curiae*

21

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,492 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ William F. Cole
WILLIAM F. COLE

## CERTIFICATE OF SERVICE

On September 14, 2021, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

/s/ William F. Cole
WILLIAM F. COLE