No. 21-12355

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

NETCHOICE, LLC, et al.,

*Plaintiffs-Appellees*,

v.

ATTORNEY GENERAL, STATE OF FLORIDA, et al.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of Florida, No. 4:21-cv-00220-RH-MAF

---

## BRIEF FOR APPELLEES

---

BRIAN M. WILLEN
STEFFEN N. JOHNSON
MENG JIA YANG
WILSON SONSINI GOODRICH
 & ROSATI, P.C.
1700 K Street, NW
Washington, DC 20006

PETER KARANJIA
JAMES J. HALPERT
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC  20004

PAUL D. CLEMENT
 *Counsel of Record*
K. WINN ALLEN
KASDIN M. MITCHELL
EVELYN BLACKLOCK
JAMES Y. XI
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

ILANA H. EISENSTEIN
BEN C. FABENS-LASSEN
DANIELLE T. MORRISON
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA  19103

*Counsel for Plaintiffs-Appellees*

November 8, 2021

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, Appellees hereby certify that NetChoice has no parent corporation and that no publicly held corporation owns ten percent or more of its stock. Appellees certify that the Computer & Communications Industry Association (CCIA) has no parent corporation and that no publicly held corporation owns ten percent or more of its stock.

Appellees also certify that, pursuant to 11th Cir. R. 26.1-1(a)(3), there are no additional attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal that were omitted from the appellants' certificate.

## STATEMENT REGARDING ORAL ARGUMENT

Appellees believe oral argument would assist the Court in deciding the issues presented by this appeal.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

STATEMENT OF THE ISSUES ........................................................ 3

STATEMENT OF THE CASE............................................................ 4

    A.    Online Service Providers and Their Editorial Judgments................... 4

    B.    The Act Curtails and Punishes Online Service Providers' Editorial Discretion ............................................................. 7

    C.    The District Court Enjoins Enforcement of the Act........................... 15

SUMMARY OF ARGUMENT..................................................... 18

STANDARD OF REVIEW ............................................................. 21

ARGUMENT ...................................................................... 22

I.    Appellees Are Overwhelmingly Likely To Succeed On Their First Amendment Claims ...................................................... 22

    A.    The First Amendment Protects Online Service Providers' Editorial Judgment ............................................................ 22

    B.    The Act Triggers Strict Scrutiny ...................................... 25

    C.    Florida's Efforts to Evade Strict Scrutiny Fail................................. 31

        1.    Florida cannot evade strict scrutiny by labeling providers' expressive activity a mere "hosting function"................................................. 31

        2.    The state's "three guiding principles" misunderstand the law and the facts............................................... 33

        3.    Florida cannot evade strict scrutiny by labeling providers "common carriers".................................... 38

        4.    Florida's remaining efforts to evade strict scrutiny are futile ...................................................... 42

D.    The Act Cannot Withstand Strict (or Even Intermediate) Scrutiny .......................................................................... 47

II.    Appellees Are Likely To Succeed On Their §230 Preemption Claim .............................................................................. 50

III.   The Other Preliminary Injunction Factors Overwhelmingly Weigh In Favor Of Maintaining The Status Quo ........................................ 55

CONCLUSION ........................................................................ 57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[1]

**Cases**

*Am. Orient Exp. Ry. v. STB*,
  484 F.3d 554 (D.C. Cir. 2007) ..........................................................39

*Ams. for Prosperity Found. v. Bonta*,
  141 S.Ct. 2373 (2012)......................................................................48

*Ark. Educ. Television Comm'n v. Forbes*,
  523 U.S. 666 (1998).........................................................................24

*Ark. Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987).........................................................................30

*Barr v. Am. Ass'n of Pol. Consultants*,
  140 S.Ct. 2335 (2020)......................................................................27

*Buckley v. Valeo*,
  424 U.S. 1 (1976).............................................................................48

*Buehrle v. City of Key West*,
  813 F.3d 973 (11th Cir. 2015)..........................................................44

*Cablevision Sys. Corp. v. FCC*,
  597 F.3d 1306 (D.C. Cir. 2010) ........................................................39

*Charles H. Wesley Educ. Found. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005).........................................................21

*Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*,
  6 F.4th 1247 (11th Cir. 2021).................................................... 24, 26

*Denver Area Educ. Telecomms. Consortium v. FCC*,
  518 U.S. 727 (1996)............................................... 23, 33, 34, 42

*Fane v. Edenfield*,
  507 U.S. 761 (1993)..........................................................................44

---

[1]     Citations on which Appellees primarily rely are marked with asterisks.

*Fane v. Edenfield*,
    945 F.2d 1514 (11th Cir. 1991) ........................................................43

*FCC v. Fox TV Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................28

*FCC v. League of Women Voters of Ca.*,
    468 U.S. 364 (1984) ........................................................................27

*FCC v. Midwest Video Corp.*,
    440 U.S. 689 (1979) ........................................................................39

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
    866 F.3d 1290 (11th Cir. 2017) ........................................................56

*Green v. Am. Online, Inc.*,
    318 F.3d 465 (3d Cir. 2003) ............................................................54

*Harris v. Quinn*,
    573 U.S. 616 (2014) ........................................................................26

\*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ................................................................ *passim*

*KH Outdoor, LLC v. Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ........................................................56

*Lewis v. Google LLC*,
    851 F.App'x 723 (9th Cir. 2021) ......................................................54

*Masterpiece Cakeshop v. Colorado C.R. Comm'n*,
    138 S.Ct. 1719 (2018) ......................................................................35

*McCutcheon v. FEC*,
    572 U.S. 185 (2014) ........................................................................48

\*Miami Herald Publ'g v. Tornillo*,
    418 U.S. 241 (1974) ................................................................ *passim*

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
    460 U.S. 575 (1983) ............................................................ 30, 46, 50

*Morrison v. Olson*,
487 U.S. 654 (1988)..................................................................57

*NARUC v. FCC*,
533 F.2d 601 (D.C. Cir. 1976) ..................................................39

*\*NIFLA v. Becerra*,
138 S.Ct. 2361 (2018)................................................ 26, 31, 44, 50

*\*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ........................... 27, 35, 55, 56

*\*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Ca.*,
475 U.S. 1 (1986)..................................................... *passim*

*Packingham v. North Carolina*,
137 S.Ct. 1730 (2017).............................................. 48, 49

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980)....................................... 17, 19, 31, 32

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)................................................ 25, 47

*Rumsfeld v. FAIR*,
547 U.S. 47 (2006).............................. 17, 19, 23, 31, 32, 33

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ..................................21

*Solomon v. City of Gainesville*,
763 F.2d 1212 (11th Cir. 1985) ..................................28

*\*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011)........................................ 30, 31, 46, 48

*Stratton Oakmont, Inc. v. Prodigy Servs.*,
1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995)...............52

*Thomas v. Review Bd.*,
450 U.S. 707 (1981)..................................................37

*Turner Broad. Sys. v. FCC,*
    512 U.S. 622 (1994)................................................................... 24, 25

*United States v. Martin,*
    438 F.3d 621 (6th Cir. 2006)................................................................54

*USTA v. FCC,*
    855 F.3d 381 (D.C. Cir. 2017) ................................................................39

*Washington Post v. McManus,*
    944 F.3d 506 (4th Cir. 2019)................................................... 49, 50

*Wollschlaeger v. Governor, Florida,*
    848 F.3d 1293 (11th Cir. 2017)................................................................29

*Wooley v. Maynard,*
    430 U.S. 705 (1977)................................................... 25, 26, 36

*Zango Inc. v. Kapersky Lab,*
    568 F.3d 1169 (9th Cir. 2009)................................................................54

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio,*
    471 U.S. 626 (1985)................................................................44

*Zeran v. Am. Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997)................................................................52

*Zhang v. Baidu.com,*
    10 F.Supp.3d 433 (S.D.N.Y. 2014) ................................................................41

**Statutes**

47 U.S.C. §230................................................................ *passim*

Fla. Stat. §106.011 ................................................................10

Fla. Stat. §106.072 ................................................................ *passim*

Fla. Stat. §501.2041 ................................................................ *passim*

2021 Fla. Sess. Law Serv. Ch. 2021-32 (S.B. 7072) ................................... 15, 16, 46

Telecommunications Act of 1996,
    Tit. V, Pub. L. No. 104-104,
    110 Stat. 56 (1996) ........................................................................52

**Other Authorities**

About, *Gab*, https://gab.com/about (last visited Nov. 8, 2021) ...............................38

Christopher S. Yoo, *The First Amendment, Common Carriers, and
    Public Accommodations*, 1 J. Free Speech L. 463 (2021) ..................................41

CNET, *Parler Returns Online After Monthlong Absence* (Feb. 16,
    2021), https://cnet.co/3qiJoHv ............................................................49

Eugene Volokh, *Treating Social Media Platforms Like Common
    Carriers?*, 1 J. Free Speech L. 377 (2021) .........................................33

Facebook Community Standards, *Facebook*, https://bit.ly/3D2ihUH
    (last visited Nov. 8, 2021) .................................................................38

*Governor Ron DeSantis Signs Bill to Stop the Censorship
    of Floridians by Big Tech*, https://bit.ly/3BXFTsr
    (last visited Nov. 8, 2021) .................................................................15

Handmade Policy, *Etsy*, https://etsy.me/3wsbNMe.
    (last visited Nov. 8, 2021) ...................................................................6

Phil Nichols, *Redefining "Common Carrier"*,
    1987 Duke L.J. 501 (1987) ................................................................41

The Twitter Rules, *Twitter*, https://bit.ly/3wuaxsb
    (last visited Nov. 8, 2021) ...................................................................6

Values, *Parler*, https://parler.com/values.html
    (last visited Nov. 8, 2021) .................................................................38

# INTRODUCTION

The district court properly enjoined Florida's unprecedented effort to strip online service providers of their constitutionally protected editorial judgment and replace it with the state's own judgments and preferences. Florida did not conceal the motivation for its novel law: to target certain large online service providers for exercising their editorial judgment in a manner that the state disfavors. Governor DeSantis—while signing the Act into law—announced that "Big Tech" would "now be held accountable" for "discriminat[ing] in favor of the dominant Silicon Valley ideology." That discriminatory intent is reflected in the Act's text, which singles out so-called "Big Tech" for disfavored treatment. The Act applies only to providers that exceed certain thresholds of users (100 million monthly) or revenue ($100 million annually). And it exempts the state's preferred speakers, such as smaller providers and—in a carveout that would make Elbridge Gerry blush—entities that own and operate theme parks.

The Act imposes onerous requirements on the state's disfavored speakers. It prohibits covered providers from prioritizing or limiting exposure to posts by or about political candidates, effectively nullifying the providers' editorial judgments. It prohibits those providers from removing or restricting content posted by "journalistic enterprises," even when the content violates the providers' community standards. The Act further intrudes on providers' editorial judgments by requiring

them to apply their editorial standards in a "consistent manner"—without defining that amorphous concept. It even prohibits providers from posting "addenda" or disclaimers to users' content—a direct prohibition on speech. And it prevents them from updating their own community standards—even in the face of rapidly changing circumstances or efforts to evade their standards—except on a schedule determined by the Act.

All the while, Florida's law subverts the vital efforts of providers to protect their websites and users from vast and varied harmful, offensive, and unlawful material: terrorist propaganda, child sexual abuse imagery, misinformation from hostile foreign governments, fraudulent schemes, annoying "spam," bullying, calls for genocide or racist violence, hate speech, and worse. The Act is a frontal attack on the editorial judgments that online service providers exercise over speech and speakers on their sites.

The district court was plainly right (and well within its discretion) to preliminarily enjoin the state from enforcing its "first-of-its-kind" law. Just as the First Amendment protects a newspaper's decision about what editorials to publish and a bookstore's choice of which books to sell, the First Amendment protects an online service provider's editorial judgment about what content to allow and how to display it. Those decisions are inherently expressive, conveying a message about the provider's values and the community it hopes to foster. By requiring providers

to convey speech that they would not otherwise convey and to make editorial judgments they would not otherwise make, the Act intrudes on "the function of editors," *Miami Herald Publ'g v. Tornillo*, 418 U.S. 241, 242 (1974), and requires providers to "alter the expressive content" of their message, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 572-73 (1995). That is a quintessential violation of the First Amendment. And significant portions of Florida's unprecedented law are also plainly preempted by §230 of the Communications Decency Act.

The merits of this case are not close—Florida may not commandeer private parties' speech or require them to adopt the state's preferred editorial choices. Appellees are thus overwhelmingly likely to succeed in their challenge. And the other preliminary injunction factors tip even more decisively in Appellees' favor. The denial of First Amendment rights is a textbook example of irreparable injury; the state has no legitimate interest in enforcing an unconstitutional law that would require Appellees' affected members to restructure their operations worldwide; and the public interest favors respect for First Amendment values, rather than novel efforts at state censorship. The district court's preliminary injunction should be affirmed.

## STATEMENT OF THE ISSUES

Whether the district court abused its discretion in determining that:

1.       Appellees established a likelihood of success on the merits of their First Amendment claim;

2.       Appellees established a likelihood of success on the merits of their preemption claim; and

3.       Irreparable injury, the balance of hardships, and the public interest weighed in favor of issuing a preliminary injunction.

## STATEMENT OF THE CASE

### A.   Online Service Providers and Their Editorial Judgments.

Appellees NetChoice and CCIA are two leading internet trade associations. Their members include online service providers covered by Florida's novel law. Those providers make available a wide assortment of content on their services, including text, photographs, audio, and video. App.43-44. That content is staggering in its volume and variety. It is generated by billions of users located throughout the world and spans the full range of human thought and expression— the good, the bad, and the ugly. *Id.* Every day, providers enable users to upload material that is creative, humorous, informative, commercial, educational, or politically engaging. *Id.* But unfortunately, some users abuse their services, posting content that is odious, dangerous, or illegal. App.44.

In light of the sheer volume and breadth of the material that users constantly upload, providers must unceasingly exercise editorial discretion in deciding what

content to present and how to present it. App.45. There is no one-size-fits-all approach, as different providers cater to different users, adopt different policies, and employ different technologies. Dkt.23-1¶¶13-28. Over the years, providers have invested significant time and resources into developing their own unique systems to edit and organize user-created content and present it in a way that fosters the environment and market niche that each provider seeks to cultivate. App.45.

The providers' editorial discretion takes many forms. Most remove material that is objectionable, unlawful, or violates terms of service or community standards, and they may also terminate the accounts of users who post such content to prevent them from uploading the same or similar objectionable material. Many providers prevent minors from accessing certain material, and empower users with tools that allow them to block, mute, or prioritize content for themselves or their children. App.45-46. They also make judgments about how to arrange and display content, what content to recommend to users, and how readily to make certain kinds of content available. App.45. In exercising their editorial discretion, many providers engage in their own direct speech by appending warnings, disclaimers, or commentary to user-created material that may contain, for example, unverified information or upsetting imagery. App.46.

These exercises of editorial discretion serve several vital and complementary functions. First, such editorial judgments communicate a message from and about

the provider itself, just as traditional publishers convey a message through their editorial decisions. Such judgments are critical to the message conveyed and the provider's success, as those decisions determine a provider's consumer audience and the kinds of advertisers it attracts. To foster a distinctive community, each provider has developed its own specific terms of service and community standards. YouTube, for example, supports a "community that fosters self-expression on an array of topics as diverse as its user base," while prohibiting "harmful, offensive, and/or unlawful material" like "pornography, terrorist incitement, [and] false propaganda spread by hostile foreign governments." Dkt.25-1¶¶3, 9. Twitter, for its part, allows a wider range of violent and adult content.[2] And Etsy, in its effort to "keep human connection at the heart of commerce" has adopted policies to requiring any item "listed as handmade" be "made and/or designed by … the seller."[3]

As those examples reveal, the rules and community standards that providers promulgate and expect users to follow vary based on the community each seeks to foster. Some prioritize content that others find less valuable or affirmatively offensive. Some restrict content that others welcome. *See* Dkt.23-1¶¶13-19; Dkt.25-1¶¶9-10; Dkt.26-1¶¶12-14; Dkt.29-1¶¶6-9.

---

[2]      The Twitter Rules, *Twitter*, https://bit.ly/3wuaxsb (last visited Nov. 8, 2021).

[3]      Handmade Policy, *Etsy*, https://etsy.me/3wsbNMe (last visited Nov. 8, 2021).

More generally, online service providers exercise their editorial judgment to organize and present content in a way that users find manageable and useful. With billions of users uploading text, photographs, audio, and video every day, the average user would quickly drown in a sea of irrelevant (or worse) content if that material were not sorted, curated, and presented in a digestible format. App.47-48. These choices are expressive.

Last, but certainly not least, editorial discretion is essential to ensuring user safety. App.47. Users and advertisers engage with these online services in part because they trust the providers to maintain certain standards of safety and security. For instance, certain controls are designed to help prevent minors from accessing adult content and being exploited by predators online. Community standards shield users from a wide variety of harmful content, ranging from ISIS recruitment videos, to material promoting suicide and self-harm, to hate speech, to fraudulent schemes targeting older adults. Dkt.23-1¶11. And as threats to user safety evolve and new forms of harmful content emerge, providers must be nimble and responsive, swiftly updating and modifying their standards and terms of use and enforcement efforts. Dkt.24-1¶23.

## B. The Act Curtails and Punishes Online Service Providers' Editorial Discretion.

Given the expressive nature of their editorial choices, online service providers can be—and are—criticized for their exercise of editorial discretion; the First

Amendment and its preferred remedy of more speech expect nothing less. But in May 2021, Florida took a different tack: It enacted S.B. 7072, a law that would strip covered providers of their First Amendment right to exercise editorial discretion over content posted on their own sites and punish them for enforcing their standards in ways the state disfavors. The Act unconstitutionally restricts and compels covered providers' speech in numerous ways.

Tellingly, the state's brief omits any detailed discussion of the censorial provisions of the Act, tucking crucial sections into footnotes and seeking to cast the law as mainly imposing mild "disclosure" requirements. App.Br.4-6. The state severely mischaracterizes the Act, which is shot through with provisions censoring, compelling, and prohibiting protected speech.

The Act targets a select group of larger online service providers for regulation and censorship, while exempting the state's preferred speakers. Fla. Stat. §501.2041(1)(g)(1). The law singles out the largest providers—services with at least 100 million monthly users or $100 million in gross annual revenue. §501.2041(1)(g)(4). The state's legislative findings do not explain why the Act targets only larger "social media platforms," but statements from Florida officials, *see infra* at 15, make clear that it was designed to single out the biggest of so-called "Big Tech" based on their perceived "leftist" political viewpoints. App.23-24.

During drafting, however, legislators realized that their definitions could cause Disney and Universal Studios to get "caught up" in the law's onerous restrictions. App.51-52. To protect those powerful Florida businesses, legislators made a last-minute change to brazenly exclude from the definition of "[s]ocial media platform" any entity that "owns and operates a theme park." Fla. Stat. §501.2041(1)(g).

After gerrymandering the definitions to exclude well-connected Florida heavyweights, the Act proceeds to impose a series of restrictions and requirements both prohibiting and compelling the speech of covered providers. It does so under the rubric of regulating editorial decisions that the law ominously (but misleadingly) labels as "censorship," "deplatforming," "shadow banning," and "post-prioritization." App.24, 36-37, 56. Ignoring that censorship generally refers to government efforts to suppress speech, not private editorial decisions, the Act defines "censor" expansively to include not only removing, regulating, or restricting user-created content, but also *adding to* user-created content by posting an addendum or disclaimer. Fla. Stat. §501.2041(1)(b). It defines "deplatform" to mean permanently or temporarily banning a user for more than 14 days, §501.2041(1)(c), and it defines "shadow ban" to mean limiting or eliminating exposure to any users or user-created content, §501.2041(1)(f). It defines "post-prioritization" to mean placing or featuring "certain content or material ahead of, below, or in a more or less

prominent position than others in a newsfeed, a feed, a view, or in search results."
§501.2041(1)(e).

Taken together, those definitions reach almost every exercise of providers'
editorial discretion to organize, present, and restrict voluminous content in a way
that is valuable to users and consistent with providers' terms of service and
community standards. The Act prohibits or severely limits those editorial judgments
in numerous ways:

*Candidate and Journalistic Enterprises Provisions.* The first set of
provisions—the candidate and journalistic enterprises provisions—provide special
favored protections for political candidates and so-called "journalistic enterprises."
The Act prohibits covered services from "deplatforming" (*i.e.*, suspending or
removing) a "candidate"—defined as anyone who "files qualification papers and
subscribes to a candidate's oath"—no matter what the candidate posts and no matter
how blatantly the candidate violates a provider's policies. Fla. Stat. §§ 106.011(e),
106.072(2). The Act goes so far as to prohibit providers from applying "post-
prioritization or shadow banning algorithms" to content posted "by *or about*" a
candidate—even if the material is defamatory, false, dangerous, or illegal.
§501.2041(2)(h) (emphasis added). Content-based restrictions on speech do not
come any clearer than that. The Act also prohibits providers from addressing, for
example, deliberate misinformation about public health, threats of violence, and

misleading "deep fakes." As one Florida legislator recognized, the law seems to allow "crazy people, Nazis and child molesters and pedophiles" to "say anything they want" online if they simply "fill out those two pieces of paper" to qualify as a "candidate." App.26-27.

Relatedly, the Act prohibits providers from taking "any action" to "censor, deplatform, or shadow ban" a "journalistic enterprise" based on the "content" of its posts. Fla. Stat. §501.2041(2)(j). The Act defines "journalistic enterprise" broadly to include not just traditional news outlets, but also "any entity doing business in Florida" that has published 100,000 words or 100 hours of audio or video online and meets certain minimum audience thresholds—covering anyone from celebrity influencers to recognized hate groups. §501.2041(1)(d). Given the broad definitions of "censor" and "shadow ban," this provision makes it unlawful for a covered provider to, for example, put an age-gate around adult videos published by Playboy Magazine—or even to append a warning that the post contains nudity.

*Consistency Mandate.* Next, the Act imposes a vague and unworkable "consistency" mandate, which requires service providers to apply what the Act terms "censorship, deplatforming, and shadow banning standards" in a "consistent manner" among users. §501.2041(2)(b). The Act does not define what it means by "consistent manner" or provide any guidance about how to gauge compliance with this amorphous mandate across the wide variety of text, video, audio, and images

11

that users create and upload.  Instead, it empowers state officials to level charges of inconsistency, authorizes private rights of action to enforce this vague mandate, and forces state judges to second-guess editorial decisions—all of which necessarily must be made in real time and in massive volumes.

*Algorithm Opt-Outs and Rule-Change Restrictions.*  The Act also requires providers to "[a]llow a user to opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." §501.2041(2)(f).  On its face, this opt-out requirement allows individual users to override the editorial judgments providers make about how to organize, present, and restrict material, regardless of the dangerous, unlawful, or inappropriate nature of the content.  This not only deprives the provider of control over its community standards, but also threatens the loss of advertisers, who will not pay to have their brands tarnished by association with such content.  Dkt.23-1¶27; Dkt.24-1¶8.

The Act further prohibits providers from changing their "user rules, terms, and agreements"—*i.e.*, their terms of service and community standards—"more than once every 30 days."  Fla. Stat. §501.2041(2)(c).  That arbitrary 30-day waiting period for rule changes severely curtails a provider's ability to react quickly to emerging threats, changed circumstances, and emergencies.  Thus, a provider may be hamstrung, for example, when trying to adapt its rules to address emerging

problems, such as campaigns daring children to ingest laundry detergent pods or spreading misinformation related to the COVID-19 pandemic.  Dkt.25-1¶¶21-23.

*Compelled Notice and Explanation Requirements.*  The final set of provisions compel covered providers to speak in a number of ways about their editorial judgments.  Under the Act, each provider must "publish the standards, including detailed definitions, it uses or has used for determining how to" (as the law puts it) "censor, deplatform, and shadow ban."  Fla. Stat. §501.2041(2)(a).  Relatedly, providers must give notice every time they "censor" or "shadow ban" a user's content, providing "a thorough rationale explaining" the decision and "a precise and thorough explanation of how" the provider "became aware of the censored content or material, including a thorough explanation of the algorithms used, if any, to identify or flag the user's content or material as objectionable."  §501.2041(2)(d)(1), (3)(c)-(d).  In other words, the Act requires covered providers to publicly disclose and justify every one of their editorial decisions, which they make on a vast scale each day. *See, e.g.*, Dkt. 26-1¶¶3, 14.  YouTube, for example, removed more than *1 billion* user comments in a single quarter in 2021, approximately half of which were spam.  Dkt.25-1¶17.  And providers must make these countless disclosures even if that means revealing proprietary methodologies developed to organize, present, and restrict material on their websites.

Providers must also allow a "deplatformed" user access to the user's content for a full two months after the notice, Fla. Stat. §501.2041(2)(i); must provide annual notice of algorithms used for "post-prioritization" and "shadow banning," §501.2041(2)(g); must, on request, tell users how many other users were shown their posts or content, §501.2041(2)(e); and must "inform" a "candidate" if they "willfully" provide the candidate "free advertising"—a term the law does not define, §106.072(4). These mandates would impose enormous new costs on Appellees (but not on their competitors excluded from the Act's coverage).

All of these speech restrictions and compulsions are backed by draconian penalties. In addition to exposing covered providers to civil and administrative actions by the state attorney general, §501.2041(5), the Act creates a private cause of action that allows individual users to sue to enforce the "consistency" and "notice" mandates and authorizes awards of up to $100,000 in statutory damages for each claim, as well as actual damages, equitable relief, potential punitive damages, and in some cases attorneys' fees. §501.2041(6). The Act authorizes the state elections commission to impose significant fines for any "candidate" whose account is removed or suspended: $250,000 per day for candidates for statewide office, and $25,000 per day for candidates for other office. §106.072(3). And the Act grants the state intrusive investigative powers, including the unprecedented power to "subpoena any algorithm" that is "related to any alleged violation." §501.2041(8).

Florida made no secret that it enacted its unprecedented law to single out and punish certain online service providers for their perceived political viewpoints. The legislative findings themselves declare that Appellees "have unfairly censored, shadow banned, deplatformed, and applied post-prioritization algorithms." 2021 Fla. Sess. Law Serv. Ch. 2021-32 (S.B. 7072), §1(9). Upon signing the Act into law, Governor Ron DeSantis announced in his official public statement: "If Big Tech censors enforce rules inconsistently, to discriminate in favor of the dominant Silicon Valley ideology," they will now be held accountable. App.24. The governor's official statement likewise quotes the lieutenant governor touting the law as "tak[ing] back the virtual public square" from "the leftist media and big corporations," who supposedly "censor if you voice views that run contrary to their radical leftist narrative." App.23-24; *Governor Ron DeSantis Signs Bill to Stop the Censorship of Floridians by Big Tech*, https://bit.ly/3BXFTsr (last visited Nov. 8, 2021). Another lawmaker added: "[O]ur freedom of speech as conservatives is under attack by the 'big tech' oligarchs in Silicon Valley. But in Florida, we said this egregious example of biased silencing will not be tolerated." *Id.*

### C. The District Court Enjoins Enforcement of the Act.

Appellees promptly filed a complaint in the district court challenging the Act. They asserted constitutional claims under the First Amendment, Due Process Clause, Equal Protection Clause, and Commerce Clause, as well as a claim for federal

preemption under the Supremacy Clause and §230. Appellees promptly sought a preliminary injunction against enforcement of the Act, which was set to go into effect on July 1, 2021—38 days after its passage. S.B. 7072 §7. The district court granted a preliminary injunction on June 30.

The district court concluded that the Act was likely unconstitutional and partly preempted. The court devoted the bulk of its analysis to the law's First Amendment infirmities. The court readily concluded that the covered providers use "editorial judgment" when they "manage" content posted by users, "much as more traditional media providers use editorial judgment when choosing what to put in or leave out of a publication or broadcast." App.1712. Indeed, the legislative record was "chock full of statements by state officials" recognizing that the providers exercise editorial judgment and characterizing those judgments as "ideologically biased" and needing to be "reined in." *Id*.

The court explained that the Act regulated private parties' editorial judgments in ideologically sensitive cases for the state's "announced purpose of balancing the discussion"—"precisely the kind of state action held unconstitutional" in a trio of Supreme Court cases. App.1716 (discussing *Tornillo*, 418 U.S. 241, *Hurley*, 515 U.S. 557, and *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Ca.*, 475 U.S. 1 (1986)). The cases on which the state relied, by contrast, primarily concerned regulation of "conduct, not speech" in less inherently expressive fora, and involved statutes that—

unlike the Act—did not compel or prohibit private actors from engaging in their own speech. App.1717-18 (distinguishing *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), and *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980)).

Having determined that the Act triggered First Amendment scrutiny, the district court concluded that strict scrutiny applied because the law is "about as content-based as it gets":  For example, the provisions regulating posts "by or about" a candidate and material posted by a "journalistic enterprise" could not be applied without regard to the content of the regulated speech. App.1719.  Moreover, statements by Florida officials, together with the Act's arbitrary theme park carveout, manifested "viewpoint-based motivation" and discrimination among speakers, both requiring strict scrutiny. App.1720

In the district court's view, the Act came "nowhere close" to surviving strict scrutiny. App.1722.  Florida had no legitimate state interest in leveling the playing field. *Id.*  Nor was the Act remotely narrowly tailored, representing "an instance of burning the house to roast a pig," and thus would fail even intermediate scrutiny. *Id.*

The district court also held that the Act was likely preempted in part by §230, as to the provisions that prohibit "deplatforming" a candidate for office and that impose liability for a provider's decision to remove or restrict access to content. App. 1710-11.

Finally, the district court concluded that Appellees "easily" satisfied the other requirements for a preliminary injunction. App.1724 Absent preliminary relief, Appellees' members would be irreparably harmed by being "compelled to speak" and "forbidden from speaking," "all in violation of their editorial judgment and the First Amendment." *Id.* That classic irreparable injury "outweigh[ed] whatever damage the injunction may cause the state," and enjoining enforcement of the Act would thus serve the public interest, which favors respect for First Amendment values. *Id.* The court accordingly exercised its discretion to preliminarily enjoin the Act.

## SUMMARY OF ARGUMENT

Florida's extreme and unprecedented law violates online service providers' vital First Amendment rights several times over by interfering with editorial judgments and compelling speech. The Supreme Court has long made clear that overriding editorial judgments violates the First Amendment. And by compelling providers to speak in ways they otherwise would not, the Act regulates on the basis of content, speaker, and viewpoint and plainly triggers strict scrutiny. The Act's intrusion into protected First Amendment territory is neither minor nor subtle. For example, the Act's political-candidate provisions compel covered providers to carry speech they otherwise would not carry, and are speaker- and content-based to boot. The "consistency" mandate is plainly content-based (not to mention impermissibly

vague), as the only way to determine whether a provider applied its rules to different posts "consistently" is to consider the content of the posts. And the avowed purpose of the Act was to target the so-called "leftist" agenda of Silicon Valley, which renders the entire law viewpoint discriminatory. The Act triggers strict scrutiny.

Florida cannot escape strict scrutiny by labeling the editorial functions of providers as mere "hosting," especially where the perceived bias of the editorial decisions is what prompted the legislation. The state bases much of its defense of the Act on *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), and *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). These cases have nothing to do with editorial judgments. *PruneYard* involved a shopping mall that was neither acting as a speech forum nor objecting to the content of third-party speech on its premises. *FAIR* involved law school recruiting—not a mandate that law schools refrain from exercising editorial control over speech that they were presenting to the world. Neither case—nor anything else the state invokes—supports its unprecedented effort to force online service providers to publicly disseminate speech that they deem unacceptable and inconsistent with their private editorial standards. Likewise, the three supposedly "guiding principles" that the state tries to extract from these cases are legally unsupported and disregard both established First Amendment law and the facts of this case.

Nor can Florida come close to satisfying strict scrutiny. The Act pursues no legitimate government ends, and Florida's chosen means are dramatically disproportionate to its stated goals. The lack of tailoring would doom the Act even under intermediate scrutiny.

The Act is also preempted in part by §230. Section 230 expressly preempts state laws that impose civil liability on internet services for deciding whether to carry, restrict, or remove certain content. Congress wanted to protect providers from liability under state law for taking actions to keep offensive material away from minors and other users. There can be no serious question that the Act does just that.

Finally, the remaining preliminary injunction factors are readily satisfied and fully support the district court's decision to preserve the status quo. The denial of First Amendment rights is a classic form of irreparable injury, and attempting to comply with the Act would mean fundamentally reshaping business practices nationwide and even worldwide. The state suffers no comparable irreparable injury or sense of urgency and has no legitimate interest in enforcing an unconstitutional law. Moreover, the public interest favors First Amendment values, not government censorship, and it is certainly not advanced by forcing providers to publish all manner of illegal and otherwise objectionable content. All four factors for injunctive relief strongly support enjoining Florida's novel and dangerous law. There is no

reason for this Court to disturb the well-reasoned decision of the district court maintaining the status quo while this litigation proceeds to a final resolution.

## STANDARD OF REVIEW

The district court may enter a preliminary injunction where a party has shown that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

This Court reviews a district court decision granting a preliminary injunction under the "highly deferential" abuse-of-discretion standard. *Id.* at 1178. "Preliminary injunction decisions, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and this Court will not set them aside unless the district court has abused its discretion in making them." *Charles H. Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005).

# ARGUMENT

## I. Appellees Are Overwhelmingly Likely To Succeed On Their First Amendment Claims.

### A. The First Amendment Protects Online Service Providers' Editorial Judgment.

The First Amendment protects the right of private entities to exercise editorial judgments in deciding what content they want to make available to the public or their users. The First Amendment right to exercise editorial judgment lies at the core of the Amendment's protections against government censorship and compelled speech and is backed by decades of Supreme Court precedent. That right is not limited to traditional media, but extends to any entity that selects, arranges, and disseminates content, whether third-party or self-generated, and certainly covers entities that the government seeks to regulate because of the way they exercise their editorial discretion.

The Court's decision in *Tornillo*—a case with striking similarities to this one—underscores that government interference with editorial discretion cannot be squared with the First Amendment. The Court in *Tornillo* invalidated Florida's "right of reply" statute that would have compelled newspapers to give political candidates space to respond to negative coverage. The Court emphasized that the "choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and

judgment" fully protected by the First Amendment.  418 U.S. at 258.  The law's "intrusion into the function of editors," even apart from any added costs or space constraints imposed on the paper, failed to "clear the barriers of the First Amendment."  *Id.*

*Tornillo* rejected many of Florida's arguments to justify the right-of-reply statute that Florida unapologetically attempts to recycle half a century later.   In *Tornillo*, Florida's complaints that the "noncompetitive and enormously powerful" press with a "monopoly" on the marketplace of ideas and "capacity to manipulate popular opinion and change the course of events" did not justify its effort to interfere with the Herald's editorial discretion.  *Id.* at 249, 251.  Likewise, the Court was unpersuaded by the state's suggestion that the law did not prevent the newspaper from "saying anything it wished."  *Id.* at 256.  By compelling "editors or publishers to publish that which reason tells them should not be published," the law operated "as a command in the same sense" as a statute "forbidding" a newspaper to "publish specified matter."  *Id*.  In other words, requiring newspapers to print material they would not otherwise print "infringed the newspaper editors' freedom of speech by altering the message the paper wished to express."  *FAIR*, 547 U.S. at 64.

While *Tornillo* concerned a traditional newspaper, its key insight—that "the editorial function itself is an aspect of 'speech,'" *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 737 (1996) (plurality op.)—is not "restricted to

the [traditional] press," but applies equally to "business corporations generally," as well as "ordinary people engaged in unsophisticated expression." *Hurley*, 515 U.S. at 574. Thus, a private utility cannot be forced to include third-party speech in its billing envelopes, *Pacific Gas*, 475 U.S. at 20-21, and a private parade organizer cannot be forced to include a group whose message it disapproves, *Hurley*, 515 U.S. at 574-76. *See also, e.g.*, *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity."); *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 636 (1994) (cable companies' exercise of editorial discretion over stations and programs entitled to First Amendment protection).

These editorial choices "fall squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 569-70. A private party's decisions about what content, viewpoints, and speakers it wishes to convey and thus be associated with are inherently expressive, reflecting judgments and opinions about what to convey and which speech is worthwhile or objectionable. *See Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254-56 (11th Cir. 2021) ("Amazon engages in expressive conduct when it decides which charities to support through the AmazonSmile program."). It does not matter whether speech that makes the editorial cut originated with the publisher or a third party. Nor does it matter how

heavy an editorial hand is applied. *Hurley*, 515 U.S. at 569-70. A right-to-reply statute is just as unconstitutional when applied to a guest editorial as to the newspaper's own editorial page, and that principle applies well beyond newspapers. The government cannot tell online service providers what third-party content to carry. A provider's choices about whether and how to display information to users conveys a message about the type of community it wishes to create. Under the First Amendment, those choices are for private parties—not the government—to make.

### B. The Act Triggers Strict Scrutiny.

Government interference with private editorial judgment—"compelling a private corporation to provide a forum for views" it rejects or disapproves, *Pacific Gas*, 475 U.S. at 9—poses the "inherent risk" that the state seeks to "manipulate the public debate through coercion rather than persuasion," *Turner*, 512 U.S. at 641. Such laws, and certainly S.B. 7072, trigger strict scrutiny several times over, because they compel speech and discriminate on the basis of content, viewpoint, and speaker.

A law compels speech where it encroaches on a private entity's "right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). A law is content-based where it "singles out specific subject matter for differential treatment." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 169 (2015). A law is speaker-based where it discriminates "among different speakers within a single medium." *Turner*, 512 U.S. at 659. And a law is viewpoint-based where "the State

has left unburdened those speakers whose messages are in accord with its own views." *NIFLA v. Becerra*, 138 S.Ct. 2361, 2378 (2018). The Act is all four.

The provisions governing content *by* and *about* candidates and journalistic enterprises exemplify the First Amendment problems with the Act and trigger strict scrutiny several times over. *See* Fla. Stat. §§501.2041(2)(j), (2)(h), 106.072(2). Those provisions force covered providers to disseminate speech by certain speakers—self-declared political candidates and so-called journalistic enterprises— even if those speakers violate the providers' policies or convey a message they reject or disapprove. Forcing providers to disseminate speech that they otherwise would not plainly undermines their editorial judgment and encroaches on their "right to refrain from speaking at all." *Wooley*, 130 U.S. at 714. It also conflicts with the "bedrock principle that, except perhaps in the rarest of circumstances, no person in this country may be compelled to subsidize speech by a third party that he or she does not wish to support." *Harris v. Quinn*, 573 U.S. 616, 656 (2014); *see also Coral Ridge*, 6 F.4th at 1254.

To make matters worse, the provisions are also content- and speaker-based. They are nakedly content-based as they expressly prohibit covered providers from exercising any editorial discretion whatsoever over material posted "about" political candidates, Fla. Stat. §501.2041(2)(h), and prohibit them from removing, restricting, or even adding to material posted by a so-called journalistic enterprise "based on"

its "content." §501.2041(2)(j). That is "as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants*, 140 S.Ct. 2335, 2346 (2020) (plurality op.). And all the while, these provisions reflect the state's speaker-based preferences by prohibiting those providers from suspending or removing candidates and journalistic enterprises (but not other users) from their websites, Fla. Stat §§106.072(2); 501.2041(2)(j), and from exercising editorial discretion over material posted "by" candidates, §501.2041(2)(h). Indeed, Florida seems to recognize that it engaged in content- and speaker-based distinctions, describing these provisions as restricting those providers' editorial judgment with respect to certain users "based on *what they say*[]" and by restricting editorial control over the users who, in the state's judgment, are "likely to have *uniquely important contributions* to the public square." App.Br.6 (emphasis added).

The candidate and journalistic enterprises provisions are not the only ones that are content-based; the Act's "consistency" mandate is hopelessly so, too. "One reliable way to tell if a law restricting speech is content-based is to ask whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated." *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020); *accord FCC v. League of Women Voters of Ca.*, 468 U.S. 364, 383 (1984). That is plainly the case here. To determine whether covered providers treated material in a "consistent manner," Fla. Stat. §501.2041(2)(b)—

however "consistency" might be defined or measured—the state must necessarily examine the content of a wide variety of user posts and make subjective comparisons. The idea that such a regime does not regulate on the basis of content does not pass a straight-face test. And that is to say nothing of the encroachment on editorial discretion that is inherent in empowering state officials to force providers to apply their editorial standards differently than they would otherwise apply them.

To make matters worse, the consistency mandate is also impermissibly vague. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). When speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54. But the Act fails to provide a person of ordinary intelligence fair notice of what is prohibited. The key statutory term—"consistent manner"—is "in no way defined." *Solomon v. City of Gainesville*, 763 F.2d 1212, 1214 (11th Cir. 1985). The Act does not provide even minimum guidelines about how to interpret this nebulous mandate, leaving covered providers to choose between risking unpredictable and arbitrary enforcement (backed by penalties of $100,000 per violation and punitive damages) or refusing to exercise their editorial discretion. "In this quintessential First Amendment area, the State may not hinge liability on a

phrase so ambiguous in nature." *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1323 (11th Cir. 2017) (en banc).

The Act's remaining provisions similarly trigger strict scrutiny. The "opt-out" provision, Fla. Stat. §501.2041(2)(f), and the 30-day waiting period for rule changes, §501.2041(2)(c), require providers to organize, present, and restrict state-favored types of content differently than they otherwise would. The opt-out feature allows users to completely override the providers' editorial judgments about what content to display. And the waiting period for rule changes requires providers to leave up content they would otherwise take down in response to changed circumstances or policies. Other provisions go even further, compelling speech *about* the providers' editorial judgments. These provisions force providers to publish "detailed" descriptions of their editorial standards for organizing, presenting, and restricting content; provide "thorough" explanations of every individual decision to restrict content or remove an account; provide notice of proprietary algorithms; tell users how many views they received; and inform candidates of any "free advertising." §§106.072(4); 501.2041(2)(a), (d), (e), (g),. Those restrictions not only impose burdensome and intrusive speech requirements on private entities, but they do so in service of intruding on editorial judgments, thus violating First Amendment values twice over. If the right-of-reply statute in *Tornillo* had compelled the Herald to disclose its reasoning in choosing what material to publish in an effort to make sure

readers could enforce their right to reply, that additional compelled speech would only make the Act more obviously subject to strict scrutiny and unconstitutional. In short, what the state tries to characterize as mere "disclosure" provisions in fact regulate content by chilling private editorial expression and "burdening its utterance." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011).

Finally, there can be no real dispute that the Act's aim was to discriminate based on viewpoint and to target certain disfavored speakers—a First Amendment infirmity that infects all of the Act's provisions. The Act unabashedly singles out certain "social media platforms" and saddles them (and only them) with a slew of onerous burdens. Fla. Stat. §501.2041(1)(g)(1). It sweeps in disfavored businesses (so-called "Big Tech") through its arbitrary size and revenue requirements. §501.2041(1)(g)(4). And it exempts favored businesses through its theme park carveout. §501.2041(1)(g). The state offers no justification for that "differential treatment," which "suggests that the goal of the [Act] is not unrelated to suppression of expression." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983); *accord id.* at 591-92; *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229-31 (1987).

It is no secret that Florida "designed" the Act to "target" certain "speakers and their messages for disfavored treatment." *Sorrell*, 564 U.S. at 565. The "history of the Act's passage," *NIFLA*, 138 S.Ct. at 2379 (Kennedy, J., concurring), confirms as

much. Official signing statements by the governor's office and explanations by the law's sponsors repeatedly denounce "Big Tech," "Silicon Valley ideology," and "radical leftist ideology," and tout Florida's new and unprecedented law as a means to force "the leftist media and big corporations" to disseminate the speech of "conservatives." *Supra* at 15. Such avowed efforts to level the playing field are verboten under the First Amendment, and attaching supposed partisan labels to the side of the debate that is to be leveled up only makes matters worse. Florida's undisguised state-sponsored viewpoint discrimination subjects the law to the kind of strict scrutiny that no law survives. *Sorrell*, 564 U.S. at 566.

## C. Florida's Efforts to Evade Strict Scrutiny Fail.

Florida makes several attempts to skirt strict scrutiny. Each is unavailing.

### 1. Florida cannot evade strict scrutiny by labeling providers' expressive activity a mere "hosting function."

Florida first tries to brush off the serious First Amendment problems with the Act by characterizing it as regulating merely the "hosting function" of covered providers, App.Br.20-39, comparing them to the shopping mall in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), and the law school in *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). But the state's reliance on *PruneYard* and *FAIR* is misplaced. Those cases did not turn on the notion that the mall and law school were merely "hosting" speech and thus were unprotected by the First Amendment. To the contrary, they involved very different entities and activities—nothing like the online

31

service providers that make expressive editorial judgments about what speech to disseminate, and whose editorial judgments drew the state's ire because of their perceived ideological nature.

*PruneYard* involved a shopping mall that banned *all* expressive activity on its property. 447 U.S. at 77-78. The mall was not a speech forum, exercised no editorial judgments whatsoever, and had no objection to the content of the pamphleteers' speech. That is why *PruneYard*—in contrast to *Tornillo* and cases like it—involved no "intrusion into the function of editors." *Id*. at 88; *accord Pacific Gas*, 475 U.S. at 12; *Hurley*, 515 U.S. at 579-80.

*FAIR* is just as far afield. That case had nothing to do with editorial judgments or the display of third-party speech. The law schools were required to open their recruiting process to occasional military recruiters, not forced to constantly display speech that violated university standards, let alone restricted in their ability to disclaim or contextualize any views via addenda. Had the Solomon Amendment imposed restrictions at all like those here—for example, prohibiting law schools from exercising editorial control over their own speech or student message boards— the First Amendment problems would have been obvious.

In short, nothing about running a shopping mall or serving in the career-development office is "inherently expressive." *FAIR*, 547 U.S. at 64. Here, the covered providers' entire business revolves around organizing and presenting

expressive content to the world on a privately owned website, and it is precisely the expressive content of those actions and their perceived ideological skew that prompted the Act. Like the newspaper editor and parade organizer, online service providers express themselves through "the editorial function," which "itself is an aspect of 'speech.'" *Denver Area*, 518 U.S. at 737 (plurality op.). Simply saying that the parade organizers "host" parade participants or the Herald "hosts" its guest editorialists and letters to the editor would not change that critical reality.[4]

**2. The state's "three guiding principles" misunderstand the law and the facts.**

The three "guiding principles" that Florida purports to derive from *PruneYard* and *FAIR*—whether a law interferes with a "host's" own ability to speak, whether it creates a risk of listener confusion about who is speaking, and whether the "host" presents a "unified speech product," App.Br.24—do not help it.

---

[4] The state's argument here is not based on any governing legal authority, but instead appears derived from a novel academic theory suggesting that the "hosting" function differs from other functions performed by social media platforms. *See* Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. Free Speech L. 377 (2021) (coining "hosting function" terminology); App.Br.31. While the state's reliance on this theory suffers multiple defects, the state tellingly ignores the parts of the article that work against it, including its conclusions that the First Amendment protects curatorial and other similar editorial choices made by online service providers. Volokh, 1 J. Free Speech L. at 453. Indeed, the statute does not even purport to draw any distinction among hosting, curating, and recommending, applying its onerous restrictions to all those functions.

*Interference with the Ability to Speak.* First, the Act indisputably interferes with online service providers' own ability to speak. *Contra* App.Br.24-27. It does so explicitly and directly by prohibiting covered providers from editing, altering, or even posting addenda to content uploaded by "journalistic enterprises" and from removing or de-prioritizing content "about" political candidates—features of the law that Florida conveniently neglects to mention until page 42 of its brief. App.Br.42; *see* Fla. Stat. §501.2041(1)(b), (2)(j). It also does so by imposing "consistency," "notice," and "explanation" requirements every time a provider chooses to edit, alter, remove, or post addenda to any user-generated content. §501.2041(1)(b), (2)(a)-(b), (2)(d)(1), (3)(c)-(d). And it interferes more generally by overriding covered providers' protected editorial judgments about what content to present, restrict, and make available to the world. Florida can disclaim interference with providers' own speech only by "beg[ging] the core question," *Tornillo*, 418 U.S. at 256, and ignoring that the "editorial function *itself* is an aspect of speech," *Denver Area*, 518 U.S. at 737 (plurality op.) (emphasis added).

Florida insists that covered providers are "free to speak on their own behalf and make clear their own views," including by using general disclaimers to dissociate themselves from user-generated content. It also emphasizes that "concerns that in some situations it is impracticable for a host to dissociate itself from hosted speech are nonexistent here." App.Br. 25, 27. But the Act classifies as

"censorship" adding an addendum to user posts—a direct prohibition on providers' ability to speak. And even putting that aside, the possibility of disclaiming compelled speech—say, by adding a give-peace-a-chance bumper sticker to a live-free-or-die license plate—does not eliminate the First Amendment problem. Indeed, telling a speaker to "dissociate" itself from forced speech by "simply post[ing] a disclaimer" would "justify *any* law compelling speech." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 138 S.Ct. 1719, 1745 (2018) (Thomas, J., concurring in part and concurring in the judgment) (emphasis added); *see also Otto*, 981 F.3d at 863. If anything, the prospect that covered providers may feel obligated to explain away speech that they are compelled to carry only exacerbates the constitutional difficulty. "Because the government cannot compel speech, it also cannot 'require speakers to affirm in one breath that which they deny in the next.'" *Masterpiece Cakeshop*, 138 S.Ct. at 1745 (Thomas, J., concurring in part and concurring in the judgment) (quoting *Pacific Gas*, 475 U.S. at 16).

Florida attempts to distinguish *Tornillo*, *Pacific Gas*, and *Hurley* by contending that covered providers can more feasibly dissociate themselves from user-generated content than can newspapers and parade organizers. App.Br.25-27. But those cases did not turn on such practical considerations. A the-government-made-me-do-this disclaimer was not infeasible in any of those cases, it was just inconsistent with the First Amendment and our national values. Indeed, *Tornillo*

emphasized that the right-of-reply statute would fail to "clear the barriers of the First Amendment" even if it did not use up limited column space—the "intrusion into the function of editors" alone was sufficient to invalidate the law. 418 U.S. at 258.

*Risk of Confusion.* The second "guiding principle" that Florida discerns—the risk of listener confusion—fares no better. First Amendment protection does not turn on such risk. The compelled speech in *Wooley v. Maynard* was unconstitutional even though every resident of the Granite State understood that the state's slogan was mandatory and not the speech of each and every New Hampshire driver. 430 U.S. 705 (1977). Likewise, there was no hint that reader confusion mattered in *Tornillo*. No reasonable observer would have confused a political candidate's right-to-reply column as the newspaper itself doing a 180. Instead, a reasonably informed reader would understand that the state had overridden the paper's editorial judgment and forced it to carry a message that it would otherwise leave on the cutting room floor.

But even if risk of listener or reader confusion was as significant a factor as the state claims, it is present here. As the record demonstrates, users, advertisers, and members of the public often believe that providers' editorial judgments about user-generated content reflect agreement or disagreement with that content. Dkt.24-1¶¶8-11, 14-15. Florida legislators have the same view and perceive a "leftist narrative" of Silicon Valley elites emerging from providers' editorial decisions. If

those decisions are overridden and altered, which is the whole point of the Act, it is hard to understand how the public, especially outside Florida, will not be confused about whose speech they are hearing.

*Common Theme*. Finally, Florida suggests that aggregated speech products fall outside First Amendment protection unless they are "highly selective" and present a "common theme" or "overall message." App.Br.24, 29-33. No case endorses the "common theme theory," and the Supreme Court expressly rejected it in *Hurley*. There, the parade organizers were "rather lenient in admitting participants." 515 U.S. at 569. Yet the Court squarely held that "a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Id.* at 569-70; *accord Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981) ("[B]eliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.").

That is for good reason. Countless speech compilations—from op-ed pages, to open-mic events, to art fairs—do not contain a "common theme." Whether to be highly selective, somewhat selective, or open-to-all-comers is itself an exercise of editorial judgment that conveys a message about the speaker and its values. The decision to allow a freewheeling discussion that excludes only falsity and profanity is itself a protected editorial expression, and is just as constitutionally protected as

only-handmade-crafts, or all-sports-talk-radio, or a thousand other editorial choices. Newspapers' choices regarding op-ed pages and letters to the editor vary in selectivity and diversity, but no one doubts their editorial decisions are protected whether or not they present an identifiable "common theme." So too with online service providers: Some providers tout their hands-off editorial policies,[5] while others seek to foster values such as "authenticity," "safety," "privacy," and "dignity."[6] Those choices are both expressive and protected, no matter where online providers choose to draw the line.

### 3. Florida cannot evade strict scrutiny by labeling providers "common carriers."

Florida ultimately falls back on the argument that it can trample online service providers' First Amendment rights because the state has converted them, by fiat, into "common carriers." App.Br.34-39. Not so. The providers covered by the Act have never been common carriers who must accommodate all comers, no matter how false, inappropriate, unlawful, or off-topic the proposed contribution. Indeed, Congress has gone out of its way to protect providers' ability to weed out

---

[5] *See, e.g.*, Values, *Parler*, https://parler.com/values.html (last visited Nov. 8, 2021) ("Discuss and defend your values, passions, accomplishments and ideas in an environment that lets you be you, free of agenda-driven 'shadow-banning.'"); About, *Gab*, https://gab.com/about (last visited Nov. 8, 2021) ("Gab.com strives to be the home of free speech online.").

[6] Facebook Community Standards, *Facebook*, https://bit.ly/3D2ihUH (last visited Nov. 8, 2021).

objectionable content.  *See, e.g.*, 47 U.S.C. §230.  Florida cannot change that reality or evade strict scrutiny by purporting to attach a label to online service providers.

To be a common carrier, a company must "serve the public indiscriminately and not 'make individualized decisions, in particular cases, whether and on what terms to deal.'"  *Am. Orient Exp. Ry. v. STB*, 484 F.3d 554, 557 (D.C. Cir. 2007); *accord FCC v. Midwest Video Corp.*, 440 U.S. 689, 701 (1979).  In other words, it must provide "indifferent service" that accommodates all comers and "confers common carrier status."  *NARUC v. FCC*, 533 F.2d 601, 608 (D.C. Cir. 1976).  A company "will not be a common carrier where its practice is to make individualized decisions in particular cases whether and on what terms to serve."  *Id.* at 608-09.

Under those long-settled principles, the covered providers plainly do not qualify as "common carriers."  They have never held themselves out as "affording neutral, indiscriminate access" to users "without any editorial filtering."  *USTA v. FCC*, 855 F.3d 381, 392 (D.C. Cir. 2017) (Srinivasan, J., concurring in denial of rehearing en banc); *cf. Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1321-22 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) ("A video programming distributor … is constitutionally entitled to exercise 'editorial discretion over which stations or programs to include in its repertoire.'  As a result, the Government cannot compel video programming distributors to operate like 'dumb pipes' or 'common carriers' that exercise no editorial control.") (citations omitted).  To the contrary, they

maintain detailed community and content standards, and they require users to abide by those standards as a condition of access. They enforce those standards routinely, making individualized decisions about what content to present or restrict, which users to welcome or ban, and how to adapt their standards to changing circumstances, while constantly engaging in "editorial filtering."

Moreover, providers' refusal to indiscriminately take on all comers is not just an undeniable reality, it is the framework Congress affirmatively sought to promote. Congress wanted service providers to continue to be able to make editorial judgments that weed out objectionable materials, and so enacted §230 to ensure that fear of liability would *not* force providers to act as mere common carriers. Just as Congress intended, online service providers have not simply displayed all materials, no matter how objectionable or indecent, but have built their own communities according to their own values.

Florida nevertheless offers a few jumbled reasons to justify its "common carrier" label, but none withstands scrutiny. Florida primarily advances an antitrust-like analysis, declaring that certain providers' supposed "market power" justifies treating them as common carriers. App.Br.34-35. But common carrier status turns on offering service with indifference to all members of the public, not "market power." Indeed, "none of the standard judicial definitions of common carriage depend on the presence of market power." Christopher S. Yoo, *The First*

*Amendment, Common Carriers, and Public Accommodations*, 1 J. Free Speech L. 463, 467 (2021) (collecting examples); *see also* Phil Nichols, *Redefining "Common Carrier"*, 1987 Duke L.J. 501, 517-18 (same).

That is why no one thought the Herald's market power could justify Florida's right-of-reply law. *Tornillo*, 418 U.S. at 251. Although the paper had an acknowledged "monopoly" on the "marketplace of ideas" at the time, the Court held that Florida could not mandate "enforced access" in the name of countering "noncompetitive and enormously powerful" media companies, promoting "fairness," or addressing supposedly "vast accumulations of unreviewable power in the modern media empires." *Id.* at 249, 250-51. The same is true here. As in *Tornillo*, the supposed "concentration of market power" among large online service providers "does not change the governing First Amendment principles." App.1713.

Notably, moreover, Florida made no legislative findings about the "market power" of the providers targeted by the Act, which sweeps in "social media platforms" such as Etsy and Reddit that do not possess "market power" by anyone's definition. Moreover, not a single provider possesses "the physical power to silence anyone's voices, no matter what their alleged market shares may be." *Zhang v. Baidu.com*, 10 F.Supp.3d 433, 437, 441 (S.D.N.Y. 2014).

Beyond all that, the Act simply does not impose anything like actual common carriers' obligations. *Contra* App.Br.38. Far from requiring nondiscrimination, it

expressly favors certain content and speakers and exempts them from the policies and standards that apply to other users. Florida invokes §230 as somehow justifying treating providers as common carriers, App.Br.38, when the whole point of that federal law is to ensure that services do not have to become a home for all content on a non-discriminatory basis. And there is no comparison to legislative designation of telephone companies as common carriers, for telephone companies do not exercise editorial discretion over the communications they carry, and no legislature ever complained that telephone companies were forwarding a leftist agenda by blocking conservative calls. *Contra* App.Br.36. The reality is that online service providers engage in the inherently expressive editorial function, which is the very antithesis of being a mere common carrier and is a form of speech protected by the First Amendment. Florida cannot overcome that reality by slapping on the "common carrier" label. *See Denver Area*, 518 U.S. at 825 (Thomas, J., concurring in judgment in part and dissenting in part) ("Labeling leased access a common carrier scheme has no real First Amendment consequences.").

### 4. Florida's remaining efforts to evade strict scrutiny are futile.

Florida's remaining efforts to evade strict scrutiny rest on a mischaracterization of the law Florida actually passed. Florida tries to defend the "consistency" mandate as a mere regulation of conduct, not speech. App.Br.39-41. That is akin to defending a censorship regime as regulating the conduct of writing

or publishing. In reality, the "consistency" mandate is all about regulating the content of editorial judgments. *Supra* at 11-12, 15. It compels covered providers to convey content they otherwise would not, and it establishes state authorities as the ultimate arbiters of hopelessly vague "consistency." Such a law plainly triggers (and flunks) strict scrutiny. Giving it a non-discrimination veneer does not advance the ball. The whole point of the Florida law invalidated in *Tornillo* was to ensure equal treatment—*i.e.*, non-discrimination—and that was at the heart of its unconstitutionality.

Florida next offers a halfhearted defense of the provisions prohibiting or restricting covered providers from posting addenda to user-generated content— addenda that, for example, warn of potentially disturbing content or that certain content was posted by state-controlled media. App.Br.42-43. Florida does not meaningfully contest that those provisions interfere with those providers' editorial judgments, but nevertheless tries to cast the addenda restrictions as permissible "time, place, and manner" regulations. App.Br.43. That is nonsense. For one thing, the addenda restrictions are facially content- and speaker-based. They apply only to addenda to posts by "journalistic enterprises" or those applied in an "inconsistent" manner. Fla. Stat. §501.2041(1)(b), (2)(b) and (j). Such "a speaker-specific, unqualified ban on a category of expressive activity" is not a valid time, place, and manner restriction. *Fane v. Edenfield*, 945 F.2d 1514, 1519 (11th Cir. 1991), *aff'd*

507 U.S. 761 (1993).  Moreover, Florida made no legislative findings, and makes no real effort in its brief, to show that the addenda restrictions are a reasonable solution to an actual problem.  Florida hypothesizes that providers could "black out" the content of "journalistic enterprises" by posting "endless addenda," App.Br.42, 54, but the state neither points to any evidence of such "black[ing] out" nor explains why it would be reasonable to address such an issue through a total ban on addenda. The addenda restrictions are unjustified and vastly overbroad.  *See Buehrle v. City of Key West*, 813 F.3d 973, 980 (11th Cir. 2015).  On top of that, they are in severe tension with Florida's insistence that providers can easily dissociate themselves from users or content they find objectionable.

Turning to the "notice and disclosure" requirements, Florida tries to depict these as "uncontroversial commercial speech" regulations.  App.Br.43-47.  As Florida's primary authority recognizes, however, such regulations cannot survive First Amendment scrutiny if they are "unjustified or unduly burdensome."  *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985).  There can be no serious question that the onerous "notice and disclosure" provisions here impose "unduly burdensome" requirements that "chill … protected speech" as effectively as an outright ban on editorial judgment.  *NIFLA*, 138 S.Ct. at 2378.  The covered providers have millions and in some cases billions of users all across the globe, and they make countless and constant editorial judgments to remove, restrict,

warn about, and organize content. The Act requires that *every single time* providers remove, restrict, regulate, edit, or post an addendum to user-generated content— even for the most routine or obvious violations—they must provide a "thorough rationale" for their decision and a "precise and thorough explanation" of the means used, apparently including any proprietary methodologies. Fla. Stat. §501.2041(2)(d)(1), (3)(c)-(d). The Act reinforces those impracticable requirements with its mandates to publish "detailed" descriptions of the provider's editorial practices, provide notice of proprietary algorithms, tell users how many views they have received, retain users' content for months even after they have been removed for violating standards, and inform candidates of "free advertising" (an undefined term). The chilling effect of those intrusive and onerous requirements on providers' editorial judgments is plain, and Florida fails to grapple with it. Moreover, these disclosure requirements work hand-in-glove with other provisions of the law that are hopelessly content-based. For example, editorial policies must be detailed to state (and private) enforcers to permit them to challenge editorial consistency. That is not an ordinary disclosure provision; that is a censorship regime.

Finally, Florida resists the conclusion that the Act is rooted in viewpoint discrimination and impermissibly targets a subset of disfavored speakers, ignoring that the Act on its face is not neutral. App.Br.48-51. The Act's definitions ensure that it targets only "Big Tech," with a carveout for favored businesses that own theme

45

parks—a provision Florida hardly mentions in its brief. *Sorrell*, 564 U.S. at 565. The legislative findings do not explain, let alone justify, that "differential treatment," which itself "suggests that the goal of the [Act] is not unrelated to suppression of expression." *Minneapolis Star & Tribune*, 460 U.S. at 585. Nor is it any answer that the Act targets "several" large providers rather than just two or three. *Contra* App.Br.50-51. Under the relevant precedent, the fact of differential treatment itself indicates that the Act was "designed" to "target" certain "speakers and their messages for disfavored treatment." That is, of itself, sufficient to subject the Act to strict scrutiny. *Sorrell*, 564 U.S. at 565. But were there any doubt that the Act targets certain speakers and their messages for disfavored treatment, the "stated purposes" in the Act's own legislative findings, *id.*, eliminate it. These findings, as confirmed and elaborated by numerous statements of the Act's sponsors and of Florida's governor, provide overwhelming evidence of viewpoint discrimination.

The legislative findings are anything but "scrupulously neutral." App.Br.49-50; *see supra* at 15. Using a carefully gerrymandered definition of "[s]ocial media platform," the Act declares that larger providers have "*unfairly* censored, shadow banned, deplatformed, and applied post-prioritization algorithms." S.B. 7072 §1(9) (emphasis added). "Unfairly," it turns out, refers to value-based editorial judgments about viewpoint and content. That is not based on, as Florida insinuates, App.Br.48, snippets of legislative history or stray floor statements from individual legislators.

46

It is based on the governor's official signing statement, and numerous contemporary statements from the lieutenant governor and the Act's sponsor, all of whom consistently indicated that the "unfairness" complained of in the legislative findings referred to editorial decisions by "Big Tech" in favor of "radical leftist ideology." *Supra* at 15. Indeed, Florida's own brief tacitly acknowledges the viewpoint-discriminatory aims of the Act when it portrays it as a needed corrective to "preventing the distribution of contested claims about COVID-19" and "suppressing news coverage of the business dealings of the President's son." App.Br.1. That effort to re-level the playing field is viewpoint discrimination pure and simple and is just one more reason the entire Act triggers the strictest form of scrutiny.

### D. The Act Cannot Withstand Strict (or Even Intermediate) Scrutiny.

The Act cannot survive strict scrutiny, and the state does not even bother to argue otherwise. Nor could the Act withstand intermediate scrutiny if that standard applied. Under either standard, the Act and the First Amendment cannot co-exist.

Strict scrutiny requires a law to be narrowly tailored to advance a "compelling" government interest. *Reed*, 576 U.S. at 171. Intermediate scrutiny demands narrow tailoring "to serve a significant governmental interest," meaning that it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Packingham v. North Carolina*, 137 S.Ct. 1730,

1736 (2017); *see also Ams. for Prosperity Found. v. Bonta*, 141 S.Ct. 2373 (2012) (reaffirming that intermediate scrutiny requires narrow tailoring).

The Act flunks either standard, because it serves no legitimate government interest. That much is crystal clear from First Amendment precedent, which repeatedly rejects efforts to level playing fields as a legitimate government interest. The "concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976); *see also Sorrell*, 564 U.S. at 578-79 ("The State may not burden the speech of others in order to tilt public debate in a preferred direction."); *Pacific Gas*, 475 U.S. at 20 (the state "cannot advance some points of view by burdening the expression of others"). Here, as in *Tornillo*, any putative interest the state may assert in "ensur[ing] that a wide variety of views reach the public" is not sufficient to justify forcing private entities to disseminate content and viewpoints they reject. *Tornillo*, 418 U.S. at 247-48.

The Act is also not remotely narrowly tailored to "avoid unnecessary abridgement" of First Amendment rights. *McCutcheon v. FEC*, 572 U.S. 185, 198 (2014) (plurality op.). "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly." *Ams. for Prosperity*, 141 S.Ct. at 2384. The means Florida has chosen are wildly out of proportion to any legitimate interests. The Act prohibits or severely restricts editorial discretion over all material posted by

"journalistic enterprises" and "candidates," no matter how blatantly they violate community standards.  It mandates "consistency" for the entire universe of editorial judgments, from delicate and context-dependent value judgments to routine application of clear rules.  It imposes an arbitrary 30-day waiting period for all rule changes, no matter the circumstances.  And it imposes notice and disclosure obligations that are practically impossible to satisfy.  Florida does not and cannot explain why such broad and draconian restrictions and requirements are necessary to achieve its objectives, unless the objective is to punish "Big Tech" for speech the state disfavors.  *See Packingham*, 137 S.Ct. at 1737-38.

On top of all that, the Act is over- and underinclusive.  It is overinclusive because the definition of "social media platform" sweeps in large providers regardless of whether they are tools for disseminating information, e-commerce sites, or havens for fraud.  Florida has presented no "evidence to justify painting with such a broad brush."  *Washington Post v. McManus*, 944 F.3d 506, 522 (4th Cir. 2019).  The Act is also hopelessly underinclusive.  Florida has no explanation for the arbitrary theme park carveout, nor for the arbitrary size requirements that in effect exempt social media sites with a different perceived ideological bent.[7]  "Such

---

[7]     *See, e.g.*, CNET, *Parler Returns Online After Monthlong Absence* (Feb. 16, 2021), https://cnet.co/3qiJoHv (noting that 12 million people use the Parler platform).

underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S.Ct. at 2376 (quotation marks omitted).  In short, the Act "burdens too much and furthers too little, and this one-sided tradeoff falls short of what the First Amendment requires." *McManus*, 944 F.3d at 523.  The Act cannot survive First Amendment scrutiny.

The state's suggestion that the Court sever the unconstitutional provisions is no answer.  *Contra* App.Br.51-53.  The speaker-based discrimination baked into the statute's definition of covered services infects the entire Act, requiring wholesale invalidation.  *See Minneapolis Star & Tribune*, 460 U.S. at 585.  And that is to say nothing of all the other ways the Act fails First Amendment scrutiny, leaving nothing for the Court to sever.

## II.   Appellees Are Likely To Succeed On Their §230 Preemption Claim.

Florida's interference with covered providers' ability to exercise their editorial discretion and mandate that they display certain content cannot be reconciled with the plain text of §230.[8]  Section 230(c)(1) provides that "[n]o provider or user of an

---

[8]      While §230 preempts two sections of the Act, the entirety of the Act must fall under the First Amendment.  Because Appellees' likelihood of success on the merits of their First Amendment claims is clear and affects the statute in its entirety, there is no need for the Court to parse the separate preemption issues, nor do principles of constitutional avoidance favor doing so here, as the Act's intrusion on First Amendment values is central to the irreparable injury inquiry—deprivation of First

interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1). Section 230(c)(2) provides that "[n]o provider or user of an interactive computer service shall be held liable on account of" any "action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected." *Id.* §230(c)(2)(A). Section 230(e)(3), in turn, makes clear that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* §230(e)(3). These provisions preempt sections 2 and 4 of the Act.

In §230, Congress set forth its view that a "vibrant and competitive free market" of different providers, each exercising editorial discretion to establish standards suited to its online community, is the best path to ensuring that the internet remains "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. §230(a), (b). And rightly observing that the internet has "flourished, to the benefit of all Americans, with a minimum of government regulation," §230 declares that it

---

Amendment rights is a quintessential irreparable injury, while being subjected to a preempted law is not.

is "the policy of the United States" that the internet be "unfettered by Federal or State regulation." *Id.*

Congress also recognized that the internet can be abused, and that unless internet providers are able to control content on their services, dangerous, offensive, and illegal content will proliferate. *See* Telecommunications Act of 1996, Tit. V, Pub. L. No. 104-104, 110 Stat. 56, 133-39. Instead of tasking government regulators with the constitutionally dubious responsibility of policing content on the internet, Congress chose "to encourage service providers to self-regulate the dissemination of offensive material over their services." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997). In so doing, Congress enacted §230 to overrule a New York state court decision holding that a provider's adoption of community standards and its exercise of editorial discretion over some, but not all, content made it liable for all of the user-created content on its site. *Stratton Oakmont, Inc. v. Prodigy Servs.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). "Fearing that the specter of liability would therefore deter service providers from blocking and screening offensive material," Congress enacted §230 "to remove disincentives" to self-regulation. *Zeran*, 129 F.3d at 331.

None of Florida's arguments against preemption holds water. Its principal argument against §230(c)(2)(A) preemption is that the law protects only "good faith" decisions. App.Br.13-14. But the Act interferes with providers' editorial decisions

across the board, regardless of whether they are taken in good faith. Nor can Florida avoid the irreconcilable conflict with §230(c)(2)(A) by claiming that certain provisions of the Act—in particular, its restrictions on "deplatforming" and its consistency mandate—do not interfere with providers' ability to "restrict access to or availability of material." App.Br.14. Even those cherry-picked provisions are preempted. When covered providers terminate or suspend a user's account (so-called "deplatforming"), they have plainly restricted others' access to content that the user posts. Likewise, Florida's "consistency" mandate creates liability for providers based on their decisions to remove or restrict content in various circumstances. The Act empowers state officials to challenge a provider's decision to reject content on the ground that the state deems it "inconsistent." And it creates liability, in the form of significant penalties, for doing so. But that is exactly what §230(c)(2)(A) forbids.

Florida makes one final effort to avoid §230(c)(2)(A) that is flatly at odds with the plain text of the statute. Florida argues that under §230(c)(2)(A), a state is free to impose liability for *viewpoint*-based decisions, which are somehow not *content*-based decisions. App.Br.15-16. That is not a reasonable reading of the statute. By its plain terms, §230(c)(2)(A) protects an internet service from liability based on its good-faith decisions "to restrict access to or availability of material that the provider or user *considers to be* obscene, lewd, lascivious, filthy, excessively violent,

harassing, or otherwise objectionable." 47 U.S.C. §230(c)(2)(A) (emphasis added). Congress carefully chose its words to enact a subjective test, providing immunity for material that the provider "considers to be" objectionable, rather than material that "is" objectionable. *See Zango Inc. v. Kapersky Lab*, 568 F.3d 1169, 1173 (9th Cir. 2009); *cf. United States v. Martin*, 438 F.3d 621, 630 (6th Cir. 2006).[9] Whether online service providers consider content harassing or lascivious, for example, may very well turn on the viewpoint being expressed. A provider is likely to find content that disparages minority groups to be harassing, but not content that praises those same groups. The difference between lascivious content, on the one hand, and useful health information, on the other, could well turn on viewpoint. The state's specious distinction thus does not hold even if one ignores the "otherwise objectionable" language in §230(c)(2)(A).

Finally, Florida makes a cursory argument that §230 must be construed narrowly to avoid constitutional concerns. App.Br.17. Florida does not even attempt to explain what its constitutional concerns are, which is reason enough to reject its arguments. And in all events, §230 is plainly constitutional, as every court that has considered the question has held. *See Lewis v. Google LLC*, 851 F.App'x 723, 724 n.2 (9th Cir. 2021); *Green v. Am. Online, Inc.*, 318 F.3d 465, 472 (3d Cir. 2003).

---

[9]     That also readily dispenses of the state's superfluity and *ejusdem generis* arguments. App.Br.15-16.

## III. The Other Preliminary Injunction Factors Overwhelmingly Weigh In Favor Of Maintaining The Status Quo.

The other preliminary injunction factors tip decidedly in favor of maintaining the status quo. Deprivation of First Amendment rights is the quintessential irreparable injury, and the remaining stay equities are not even close. The state simply ignores the cascade of practical harms to the covered providers and the public should this law go into effect.

Because the Act is "an unconstitutional 'direct penalization' of protected speech, continued enforcement, even 'for minimal periods of time,' constitutes a per se irreparable injury." *Otto*, 981 F.3d at 870. The harm here is especially acute because the Act's sanctions for violations are especially severe; violators face up to $100,000 in statutory damages (in addition to potential punitive damages) for editorial judgments that they make hundreds of millions of times each day. Fla. Stat. §501.2041(5), (6). The Act also authorizes the state elections commission to impose serious fines for violating the candidate "deplatforming" provision— $250,000 per day for candidates for statewide office, and $25,000 per day for candidates for other offices. §106.072(3). Unless the Act is preliminarily enjoined, Appellees' members who are covered by the Act will face a perilous choice between exposing themselves to massive liability for their speech, or drastically curtailing their exercise of editorial judgment on a massive scale, across the globe, all before having a court decide the merits of their claims.

The balance of equities and the public interest "can be consolidated" when, as here, the government opposes the injunction. *Otto*, 981 F.3d at 870. Both factors favor the grant of a preliminary injunction when a plaintiff has shown a likelihood of success on the merits of a First Amendment challenge. The state has "no legitimate interest in enforcing an unconstitutional [statute]" and, as noted, "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury." *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006); *accord Otto*, 981 F.3d at 870; *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). Moreover, the state has not proceeded as if its interests demand immediate enforcement of the Act. The legislature delayed the effective date of the Act for 38 days. And when the district court enjoined the Act from going into effect, the state pursued neither a stay pending appeal nor even expedited briefing.

Finally, the public interest must account for the prospect that immediate enforcement will translate into more objectionable material being disseminated more widely on the internet. Congress has recognized that online service providers exercise editorial discretion to weed out a wide range of objectionable materials—from spammers to sex traffickers to agents of foreign governments—and acted to encourage and protect that editorial function. Florida's effort to re-level the playing field runs counter to both core First Amendment values and the public interest in

ensuring that self-regulation of objectionable content on the internet is feasible. The case for a preliminary injunction here is plain. When it comes to threatening First Amendment values, "this wolf comes as a wolf," *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting), and the remaining preliminary injunction factors tip strongly in favor of maintaining the status quo.

## CONCLUSION

For the foregoing reasons, the Court should affirm.

Respectfully submitted,

BRIAN M. WILLEN
STEFFEN N. JOHNSON
MENG JIA YANG
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1700 K Street, NW
Washington, DC 20006

PETER KARANJIA
JAMES J. HALPERT
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC  20004

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
K. WINN ALLEN
KASDIN M. MITCHELL
EVELYN BLACKLOCK
JAMES Y. XI
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

ILANA H. EISENSTEIN
BEN C. FABENS-LASSEN
DANIELLE T. MORRISON
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA  19103

*Counsel for Plaintiffs-Appellees*

November 8, 2021

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

November 8, 2021

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2021, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Eleventh

Circuit by using the CM/ECF system. I certify that all participants in this case are

registered CM/ECF users and that service will be accomplished by the CM/ECF

system.

<u>s/Paul D. Clement</u>
Paul D. Clement