No. 21-12355

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————

NetChoice, LLC, et al.,

*Plaintiffs-Appellees*,

v.

Attorney General, State of Florida, et al.,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court
for the Northern District of Florida, No. 4:21-cv-00220-RH-MAF

————————

## SUPPLEMENTAL APPENDIX FOR APPELLEES
————————

Brian M. Willen
Steffen N. Johnson
Meng Jia Yang
WILSON SONSINI GOODRICH
 & ROSATI, P.C.
1700 K Street, NW
Washington, DC 20006

Peter Karanjia
James J. Halpert
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC  20004

Paul D. Clement
 *Counsel of Record*
K. Winn Allen
Kasdin M. Mitchell
Evelyn Blacklock
James Y. Xi
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
paul.clement@kirkland.com

Ilana H. Eisenstein
Ben C. Fabens-Lassen
Danielle T. Morrison
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA  19103

*Counsel for Plaintiffs-Appellees*

November 11, 2021

# INDEX TO SUPPLEMENTAL APPENDIX

Docket/Tab #

Declaration of Matthew Schruers (June 3, 2021) ...................................... Tab 1
(Dkt.23-1)

Declaration of Netchoice, LLC (June 3, 2021).......................................... Tab 2
(Dkt.24-1)

Declaration of Alexandra Veitch (June 3, 2021)....................................... Tab 3
(Dkt.25-1)

Declaration of Neil Potts (June 3, 2021)................................................... Tab 4
(Dkt.26-1)

Declaration of Stop Child Predators (June 3, 2021) ................................. Tab 5
(Dkt.27-1)

Declaration of Technology Network (June 3, 2021)................................. Tab 6
(Dkt.28-1)

Declaration of Etsy, Inc. (June 3, 2021).................................................... Tab 7
(Dkt.29-1)

# TAB 1

## DECLARATION OF MATTHEW SCHRUERS

I, Matthew Schruers, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am President of the Computer & Communications Industry Association (CCIA). I have worked at the organization for nearly sixteen years. Upon joining the Association, I focused on legal, legislative, and policy matters, before taking on the roles of Chief Operating Officer and President. In each of these capacities, I have worked closely and communicated often with CCIA members regarding how public policy proposals affect their businesses, operations, and relationships with their users.

2.     Trust and safety operations, and online content moderation specifically, is an important area of CCIA's work and a constant focus for many of our members. As a result, I spend significant time understanding the content moderation policies and practices of CCIA's members, as well as monitoring and analyzing the legislative or policy proposals that affect this critical business function. I also interact regularly with trust and safety experts throughout the industry, and have an understanding of the challenges faced by trust and safety professionals. I have been tracking and evaluating Florida Senate Bill 7072 since before its passage so as to advise CCIA members on its provisions and impact on their businesses.

3.     The statements contained in this declaration are made upon my personal knowledge. I am over 18 years of age, and am competent to make the statements set forth herein.

**CCIA and Its Work on Content Moderation**

4.     CCIA is an international, not-for-profit membership association representing a broad cross-section of companies in the computer, Internet, information technology, and telecommunications industries. For nearly fifty years, CCIA has promoted open markets, open

systems, and open networks, and advocated for the interests of the world's leading providers of technology products and services before governments and the courts.

5.    CCIA's membership includes computer and communications companies, equipment manufacturers, software developers, service providers, re-sellers, integrators, and financial service companies. Currently, CCIA's members include: Amazon, BT Group (British Telecommunications), Cloudflare, Dish Network, eBay, Eventbrite, Facebook, Google, Intel, Intuit, McAfee, Mozilla, Newfold Digital, Pinterest, Rakuten, Red Hat, Samsung, Shopify, Stripe, Twitter, Uber, Verizon Media, Waymo, Wolt, and Zebra.

6.    Because of the broad definition of "social media platform" within S.B. 7072, a number of these members would qualify even though their services would not be considered as such by the general public. Such members span various sectors and products, and enable billions of users around the world to create and share content on their services, whether to facilitate work, study, prayer, socialization, commerce, or communications. These companies moderate and curate content as a vital part of operating their services, and some must manage a massive and constantly expanding amount of content in order to provide valuable products and tools for their users.

7.    Because content moderation is central to the operations of these members, issues surrounding content moderation constitute a significant part of CCIA's policy and advocacy work. To that end, among our other endeavors and programs in this area, CCIA is currently incubating a new non-profit organization called the Digital Trust & Safety Partnership.[1] The

---

[1] Digital Trust & Safety Partnership, https://dtspartnership.org/

members of this new partnership include CCIA members and others dedicated to identifying and preventing harmful content online.[2]

8.      This new organization aims to develop and iterate upon industry best practices for, among other things, the moderation of third-party content and behavior, with the goal of ensuring a safer and more trustworthy Internet. The Partnership's objectives include the facilitation of internal assessments, and subsequently independent third-party assessments, of participants' implementation of identified best practices for promoting the safety of their users and the online communities that they maintain. The organization balances these collective goals with the recognition that each of its member companies has its own values, product aims, digital tools, and human-led processes for moderating the extremely broad range of human expression they facilitate.

**Content Moderation: How It Works and Why It Matters**

9.      The online services provided by many CCIA members host or support a wide variety of user-created content in myriad forms—including text, videos, audio clips, and photographs. The scale of users and activity on these services is significant. Facebook[3] and YouTube[4] each has over two billion users. Every day, users watch over a billion hours of video on YouTube.[5] Over 100 billion messages are shared every day on Facebook.[6] Billions of searches are run on Google every day.[7] More than 500 hours of content are uploaded to YouTube every *minute*.[8] Pinterest's visual discovery engine draws more than 440 million

---

[2] *Tech giants list principles for handling harmful content*, Axios, https://www.axios.com/tech-giants-list-principles-for-handling-harmful-content-5c9cfba9-05bc-49ad-846a-baf01abf5976.html
[3] *Hearing Before The United States Senate Judiciary Committee Subcommittee on Privacy, Technology, and the Law*, https://www.judiciary.senate.gov/imo/media/doc/Bickert%20Testimony.pdf
[4] *YouTube has over 2 billion monthly logged-in users*, YouTube, https://blog.youtube/press/
[5] *Id.*
[6] *Company Info*, Facebook, https://about.facebook.com/company-info/
[7] *Zeitgeist 2012*, Google, https://www.internetlivestats.com/google-search-statistics/
[8] *YouTube has over 2 billion monthly logged-in users*, YouTube, https://blog.youtube/press/

visitors per month.[9] Uber, a ride-sharing platform, connects 3.9 million drivers with 91 million active consumers to serve their transportation needs, which translates into 14 million trips completed each day.[10] Amazon has more than 1.9 million small- and medium-sized businesses selling on its online store,[11] and millions of user-generated reviews are posted on the listings for the products of those businesses and others.[12]

     10.    The material uploaded to these services comes from all over the world and is incredibly diverse. The services enable and provide a forum for the height of human thought and creativity: material that is culturally significant, highly informative, brilliantly funny or satirical, and politically engaging. To raise just a few examples of notable uses of members' services during the ongoing public health crisis:

     a.    When the COVID-19 pandemic struck, and communities implemented stay-at-home orders, many small businesses turned to social media services and online tools to continue operations, engage current and prospective customers, and cultivate loyalty in a socially distant context.[13] After using Facebook Live "weekly" through the pandemic, the Tampa mayor encouraged small businesses to do the same to reach and grow their customer base.[14] Many small businesses

---

[9] *Transparency report*, Pinterest, https://policy.pinterest.com/en/transparency-report
[10] *Company Info*, Uber, https://www.uber.com/newsroom/company-info/
[11] *2020 Letter to Shareholders*, Amazon, https://www.aboutamazon.com/news/company-news/2020-letter-to-shareholders
[12] *Update on customer reviews*, Amazon, https://www.aboutamazon.com/news/innovation-at-amazon/update-on-customer-reviews
[13] *5 Small Business Owners Reveal How They Are Marketing On Social Media During COVID-19*, US Chamber, https://www.uschamber.com/co/good-company/growth-studio/promoting-business-on-social-media-during-pandemic
[14] *'Boost with Facebook' to host virtual event in Tampa Thursday to help small businesses*, Florida Politics, https://floridapolitics.com/archives/419768-boost-with-facebook-to-host-virtual-event-in-tampa-thursday-to-hep-small-businesses/

who succeeded in the "shut-in economy"[15] did so by embracing social media services and digital tools, including those offered by Florida providers.[16]

b.  Amid a quarantine of indeterminate length, schools and public services both turned to social media tools to meet the needs of distance-education students and citizens with special needs, such as by offering live captions at local government press conferences on public health via Facebook Live,[17] and live captions for remote learning via Google Meet and Zoom.[18] These virtual tools helped make life during social distancing more accessible and inclusive for people who are deaf or English-language learners,[19] as well as generally helping families communicate when they are apart.[20]

c.  Social media and digital services are also a critical tool as learning returns to the classroom. Volunteers in Leon County, Florida, including educators and parents, "through the power of social media" created a "Stock our Schools: Leon County" Facebook group with more than 4000 members[21] to help get teachers school and cleaning supplies for their classrooms through public online wish lists and

---

[15] *As COVID-19 Continues, Online Commerce Rises*, Project Disco, https://www.project-disco.org/competition/121420-as-covid-19-continues-online-commerce-rises/
[16] *Small Businesses in Florida, Georgia and New York Ready for Post-Covid Economy*, Small Business Trends, https://smallbiztrends.com/2021/04/small-business-reopening-plan.html
[17] https://tech.fb.com/powered-by-ai-new-automated-captions-are-helping-people-receive-news-and-critical-updates/
[18] *Google Meet expands live captions to 4 more languages, extends unlimited meetings*, ZDNet, https://www.zdnet.com/article/google-meet-expands-live-captions-to-4-more-languages-extends-unlimited-meetings/
[19] *Live captions come to Meet in four new languages*, Google, https://blog.google/products/meet/live-captions-new-languages/
[20] *A CODA story: Why accessible technology matters*, Google, https://blog.google/outreach-initiatives/accessibility/tonys-story-accessibility-features/
[21] *Stock our Schools: Leon County*, Facebook, https://www.facebook.com/groups/leoncountystockourschools/

contactless delivery from community volunteers.[22] The group has extended to

Florida "teachers all across the Big Bend and South Georgia."[23]

d. While Twitter has long been used by Florida sports franchises like the

Jacksonville Jaguars, Tampa Bay Rays, and Miami Heat to share game highlights

and scores, and connect with and inform fans,[24] Florida municipalities took to

using Twitter last year at the height of the pandemic to inform residents about

safety and social distancing measures. For example, Miami Beach partnered with

Twitter to encourage mask use,[25] and Leon County memorably tweeted that

residents should "keep at least 1 large alligator between you and everyone else."[26]

Other localities also reached out via other social media, like the City of

Tallahassee, whose YouTube video in April, 'Stay at home, Tallahassee',

received over 25,000 views.[27] Nor were such efforts limited to Florida; New York

and many other states used services like Instagram and Snapchat to provide

critical messages to young people and LinkedIn and NextDoor to keep residents

informed with updates.[28]

---

[22] *Leon County moms help 'Stock our Schools'*, WCTV, https://www.wctv.tv/2020/07/26/leon-county-moms-help-stock-our-schools/
[23] *Id.*
[24] Jaguars, Twitter, https://twitter.com/Jaguars; Tampa Bay Rays, Twitter, https://twitter.com/RaysBaseball;  Miami HEAT, Twitter, https://twitter.com/MiamiHEAT.
[25] *Amid 'caution fatigue,' a new social media-inspired mask campaign is heading to South Florida*, South Florida Sun Sentinel, https://www.sun-sentinel.com/coronavirus/fl-ne-twitter-billboard-mask-miami-20200924-zgtwh3wiafbw7mb4jlmyj7qaai-story.html
[26] Leon County, FL, Twitter, https://twitter.com/LeonCounty/status/1245796313658163201
[27] *Stay at home, Tallahassee*, YouTube, https://www.youtube.com/watch?v=Kp2AfBH7eDA
[28] *Amid Ongoing COVID-19 Pandemic, Governor Cuomo Launches Multi-Platform, Multi-Language Education and Awareness Campaign to Reach All New Yorkers Across the State in All Zip Codes and Communities*, New York State, https://www.governor.ny.gov/news/amid-ongoing-covid-19-pandemic-governor-cuomo-launches-multi-platform-multi-language-education

11.     By contrast, some of the material posted on online services is the polar opposite.
Because almost anyone can create an account and post content on certain social media services,
users can attempt to submit content ranging from dangerous, illegal, and abusive, to things that
are just undesirable or annoying. A few examples of content shared on the darker side of the
Internet, which trust and safety teams work around the clock to address, include:

    a. Video footage of the mass shootings targeting two mosques in Christchurch, New
Zealand that was recorded by the gunman and broadcast online, which despite
being removed within minutes, resurfaced on various other services, leading to
extensive efforts across the industry to remove the videos.[29]

    b. Videos and propaganda posted by ISIS to recruit American teenagers or otherwise
persuade them to adopt its extremist ideology.[30]

    c. Fraud schemes that specifically target older adults online; for instance, by
contacting a senior through social media, building a relationship, and then asking
for money.[31]

    d. Sexual, graphic, or otherwise disturbing content that is lawful but may be
inappropriate for certain audiences or contexts, such as on gaming platforms used
by children.[32]

---

[29] *Update on New Zealand*, Facebook, https://about.fb.com/news/2019/03/update-on-new-zealand/; *Six months after Christchurch shootings, videos of attack are still on Facebook*, NBC News, https://www.nbcnews.com/tech/tech-news/six-months-after-christchurch-shootings-videos-attack-are-still-facebook-n1056691.
[30] *This Is How ISIS Uses Social Media to Recruit American Teens*, Teen Vogue, https://www.teenvogue.com/story/isis-recruits-american-teens
[31] *Common Scams That Target the Elderly*, Senior Living, https://www.seniorliving.org/research/common-elderly-scams/
[32] *Roblox tries to deal with adult content on a platform used by many kids (2020)*, Trust & Safety Foundation, https://www.tsf.foundation/blog/roblox-tries-to-deal-with-adult-content-on-a-platform-used-by-many-kids-2020

e. Content that promotes or glorifies self-harm, including suicide, or that encourages young people to engage in dangerous conduct, such as consuming detergent pods or other bizarre behavior.[33]

12.     The companies my association represents, and many others like them, therefore have an obvious business need to address certain kinds of content and behavior, as well as to take action against abusive users who repeatedly or flagrantly violate their rules or post illegal, dangerous, or offensive material. Without the ability to respond to that content per the company's stated policies and terms of service (along with limiting the ability of repeat offenders to continue abusing the company's services), many services would be flooded with abusive, objectionable, and in some cases unlawful material, drowning out the good content and making their services far less enjoyable, useful, and safe.

13.     For that reason, CCIA members have rules governing what kinds of material and uses are, and are not, permitted.[34] That is also why these services put significant amounts of time, resources, personnel, and effort into developing sophisticated trust and safety operations to protect users and the public. The scope of these editorial efforts reflects the sheer scale and volume of user-generated content posted on popular online services.

14.     Content moderation takes many forms, including both human review and the use of digital tools that rely in part on algorithms (or other automated sorting). Moderation

---

[33] *YouTube is taking down Tide Pod Challenge videos and oh my god don't eat laundry pods*, The Verge, https://www.theverge.com/2018/1/17/16902990/youtube-tide-pod-challenge-video-take-down-community-guidelines-removal

[34] *E.g., Amazon Community Guidelines*, Amazon, https://www.amazon.com/gp/help/customer/display.html?nodeId=GLHXEX85MENUE4XF; *eBay Member Behavior Policies*, eBay  https://www.ebay.com/help/policies/member-behaviour-policies/member-behaviour-policies?id=4209; *Pinterest Community Guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines; *Facebook Community Standards*, Facebook, https://www.facebook.com/communitystandards/; *The Twitter Rules*, Twitter, https://help.twitter.com/en/rules-and-policies/twitter-rules; *YouTube Community Guidelines*, YouTube, https://www.youtube.com/howyoutubeworks/policies/community-guidelines/.

sometimes requires removing objectionable or illegal content or terminating the accounts of users who post it. But far more frequently, it involves context-specific decisions about how to arrange and display content, how best to recommend content to users based on their interests, and how easy it should be to access certain kinds of content. Instagram, for example—an image- and video-sharing service popular with younger users (which is owned by CCIA member Facebook)—has made it harder to search for graphic images involving suicide attempts and self-harm, and taken steps to stop recommending such content to users.[35]

15.    Another example of moderation is "age-gating," whereby certain content is made accessible only to adults or teenagers but not to younger children. YouTube, for example, does this extensively.[36] Content that may be age-restricted includes: videos about a cannabis dispensary; material featuring people in sexually provocative poses; material using vulgar language; or videos that show violent or gory imagery.[37]

16.    In other circumstances, moderation includes giving users tools to decide for themselves what content they wish to avoid, such as by obscuring potentially upsetting but clearly newsworthy information, blocking or muting other users (meaning that they no longer see that user's content), making certain content inaccessible to their children, or shielding themselves from material that is likely to offend sensitive users. For instance, YouTube provides a Restricted Mode that users (or institutions such as libraries and schools) can choose to activate in order to avoid such material.[38] Likewise, on Instagram, users have a variety of

---

[35] *Tightening Our Policies and Expanding Resources to Prevent Suicide and Self-Harm*, Facebook, https://about.fb.com/news/2019/09/tightening-our-policies-and-expanding-resources-to-prevent-suicide-and-self-harm/

[36] *Age-restricted content*, YouTube, https://support.google.com/youtube/answer/2802167?hl=en ("Sometimes content doesn't violate our policies, but it may not be appropriate for viewers under 18. In these cases, we may place an age-restriction on the video.").

[37] *See id.*

[38] *Disable or enable Restricted Mode*, YouTube, https://support.google.com/youtube/answer/174084?co=GENIE.Platform%3DAndroid&hl=en.

tools for controlling how they interact with other users' content, including blocking accounts or commenters, muting an account (which stops content from that user from showing up in a feed), and creating lists of words or emojis that the user does not wish to see in the comments on his or her posts.[39]

17.    Moderation can also include direct speech by service providers. Sometimes the services engage in direct speech when they have made a considered determination that particular material conveyed via their service is questionable. For example, services may decide to attach warning labels, disclaimers, or general commentary informing users that certain user-submitted content has either not been verified by official sources or may contain upsetting imagery:

    a.  Facebook adds "warning screens" over potentially sensitive content such as violent or graphic imagery, nudity, and posts related to suicide or suicide attempts.[40] Similarly, Twitter requires users who may legitimately intend to share violent or abusive but newsworthy content (such as news media, bloggers, or citizen journalists) to mark their accounts as sensitive, so that media can be placed behind interstitial warnings. This ensures unsuspecting users are not suddenly confronted with sensitive media, such as violent news coverage from war zones or mass shootings.[41]

---

[39] *Keeping Instagram a safe and supportive place*, Instagram, https://about.instagram.com/community/safety.
[40] *Providing context on sensitive or misleading content*, Facebook, https://transparency.fb.com/enforcement/taking-action/context-on-sensitive-misleading-content/
[41] *Sensitive media policy*, Twitter, https://help.twitter.com/en/rules-and-policies/media-policy

    b.  YouTube adds labels to content by state-supported media channels, including flagging sources of funding—such as for videos sponsored by the Russian government.[42]

    c.  During the 2020 election, Twitter added warning labels to Tweets making claims about election results that had not been verified by official sources.[43]

18.    Other times, however, moderation is necessary so that even the most basic online functions, like shopping or searching for local businesses or having material arranged by topic or geography, work as intended. Without prioritizing, classifying, and ordering the never-ending volume of online content, online services would have no way to deliver the content users want—or even critically need—to see. This, for example, is the essential function of Internet search engines like Google.[44] The ability to search is also an essential function of many other online services. Customers rely on services like eBay and Amazon to search for products they want to buy, and to provide helpful information and reviews about those products; users on Facebook want and expect to be able to search for people they might know; users on Pinterest want and expect to be able to search for recipes and design inspiration according to their taste and preferences.

19.    These content moderation efforts serve at least three distinct vital functions. *First*, moderation is an important way that some online services express themselves and effectuate their community standards, thereby delivering on commitments that they have made to their

---

[42] *Greater transparency for users around new broadcasters*, YouTube, https://blog.youtube/news-and-events/greater-transparency-for-users-around; *State media warning can counteract the effects of foreign misinformation*, Harvard Kennedy School Misinformation Review, https://misinforeview.hks.harvard.edu/article/state-media-warning-labels-can-counteract-the-effects-of-foreign-misinformation/

[43] *Additional steps we're taking ahead of the 2020 US Election*, Twitter, https://blog.twitter.com/en_us/topics/company/2020/2020-election-changes.html ("Tweets which include premature claims will be labeled and direct people to our official US election page.").

[44] *How Google Search works*, Google, https://www.google.com/search/howsearchworks/.

communities. Content moderation rules and enforcement actions reflect normative judgments about what will best foster the kind of environment that companies have promised to their users. Choices about whether to allow pornography, depictions of violence, or certain kinds of offensive language, for example, are all expressions of the service's own preferences— important statements about the kind of online community it wishes to foster and what speech and speakers the company wishes to associate with or avoid.

20.    *Second*, moderating content is often a matter of ensuring online safety. Some content posted online unfortunately can be highly dangerous, whether to specific individuals or to the public at large. Social media companies regularly engage in content moderation to remove material such as illegal non-consensual intimate imagery (sometimes referred to as "revenge pornography"), depictions of child sexual abuse, calls for genocide, efforts to steal people's personal information, attempts to encourage teens to commit suicide, attempts to sell illegal weapons and drugs, content that aids counterfeiting, and efforts by foreign adversaries to manipulate the American public. Any effort that hamstrings how online services respond to these egregious communications threatens the safety of those services, their users, and the public.

21.    *Third*, moderation facilitates the organization of content, rendering an online service more useful. Imagine if a search engine presented results in a random or purely chronological order—instead of prioritizing what is most relevant. Or if an online store presented a random assortment of products or listings—instead of those products the user actively sought out. For many digital services, the main utility they offer to users is the organizing, sorting, and presenting of the vast amount of information available online.

**The Importance of Curatorial Discretion**

22.      A daily challenge facing many CCIA members is pursuing these goals—
expressing the service's curatorial judgment, protecting users, and offering value—while
addressing a massive and ever-changing body of content that users generate. Each piece of
content involves different circumstances and different potential risks, which often requires an
individualized judgment by the service regarding whether it calls for moderation.

23.      Normative judgments about how content is moderated within the bounds of a
service's policies frequently involve matters of opinion and values about which people could
very well disagree. The choice of whether a violent but newsworthy video should be removed,
left up, or obscured behind an interstitial warning pursuant to a service's policy on sensitive
media is equally as expressive as a newspaper's calls about which stories make the front page,
which editorials appear in the opinion column, and what is newsworthy, as a general matter.
The difference is that online service providers are called upon to make moderation decisions on
a vast scale for immense volumes of content:

   a.   Facebook is a community of over three billion people, and over one billion
        "stories" (audio or video clips) are shared on its service every day.[45] As one
        would expect, that means that Facebook has to remove millions of pieces of
        content each year to ensure that its service is safe and enjoyable for users. In the
        first quarter of 2021, Facebook removed 8.8 million pieces of "bullying and
        harassment content," 9.8 million pieces of "organized hate content," and 25.2
        million pieces of "hate speech content."[46]

---

[45] *Company Info*, Facebook, https://about.facebook.com/company-info/
[46] *Id.*; *Community Standards Enforcement Report, First Quarter 2021*, Facebook,
https://about.fb.com/news/2021/05/community-standards-enforcement-report-q1-2021/

b. Over 500 million accounts are active daily on Instagram, where they view and/or post photos, stories, and "reels." To keep the service safe and usable, Instagram removed 5.5 million pieces of "bullying and harassment content," 324,500 pieces of "organized hate content," and 6.3 million pieces of "hate speech content" in the first quarter of 2021.[47]

c. There are more than 300 billion "pins" or pieces of posted content on Pinterest. Because the Pinterest community is not welcoming to pornography,[48] between October and December 2020, the service took down over 2.1 million distinct images containing adult content, which amounted to nearly 50 million pins (meaning that some images were pinned by users multiple times). In addition, Pinterest removed over 1.3 million discrete images or 3.4 million pins containing spam.[49]

d. In the first six months of 2020, Twitter took action against 1.9 million accounts, suspended over 900,000 accounts, and removed 1.9 million pieces of content. With respect to the removed content, the top three categories were (1) "hateful conduct," which includes the promotion of violence against people on the basis of race, gender, age, and other protected characteristics (approx. 955,000 instances); (2) "abuse/harassment" (approx. 609,000 instances); and (3) "sensitive media," including graphic violence and adult content (approx. 171,000 instances).[50]

---

[47] *Tell your brand story your way with Instagram*, Facebook, https://www.facebook.com/business/marketing/instagram; *Community Standards Enforcement Report, First Quarter 2021*, Facebook, https://about.fb.com/news/2021/05/community-standards-enforcement-report-q1-2021/
[48] *Community guidelines*, Pinterest, https://policy.pinterest.com/en/community-guidelines
[49] *Transparency report*, Pinterest, https://policy.pinterest.com/en/transparency-report
[50] Twitter Transparency Report, *Rules for Enforcement*, Twitter, https://transparency.twitter.com/en/reports/rules-enforcement.html#2020-jan-jun.

    e.   YouTube sees 500 hours of content uploaded to its platform every minute and has a community of over 2 billion users.[51] In the last three months of 2020 alone, YouTube removed just over 2 million channels and over 9 million videos for violations of its policies, the majority of which had fewer than ten views each at the time of removal due to the use of automated processes for reviewing and removing violative content.[52]

24.    The sheer number of decisions that online services are forced to make is often matched by the degree of difficulty and nuance involved in the hardest judgment calls. For certain pieces of content, there is simply no right answer as to whether and how to moderate, and any decision holds significant consequences for the service's online environment, its user community, and the public at large. To raise a few examples of such cases:

    a.   Facebook generally aims to remove content that advertises marijuana. But for some pieces of content, it can be difficult to determine whether the material in question actually *is* advertising marijuana—such as when the product is obscured by packaging or resembles other products.[53]

    b.   YouTube generally attempts to remove content that supports Nazi ideology or white supremacism. However, its policies on restricting such content are tested by material where it is not obvious whether the content is actually supporting Nazism or, instead, historical or informative in nature. For those videos, YouTube must determine whether ambiguous discussions regarding Nazism or interviews with

---

[51] *YouTube for Press*, YouTube, https://www.youtube.com/intl/en-GB/about/press/.
[52] YouTube Transparency Report, *YouTube Community Guidelines enforcement*, YouTube, https://transparencyreport.google.com/youtube-policy/removals?hl=en.
[53] *F8 2019 Day 2 keynote and session videos*, Facebook, https://engineering.fb.com/2019/05/01/ai-research/f8-2019-day-2/

white supremacists serve an educational function or, instead, glorify those ideologies.[54]

    c.   Given my role within the industry, I am aware that companies beyond CCIA's membership frequently face similar problems. For example, Spotify previously announced that it would try to harmonize its values with the artists that it promoted. In practice, this included moderating or removing the portfolios of artists that engaged in reprehensible conduct, such as sexual assault. These judgment calls, however, are sensitive in nature, and prompt comparisons to other artists that are also accused of or found responsible for misconduct.[55]

25.    To make reasonable decisions about such content, a service needs flexibility to craft policies and rules that reflect their commitment to users and to adapt those policies to the ever-changing circumstances presented by user content. It goes without saying that no service is able to anticipate unexpected forms of content *and* decide how to moderate each instance *in advance*. It is for that very reason that these services develop policies and rules that act as guidelines for their future moderation decisions—and within which each service has the ability to exercise discretion in specific instances.

26.    The content that many of CCIA's members moderate does not exist in a vacuum; it is also affected by societal circumstances and/or the service's own attitudes. Because those circumstances and attitudes also evolve over time, adapting to changed circumstances, services

---

[54] *YouTube's new policy on Nazi content results in removal of historical and education videos (2019)*, Trust & Safety Foundation, https://www.tsf.foundation/blog/youtube-s-new-policy-on-nazi-content-results-in-removal-of-historical-and; https://blog.youtube/inside-youtube/look-how-we-treat-educational-documentary-scientific-and-artistic-content-youtube/

[55] *Spotify enforces hateful conduct policy, removing artists from its platform for off-platform behavior (2018)*, Trust & Safety Foundation, https://www.tsf.foundation/blog/spotify-enforces-hateful-conduct-policy-removing-artists-from-its-platform

may view their content moderation policies differently as they gain experience and encounter new material:

    a.  Facebook, for example, has placed a greater emphasis in its content moderation on identifying and proactively suppressing racist content (such as depictions of blackface) and antisemitic content (such as content that denies the Holocaust or encourages the idea that Jews control the world), as it encounters more and more examples of that kind of content.[56]

    b.  Similarly, content moderation policies on Facebook, Instagram, Twitter, and YouTube have increasingly attempted to limit material that would encourage eating disorders or other forms of destructive self-harm.[57]

    c.  As yet another example, YouTube recently took action to limit the influence of the military in Myanmar after the military launched a coup that captured control of the government. As a result of the changing circumstances and the military's violence, YouTube prevented five television channels run by the military from conveying content via its service.[58]

    d.  Twitter's "hateful conduct policy" was updated to include "targeted misgendering or deadnaming of transgender individuals." Twitter made that change as part of a broader change to its policy on "dehumanizing language," which was expanded

---

[56] *Measuring Our Progress Combating Hate Speech*, Facebook, https://about.fb.com/news/2020/11/measuring-progress-combating-hate-speech/
[57] *Tightening Our Policies and Expanding Resources to Prevent Suicide and Self-Harm*, Facebook, https://about.fb.com/news/2019/09/tightening-our-policies-and-expanding-resources-to-prevent-suicide-and-self-harm/; *Taking More Steps To Keep The People Who Use Instagram Safe*, Instagram, https://about.instagram.com/blog/announcements/more-steps-to-keep-instagram-users-safe; *Suicide and Self-harm Policy*, Twitter, https://help.twitter.com/en/rules-and-policies/glorifying-self-harm; *Suicide & self-injury policy*, YouTube, https://support.google.com/youtube/answer/2802245
[58] *YouTube Bans Myanmar Military Channel as Violence Rises*, New York Times, https://www.nytimes.com/2021/03/05/business/youtube-myanmar.html; https://www.reuters.com/article/us-myanmar-politics-youtube/youtube-removes-five-myanmar-tv-channels-from-platform-idUSKBN2AX0BQ

"to include content that dehumanizes others based on their membership in an

identifiable group, even when the material does not include a direct target."[59]

27.     Furthermore, many digital services are "multi-sided markets," meaning that their

business model unites distinct constituencies in transactions. Users, therefore, are not the only

community whose interests these services must seek to safeguard. For ad-supported, free-to-the-

user services, advertisers constitute another critical constituency. These advertisers are wary of

what some refer to as "brand damage" should their products be advertised in proximity to

problematic content. As a result, advertisers work closely with social media companies and

other digital services to reduce the chance that their advertising dollars are perceived to support

potentially harmful content or behavior.[60]

28.     Content moderation is therefore far from static. Instead, it is a dynamic process in

which the service has to account for its own values and opinions, user preferences, and what is

happening in the world. Succeeding at that delicate balancing act requires companies to have the

freedom to change how they moderate content over time, both to best serve the needs of their

users and to protect the online environment that they are curating. Limiting changes to content

moderation policies to, at most, once a month is wholly impractical. Both the online and real

world change from second to second, and each company must be able to respond to those

changes in real time to protect its service and users.

---

[59] *Hateful conduct policy*, Twitter, https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy; *see How Twitter's Ban on 'Deadnaming' Promotes Free Speech*, New York Times, https://www.nytimes.com/2018/11/29/opinion/twitter-deadnaming-ban-free-speech.html; *Creating new policies together*, Twitter, https://blog.twitter.com/official/en_us/topics/company/2018/Creating-new-policies-together.html.
[60] *Advertisers agree deal with social media on steps to curb harmful content*, Reuters, https://www.reuters.com/article/tech-advertising/advertisers-agree-deal-with-social-media-on-steps-to-curb-harmful-content-idUSKCN26E1O1; *Facebook to develop tools for advertisers to tackle harmful content*, Reuters, https://www.reuters.com/article/us-facebook-advertising/facebook-to-develop-tools-for-advertisers-to-tackle-harmful-content-idUSKBN29Y1UJ

**The Burdens Posed by S.B. 7072**

29.     Compliance with the content moderation provisions of S.B. 7072 would be

unduly burdensome at a minimum, and may not be technically feasible at all. Due to the scale at

which the covered online services operate, much of their moderation work must be done

algorithmically—or at least with the assistance of algorithms or automated processes—in order

to function. Complying with the statute's restrictions on algorithmic content moderation would

require CCIA members to cease or limit the operation of automated tools used to block and

remove harmful, dangerous, and unlawful material. At the least, this would substantially

degrade the users' experience, but it may also place users or others at risk from dangerous,

illegal, or abusive content.

30.     The capacity to make moderation decisions algorithmically in the first instance is

vitally important to many services offered by CCIA members. Not only do these tools facilitate

the moderation of the incalculable volume of content online, but for some of the content that

requires moderation or removal—such as graphically violent, sexual, or criminal content—time

is of the essence. An important aspect of the goodwill that many members have built up with

their users over time is the ability of moderators to respond quickly to halt the spread of

dangerous, illegal, or otherwise inappropriate content before it becomes widespread. Making

certain moderation decisions algorithmically in the first instance allows the services to respond

to objectionable content in a way that preserves the user experience, promotes online safety, and

helps ensure that the communications that our members' services disseminate reflect their

community values.

31.     Millions of Floridians, and billions of people worldwide, use CCIA members'

services. And even if CCIA members could comply with S.B. 7072's content moderation

requirements (which they cannot), members generally have no way to determine whether a user either resides in Florida or claims a Florida domicile,[61] as they would need to, to ensure they are complying with the onerous procedures required with respect to such users. And it would be effectively impossible to comply with these procedures solely as to Floridians, while maintaining sufficiently economical and effective moderation and content prioritization for the services' many users outside Florida.

32.      Decisions to remove a particular item of content uploaded by a user, or to temporarily or permanently remove a user's ability to upload content to the service, serve different purposes within our members' businesses. These decisions often need to strike a balance between limiting the detrimental effects of objectionable content on the services and preserving open access. Having a full panoply of moderation tools available enables CCIA member companies to strike an appropriate balance in each situation. S.B. 7072's requirements would remove the services' ability to use some of these moderation tools in certain circumstances and would upset the delicate balance between openness and responsibility that makes many members' services usable and enjoyable by a wide variety of users.

33.      The vague requirement of consistency would make moderation by CCIA's members impossible at the scale required. At $100,000 in statutory damages per violation, the risk that any two moderation decisions will be deemed subjectively "inconsistent", along any one of multiple possible lines of comparison, by an observer with the benefit of hindsight, will make it very difficult to justify removing or moderating any content at all. Moreover, S.B. 7072

---

[61] While some services may be able to form inferences about a user's location based on information like IP addresses, such information may be unreliable, and does not substitute for knowing a user's state of residence or state of domicile. While some services may have physical addresses for users, many do not. And even those services that do possess such data cannot be certain whether the user *resides or is domiciled* at the provided address for purposes of Florida law.

makes no distinction between moderation decisions in terms of the application of the consistency requirement—whether temporary and permanent, whether a removal or a decision to make content less visible, or less readily searchable, or simply to append the service's own commentary to a given piece of content—all of these decisions must be "consistent" under S.B. 7072. Once any decision to moderate is made, every other decision to moderate or not moderate might be challenged for inconsistency with the first decision—even when failures to moderate are based on the limited capacity of the service's human moderators, and even where capacity may be reduced due to a public health emergency that prevents individual moderators from accessing the machines that they use to review and moderate content.

34.     The notice requirement that applies whenever a Florida user is "censored" or "shadow banned" would likely result in the services sending millions of such notices per day. The breadth of the statutory definitions of these terms would cause them to apply to moderation decisions that remove clearly unacceptable material, as notice is required as to every kind of content that is not considered "obscene" under state law. Each notice must also include a "thorough rationale" of why the content was moderated and a "precise and thorough explanation" of how the content came to the service's attention—again with the threat of massive statutory damages if any of these explanations is ruled deficient in hindsight by a court. Since the penalty for not sending such a notice is so significant, the services will have to err on the side of preparing and sending a notice whenever content potentially could have been submitted by a Florida resident, creating significant waste and inefficiencies. Even beyond not knowing what users reside in Florida, services will also face the risk of significant penalties whenever a user disputes the level of precision or thoroughness of a given explanation.

35.     The opt-out requirements would also require many member companies to create new metrics for sorting content on their services that do not currently exist and are not congruent with the way users actually use online services. Few if any search engines allow sorting by "most recently crawled" or "most recently changed." Furthermore, allowing users to opt out of "post-prioritization" to produce chronological posts and content would greatly increase the moderation burden for the vast majority of online services that enable their users to search for content relevant to their interests, and that strive to deliver content that users want or need to see. The services' reputations, and their ability to ensure that the content they are conveying to their users is not inconsistent with their values, would inevitably suffer as a result.

36.     The requirement not to "deplatform" political candidates, nor to apply various standard operations (which S.B. 7072 implausibly defines as "shadow banning"), nor perform "post-prioritization" to content by or about candidates, would similarly undermine the services' ability to do a wide swath of moderation activity. Taken together, due to the sweeping definition of "shadow ban" in the statute, these requirements make content supplied by broadly defined political "candidates" virtually immune to moderation except by unaided human review. The requirement that content "about" candidates similarly not be subject to algorithmic moderation or "post-prioritization" creates an additional vagueness problem, as it will not always be apparent whether a given piece of content is "about" a political candidate. Moreover, requiring that "post-prioritization" not be applied to such content creates nonsensical obligations for some services, such as search engines, and search features within certain member services, which must apply some method of organizing search results by relevance (rather than chronology), and that will necessarily fall within the definition of "post-prioritization" (in order for the search results to be usable).

37.     It hardly requires stating that the requirement not to moderate "journalistic enterprises" based on content (aside from obscenity) would likewise create serious problems for many members' ability to maintain their community standards for content. Moreover, member services have no way to determine with confidence whether a user is a "journalistic enterprise" within the meaning of the statute. The threat of liability under this requirement with respect to users that might or might not qualify as "journalistic enterprises" would only exacerbate the problem of requiring the covered services to host content that violates their community standards, by adding to the number of users who might be virtually immune to moderation.

38.     If these provisions were to go into effect, they would seriously undermine the safety and utility of the members' services. The risk of liability on the basis of various provisions of S.B. 7072 would require many member services to substantially cut back on their moderation efforts, with the foreseeable results of (1) leaving offensive and dangerous content accessible to the public via the services; (2) making maintenance of family-friendly, curated collections of user-uploaded content nigh impossible; and (3) making the services less useful for their intended purposes.

39.     For many services, a substantial proportion of the value provided to users is the service's arrangement of relevant, useful, or entertaining information in a way that provides the sort of content and experience that the user is seeking. These ways of organizing information on a service can fall afoul of the statute's definitions despite being wholly conventional and benign. The statute's broad and vague descriptions of what practices are prohibited leave a number of questions unanswered, and the provisions that are comprehensible impose practices that would severely undermine the services' value to their users.

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 3rd,

2021 in Washington D.C.

Matthew Schruers

# TAB 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| **NetChoice, LLC** d/b/a NetChoice, a District of Columbia organization; and **Computer & Communications Industry Association** d/b/a CCIA, a Virginia corporation, | **Civil Action No.:** 4:21-cv-00220-RH-MAF |
| *Plaintiffs*, | |
| v. | |
| **Ashley Brooke Moody**, in her official capacity as Attorney General of the State of Florida; **Joni Alexis Poitier**, in her official capacity as Commissioner of the Florida Elections Commission; **Jason Todd Allen**, in his official capacity as Commissioner of the Florida Elections Commission; **John Martin Hayes**, in his official capacity as Commissioner of the Florida Elections Commission; **Kymberlee Curry Smith**, in her official capacity as Commissioner of the Florida Elections Commission; **Barbra Stern**, in her official capacity as Commissioner of the Florida Elections Commission; and **Patrick Gillespie**, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services, | |
| *Defendants*. | |

## DECLARATION OF NETCHOICE, LLC
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, **Carl Szabo**, declare as follows:

1.     I am the Vice President and General Counsel of NetChoice, LLC ("NetChoice"). I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

2.     In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet.

3.     Plaintiff NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and "engages at the local, state, national, and international levels to ensure a bright digital future."[1] In particular, we are dedicated to preserving the Internet as a vibrant

---

[1] *Home,* NetChoice, https://perma.cc/3NPH-KH2T.

1

marketplace for communication, commerce, and the exchange of ideas. When online businesses are free to make their own moderation decisions, they create choices for users and advertisers alike—for example, Floridians looking for an unmoderated experience can use social media platforms like Parler; those looking for more family-friendly services can find options from several NetChoice members. All in all, we strongly believe in giving users and advertisers choices in how they use the Internet.

4.      For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services and platforms, including: Airbnb, Alibaba.com, Amazon.com, AOL, DJI, DRN, eBay, Etsy, Expedia, Facebook, Fluidtruck, Google, HomeAway, Hotels.com, Lime, Nextdoor, Lyft, Oath, OfferUp, Orbitz, PayPal, Pinterest, StubHub, TikTok, Travelocity, TravelTech, Trivago, Turo, Twitter, Verisign, VRBO, Vigilant Solutions, VSBLTY, Waymo, Wing, and Yahoo!.[2]

5.      As described in our Complaint,[3] several of NetChoice's members are subject to Florida's new law, S.B. 7072, 2021 Leg. (Fla. 2021) (the "Act"), because they meet the statutory definition of a covered "social media platform" under the

---

[2] *About Us*, NetChoice, https://perma.cc/4NPV-PLU7.
[3] Complaint, *NetChoice v. Moody*, No. 4:21-cv-00220-RH-MAF (N. D. Fla. Tallahassee Div.).

Act: they (i) allow users to post or upload content onto their platforms; (ii) are incorporated legal business entities; (iii) do business in the State of Florida; (iv) meet the Act's revenue or user-based thresholds; and (v) are not exempted under the exception for certain operators of theme parks. *See* Act § 4 (adding § 501.2041(1)(g)). Several of these NetChoice members have submitted declarations attesting to the irreparable harms they will suffer if the Act is allowed to go into effect.[4]

6.     NetChoice has over two decades of experience advocating for online businesses and the principles of free speech and free enterprise on the Internet, so we are intimately familiar with the business models our members use and rely on to provide services to users and advertisers alike. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that this Act, should it take effect, would irreparably harm our members and their business models by repelling users and advertisers and creating long-term, adverse impacts when it comes to our members' reputations. This is attested to by similarly situated technology-focused trade associations.[5]

7.     These negative effects of the Act are associative and enduring, and thus irreparable. Once the public associates an online business with harmful or offensive

---

[4] Potts Decl. (June 3, 2021); Veitch Decl. (June 3, 2021); Pavlovic Decl. (June 3, 2021).
[5] Schruers Decl. ¶ 29-39 (June 3, 2021); Esparza Decl. ¶ 4-8 (June 3, 2021).

content, it is nearly impossible to undo that association. Indeed, what common sense suggests and evidence confirms is that users and advertisers prefer not to see harmful or objectionable content online and will strongly associate that content with the platform on which they saw it.[6]

8.    That is because online services, like most businesses, rely on their reputations—which they have often spent many years diligently cultivating and protecting—to gain and maintain users and advertisers.[7] By hosting harmful or objectionable content, as the Act would force them to do, online services would suffer enduring reputational harm. Many long-time users and advertisers will likely quit or reduce use of these online services should their websites become polluted with offensive content. This content is also likely to repel potential users and turn off potential advertisers by greatly deteriorating the value and usability of these services.[8] And, as experience has shown, these deleterious effects would likely lead advertisers—the main source of revenue for many online services—to reduce or curtail their spending on advertisements on these websites.

9.    In fact, the World Federation of Advertisers—a leading global trade association for advertisers—is adamant that online services must moderate user-

---

[6] *See, e.g.*, Tiffany Hsu & Eleanor Lutz, *More Than 1,000 Companies Boycotted Facebook. Did it Work?*, N.Y. Times (last updated Nov. 17, 2020), https://perma.cc/EL62-NCDP.
[7] Veitch Decl. ¶¶ 8, 21-35 (June 3, 2021); Potts Decl. ¶ 30 (June 3, 2021).
[8] Veitch Decl. ¶ 8 (June 3, 2021)

generated content to prevent exposure to objectionable or offensive content.[9] "The issue of harmful content online," WFA's CEO Stephan Loerke explains, "has become one of the challenges of our generation. As the primary monetization mechanism of the online ecosystem, advertisers have a critical role to play in driving positive change [. . .]. A safer social media environment will provide huge benefits not just for advertisers and society but also to the platforms themselves."[10] Not only does this risk immediate financial harm to online businesses if the Act takes effect, it risks permanent, irreparable harm should any of those users or advertisers decide never to return to our members' sites based on their past experience or the detrimental feedback they have heard from others.

10.    Because many online businesses (not just social media platforms, but also online exchanges and websites that allow users to post reviews) rely on advertising as a necessary mechanism to remain in business, the decisions of advertisers to take their business elsewhere have very serious consequences for these businesses, including lost revenue and long-term reputational damage. Not only will advertisers pull their ads and funding immediately after the Act takes effect and force our members to host objectionable content, advertisers will be hesitant to return to these businesses in the future. Consider that WFA's call for advertisers to "driv[e]

---

[9] *See, e.g., WFA and Platforms Make Major Progress to Address Harmful Content*, World Federation of Advertisers (Sept. 23, 2020), https://perma.cc/YC3N-738F.
[10] *Id.*

positive change" reveals an implicit truth about online services and digital platforms: their advertising space is valuable only if it is not displayed next to harmful and offensive content that users do not want to see and advertisers do not want to be associated with. This Act, as discussed, makes our members more vulnerable to advertiser boycotts, which directly hurts their revenue and reputation. In the long run, this loss of a quintessential monetization mechanism could jeopardize the very business model on which so many of these digital services rely.

11.     Being able to moderate, organize, curate, and otherwise prioritize content is critical to our members—especially search engines, social media platforms, and other digital services that retrieve and present information responsive to user requests—so that they can deliver users and advertisers the high-quality services they demand.[11] As noted above, it is essential for our members to be able to develop a brand and customer experience that allows them to avoid exposing their users to objectionable, offensive, harmful, or unlawful content.  It is also essential that our members be able to organize and curate content in a way that is useful to users. For example, an online marketplace that displayed items in purely chronological order (rather than categorizing them by product type) would be far less helpful in connecting users with the products they are looking for. Similarly, a

---

[11] Potts Decl. ¶¶ 20-30 (June 3, 2021); Veitch Decl. ¶ 21-27 (June 3, 2021); Pavlovic Decl. ¶ 10-14 (June 3, 2021).

social media platform that is forced to deliver content in purely chronological order
may cause its users to miss out on more relevant content. This Act would deny our
members the ability to organize and display content in ways that best serve the needs
of their users.

12.   If the Act takes effect on July 1, 2021, NetChoice's mission to protect
free speech and free enterprise online would be directly and substantially hurt.
NetChoice members would also be harmed by the Act's severe restrictions on their
ability to moderate content (action that is protected under the First Amendment) and
its provisions exposing our members to potential draconian fines and a new private
right of action if they do not comply with these onerous restrictions.

13.   The Act will also limit user choice and would pollute family-friendly
websites with highly offensive and objectionable content and products, greatly
reducing the value of the services for both users and advertisers. Most users do not
want to see harmful content such as advocacy of white supremacy, advocacy of
extremism and terrorism, medical disinformation like so-called miracle cures for
Covid-19, bullying and harassment, and other highly objectionable content.
Advertisers likewise do not want their names and products displayed alongside such
content. Users and advertisers would likely abandon online businesses that are no
longer permitted to moderate offensive and harmful content.

14.   Such an outcome would greatly harm our members by directly and

durably undermining their business models. Perhaps more concerning, advertisers and users would associate this content with our members themselves, creating irreparable damage to our members' reputations and harming them well into the future. We have already seen this loss of revenue happen when advertisers removed millions of dollars' worth of ads due to the presence of "extremist content."[12] NetChoice members moved quickly to rectify the situation, but even in this short instance, NetChoice members lost millions.[13]

15.    For example, in 2017 Google's wholly owned subsidiary YouTube lost millions of dollars in advertising revenue after a number of major corporations including Walmart, Verizon, Johnson & Johnson, and Pepsi took down their ads after seeing them distributed next to videos containing extremist content and hate speech.[14] Similarly, in 2020 Facebook saw a nearly identical response as some of the largest businesses in the world including Coca-Cola, Microsoft, Starbucks, Target, Hershey, Honda, and Unilever all pulled their ads and boycotted Facebook citing concerns of third parties' use of the website to spread hate speech and

---

[12] *See, e.g.*, Olivia Solon, *Google's Bad Week: YouTube Loses Millions as Advertising Row Reaches US*, The Guardian (Mar. 25, 2017), https://perma.cc/YWQ5-BXGB; Kim Lyons, *Coca-Cola, Microsoft, Starbucks, Target, Unilever, Verizon: All the Companies Pulling Ads from Facebook*, The Verge (Jul. 2, 2020), https://perma.cc/LTC2-HKFW.
[13] *Id.*
[14] Olivia Solon, *Google's Bad Week: YouTube Loses Millions as Advertising Row Reaches US*, The Guardian (Mar. 25, 2017), https://perma.cc/YWQ5-BXGB.

misinformation.[15] While the short-term loss of revenue resulting from these examples was already substantial, it pales in comparison to the long-term reputational loss this Act will inflict on YouTube and Facebook's overall brand— not to mention the fact that such third-party content runs counter to these companies' policies and standards. Once harmful or offensive content is associated with a business, it is nearly impossible to undo the harm. The content will forever be intertwined with a user or advertiser's perception of the underlying business.

16.    Under the Act, NetChoice members will have to host content that they would otherwise remove or restrict because it violates their terms of service and moderation policies, including the harmful and objectionable forms of content referenced above. Under the Act, these online services would be significantly constrained in their ability to remove harmful content that offends their users and advertisers. For example, these online services would be prohibited from removing almost all forms of content originating from any "journalistic enterprise"[16] as defined in the Act. As a result, NetChoice members would be forced to host harmful and offensive content including but not limited to:

---

[15] Kim Lyons, *Coca-Cola, Microsoft, Starbucks, Target, Unilever, Verizon: All the Companies Pulling Ads from Facebook*, The Verge (Jul. 2, 2020), https://perma.cc/LTC2-HKFW.
[16] Fl. Stat. § 501.2041(1)(d)) (defining "journalistic enterprise" to include entities doing business in Florida that "[p]ublishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users" or "[p]ublishes 100 hours of audio or video available online with at least 100 million viewers annually").

- Racial epithets;[17]

- Nazi antisemitism;[18]

- Pornographic images and videos;[19]

- Aggressive homophobia and transphobia;[20]

- Harassment and revenge porn;[21]

- Medical misinformation and harmful at-home "remedies";[22]

- Dangerous conspiracy theories;[23] and

- Cyberbullying.[24]

17.    The Act would also leave children vulnerable to predators and would tie NetChoice members' hands in trying to protect children and stop predators from using their services to harm children.[25] As Stop Child Predators points out in its

---

[17] *See* Cheyenne MacDonald, *These Abhorrent Images From Parler Show Why Apple Upheld its Ban*, Input (Mar. 10, 2021), https://perma.cc/H7GV-ZFZQ.

[18] *See* Nathan Grayson, *Valve Removes Nazi Steam Profiles After German Complaints*, Kotaku (Dec. 11, 2019), https://perma.cc/6L8E-E7NB; Brianna Sacks, *Reddit Is Removing Nazi And Alt-Right Groups As Part Of A New Policy And Some Users Are Confused*, BuzzFeed News (Oct. 25, 2017), https://perma.cc/W7NL-CKGN.

[19] *See* Craig Timberg, Drew Harwell & Rachel Lerman, *Parler's Got a Porn Problem: Adult Businesses Target Pro-Trump Social Network*, The Washington Post (Dec. 2, 2020), https://perma.cc/2ATC-Z8SQ.

[20] *See Removing Harassing Subreddits*, Reddit (Jun. 10, 2015), https://perma.cc/65FF-TPVC.

[21] *See Removing Harassing Subreddits*, Reddit (Jun. 10, 2015), https://perma.cc/63AH-S3LP; Olivia Solon, *Inside Facebook's Efforts to Stop Revenge Porn Before it Spreads*, NBC News (Nov. 18, 2019), https://perma.cc/L44B-3PB3.

[22] *See* Beth Mole, *Facebook Bans Health and Conspiracy Site Natural News [Updated]*, ARS Technica (Jun. 10, 2019), https://perma.cc/2875-RCYS.

[23] *See* Marianna Spring, *The Casualties of This Year's Viral Conspiracy Theories*, BBC News (Dec. 26, 2020), https://perma.cc/XAD2-3528.

[24] *See* Alexandria Ingham, *7 Real Life Cyberbullying Horror Stories*, Family Orbit Blog (Nov. 11, 2018), https://perma.cc/52DW-B3JN.

[25] Rumenap Decl. ¶¶ 7-11 (June 3, 2021).

10

declaration, the Act would:

- "[R]equire online platforms to host content—legal or not—from 'journalistic enterprises'";

- "[P]rohibit[] them from using algorithms in ways that could flag, remove, restrict, or demote harmful content, including [Child Sexual Abuse Material]";

- "[A]ll but guarantee[] that the online platforms will be [hamstrung] in responding to new threats to children's online safety and to new methods of distributing or soliciting photos and videos of child sexual abuse";

- "[H]inder their ability to adapt to predators' schemes"; and

- "[G]ive child predators a roadmap to escape detection" by forcing platforms to disclose "how algorithms and content moderation work in detail."[26]

18.    The Act's harmful effects on online platforms' efforts to combat child predation and CSAM are particularly concerning given the magnitude of harm involved. With few exceptions, no business wants to be associated with material harmful to children, let alone material of child sexual abuse. And certainly no NetChoice member wants child predators to use its service or product to prey on

---

[26] Rumenap Decl. ¶¶ 8-11 (June 3, 2021).

11

children. That is why, for example, NetChoice members take seriously their responsibility to police their platforms in ways that protect children. And, as Stop Child Predators notes, those efforts resulted in over 45 million referrals to law enforcement of suspected child abuse and child exploitation in 2018 alone.[27] But under this Act, online businesses will have a far more challenging time in policing their services (i) to detect, remove, and report CSAM, (ii) to suspend or block accounts from child predators who meet the criteria for the Act's "journalistic enterprise" or "political candidate" definitions, and (iii) to use algorithms to help protect children from predation and to remove CSAM.

19.     As common sense suggests, NetChoice members do not want to host such content. Nor do they want to aid child predators. But under this Act, they would unfortunately have to do just that. The potential for reputational harm is staggering. And the potential to repel users and advertisers is even worse: Trust between NetChoice members and their users and advertisers would evaporate and be difficult to regain—and understandably so. Society, online and off, has an obligation to protect the most vulnerable among us. And to prevent or at least mitigate harm to children, which is often recurring—each time an image or video is shared, the child

---

[27] Rumenap Decl. ¶ 5 (June 3, 2021) (citing Katie Benner & Mike Isaac, *Child-Welfare Activists Attack Facebook Over Encryption Plans*, N.Y. Times (Feb. 5, 2020), https://perma.cc/E6DD-M562).

suffers again—and often permanent.[28]

20.   Further, given the sweepingly broad and vague definition of "journalistic enterprise," this moderation restriction would also elevate and protect, for example, foreign propaganda posted by RT, a cable and satellite TV channel that transmits Russian government propaganda.[29] It would also include the InfoWars website, which has more than 100,000 monthly active users and carries miracle cure ads for products such as "Super Male Vitality," which it touts with the following disclaimer:

> *These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. If you are pregnant, nursing, taking medication, or have a medical condition, consult your physician before using this product.*[30]

21.   Some Neo-Nazi websites like Stormfront would also likely meet the definition of a "journalistic enterprise" as they have surpassed the required number

---

[28] *See Paroline v. United States*, 572 U.S. 434, 457 (2014); *id.* at 468-69 (Roberts, J., dissenting); *id.* at 474-75 (Sotomayor, J., dissenting) (citation omitted) ("Congress found, for example, that the 'continued existence' and circulation of child pornography images 'causes the child victims of sexual abuse continuing harm by haunting those children in future years.').
[29] *See Where to Watch, USA*, Russia Today, https://web.archive.org/web/20201127200231/https://www.rt.com/where-to-watch/USA/ (listing carriage on, among others, Buckeye CableSystem, DISH Network, and DirecTV); *see also* Russell Goldman, *Russia's RT: The Network Implicated in U.S. Election Meddling*, N.Y. Times (Jan. 9, 2017), https://perma.cc/9BR6-VDF7.
[30] Super Male Vitality, InfoWars, https://web.archive.org/web/20210419191038/https://www.infowarsstore.com/super-male-vitality.

of average monthly users consistently in the past.[31] As such, social media sites would

have to host virtually all of the content published by these types of sites, regardless

of how patently offensive or even dangerous the content may be for certain groups

and the general public.

22.    The Act would also prohibit many NetChoice members from

suspending the account of any "candidate"—a qualification that can be satisfied just

by paying a candidate filing fee (for some offices, a fee as low as $25)[32]—regardless

of the justification for the suspension decision.

23.    The Act would also harm NetChoice members by prohibiting them

from changing their content-moderation standards or policies more than once every

30 days.[33] This would stop them from quickly and effectively responding to

dangerous or harmful trends as they emerge and before they spread virally, such as:

- The "Tide Pod challenge" (teens recording themselves eating Tide

  laundry detergent pods on video and then challenging friends to do the

---

[31] *See* Josh Harkinson, *White Supremacist Sites Claim Their Traffic Is Booming. Actually, No.*, Mother Jones (Nov. 23, 2016), https://perma.cc/URY6-5AZ9.

[32] Fl. Stat. § 106.011(3)(e)) (defining "candidate" as a person who "seeks to qualify for nomination or election by means of the petitioning process," or "seeks to qualify for election as a write-in candidate," or "receives contributions or makes expenditures, or consents for any other person to receive contributions or make expenditures, with a view to bring about his or her nomination or election to, or retention in, public office," or "appoints a treasurer and designates a primary depository," or "files qualification papers and subscribes to a candidate's oath as required by law.").

[33] *Id.* at § 501.2041(2)(c); Veitch Decl. ¶ 21-24 (June 3, 2021).

same);[34]

- The "Knockout game" (people recording themselves attempting to "knock out" an unsuspecting victim with a single strike to the head);[35]

- "Swatting" instigation;[36]

- "Deep fakes" (edited and misleading photos and videos that appear real);[37]

- Election disinformation; and

- Medical disinformation.

24.    As stated in other sworn declarations,[38] NetChoice members would incur substantial, unrecoverable costs in complying with the Act's overly burdensome requirements. These costs could not be recouped if Plaintiffs' challenge to the Act is ultimately successful on the merits.

\*       \*       \*

I, **Carl Szabo**, declare under penalty of perjury under the laws of the United

---

[34] Lindsey Bever, *Teens are Daring Each Other to Eat Tide Pods. We Don't Need to Tell you That's a Bad Idea.*, The Washington Post (Jan. 17, 2018), https://perma.cc/65X3-V44L.

[35] Gene Demby, *'The Knockout Game': An Old Phenomenon With Fresh Branding*, NPR (Nov. 27, 2013), https://perma.cc/5H35-F6XS.

[36] See Nichole Manna, *Call of Duty Gaming Community Points to 'Swatting' in Deadly Wichita Police shooting*, The Wichita Eagle (Dec. 29, 2017), https://web.archive.org/web/20210513003321/https://www.kansas.com/news/local/crime/article192111974.html; Michael Kunzelman, *Man has Plea Deal over Neo-Nazi Group's 'Swatting' Calls*, ABC News (Apr. 13, 2020), https://perma.cc/8B6P-ZZHQ.

[37] Ian Sample, *What are Deepfakes – and How Can You Spot Them?*, The Guardian (Jan. 13 2020), https://perma.cc/B2CR-HUTS.

[38] Potts Decl. (June 3, 2021); Veitch Decl. (June 3, 2021); Pavlovic Decl. (June 3, 2021).

States that the foregoing is true and correct. Executed this 3rd day of June, 2021 in

Washington, D.C.

Carl Szabo
Vice President and General Counsel
NetChoice, LLC d/b/a NetChoice

16

# TAB 3

I, Alexandra Veitch, declare as follows:

1.      I am the Director of Public Policy for the Americas at YouTube. As part of my role, I lead a team that advises the company on public policy issues around online, user-generated content. My team advises on YouTube's content moderation policies and practices, identifies when changes to our policies or their application are required in response to new challenges, and assesses policy proposals and legislation, such as Florida's Senate Bill 7072, that would affect YouTube's ability to moderate content.

2.      The statements contained in this declaration are based on my personal knowledge. I am over 18 years of age and competent to make the statements set forth herein.

*Content Moderation at YouTube*

3.      YouTube is an online platform that allows users to create, upload, and share videos with others around the world. YouTube strives to be a community that fosters self-expression on an array of topics as diverse as its user base, and to nurture a thriving creative and informational ecosystem. Over two billion logged-in users visit each month, and over 500 hours of content are uploaded every minute by an extraordinarily diverse community of creators, who span over 100 countries and 80 languages. On a daily basis, users watch over a billion hours of video on YouTube. YouTube LLC does business in Florida.

4.      With this volume of users comes a significant responsibility to protect those users. Since the beginning, YouTube has always had policies that govern how people may use the service, including restrictions on the types of content that they may post. These policies are designed and regularly updated to make YouTube a safer and more enjoyable place for users and creators. For many years, YouTube's number one priority has been the responsibility to maintain

its community as a positive, open, and useful space on the Internet. The health of our community and the success of our business depends on it.

5.    YouTube makes content moderation decisions seeking to strike the right balance between fostering freedom of expression and lessening the likelihood that users will encounter harmful content on our platform. YouTube's approach generally is to remove content that violates our policies (developed with outside experts to prevent real-world harms), reduce the spread of harmful misinformation and content that brushes up against our policy lines, and raise authoritative and trusted content. These moderation efforts, described below, are critical to cultivating a vibrant and healthy YouTube community by identifying and removing any material that violates our policies and harms our users.

6.    The company has hired over 10,000 people who are responsible for moderating content on YouTube. Those reviewers work with technology—machine learning (using algorithms)—that YouTube has developed with significant investment. In Q4 2020 alone, YouTube removed over 2 million channels and over 9 million videos for violations of YouTube's policies.[1] Further statistics (including others discussed in this declaration) may be found in the YouTube Community Guidelines enforcement report, updated quarterly. https://transparencyreport.google.com/youtube-policy/removals.

7.    We estimate that 0.16-0.18% of the views on YouTube in Q4 2020 came from violative videos.[2]

_____

[1] Of those videos, more than 30,000 contained misinformation about the Covid-19 vaccine, part of YouTube's larger effort to remove medical misinformation about the virus resulting in the removal of 1,000,000 videos related to dangerous or misleading Covid-19 information since February 2020.
[2] In other words, out of every 10,000 views on YouTube in Q4 2020, 16-18 came from videos that violate our content policies. This metric, "Violative View Rate" (VVR), is an estimate of the proportion of video views that violate our Community Guidelines in a given quarter (excluding spam). Jennifer O'Connor, *Building greater transparency and accountability with the Violative*

8.     Yet even this small amount of content can have a huge impact, both in potential

harm to our users, as well as a loss of faith in the open model that has enabled YouTube's

creative community to thrive. Failure to consistently address harmful content uploaded to the site

not only threatens the safety of our users and creators, but also threatens the safety and reputation

of our advertising partners' brands. Harmful content on our platform makes YouTube less open,

not more, by creating a space where creators and users may not feel safe or comfortable to share.

YouTube's business depends on the trust of our users and our advertisers. S.B. 7072 significantly

limits our ability to make content moderation choices and would subject YouTube to harm by

frustrating our ongoing efforts to make YouTube a far more accessible and welcoming place.

***YouTube's Community Guidelines***

9.     Our Community Guidelines provide clear, public-facing guidance on types of

content not allowed on the platform.[3] The Community Guidelines prohibit a variety of harmful,

offensive, and/or unlawful material, such as pornography, terrorist incitement, false propaganda

spread by hostile foreign governments, promotion of fraudulent schemes, spam, egregious

violations of personal privacy like revenge pornography, violations of intellectual property

rights, bullying and harassment, conspiracy theories, and dangerous computer viruses. A full list

of YouTube's Community Guidelines is available at:

https://www.youtube.com/howyoutubeworks/policies/community-guidelines/

10.     YouTube has never allowed pornography, incitement to violence, or content that

would harm children. Still, YouTube revises the Community Guidelines from time to time to

---

*View Rate*, YouTube Blog (Apr. 6, 2021), https://blog.youtube/inside-youtube/building-greater-transparency-and-accountability/
[3] We communicate our practices to all users through YouTube's Community Guidelines, which are incorporated into our Terms of Service. A user must agree to both in order to create an account and upload materials to YouTube.

account for new and different content or behavior that YouTube deems unacceptable, unsafe, or unwelcome on its service.

### *How YouTube Approaches Content Moderation*

11.     YouTube takes a multi-faceted and nuanced approach to moderating content, working to distinguish those posts that are truly problematic, those that are borderline, and those which contribute positively to the YouTube community. We have developed a diverse set of moderation tools for use in different circumstances including: age-gating, limiting access to borderline content, appending warnings, posting restrictions, showing information panels, removing video and comments, and suspending and/or terminating an account.

12.     Given YouTube's scale, it is not surprising that some users do not always abide by the Community Guidelines--so YouTube enforces them using a variety of methods, including human review and machine learning. We employ an array of remedial actions when enforcing our policies, ranging from required education and warnings, to service-usage penalties such as temporary suspensions of uploading rights and permanent termination of accounts.

13.     Moderation can also include affirmatively providing users with information to help them make choices about whether or not to interact with certain kinds of content. There are occasions when it is helpful to provide viewers with additional context about the content they are watching, and we display a variety of information panels that provide users with context on content relating to topics and news prone to misinformation, as well as the publishers of the content themselves. One example is an information panel displayed on videos from a channel owned by a news publisher.[4]  YouTube's information panels have been shown billions of times; COVID-19 information panels alone have been shown over 400 billion times.

---

[4] *Information panel providing publisher context*,
https://support.google.com/youtube/answer/7630512?hl=en

*Algorithms and Machine Learning*

14.      YouTube uses machine learning—a type of algorithm—to moderate content in

two key ways: to proactively identify and flag potentially harmful content uploaded to the site,

and to automatically remove content that is identical or substantially similar to violative content

that was previously removed. Data inputs are used to train these machine learning systems to

identify patterns in content—both the rich media content in videos, as well as textual content like

metadata and comments—so our systems can make predictions about new examples to match.

Machine learning is well-suited to detecting patterns, which helps us to identify content similar

to other content we have already removed, even before it is ever viewed. We also use hashes (or

"digital fingerprints") to automatically identify copies of known violative content before they are

ever made available for viewing.[5] These systems automatically remove content only where there

is high confidence of a policy violation—e.g., spam—and flag the rest for human review.

Algorithmic detection identifies the vast majority of content deemed to violate the Community

Guidelines.

15.      Machine learning is critical for content moderation and keeping our users safe.

YouTube relies heavily on technology and algorithms to moderate content and cannot feasibly

do otherwise, since over 500 hours of video are uploaded to YouTube every single minute of

every day. At this massive scale, it would be virtually impossible to remove content that violates

our Community Guidelines without the use of algorithmic tools, even with tens of thousands of

reviewers watching newly uploaded videos 24 hours a day, 7 days a week. By contrast,

---

[5] In Q1 2021, 27.8% of removed videos were taken down before a single view. A further 39% of
removed videos had between 1 and 10 views. Transparency Report, *YouTube Community
Guidelines enforcement*, https://transparencyreport.google.com/youtube-
policy/removals?hl=en&lu=videos_by_views&videos_by_views=detection_sources:ALL

improvements in our machine learning algorithms have resulted in a 70% decrease in the amount of views of videos violating our policies, *see* fn.2.

16.   In the first quarter of 2021, YouTube removed 9,569,641 videos that violated the Community Guidelines. The vast majority—9,091,315, or 95% of the total removals—were automatically flagged for moderation by YouTube's algorithms and removed based on human confirmation of a violation. Less than 5%—478,326 videos—were removed based on initial flags by a user or other human flagger. This removal system is highly efficient: the majority of removed videos were removed before accumulating more than 10 views. In Q1 2021, 53% of the videos removed were due to child safety issues.

17.   YouTube also removed over 1 billion comments in the first quarter of 2021, 99.4% of which were flagged for moderation by YouTube's automated systems. In Q1 2021, 55.4% of those removed comments were due to spam.[6]

18.   Our machine learning and human reviewers work hand in hand: machines are effective for scale and volume, whereas human reviewers can evaluate context for more nuanced enforcement of our policies. Once our machine learning systems flag a potentially violative video, human reviewers then remove videos that are violative while non-violative videos remain live. These decisions are in turn used as inputs to improve the accuracy of our automated detection systems so that we are constantly updating and improving the system's ability to identify potentially violative content. In addition, when we introduce a new policy or alter an existing one, it takes our systems time to improve detection rates and begin accurately detecting violative content at scale. Our enforcement of new policies improves quarter over quarter.

---

[6] YouTube uses automated systems to identify comments that are likely spam and allows video creators to permit these comments to be left on their videos or reject them.

19.     Given YouTube's scale, we sometimes make mistakes, which is why creators can appeal removal decisions. YouTube generally notifies creators when their video is removed, and we provide a link with instructions on how to appeal the removal decision. If a creator chooses to submit an appeal, the video goes to human review, and the decision is either upheld or reversed. We are transparent about our appeals process. As reported in our most recent Transparency Report, in Q1 2021, creators appealed approximately 216,000 videos, or 2% of all videos removed. Of those, more than 66,000 were reinstated.

***The Burdens Posed by S.B. 7072***

20.     The restrictions of S.B. 7072 would fundamentally burden and undermine YouTube's ability to operate responsibly and enforce its Community Guidelines. The statute has broad definitions of content moderation activities—in categories called "censor," "deplatform," "shadow-ban," and "post-prioritization"—that would, in many cases, directly prevent YouTube from enforcing critical standards designed to prevent the degradation of users' experiences on that platform and to ensure their safety, including for children. The text allows users to "opt out of post-prioritization and shadow-banning algorithms" and bans the use of those algorithms for posts by or about a political candidate. In other cases, YouTube would face an impossible choice between (1) risking significant liability by moderating content identified to violate its standards or (2) subjecting YouTube's community to harm by allowing violative content to remain on the site.

***The Need for Evolving Content Moderation Policies***

21.     S.B. 7072's prohibition on changing rules more than once every 30 days would significantly limit YouTube's ability to respond in real-time to new and unforeseen trends in dangerous material being uploaded by users, or new legal or regulatory developments. The

harms of user-generated content are ever-evolving, and YouTube's content moderation policies have necessarily had to evolve to address the same. YouTube must be able to react quickly to promote the safety of its users in changing and emerging contexts. In 2020, YouTube updated its policies related to medical misinformation alone more than ten times, which is in line with historical trends. In 2019, YouTube made over 30 updates to its content moderation policies generally—on average, once every 12 days. The same was true in 2018. Limiting YouTube's ability to update policies, as S.B. 7072 mandates, means that YouTube would be forced to host unanticipated, dangerous, or objectionable content during those windows where the law prohibits YouTube from making any changes to its content policies.

22.   Because of the demonstrated need to prevent emerging harm, YouTube has invested significantly in being able to respond quickly. YouTube's Intelligence Desk monitors news, social media, and user reports to detect new trends—such as the Tide Pod challenge—so as to address them before they become a larger issue. YouTube has over 100 people working to develop new policies and improve existing ones.

23.   YouTube's judgments evolve over time as social and cultural conditions change or unforeseen threats and challenges arise. For example, after a recent violent military coup in Myanmar, YouTube took action against five existing YouTube channels run by the Myanmar military, terminating the channels to prevent the military from promoting political propaganda.[7]

### The Importance of Editorial Discretion for YouTube

24.   YouTube needs discretion and flexibility when moderating content because it encounters such a high volume and diversity of content. YouTube's Terms of Service, Community Guidelines and other content-moderation rules include flexible terms that allow

---

[7] Paul Mozur, YouTube Bans Myanmar Military Channels as Violence Rises, NEW YORK TIMES (Mar. 11, 2021), https://www.nytimes.com/2021/03/05/business/youtube-myanmar.html

YouTube to exercise its judgment about specific uses or pieces of content. Yet S.B. 7072 requires that content moderation must be applied "in a consistent manner" with risk of liability. This requirement would limit and burden YouTube's discretion to find the right balance between free expression on YouTube and responsibility for fostering a safe community for its users.

25.    ***EDSA.*** Our content policies have an exception for videos that would otherwise be in violation if there is a compelling educational, documentary, scientific, or artistic reason, with visible context, for viewers. YouTube refers to this exception as "EDSA," which is a critical way to make sure that important speech remains on YouTube, while simultaneously protecting the wider YouTube ecosystem from harmful content.[8] These decisions depend on a variety of factors impacted by context and requiring nuance, and the bar varies by video and policy category.[9] For example, hate speech and encouragement of violence violate our policies, but a documentary about WWII that features speeches from Nazi leaders may be allowed if the documentary provides historical context and does not aim to support the despicable views promoted by the Third Reich.

26.    ***Borderline Content.*** Some problematic content, such as certain kinds of misinformation, comes close to violating our Community Guidelines but may not cross the line—what YouTube calls "Borderline Content." Borderline content is just a fraction of 1% of what is watched on YouTube in the United States. Because such borderline content may be disturbing or otherwise inappropriate for some viewers, YouTube uses algorithms to reduce its availability including disabling features like sharing, commenting, liking, and placing in

---

[8] Michael Grosack, *A look at how we treat educational, documentary, scientific, and artistic content on YouTube* (Sept. 17, 2020), https://blog.youtube/inside-youtube/look-how-we-treat-educational-documentary-scientific-and-artistic-content-youtube/
[9] Some sensitive or egregiously harmful categories are ineligible, such as child endangerment, footage of deadly violence filmed by the perpetrator, or illegal content.

YouTube's suggested videos module. After we announced changes in 2019 to our recommendation systems to reduce the spread of borderline content, there was a 70% drop in watchtime on non-subscribed, recommended borderline content in the U.S. that year. Since algorithms help identify and prevent these borderline videos from being suggested to others, S.B. 7072's restrictions on content moderation algorithms would impair YouTube's ability to effectively reduce the availability of borderline content on our site.

***Consistency and Algorithms***

27.     The "consistency" requirement would also undermine YouTube's ability to act quickly to terminate accounts that are clearly seeking to violate our Community Guidelines. When an account uploads content that violates the Community Guidelines, the content is removed and the account generally receives a warning. Subsequent violative content results in a "strike," which temporarily suspends the account's ability to upload content. Three strikes within 90 days leads to the account's termination and deletion of all content uploaded from the account. And in the case of severe abuse (such as predatory behavior, spam, or pornography), YouTube will immediately terminate accounts to protect the YouTube community.

28.     The "consistency" requirement would burden YouTube's decisions to protect its communities from harm by removing violative videos quickly. Attempting to comply would result in a significantly higher proportion of content being available on YouTube that violates the Community Guidelines. As noted above, (*id.* ¶19), no content policy enforcement system is perfect, especially at YouTube's scale. Recent examples illustrate the tension that can arise between accuracy when enforcing content policies and the need to limit potentially harmful content accessible on the site. In response to Covid-19, YouTube took steps to protect the health and safety of our extended workforce and reduced in-office staffing. As a result of reduced

human review capacity, YouTube had to choose between limiting enforcement while maintaining a high degree of accuracy, or using automated systems to cast a wider net to remove potentially harmful content quickly but with less accuracy. YouTube chose the latter, despite the risks that automation would lead to over-enforcement—in other words, removing more content that may not violate our policies for the sake of removing more violative content overall. For certain sensitive policy areas, such as violent extremism and child safety, we accepted a lower level of accuracy to ensure the removal of as many pieces of violative content as possible. This also meant that, in these areas specifically, a higher amount of non-violative content was removed. The decision to over-enforce in these policy areas—out of an abundance of caution—led to a more than 3x increase in removals of content that our systems suspected was tied to violent extremism or potentially harmful to children. These included dares, challenges, or other posted content that may endanger minors.

29.     For similar reasons, S.B. 7072's provisions banning the use of certain algorithms (categories named "post-prioritization" and "shadow ban") as to political candidates, and allowing all users to opt out of those algorithms, would greatly limit YouTube's ability to utilize machine learning for content moderation purposes. Such limitations on algorithmic enforcement would necessarily result in more views of violative and harmful content on the site while awaiting human review. Over 95% of violative content is currently flagged by algorithms. It would be impracticable for human review to keep pace with 500 hours of video uploaded every single minute of every day.

**Other Impact**

30.     **Age Gating, Restricted Mode, and YouTube Kids.** YouTube provides features, tools, and content-gated offerings to content-sensitive users and organizations (such as libraries

and families with young children). For example, YouTube uses age-gating, a process whereby certain content—such as material featuring sexual situations or graphic depictions of violence—is made inaccessible to users under age 18. YouTube also has a feature called Restricted Mode, an optional setting that sensitive users can choose to use to limit the content they see on YouTube. It is also used by libraries, schools, and public institutions. Videos containing potentially adult content like drugs or alcohol use, sexual situations, or violence are not shown to users in Restricted Mode.[10] YouTube also produces an app called YouTube Kids, which includes only videos that are determined to be suitable for children through a combination of human and algorithmic review, and which blocks access to comments more suitable for adults. Over 35 million weekly viewers in more than 100 countries use YouTube Kids. S.B. 7072 would force Restricted Mode and YouTube Kids to display all content posted by any Florida political candidate, and all content (short of legal obscenity) posted by a "journalistic enterprise," even if that content would otherwise be violative of YouTube's policies, or is content that YouTube believes in its judgment to be inappropriate for those audiences. Similarly, YouTube would have to stop age-gating such content. These changes would contradict the purpose of these features and products to give parents options for increased safety, forcing YouTube to make age-inappropriate content available to minors and other users in Restricted Mode.

31.    **Unclear User Scope.** YouTube would be unable to determine with confidence whether an account holder is subject to the Act as either (1) a Florida resident or (2) someone claiming Florida domicile (collectively, "Floridian"). A user can create a YouTube account without providing a physical address. While IP geolocation offers clues as to a user's location,

---

[10] *Your content & Restricted Mode*, https://support.google.com/youtube/answer/7354993/your-content-and-restricted-mode#guidelines&zippy=%2Cwill-my-content-show-if-my-viewers-have-restricted-mode-turned-on

those signals can be obscured by known measures, such as Virtual Private Networks ("VPNs"). And, a user's location does not identify users who are located out of state but claim domicile in Florida. To prevent liability, YouTube would have to lower its moderation standards broadly for any video and comment that might have been posted by a Floridian subject to the Act, even if the content was neither uploaded nor posted by a Floridian.

32.    **Notices.** While YouTube already alerts users when their videos or comments are removed for violating the Community Guidelines or generally when their account is suspended, YouTube does not currently provide notice in every instance where required by S.B. 7072, e.g., Section 4 (1)(b).[11]  One example is showing information panels, and just one panel, YouTube's COVID-19 information panel, has been shown over 400 billion times. The complexity of complying at this scale has a further component, since S.B. 7072 mandates that notices provide several "thorough" explanations.

33.    **"Political Candidates."**  S.B. 7072's requirement not to "deplatform" political candidates, nor to apply algorithms for "post-prioritization" and "shadow banning" to content by or about candidates, would preclude YouTube from using Community Guidelines or content moderation efforts to remove harmful content posted by such candidates. It would create a special category of users who, unlike every other YouTube user, could post violative materials harming the YouTube community without consequence. Such a category would contradict YouTube's curatorial judgment to enforce our content policies regardless of the speaker, political viewpoint, their background, their position, or their affiliations. There is also no clear way for

---

[11] "(b) 'censor' includes any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. The term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform."

YouTube's search results to comply with S.B. 7072's requirement not to apply "post-prioritization" algorithms to content about political candidates. Simply put, returning any search results requires the use of "algorithms" whose actions would fall into the broad statutory definition of "post-prioritization."

34.   **"Journalistic Enterprises."**  The prohibition against using any moderation action—including those purely by human reviewer without the assistance of algorithms—regarding content posted by "journalistic enterprises" would preclude any enforcement of the Community Guidelines as to those entities. As noted above, objectionable content uploaded by a "journalistic enterprise" would have to be shown in Restricted Mode browsing and in YouTube Kids, greatly diminishing the value of these offerings for users. The prohibition would also require YouTube to create another new category of speakers on YouTube that are immune to the same Community Guidelines applicable to everyone else. And YouTube currently discloses government or public funding for news publishers for over a thousand channels via information panels alongside their videos. YouTube would not know which entities might qualify as a covered "journalistic enterprise" under S.B. 7072, so YouTube would risk significant liability when enforcing its Community Guidelines against entities that may so qualify.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge. Executed on this 2nd day of June, 2021 in Washington, D.C.

Alexandra Veitch

# TAB 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| NETCHOICE, LLC d/b/a NETCHOICE, a 501(c)(6) District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a 501(c)(6) non-stock Virginia corporation, <br><br> Plaintiffs, <br><br> v. <br><br> ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida; JONI ALEXIS POITIER, in her official capacity as Commissioner of the Florida Elections Commission; JASON TODD ALLEN, in his official capacity as Commissioner of the Florida Elections Commission; JOHN MARTIN HAYES, in his official capacity as Commissioner of the Florida Elections Commission; KYMBERLEE CURRY SMITH, in her official capacity as Commissioner of the Florida Elections Commission; and PATRICK GILLESPIE, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services, <br><br> Defendants. | Civil Action No.: 4:21-cv-00220-RH-MAF <br><br> **DECLARATION OF NEIL POTTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

DocuSign Envelope ID: EF85558D-4816-47C0-9E74-E464F44C43AC

I, Neil Potts, declare as follows:

1.     I am currently a Vice President, Trust & Safety Policy, at Facebook, Inc. ("Facebook"), and have been employed there since April 2016. I am over the age of 18 years and maintain an office at 1601 Willow Road, in Menlo Park, California. I make this Declaration in support of Plaintiffs' Motion for Preliminary Injunction in the above-captioned matter. I have personal knowledge of the matters set forth in this Declaration and if called as a witness, I could and would testify under oath as follows.

2.     In my role at Facebook, I am familiar with Facebook's content policies and practices, including Facebook's Terms of Service and Community Standards.

## Background

3.     Facebook was founded in 2004. Its products enable more than 3 billion people around the world to share ideas, offer support, and discuss important issues, including politics, public health, and social issues. Users of Facebook's products share over a billion stories and over 100 billion messages, every day.

4.     On Facebook, people can share status updates, photos, videos, and links (among other types of content) with family and friends. People can also follow Pages managed by businesses, organizations, and public figures (such as politicians or celebrities) that share content, as well as join Groups or attend Events

that relate to topics of interest to them. These are some of the many ways in which people can share and interact with others on Facebook.

5.     The average person could be flooded with millions of posts each day from people all over the world, but most people do not have time (or interest) to look at all of their available content. As a result, Facebook has invested significant resources to develop systems to "rank" content that users are most likely to find relevant and meaningful. The rankings are unique to each user and are informed by their individual choices and actions (both historical and real-time).

6.     Facebook displays ranked content in News Feed, a feature it launched in 2006. News Feed uses algorithms to show a constantly updated and personalized list of stories--for example, vacation pictures from friends, videos from family gatherings, articles from local or national news outlets, and much more.

## **Content Moderation**

7.     Facebook's mission is to empower people to build community and bring the world closer together.

8.     Facebook has invested substantial resources to maintain a safe experience for its community. People will not use Facebook if they do not feel safe. Similarly, advertisers will not advertise on Facebook if they believe it is not effective at removing harmful or offensive content. Users and advertisers have stopped using Facebook for this very reason.

Case 4:21-cv-00220-RH-MAF   Document 26-1   Filed 06/03/21   Page 4 of 12

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC
USCA11 Case: 21-12355   Document: 55   Date Filed: 11/12/2021   Page: 65 of 97

9.      Facebook has long recognized the importance of giving its users a voice and allowing debate on topics about which people may disagree. But content that harasses, threatens, seeks to defraud, or violates the rights of other users makes the community less safe and/or puts people at risk of harm.

10.     Facebook has over many years developed robust policies and practices relating to content moderation. Facebook continues to refine these policies and practices based on its experience, evolving societal norms, extraordinary current events, and input from external stakeholders and experts (among others). Moderating speech often involves difficult judgment calls--a task further complicated by the sheer volume of content appearing online, global reach of Facebook's products, and absence of vital context typically accompanying speech in the offline world.

11.     Facebook's publicly available Terms of Service[1] (to which people must agree to use the service) and Community Standards[2] (which people agree not to violate) describe what content is acceptable. Facebook has had terms and policies like these in place for many years, though the specific requirements have evolved.

---

[1] Facebook's Terms of Service is available at:  https://www.facebook.com/terms.php.
[2] Facebook's Terms of Service is available at:  https://www.facebook.com/communitystandards/.

12.    The Terms of Service prohibit users from doing or sharing anything that is "unlawful, misleading, discriminatory or fraudulent" or that "infringes or violates someone else's rights, including their intellectual property rights."

13.    The Community Standards provide details about what content is not allowed on Facebook. The Community Standards are organized into five categories: (i) violence and criminal behavior, (ii) safety, (iii) objectionable content, (iv) integrity and authenticity, and (v) respecting intellectual property. Within each of those five categories, the Community Standards identify additional subcategories, such as "adult nudity and sexual activity" or "hate speech." Users can see Facebook's policy rationale for prohibiting each category of content and examples. For example, the Community Standards explain that "hate speech" is not allowed on Facebook. Notwithstanding, Facebook recognizes that people sometimes share content that includes someone else's hate speech to condemn it or raise awareness. In other cases, speech that might otherwise violate our standards can be used self-referentially or in an empowering way.  Facebook's policies are designed to allow room for these types of speech. The Community Standards also include information about when content may be accompanied by a sensitivity warning.

14.    Facebook relies on both automated and human review to enforce its terms and policies at scale. For many categories, Facebook's artificial intelligence

systems find more than 90% of the content it removes before anyone reports it.
Facebook also has over 35,000 people working on safety and security. Teams
across the company work together to, for example, prevents millions of attempts to
create fake Facebook accounts and remove million pieces of content containing
adult nudity, sexual activity, bullying and harassment, child nudity and sexual
exploitation of children, and hate speech, content shared by terrorist and organized
hate groups, and content that violates intellectual property rights. Facebook
publicly shares information about its enforcement efforts in its Transparency
Center.[3]

15.    Facebook regularly publishes updates about its efforts to remove harmful
content and protect its community. For example, in September 2018, Facebook
published an article on how it uses artificial intelligence on Facebook to help
suicide prevention efforts.[4] In October 2019, Facebook published an article about
the substantial efforts it had undertaken to protect against efforts to interfere with
the 2020 U.S. election.[5] In June 2020, Facebook published an article related to
labels it would add to content and ads from entities believed to be state-controlled
media; in February 2021, Facebook announced it would add informational labels to

---

[3] Facebook's Transparency Center is available at:  https://transparency.fb.com/data/.
[4] https://about.fb.com/news/2018/09/inside-feed-suicide-prevention-and-ai/.
[5] https://about.fb.com/news/2019/10/update-on-election-integrity-efforts/.

some posts related to climate change.[6] In May 2021, Facebook published a threat report on efforts it is taking to protect against influence operations aimed at manipulating or corrupting public debate on Facebook by governments, commercial entities, politicians, and conspiracy and fringe political groups.[7]

16.    Facebook has had to implement changes to its policies and practices in response to extraordinary situations. For example, following Myanmar's military coup in February 2021, Facebook reduced the distribution of misinformation shared by the Myanmar military but also protected content, including political speech, that allowed "the people of Myanmar to express themselves."[8] Facebook also revised its policies as information emerged during the COVID-19 pandemic.[9]

17.    Facebook has an appeals process for users to request review of most of its enforcement decisions. If Facebook determines it made an incorrect judgment, it will restore the content. In May 2020, Facebook established an external Oversight Board to review some of the most difficult enforcement decisions; the Oversight Board's decisions are binding on Facebook. Facebook also relies on independent, third-party fact-checkers to help identify and review certain types of content. If a

---

[6] https://about.fb.com/news/2020/06/labeling-state-controlled-media/; https://about.fb.com/news/2021/02/connecting-people-with-credible-climate-change-information/.
[7] https://about.fb.com/news/2021/05/influence-operations-threat-report/.
[8] https://about.fb.com/news/2021/02/an-update-on-myanmar/.
[9] https://about.fb.com/news/2020/04/covid-19-misinfo-update/.

DocuSign Envelope ID: EF85E58D-4815-47C0-9E74-E464F44C43AC

fact-checker determines a particular post contains false information, Facebook will label the content and reduce its distribution.

18.    Facebook also has tools that enable users to curate their own News Feeds-- for example, choosing a list of "Favorite" friends and pages to feature, and blocking content from certain users or Pages or reporting content they believe is inappropriate. Facebook has rolled out other features in response to feedback, such as the ability to turn off a counter displaying how many people have "liked" a post or photo.

19.    Facebook has implemented a number of changes over the years to the way it ranks and prioritizes content in News Feed. For example, in January 2018, Facebook announced changes to prioritize content from friends, family, and Groups in News Feed. Facebook recognized this change would likely decrease the amount of time users spent on Facebook, which it did, but believed it would be good for the community and its business over the long term. Facebook also announced recently that users were requesting to see less political content in their News Feeds and so it was studying ways to reduce the prominence of such posts.[10]

---

[10] https://about.fb.com/news/2021/02/reducing-political-content-in-news-feed/.

## S.B. 7072's Impact on Facebook

20.    I understand that on or around May 25, 2021, the State of Florida enacted S.B. 7072, 2021 Leg. (Fla. 2021) (the "Act"), which is set to go into effect on July 1, 2021.  I understand Facebook's products will be subject to the Act.

21.    The Act will significantly undermine, if not outright prevent, Facebook from enforcing its content policies and will require substantial and burdensome changes to the design and operation of its products. I will describe some examples below.

22.    I understand the Act will severely restrict Facebook's ability to enforce its policies against people or entities that qualify as "journalistic enterprises." To the extent Facebook can know who even qualifies, this requirement apparently will force Facebook to carry content posted by any entity meeting this definition, regardless of whether they post hate speech, or sexually explicit or graphic content. Nor apparently could Facebook remove content from a "journalistic enterprise" engaged in U.S. election interference. This provision also seemingly prevents Facebook from adding labels to content from media companies Facebook believes are controlled by foreign governments.

23.    I understand the Act will prohibit services like Facebook from terminating or suspending the accounts of "political candidates," no matter how egregious or illegal the candidate's conduct. Likewise, Facebook apparently could not remove a

8

candidate's account even if she or he were believed to be a foreign operative

interfering in U.S. elections.

24.     Further, I understand the Act will prevent Facebook from enforcing its

policies against content anyone might post "about" such candidates.  This

provision apparently would prevent Facebook from removing hate speech or

violent threats directed at a candidate and labelling content believed to be an AI-

modified video, or a "deep fake."

25.     I understand the Act mandates enforcement of content policies in an

undefined "consistent manner." I understand Facebook could face liability if, for

example, it removed or reduced the distribution of content posted by one user, but

not similar content posted by another user, regardless of where such users resided

and/or shared the content and regardless of vital context. Because Facebook users

reside throughout the world and can share content with anyone, and Facebook

enforces its policies globally, the Act effectively will impact more than 2 billion

Facebook users around the world.

26.     Furthermore, given the sheer volume of content posted on Facebook every

day, and because the service is personalized based on what individual users want to

see, it will be near impossible for Facebook to treat similar content "consistently"

in every instance (even though it endeavors to do so). Facebook will face the

impossible choice of ceasing enforcement of its policies and no longer

DocuSign Envelope ID: EF85E68D-4815-47C0-9E74-E464F44C43AC

personalizing the product experience, or incurring potentially significant liability from treating allegedly similar content differently, even if inadvertently. Facebook apparently will be precluded from shielding teens from content containing violence or nudity. And Facebook will be forced to consider extraordinary changes to its algorithms and other ranking systems, to mitigate the risk that it is charged with treating similar content "inconsistently."

27.    I understand the Act will restrict Facebook's ability to label content, given the potential charge that labels are applied "inconsistently." Facebook effectively will be precluded from warning users, including teens, before viewing graphically-violent content or about content independent fact-checkers have determined is false.

28.    I understand the Act will impose disclosure obligations every time Facebook removes content that violates its policies or, potentially, when Facebook prioritizes content (which happens every time a user loads her or his News Feed since our product experiences are personalized). Given the extraordinary scale of Facebook's systems and enforcement efforts, as described above and in Facebook's transparency reports, this provision would impose an enormous burden on Facebook, to the extent compliance is even feasible. The Act would also give bad actors a roadmap for evading Facebook's enforcement efforts and make it harder to keep harmful content off Facebook.

DocuSign Envelope ID: EF85E58D-4815-47C0-9F74-E464F44C43AC

29.     I understand the Act requires Facebook to "categorize algorithms used for post-prioritization and shadow banning." Though the Act does not explain what information is sufficient to satisfy these requirements, it seemingly requires Facebook to disclose non-public, sensitive information regarding how its algorithms and internal processes operate, which would cause substantial competitive harm to Facebook.

30.     In short, if the Act's restrictions go into effect, it will, among other things, force Facebook to display, arrange, and prioritize content it would otherwise remove, restrict, or arrange differently; it will chill Facebook's own speech; it will lead some users and advertisers to use Facebook less or stop use entirely; it will force Facebook to substantially modify the design and operation of its products; it will force Facebook to disclose highly sensitive, business confidential information; and it will impose excessive burdens on Facebook to notify users every time their content is removed, restricted, or labeled.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 3rd day of June, 2021, in Fall Church, Virginia.

Neil Potts

# TAB 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

NETCHOICE, LLC d/b/a NETCHOICE,
a District of Columbia organization; and
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION d/b/a
CCIA, a Virginia corporation,

        Plaintiffs,

v.

ASHLEY BROOKE MOODY, in her
official capacity as Attorney General of
the State of Florida; JONI ALEXIS
POITIER, in her official capacity as
Commissioner of the Florida Elections
Commission; JASON TODD ALLEN, in
his official capacity as Commissioner of
the Florida Elections Commission;
JOHN MARTIN HAYES, in his official
capacity as Commissioner of the Florida
Elections Commission; KYMBERLEE
CURRY SMITH, in her official capacity
as Commissioner of the Florida
Elections Commission; BARBRA
STERN, in her official capacity as
Commissioner of the Florida Elections
Commission; and PATRICK
GILLESPIE, in his official capacity as
Deputy Secretary of Business Operations
of the Florida Department of
Management Services,

        Defendants.

Civil Action No.: 4:21-cv-00220-RH-MAF

## DECLARATION OF STOP CHILD PREDATORS
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Stacie D. Rumenap, declare as follows:

1.     I am President at Stop Child Predators (SCP), an organization founded in 2005, to combat the sexual exploitation of children and protect the rights of crime victims nationwide. I have led SCP since 2006, having worked in all 50 states – including spearheading the passage in 46 states of Jessica's Law, which originated in Florida – on laws and educational efforts to bring together a team of policy experts, law enforcement officers, community leaders, and parents to launch state and federal campaigns to inform lawmakers and the public about policy changes that will protect America's children from sexual predators both online and in the real world.

2.     We work with parents, lawmakers, and technology companies to better educate families, schools, and lawmakers about the potential risks children face online, including grooming, luring, bullying, child pornography, and other harms to children.

3.     We also launched the Stop Internet Predators (SIP) initiative in 2008 because sex offender management and child safety must be addressed both in the real world and online. SIP recognizes that child predators often use online social-networking platforms to recruit child sex-trafficking victims, to groom children for

1

sexual exploitation, and to sexually victimize children in general. Because previously convicted and registered sex offenders are the most identifiable and likely class of predators to target children online, we focus our policy efforts on keeping social media and the Internet more broadly safe for children.

4.      To do this, we work with leading online platforms, including Plaintiffs' members, to develop and enforce content-moderation and safety policies that prioritize children's safety while still promoting free speech. Our goal is to help these businesses develop tools and mechanisms to identify illegal content—Child Sexual Abuse Material—as soon as possible so that children are not exposed to abuse.

5.      Unfortunately, CSAM is prolific on the Internet. In 2018 alone, leading social media platforms reported over 45 million photos and videos of children being sexually abused.[1] In fact, there are so many reports of child exploitation that FBI and Department of Justice officials said it would require assigning cases to every FBI agent. The government does not presently have the resources to do that.[2]

6.      The government's limited resources underscore the critical importance of private moderation and filtering technologies. In order to detect CSAM, as well as to report it to authorities, online companies must develop and use advanced

---

[1] Katie Benner & Mike Isaac, *Child-Welfare Activists Attack Facebook Over Encryption Plans*, N.Y. Times (Feb. 5, 2020), https://www.nytimes.com/2020/02/05/technology/facebook-encryption-child-exploitation.html.
[2] *Id.*

algorithms and other screening tools.

7.     If Florida's S.B. 7072, 2021 Leg. (Fla. 2021) (the "Act") is allowed to go into effect on July 1, 2021, we are concerned that it would be harder to remove objectionable content online.

8.     The online platforms we work with remove millions of pieces of content that would enable child predation and harm children. We have grave concerns that the Act will impede their ability to remove such content and undermine my group's efforts to stop child predation. Not only does the Act require online platforms to host content—legal or not—from "journalistic enterprises," it also prohibits them from using algorithms in ways that could flag, remove, restrict, or demote harmful content, including CSAM.

9.     Equally concerning is the Act's limit on the number of changes online platforms can make to their algorithms each month. Under the Act, platforms may not change their algorithms more than once every 30 days. This restriction all but guarantees that the online platforms will be hamstringed in responding to new threats to children's online safety and to new methods of distributing or soliciting photos and videos of child sexual abuse. It will also hinder their ability to adapt to predators' schemes. As history and experience have shown, predators continue to find a way around existing safeguards, requiring us, the platforms, and the public to remain ever vigilant.

10.     Similarly, the Act's disclosure requirements give child predators a roadmap to escape detection. If they know how algorithms and content moderation work in detail, they will have an even easier time preying on vulnerable children.

11.     Likewise, the Act's onerous obligations for account and content removal will likely cause online platforms to moderate less aggressively. That is particularly concerning at a time when we need even more moderation and even more filtering.

12.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 2nd day of June, 2021 at 3:00 pm.

_____
Stacie D. Rumenap

4

# TAB 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

NETCHOICE, LLC d/b/a NETCHOICE,
a District of Columbia organization; and
COMPUTER & COMMUNICATIONS
INDUSTRY ASSOCIATION d/b/a
CCIA, a Virginia corporation,

        Plaintiffs,

   v.

ASHLEY BROOKE MOODY, in her
official capacity as Attorney General of
the State of Florida; JONI ALEXIS
POITIER, in her official capacity as
Commissioner of the Florida Elections
Commission; JASON TODD ALLEN, in
his official capacity as Commissioner of
the Florida Elections Commission;
JOHN MARTIN HAYES, in his official
capacity as Commissioner of the Florida
Elections Commission; KYMBERLEE
CURRY SMITH, in her official capacity
as Commissioner of the Florida
Elections Commission; BARBRA
STERN, in her official capacity as
Commissioner of the Florida Elections
Commission; and PATRICK
GILLESPIE, in his official capacity as
Deputy Secretary of Business Operations
of the Florida Department of
Management Services.

        Defendants.

Civil Action No.:

## DECLARATION OF TECHNOLOGY NETWORK
## IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
## INJUNCTION

I, Servando Esparza, declare as follows:

1.      I am the Executive Director of Texas and the Southeast at TechNet. As TechNet's executive director for Texas and the Southeast, I develop and manage TechNet operations in the Southeast region of the United States, coordinating with TechNet members, TechNet's vice president of state policy and government relations, and other TechNet staff. I work closely, in a bipartisan fashion, with state legislators and their senior staff, policymakers in the executive branch of state governments and at state regulatory bodies, and TechNet members to lobby and advocate on behalf of TechNet's agenda before state legislatures.

2.      Technology Network (dba TechNet) is the national, bipartisan network of technology CEOs and senior executives that promotes the growth of the innovation economy by advocating a targeted policy agenda at the federal and 50-state level. TechNet's diverse membership includes dynamic American businesses ranging from startups to the most iconic companies on the planet and represents more than three and a half million employees and countless customers in the fields of information technology, e-commerce, the sharing and gig economies, advanced energy, cybersecurity, venture capital, and finance. TechNet is a 501(C)(6) trade association based in Washington, DC. TechNet represents its members at the state

1

and federal levels of government by advocating for or against legislation that affects its members.

3.      TechNet's work is guided by our federal and state policy principles, which cover a broad set of policy issues. At the state level, these include privacy and security, energy, education and workforce development, financial technology, diversity, and inclusion, new technologies and the future of work, automated vehicles, procurement, smart infrastructure, and taxation. TechNet's policy principles are decided by TechNet members on an annual basis and outlined on TechNet's website[1]. TechNet represents more than 80 companies including Facebook, Google, Amazon, eBay, Apple, AT&T, DoorDash, Dell, HP, Lyft, Uber, and many others. Social media platforms as defined in S.B. 7072, 2021 Leg. (Fla. 2021) ("the Act") would include several TechNet members including Facebook, Google, and Amazon ("affected TechNet members").

4.      Social media platforms understand that they have an obligation to remove objectionable content, otherwise their users will be subjected to dangers like images of child endangerment, financial scams, spam, and other harmful links. Companies take this responsibility seriously, removing harmful content in an unbiased manner while keeping their services open to a broad range of ideas. In the overwhelming number of cases, removal of offensive content is accomplished as

---

[1] See www.technet.org.

intended. However, the sheer volume of content – hundreds of millions of posts per day – ensures that both artificial intelligence and human reviewers at companies cannot get it right 100 percent of the time. Billions of transactions, after all, will inevitably lead to errors. The Act will allow users to sue social media platforms merely for enforcing their content policies – standards that are laid out in detail on the platforms' websites.

5.     The Act perversely creates an incentive for affected TechNet members to not prohibit and remove any objectionable content on their social media platforms in order to avoid being accused of violating F.S. § 501.2041 (h)(2)(d) and being sued by a user. Florida Statutes § 501.2041 (h)(2)(d) would prohibit affected TechNet members from taking any moderation action (which the Act includes in broadly defined categories named "censor" or "shadow ban") against a user's content or material or "deplatforming" a user from the social media platform except if the material is "obscene" as defined by F.S. §847.001. Content including threatening or intimidating messages, conspiracy theories, anti-vaccine misinformation, Holocaust denial content and content promoting white supremacy do not fall under the definition of obscene and thus could not be without violating the Act. This would cause real-world, irreversible harm in Florida's communities and beyond.

6.     Florida Statutes §106.072 (d)(2) prohibits affected TechNet members from deplatforming a candidate for state office, therefore providing preferential

3

treatment only for candidates for office even if a candidate blatantly violates the platform's terms of service or posting guidelines. The Act would prevent social media companies from removing content by candidates even if that content was obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable. For instance, a candidate for office in Florida could post conspiracy theories and promote racist content that blatantly violate affected TechNet member's content guidelines, however the Act prevents an affected TechNet member from either removing content from that candidate or removing the candidate from the platform.

7.      Content moderation is at the core of the business models for social media platforms because it is critical for their business that the platforms are safe and family- and workplace-friendly. If affected TechNet members are unable to maintain a family- and workplace-friendly platform, it will affect their ability to attract advertisers who will not want to be associated with objectionable content. Additionally, users may decide to leave the platform if objectionable content that they report is not removed. Losing users and advertisers will have a negative financial impact on affected TechNet members.

8.      The Act runs counter to the American free speech law governing content liability on the internet, Section 230 of the federal Communications Decency Act ("Section 230"). Since its enactment in 1996, Section 230's two key provisions

4

have empowered online intermediaries to remove harmful content while providing them with the immunity that commonly exists in other real world offline contexts – for example, not holding a bookseller liable for libelous books, but rather the individual who committed the libel. Due to Section 230, American companies have the right to curate information on their service to meet the needs and expectations of their customers. Section 230 has supported innovation across the internet while also encouraging companies to be "Good Samaritans" by allowing them to "to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected."

9.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 3rd day of June, 2021 in Austin, Texas.

Servando Esparza
Executive Director, Texas & Southeast
TechNet

# TAB 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| NETCHOICE, LLC d/b/a NETCHOICE, a District of Columbia organization; and COMPUTER & COMMUNICATIONS INDUSTRY ASSOCIATION d/b/a CCIA, a Virginia corporation, | Civil Action No.: |

          Plaintiffs,

    v.

ASHLEY BROOKE MOODY, in her official capacity as Attorney General of the State of Florida; JONI ALEXIS POITIER, in her official capacity as Commissioner of the Florida Elections Commission; JASON TODD ALLEN, in his official capacity as Commissioner of the Florida Elections Commission; JOHN MARTIN HAYES, in his official capacity as Commissioner of the Florida Elections Commission; KYMBERLEE CURRY SMITH, in her official capacity as Commissioner of the Florida Elections Commission; BARBRA STERN, in her official capacity as Commissioner of the Florida Elections Commission; and PATRICK GILLESPIE, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services.

          Defendants.

<u>**DECLARATION OF ETSY, INC**</u>
<u>**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY**</u>
<u>**INJUNCTION**</u>

I, Corinne Pavlovic, declare as follows:

1.     I am Corinne Pavlovic and serve as Vice President for Trust & Safety at Etsy, Inc. ("Etsy"). I have worked at Etsy for over ten years, and I have served in several roles focusing on leading our Trust & Safety programs. As VP for Trust & Safety, I oversee Etsy's team that protects the integrity of Etsy's platform. The team guards our community from risks, such as fraud, prohibited and unlawful items, and taking appropriate action when someone fails to comply with our policies and applicable law.

2.     Etsy, Inc. ("Etsy") operates www.etsy.com and the Etsy app, a global marketplace where independent sellers of unique and creative goods and buyers around the world connect. Etsy is an online forum that enables users to buy and sell a wide variety of "special, extraordinary items, from unique handcrafted pieces to vintage treasures"[1] Many goods sold on Etsy are one-of-a-kind items created by individuals.  According to Etsy's 2019 Global Seller Census that surveyed almost 7,000 Etsy sellers from six core geographies, 80% of Etsy sellers are small

---

[1] https://www.etsy.com/about?ref=ftr ("About Etsy").

businesses of one and 97% operate out of their homes, and 54% consider themselves part of the independent workforce.[2] In addition, per Etsy's 2020 10-K filed with the Securities and Exchange Commission, 87% identify as women, 97% operate out of their homes, and 65% started their Etsy shop as a way to supplement income.[3] Etsy sellers range from those who rely on Etsy as their principal income and those who use it to engage their creative talents and supplement their income.

3.      Our website explains our "mission to keep human connection at the heart of commerce" by empowering a large community of sellers (many of them individuals) to "turn their ideas into successful businesses."[4] Our platform connects these small businesses with "millions of buyers looking for an alternative" to mass-produced items—"something special with a human touch."[5] Our sellers include designers and "makers" who "are literally making their items with their own hands (or tools)."[6]

4.      Individuals who seek to sell an item may post it in the Etsy online marketplace for a flat 20 cent fee.[7] Etsy also offers additional optional services, such as on-site advertising services, which enable Etsy sellers to bid for prominent

---

[2] https://extfiles.etsy.com/advocacy/Etsy_GlobalSellerCensus_4.2019.pdf ("2019 Global Census.")

[3] https://investors.etsy.com/financials/sec-filings/default.aspx ("Etsy 2020 10-K").

[4] *See* About Etsy.

[5] *Id.*

[6] https://www.etsy.com/legal/handmade/?ref=list ("Handmade Policy").

[7] https://www.etsy.com/legal/fees/ ("Fees and Payments Policy")

placement of their listings alongside search results.[8]

5.   Etsy (1) is an incorporated business entity, (2) doing business in Florida, (3) that permits users to post or upload content, and (4) it had revenues in excess of $100 million in 2020 and anticipates revenues in excess of that amount in 2021.

6.   Generally, for a seller to list an item on Etsy, it must meet Etsy's Handmade Policy, Vintage Policy or be a craft supply.[9] In addition, via Etsy's Prohibited Items Policy, Etsy prohibits certain types of items from our platform because they are inconsistent with Etsy's values and "the spirit of Etsy," including items that are high risk, potentially harmful to our members, or unlawful.[10]   At Etsy, we have a "zero tolerance policy for prohibited items, particularly those that promote, support or glorify hatred, those that promote, support or glorify violence, or are unlawful." Any sellers deemed by Etsy to have violated this policy are subject to Etsy's Terms of Use and Seller Policy, and may receive a warning, item takedowns, immediate account suspension or termination.[11]

7.   Etsy's Prohibited Items Policy provides rules and guidance for sellers, explaining, for example, the types of items that are not permitted in the following

---

[8] https://www.etsy.com/legal/advertising/ ("Advertising and Marketing Policy")
[9] *See* Handmade Policy, https://www.etsy.com/legal/policy/vintage-items-on-etsy/242665563649 ("Vintage Policy"), and https://www.etsy.com/legal/policy/craft-supplies/239327031264 ("Craft Supplies Policy.")
[10] https://www.etsy.com/legal/prohibited ("Prohibited Items Policy.")
[11] https://www.etsy.com/legal/terms-of-use ("Terms of Use.")

categories:

   a. "Alcohol, Tobacco, Drugs, Drug Paraphernalia, and Medical Drugs;"

   b. "Animal Products and Human Remains;"

   c. "Dangerous Items: Hazardous Materials, Recalled Items, and Weapons;"

   d. "Hate Items: Items that Promote, Support, or Glorify Hatred;"

   e. "Illegal Items, Items Promoting Illegal Activity, and Highly Regulated Items;"

   f. "Internationally Regulated Items;"

   g. "Pornography and Mature Content;" and

   h. "Violent Items: Items that Promote, Support, or Glorify Violence."[12]

   8.   Per Etsy's 2020 Transparency Report, Etsy received more than 4 million flags on content that potentially violated our policies, including the Prohibited Items Policy.[13] We will not post content such as, for example: (1) items that promote, support or glorify hatred toward people or otherwise demean people based upon: race, ethnicity, national origin, religion, gender, gender identity, disability, or sexual orientation; (2) imitation firearms that look real, or are prohibited by law; (3) "items that support or commemorate current or historical hate

---

[12] *See* Prohibited Items Policy.
[13] *See* https://storage.googleapis.com/etsy-extfiles-prod/Etsy_2020_Transparency_Report.pdf ("2020 Transparency Report.")

groups" such as "Nazi or Neo-Nazi groups, Ku Klux Klan (KKK) groups, white supremacist groups, misogynist groups, or groups that advocate anti-gay, anti-immigrant, or Holocaust denial agendas"; (4) pornography; and (5) "[i]tems that glorify human suffering or tragedies, including items that commemorate or honor serial killers ... exploit natural disasters or human tragedies ... encourage, glorify, or celebrate acts of violence against individual groups ... encourage self-mutilation, starvation, or other self-harm."[14]  Some rules are based on applicable laws and regulations in the US and worldwide. In many cases they are editorial judgments based on our policies, standards, and values.  As our Prohibited Items Policy notes:

> Policy decisions are complex. We consider many different and often divergent factors before coming to a decision about what is best for our community. Because we are a creative community, we err on the side of freedom of expression. We also tend to allow items that have educational, historical, or artistic value, but we know that even those items are subject to a variety of valid and sometimes conflicting interpretations and emotional responses. [15]

9.      If enacted, the Act would force Etsy to host content that would violate these policies, standards, and values, including potentially unlawful content. As a simple example, if Etsy were required to allow listings that were not within our generally applicable Handmade, Vintage or Craft Supplies Policies, just because they were from certain individuals (like a selected subset of politicians and journalists), it would interfere with the core mission of the platform, let alone Etsy's

---

[14] *See* Prohibited Items Policy.
[15] *Id.*

5

editorial judgement and ability to moderate its marketplace. More crucially, it would be anathema to our policies and values if Etsy was forced to allow an individual to post, for example, an entire storefront of neo-Nazi memorabilia because they fell into a statutory exception under the Act.

10.  The Act would delay, or prohibit outright, Esty from taking a wide range of moderation actions to further our policies, standards, and values and decline to open our private platform to prohibited items such as those "that support or commemorate current or historical hate groups" including "Nazi or Neo-Nazi groups, Ku Klux Klan . . . groups, [and] white supremacist" and anti-Semitic groups.

11.  For example, the Act would flatly prohibit us from "tak[ing] any action" that involves (among other things) "restrict[ing], edit[ing], alter[ing], [or] inhibit[ing] the publication of ... any content or material posted by a user" who meets the definition of a "journalistic enterprise."   Act § 4 (adding F.S. § 501.2041(2)(j)); *see also id.* (adding F.S. § 501.2041(1)(b) (defining "censor"). Given the sweepingly broad and vague definition of "journalistic enterprise,"[16] this moderation restriction could require us to open our private service to offer for sale items from any group that meets the minimum size or audience requirements of the

---

[16] Fl. Stat. § 501.2041(1)(d) (defining "journalistic enterprise" to include entities doing business in Florida that "[p]ublishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users" or "[p]ublishes 100 hours of audio or video available online with at least 100 million viewers annually").

law, and even if well outside our platform's mission, such as even racist and white supremacist organizations seeking to disseminate Nazi memorabilia; or terrorist groups seeking to peddle propaganda. Moreover, it is unclear under the Act whether Etsy could take action against those enterprises if they are, for example, attempting fraud schemes against our community.

12.    Further, the Act could not only compel Etsy to host hateful and highly offensive content and limit its ability to protect its community from misconduct, but also give such content and potential misconduct preferential treatment (depending on the poster), thereby compelling us to effectively advertise this content.  This would run counter to our mission and values, undermine our editorial decision making and could interfere with our ability to police and protect our community.

13.    The Act would also limit our ability to curate and organize items in a manner that is most helpful to prospective buyers.  This could drastically alter the nature of our service, severely harming our users' experience.  For example, beyond being forced to include content not relevant to the Etsy community, the Act could force Etsy to allow sellers to "opt out" of content moderation in a way that deprives us of our ability to use modern tools (algorithms) to sort and curate content, so users can quickly and easily find what they're looking for.   Act, § 4 (adding § 501.2041(2)(f)(2)).  Under the Act's mandate, by contrast, a prospective seller could insist that Etsy "allow sequential or chronological posts and content,"

*id.*, which makes little sense for a marketplace of more than ninety million diverse items. It would make our service less useable for our community and interfere with Etsy's mission to keep commerce human, all for little or no cognizable benefit. . The harms to Etsy, its buyers and its sellers could be irreparable.

14.    The Act could also inflict serious harms in other ways. We would be hamstrung in our ability to change our standards and policies regarding objectionable, offensive, dangerous, or unlawful material more than once every thirty days. Act, § 4 (*Id.* (adding § 501.2041(2)(c)). This would prevent us from swiftly responding to new trends in the marketplace, a new law or judicial ruling, or regulatory requests from Federal and state agencies (such as attempted sales of counterfeit goods, responding to bad actors taking advantage of a fast-moving news story, or sales of contraband).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 3rd day of June, 2021 at ___Hudson , NY

Corinne Pavlovic
VP, Trust & Safety
Etsy, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on November 11, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement