No. 21-12355

# In the United States Court of Appeals for the Eleventh Circuit

NETCHOICE LLC, ET AL.,

*Plaintiffs–Appellees*,

v.

ATTORNEY GENERAL, STATE OF FLORIDA, ET AL.,

*Defendants–Appellants.*

## REPLY BRIEF OF DEFENDANTS-APPELLANTS

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NO. 4:21-CV-220-RH-MAF

Henry C. Whitaker
*Solicitor General*
Daniel W. Bell
*Chief Deputy Solicitor General*
Evan Ezray
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-05
Tallahassee, FL 32399
(850) 414-3300
Henry.Whitaker@myfloridalegal.com
Daniel.bell@myfloridalegal.com
Evan.Ezray@myfloridalegal.com

*Attorneys for Defendants-Appellants
Ashley Moody, in her official capacity
as Attorney General of Florida; Joni
Alexis Poitier, in her official capacity as
Commissioner of the Florida Elections
Commission; Jason Todd Allen, in his*

Charles J. Cooper
David H. Thompson
Brian W. Barnes
Joseph O. Masterman
John W. Tienken
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jmasterman@cooperkirk.com
jtienken@cooperkirk.com

Raymond F. Treadwell
*Chief Deputy General Counsel*
EXECUTIVE OFFICE OF GOVERNOR
RON DESANTIS
Office of the General Counsel

*official capacity as Commissioner of the Florida Elections Commission; John Martin Hayes, in his official capacity as Commissioner of the Florida Elections Commission; and Kymberlee Curry Smith, in her official capacity as Commissioner of the Florida Elections Commission*

The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
Ray.Treadwell@eog.myflorida.com

*Attorneys for Defendant-Appellant Patrick Gillespie, in his official capacity as Deputy Secretary of Business Operations of the Florida Department of Management Services*

*Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Defendants-Appellants certify that the following is a complete list of interested persons as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1:

1.     Abdo, Alex, *Attorney for Amicus Curiae Knight First Amendment Institute at Columbia University\**

2.     Allen, Jason Todd, *Defendant/Appellant*

3.     Allen, Kenneth Winn, *Attorney for Plaintiffs/Appellees*

4.     America First Policy Institute, *Amicus Curiae\**

5.     American Booksellers Association, *Amicus Curiae\**

6.     American Civil Liberties Union of Florida, *Amicus Curiae*

7.     American Civil Liberties Union, *Amicus Curiae*

8.     Ausley & McMullen, PA, *Attorneys for Amicus Curiae\**

9.     Authors Guild Inc., *Amicus Curiae*

10.    Bambauer, Jane, *Amicus Curiae First Amendment Law Professor\**

11.    Barnes, Brian W., *Attorney for Defendant/Appellant*

12.    Barthold, Corbin K., *Attorney for Amicus Curiae TechFreedom*

13.    Bassett, Glenn Allen, *Attorney for Defendants/Appellants*

14.    Bell, Daniel William, *Attorney for Defendants/Appellants*

15.   Berry, Thomas A., *Attorney for Amicus Curiae The CATO Institute\**

16.   Bhagwat, Ashutosh, *Amicus Curiae First Amendment Law Professor\**

17.   Blacklock, Evelyn, *Attorney for Plaintiffs/Appellees*

18.   Brnovich, Mark, *Attorney for Amicus Curiae State of Arizona\**

19.   Burhans Jr., Glenn T., *Attorney for Plaintiff/Appellee*

20.   Campbell, Joshua J., *Attorney for Amicus Curiae America First Policy Institute\**

21.   Cameron, Daniel, *Attorney for Amicus Curiae State of Kentucky\**

22.   Candeub, D. Adam, *Attorney for Amicus Curiae America First Policy Institute\**

23.   Caramanica, Mark R., *Attorney for Amicus Curiae Center for Democracy & Technology\**

24.   Carome, Patrick J., *Attorney for Amicus Curiae*

25.   Catherine R. Gellis, Esq., *Attorneys for Amicus Curiae Floor64, Inc., d/b/a The Copia Institute\**

26.   Center for Democracy and Technology, *Amicus Curiae*

27.   Chamber of Progress, *Amicus Curiae*

28.   Clark, Christopher Roy, *Attorney for Plaintiff/Appellee*

29.   Clement, Paul D., *Attorney for Plaintiffs/Appellees*

30.   Cohn, Ari, *Attorney for Amicus Curiae TechFreedom\**

31.  Cole, William F., *Attorney for Amicus Curiae State of Texas\**

32.  Computer & Communications Industry Association, *Plaintiff*

33.  Connected Commerce Council, *Amicus Curiae*

34.  Consumer Technology Association, *Amicus Curiae*

35.  Cooper, Charles J., *Attorney for Defendant/Appellant*

36.  Cooper & Kirk, PLLC, *Attorneys for Defendant/Appellant*

37.  Cox, Christopher, *Amicus Curiae\**

38.  CTA®, *Amicus Curiae\**

39.  Dillon, Dan, *Member of Amici Curiae, The Babylon Bee, LLC and Not the Bee, LLC\**

40.  Dillon, Seth, *Member of Amici Curiae, The Babylon Bee, LLC and Not the Bee, LLC\**

41.  DLA Piper US LLP, *Attorneys for Plaintiff/Appellee*

42.  Doss, Jeffrey P., *Attorney for Amicus Curiae Christopher Cox\**

43.  Eisenstein, Ilana Hope, *Attorney for Plaintiff/Appellee*

44.  Electronic Frontier Foundation, *Amicus Curiae*

45.  Engine Advocacy, *Amicus Curiae*

46.  Esparza, Servando, *Declarant*

47.  Ezray, Evan Matthew, *Attorney for Defendant/Appellant\**

48.  Fabens-Lassen, Ben, *Attorney for Plaintiff/Appellee*

49.    First Liberty Institute, *Attorneys for Amici Curiae The Babylon Bee, LLC, and Not the Bee, LLC\**

50.    Fitch, Lynn, *Attorney for Amicus Curiae State of Mississippi\**

51.    Floor64, Inc., d/b/a The Copia Institute, *Amicus Curiae\**

52.    Florida Department of Management Services, *Defendant/Appellant*

53.    Florida Elections Commission, *Defendant/Appellant*

54.    Florida Office of the Attorney General, *Attorneys for Defendants/Appellants*

55.    Ford, Adam, *Member of Amici Curiae, The Babylon Bee, LLC and Not the Bee, LLC\**

56.    Gardner Brewer Martinez-Monfort P.A., *Attorneys for Amicus Curiae America First Policy Institute\**

57.    Gellis, Catherine, *Attorney for Amicus Curiae Floor64, Inc., d/b/a The Copia Institute\**

58.    Geronimo, Andrew, *Amicus Curiae First Amendment Law Professor\**

59.    Gillespie, Patrick, *Defendant/Appellant*

60.    Goldman, Eric, *Amicus Curiae First Amendment Law Professor\**

61.    Goldstein, Leonid, *Amicus Curiae*

62.    Green, Jonathan Allen, *Attorney for Plaintiff/Appellee*

63.    Greenberg Traurig, PA, *Attorneys for Plaintiff/Appellee\**

64. Greene, David Allen, *Attorney for Amicus Curiae*

65. Gross, Robin D., *Attorney for Amicus Curiae IP Justice\**

66. Gura, Alan, *Attorney for Amicus Curiae Institute for Free Speech\**

67. Hacker, David J., *Attorney for Amici Curiae\**

68. Hans, G.S., *Attorney for Amicus Curiae First Amendment Law Professors\**

69. Hayes, John Martin, *Defendant/Appellant*

70. Hinkle, Judge Robert L., *District Court Judge*

71. Holtzblatt, Ari, *Attorney for Amicus Curiae*

72. Homer, Bonner, *Attorneys for Amicus Curiae*

73. Homer, Peter Winslow, *Attorney for Amicus Curiae*

74. Hopkins, Christopher, *Attorney for Amici Curiae*

75. Hopkins & Carley, *Attorneys for Amicus Curiae IP Justice\**

76. Information Technology & Innovation Foundation, *Amicus Curiae*

77. Institute for Free Speech, *Amicus Curiae\**

78. Internet Association, *Amicus Curiae*

79. IP Justice, *Amicus Curiae\**

80. Jackson, Tatum L., *Attorney for Amicus Curiae Christopher Cox\**

81. Jaffer, Jameel, *Attorney for Amicus Curiae Knight First Amendment Institute at Columbia University\**

82. Jain, Samir, *Attorney for Amicus Curiae Center for Democracy & Technology\**

83. Johnson, Steffen N., *Attorney for Plaintiff/Appellee*

84. Joshua Joseph Campbell Law Office, *Attorneys for Amicus Curiae America First Policy Institute\**

85. Karanjia, Peter, *Attorney for Plaintiff/Appellee*

86. Kilby, Douglas Lamar, *Attorney for Plaintiff/Appellee*

87. Kirkland & Ellis LLP, *Attorneys for Plaintiffs/Appellees*

88. Knight First Amendment Institute at Columbia University, *Amicus Curiae\**

89. Knudsen, Austin, *Attorney for Amicus Curiae State of Montana\**

90. Kolde, Endel, *Attorney for Amicus Curiae Institute for Free Speech\**

91. Lake, James B., *Attorney for Amicus Curiae Center for Democracy & Technology\**

92. Law Office of Robin Gross, *Attorneys for Amicus Curiae IP Justice\**

93. Lawson, Richard, *Attorney for Amicus Curiae America First Policy Institute\**

94. Levy, Allonn E., *Attorney for Amicus Curiae IP Justice\**

95. LGBT Tech Institute, *Amicus Curiae\**

96.  Lightfoot, Franklin & White LLC, *Attorneys for Amicus Curiae Christopher Cox\**

97.  Little, Jonathan R., *Attorney for Amicus Curiae Christopher Cox\**

98.  Llansó, Emma, *Attorney for Amicus Curiae Center for Democracy & Technology\**

99.  Mackey, Aaron, *Attorney for Amicus Curiae*

100. Mann, Kyle, *Member of Amicus Curiae The Babylon Bee, LLC\**

101. Marshall, Steve, *Attorney for Amicus Curiae State of Alabama\**

102. Masnick, Michael, *Founder and principal of Amicus Curiae Floor64, Inc., d/b/a The Copia Institute\**

103. Masterman, Joseph, *Attorney for Defendant/Appellant*

104. Mateer, Jeffrey C., *Attorney for Amici Curiae\**

105. McDonald Hopkins LLC, *Attorneys for Amicus Curiae*

106. Media Law Resource Center Inc, *Amicus Curiae*

107. Michigan State University College of Law, *Attorneys for Amicus Curiae for America First Policy Institute\**

108. Mitchell, Kasdin M., *Attorney for Plaintiffs/Appellees*

109. Moody, Ashley B., *Defendant/Appellant*

110. Morrison, Danielle T., *Attorney for Plaintiff/Appellee*

111. National Black Justice Coalition, *Amicus Curiae*

112. NetChoice LLC, *Plaintiff*

113. Not the Bee, LLC, *Amicus Curiae**

114. Office of the Attorney General of Texas, *Attorneys for Amicus Curiae States**

115. Oprison, Christopher George, *Attorney for Plaintiff/Appellee*

116. Opsahl, Kurt, *Attorney for Amicus Curiae*

117. Pavlovic, Corinne, *Declarant*

118. Paxton, Warren Kenneth, *Attorney for Amicus Curiae State of Texas**

119. Pen American Center Inc., *Amicus Curiae*

120. Phillips, Joseph Trumon, *Attorney for Plaintiff/Appellee*

121. Poitier, Joni Alexis, *Defendant/Appellant*

122. Potts, Neil, *Declarant*

123. Pratt, Christine K., *Attorney for Amici Curiae The Babylon Bee, LLC, and Not the Bee, LLC**

124. Pratt, Jordan E., *Attorney for Amici Curiae**

125. Progressive Policy Institute, *Amicus Curiae*

126. Protect Democracy Project, Inc., *Amicus Curiae*

127. Rathi, Mukund, *Attorney for Amicus Curiae Electronic Frontier Foundation**

128. Reporters Committee For Freedom of the Press, *Amicus Curiae*

129.  Rumenap, Stacie D., *Declarant*

130.  Rutledge, Leslie, *Attorney for Amicus Curiae State of Arkansas\**

131.  Schmitt, Eric, *Attorney for Amicus Curiae State of Missouri\**

132.  Schruers, Matthew, *Declarant*

133.  Shackelford, Kelly J., *Attorney for Amici Curiae \**

134.  Shapiro, Ilya, *Attorney for Amicus Curiae The CATO Institute\**

135.  Sharman, Jackson R. III, *Attorney for Amicus Curiae Christopher Cox\**

136.  Shullman, Deanna K, *Attorney for Amici Curiae*

137.  Shullman, Fugate PLLC, *Attorneys for Amici Curiae*

138.  Siekkinen, Nury Agudo, *Attorney for Amici Curiae*

139.  Smith, Kymberlee Curry, *Defendant/Appellant*

140.  Smitha, Bridget Kellogg, *Attorney for Plaintiff/Appellee*

141.  Sommer, Jacob, *Attorney for Amici Curiae Chamber of Progress, et al.*

142.  State of Alabama, *Amicus Curiae\**

143.  State of Alaska, *Amicus Curiae\**

144.  State of Arizona, *Amicus Curiae\**

145.  State of Arkansas, *Amicus Curiae\**

146.  State of Kentucky, *Amicus Curiae\**

147.  State of Mississippi, *Amicus Curiae\**

148.  State of Missouri, *Amicus Curiae\**

149. State of Montana, *Amicus Curiae*\*

150. State of South Carolina, *Amicus Curiae*\*

151. State of Texas, *Amicus Curiae*\*

152. Stearns Weaver Miller Alhadeff & Sitterson, P.A., *Attorneys for Plaintiff/Appellee*

153. Stone, Judd E. II, *Attorney for Amicus Curiae State of Texas*\*

154. Szabo, Carl, *Declarant*

155. Szoka, Berin Michael, *Attorney for Amicus Curiae*

156. Taylor, Treg, *Attorney for Amicus Curiae State of Alaska*\*

157. TechFreedom, *Amicus Curiae*

158. Technet, *Amicus Curiae*

159. The Babylon Bee, LLC, *Amicus Curiae*\*

160. The CATO Institute, *Amicus Curiae*\*

161. The Media Coalition Foundation, Inc., *Amicus Curiae*\*

162. Thomas & LoCicero PL, *Attorneys for Amicus Curiae Center for Democracy & Technology*\*

163. Thompson, David H., *Attorney for Defendant/Appellant*

164. Tienken, John W., *Attorney for Defendant/Appellant*

165. Treadwell, Raymond Frederick, *Attorney for Defendant/Appellant*

166. Uthmeier, James William, *Attorney for Defendant/Appellant*

167.  Vanderbilt Legal Clinic, *Attorney for Amici Curiae First Amendment Law Professors\**

168.  Veitch, Alexandra, *Declarant*

169.  Vogus, Caitlin, *Attorney for Amicus Curiae Center for Democracy & Technology\**

170.  Walters Law Group, *Attorneys for Amicus Curiae*

171.  Walters, Lawrence G, *Attorney for Amicus Curiae*

172.  Washington Center for Technology Policy Inclusion, *Amicus Curiae*

173.  Webster, Brent, *Attorney for Amicus Curiae State of Texas\**

174.  Whitaker, Henry C., *Attorney for Defendants/Appellants*

175.  White, Lauren Gallo, *Attorney for Plaintiff/Appellee*

176.  Wilkens, Scott, *Attorney for Amicus Curiae Knight First Amendment Institute at Columbia University\**

177.  Willen, Brian M., *Attorney for Plaintiff/Appellee*

178.  Wilmer Cutler Pickering Hale and Dorr LLP, *Attorneys for Amicus Curiae*

179.  Wilson, Alan, *Attorney for Amicus Curiae South Carolina\**

180.  Wilson Sonsini Goodrich & Rosati, P.C., *Attorneys for Plaintiff/Appellee*

181.  Winship, Blaine H., *Attorney for Defendants/Appellants*

182.  Wolfson, Paul R., *Attorney for Amicus Curiae*

183. Xi, James, *Attorney for Plaintiffs/Appellees*

184. Yang, Meng Jia, *Attorney for Plaintiff/Appellee*

185. ZwillGen, *Attorneys for Amici Curiae*

186. Zwillinger, Marc, *Attorney for Amici Curiae Chamber of Progress, et al.*

187. Undisclosed members of Appellees

Apart from undisclosed members of Appellees, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: December 20, 2021

/s/ Henry C. Whitaker
Henry C. Whitaker
*Solicitor General*
Daniel W. Bell
*Chief Deputy Solicitor General*
Evan Ezray
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
Henry.Whitaker@myfloridalegal.com
Daniel.bell@myfloridalegal.com
Evan.Ezray@myfloridalegal.com

*Attorneys for Defendants-Appellants*
*Ashley Moody, in her official capacity as*
*Attorney General of Florida; Joni Alexis*
*Poitier, in her official capacity as*
*Commissioner of the Florida Elections*
*Commission; Jason Todd Allen, in his*
*official capacity as Commissioner of the*
*Florida Elections Commission; John*
*Martin Hayes, in his official capacity as*
*Commissioner of the Florida Elections*
*Commission; and Kymberlee Curry*
*Smith, in her official capacity as*
*Commissioner of the Florida Elections*
*Commission*

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper
David H. Thompson
Brian W. Barnes
Joseph O. Masterman
John W. Tienken
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jmasterman@cooperkirk.com
jtienken@cooperkirk.com

Raymond F. Treadwell
*Chief Deputy General Counsel*
EXECUTIVE OFFICE OF GOVERNOR RON
DESANTIS
Office of the General Counsel
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
Ray.Treadwell@eog.myflorida.com

*Attorneys for Defendant-Appellant*
*Patrick Gillespie, in his official capacity*
*as Deputy Secretary of Business*
*Operations of the Florida Department of*
*Management Services*

**TABLE OF CONTENTS**

                                                                        **Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION .............................................................................1

ARGUMENT ....................................................................................2

I.    Plaintiffs Are Unlikely To Succeed on the Merits of their Preemption
      Claim. ...................................................................................2

II.   Plaintiffs Are Unlikely To Succeed on the Merits of their First
      Amendment Claim. ............................................................... 5

      A.    The Act's hosting provisions do not trigger First Amendment
            scrutiny. ...............................................................8

            1.    The First Amendment's protections do not depend on
                  whether Plaintiffs' censorship decisions can be labeled
                  as "editorial judgments." ...........................................8

            2.    The Act's hosting provisions do not interfere with social
                  media platforms' speech. ........................................11

            3.    The Act's hosting provisions permissibly treat social media
                  platforms as common carriers. ............................... 17

            4.    The Act's consistency provision permissibly regulates
                  social media platforms' conduct. ............................ 19

      B.    The Act's notice and disclosure provisions are permissible under
            *Zauderer*. ....................................................... 23

      C.    Plaintiffs' other arguments for the wholesale application of strict
            scrutiny fail. .......................................................25

III.  Plaintiffs Lack All Other Prerequisites for a Preliminary Injunction. ..........26

i

CONCLUSION ................................................................27

**Cases**                                                                      **Page**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, ("*AOSI II*"), 140 S. Ct.
   2082 (2020) ....................................................................... 11, 13, 14

*Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220 (2021) ............................ 19

*Bd. of Educ. of Westside Cmty. Schs. (Dist. 66) v. Mergens*,
   496 U.S. 226 (1990) .......................................................................... 14

*Bloedorn v. Grube*, 631 F.3d 1218 (11th Cir. 2011) .................................................. 26

*Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352 (11th Cir. 1986) .. 17

*CIR v. Fink*, 483 U.S. 89 (1987) ........................................................................... 22

*Conroy v. Aniskoff*, 507 U.S. 511 (1993) ............................................................. 25

*Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320 (11th Cir. 2004) ....... 5

*Engquist v. Oregon Dept. of Agric.*, 553 U.S. 591 (2008) ................................ 22, 23

*Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) ............................................ 21

*Gonzalez v. Google LLC*, 2 F.4th 871 (2021) ....................................................... 21

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ............................................... 22

*Holton v. Boston Elevated Ry. Co.*, 21 N.E.2d 251 (Mass. 1939) ......................... 17

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*,
   515 U.S. 557 (1995) .............................................................. 12, 13, 15, 16

*In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015) ................................................... 25

*Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759 (2019) ..................................................... 23

*Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) ....... 3

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ................. 8, 14

*Maryland v. King*, 567 U.S. 1301 (2012) ............................................................ 27

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ....................................................... 3

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ............................. 9

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
   460 U.S. 575 (1983) .......................................................................... 26

*Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*,
   525 F.2d 630 (D.C. Cir. 1976) ...................................................... 17, 18

*NIFLA v. Becerra*, 138 S. Ct. 2361 (2018) ............................................................23

*Nye v. W. Union Tel. Co.*, 104 F. 628 (C.C.D. Minn. 1900) ..................................17

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ..........................................1

*Pine v. City of W. Palm Beach*, 762 F.3d 1262 (11th Cir. 2014) ............................7

*PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74 (1980) .................................13, 20

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, ("*FAIR*"),
    547 U.S. 47 (2006).................................................8, 9, 10, 11, 14, 15, 20

*Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc.*,
    3 So.3d 1220 (Fla. 2009)..........................................................................22

*Semon v. Royalty Indem. Co.*, 279 F.2d 737 (5th Cir. 1960)...........................17, 19

*State v. W. Union Tel. Co.*, 97 A.2d 480 (N.J. 1953) ............................................17

*Turner Broad. Sys. v. FCC*, ("*Turner I*"), 512 U.S. 622 (1994)..... 2, 5, 6, 25, 26, 27

*Turner Broad. Sys., v. FCC*, ("*Turner II*")*,* 520 U.S. 180 (1997).........................19

*U. S. v. O'Brien*, 391 U.S. 367 (1968)..................................................................25

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016)................................18

*U.S. v. U.S. Gypsum Co.*, 438 U.S. 422 (1978) ......................................................3

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982)...........7

*Wooley v. Maynard*, 430 U.S. 705 (1977) ......................................................13, 14

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*,
    471 U.S. 626 (1985)..................................................................................23

## Statutes and Legislative Materials

47 U.S.C.

   § 230(c)(1).................................................................................................2
   § 230(c)(2)(A).....................................................................................2, 3, 4
   § 230(e)(3) ................................................................................................4

Fla. Stat.

   § 106.072(2) ..............................................................................................8
   § 106.072(4) ............................................................................................24
   § 501.2041(2)(a) ..................................................................................8, 22
   § 501.2041(2)(b) ........................................................................................8
   § 501.2041(2)(d)(1) ...................................................................................3

§ 501.2041(2)(h) ..................................................................8
§ 501.2041(2)(j) ..................................................................8

S.B. 7072 § 1(11) ................................................................25

**Other Authorities**

Brief for Def.-Appellee, *Force v. Facebook*, 2018 WL 4944738
(2d Cir. Oct. 3, 2018)........................................................21

Brief for the Respondents, *Rumsfeld v. Forum for Academic and Institutional
Rights*, 2005 WL 2347175 (U.S.)...................................9, 10, 16

Christopher Yoo, *The First Amendment, Common Carriers, and Public
Accommodations: Net Neutrality, Digital Platforms, and Privacy*, 1 J. FREE
SPEECH L. 463 (2021) ......................................................18

*Consistent*, OXFORD LEARNERS' DICTIONARY ONLINE (December 2021) .............22

Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*,
1 J. OF FREE SPEECH L. 377, 382 n.12 (2021) ..................................18

*Senate Committee on Appropriations Meeting*, at 3:41:00–43:07, FLA. SENATE
(Apr. 19, 2021), https://bit.ly/3vG24jm.............................................19

**INTRODUCTION**

In response to growing concern that large technology companies are arbitrarily censoring users' speech on their platforms, Florida passed a law meant to protect its citizens' speech in "the most important places . . . for the exchange of views." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). The law demands that technology companies publish the rules of their platforms in advance, apply those rules consistently, and notify users when they are broken. The law also requires platforms to host certain content by journalists and political candidates.

Two trade associations immediately filed suit claiming that those modest regulations infringe their member technology companies' free speech rights. Outside of this litigation, Plaintiffs' members disclaim responsibility for the user speech they host, and they have won more than one lawsuit when federal courts took them at their word. *See* Opening Br. 26–27; *infra* 21. Yet Plaintiffs' principal argument to this Court is that their platforms are full of the platforms' *own* speech. These representations cannot both be true. Florida identified this contradiction in its opening brief, and Plaintiffs have no answer.

Imagine if the plaintiffs in *Tornillo* had said, as Twitter represents in its Terms of Service, that they did not "monitor or control" the articles in the *Miami Herald*. App.650 (Doc.106-1 at 561). Or suppose that the plaintiffs in *Hurley* had said that they were "not responsible for . . . any content" in the parade, as Facebook declares

1

about the posts that appear on its platform. App.633 (Doc.106-1 at 544). Plaintiffs insist they are no different from newspaper editors, but in truth they are more like a telephone company, controlling the very instrument others use to express themselves.

To accept Plaintiffs' contrary theory of the case would leave these platforms—including some of the largest entities on the planet—fully outside government regulation. These platforms essentially assert that in their interactions with users they are a law unto themselves, assuming the authority to silence whomever they want. Nothing in federal law requires States to meekly stand by when private interests assert such authority to restrict the "free flow of information and ideas." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 657 (1994) ("*Turner I*"). The preliminary injunction should be reversed.

## ARGUMENT

### I. Plaintiffs Are Unlikely To Succeed on the Merits of their Preemption Claim.

Plaintiffs all but abandon their preemption claim. They do not even argue that the Act is preempted by 47 U.S.C. § 230(c)(1). *See* Pls.' Br. 52–54 (relying on only Section 230(c)(2)(A)). Hence the question is not whether the Act conflicts with the general editorial immunity that some circuits have incorrectly derived from Section 230(c)(1), but whether it conflicts with Section 230(c)(2)(A)'s more limited protection for "good faith" decisions to "restrict access to" defined categories of

"objectionable" content. *Id.* § 230(c)(2)(A). And Plaintiffs do not dispute that, in this facial challenge, they must show that the challenged provisions of the Act would be preempted in all possible applications—*i.e.*, that *no* censorship decision would both violate the Act and fall outside Section 230(c)(2)(A)'s protection.

Plaintiffs cannot make that showing, and they do not even try. Some of the Act's challenged provisions merely require notice of censorship decisions. *See* FLA. STAT. § 501.2041(2)(d)(1). These provisions can concededly be applied consistently with Section 230(c)(2)(A): they have nothing to do with restricting access to content, and they go entirely unmentioned in Plaintiffs' preemption argument. Plaintiffs also cannot show that the Act imposes liability "regardless of . . . good faith," as that phrase is used in Section 230(c)(2)(A). Pls.' Br. 53. Questions of good faith are inherently "fact-specific," *U.S. v. U.S. Gypsum Co.*, 438 U.S. 422, 455 (1978), and nothing in Section 230 preempts the Act as applied to facts demonstrating bad faith.

In any event, Plaintiffs' preemption arguments fail on their own terms. Like the courts that have "rea[d] extra immunity into" Section 230(c)(1), Plaintiffs suggest that "policy and purpose" support similarly "sweeping protection" under Section 230(c)(2)(A). *See Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 15 (2020) (statement of Thomas, J.); Pls.' Br. 51–52. But broad statements of policy cannot overcome the well-established presumption against preemption. *See, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). And

3

Congress plainly did not intend Section 230(c)(2)(A) to leave platforms entirely free of state regulation. Congress itself drafted that section to protect only "good faith" content moderation and expressly preserved all "consistent" state laws. 47 U.S.C. §§ 230(c)(2)(A), (e)(3). Plaintiffs thus place far more weight on Section 230(c)(2)(A) than it can bear.

Plaintiffs also argue that, by its terms, Section 230(c)(2)(A) allows platforms to remove a user's post if they simply dislike its point of view. Pls.' Br. 54. Plaintiffs emphasize a platform's statutory authorization to remove content that it "*considers to be*" objectionable. *Id.* (quoting 47 U.S.C. § 230(c)(2)(A); emphasis in original). But Florida does not deny that Platforms are free to engage in good faith viewpoint discrimination. *No provisions of the Act* prohibit viewpoint discrimination. To comply with the Act, platforms need only apply viewpoint-discriminatory standards consistently and with proper notice. So these provisions do not conflict with Section 230(c)(2)(A) even as Plaintiffs construe it.

Ultimately, Plaintiffs identify just two provisions as allegedly preempted: the consistency requirement and the prohibition on deplatforming political candidates. Like the notice requirements, however, neither provision on its face prevents platforms from restricting access to "objectionable" content. The first merely requires that platforms apply the same "objectionability" standards to all users. The second protects certain users' access to a platform, not any potentially objectionable

content they post. It might be possible to imagine cases where liability under these provisions would run afoul of Section 230(c)(2)(A). But it is just as easy to imagine a platform violating these provisions by removing content or blocking a user in bad faith. The lines between federal-law protection and state-law liability can and must be drawn case-by-case.

Plaintiffs finish by dismissing the constitutional concerns that arise from their capacious reading of Section 230(c)(2)(A), without disputing that federal preemption of a state law protecting speech constitutes state action. The resulting First Amendment concerns are clear and only exacerbated by Plaintiffs' insistence that Section 230(c)(2)(A) licenses viewpoint discrimination.

## II.     Plaintiffs Are Unlikely To Succeed on the Merits of their First Amendment Claim.

Three principles must guide this Court's First Amendment analysis. First, each provision of the Act must be assessed on its own terms. After all, not every provision of the Act interferes with speech, and not "every interference with speech triggers the same degree of scrutiny under the First Amendment." *Turner I*, 512 U.S. at 637. Such an approach reflects the severability of distinct provisions of a multifaceted state law. *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1348 (11th Cir. 2004). And it also reflects that *different* provisions of the Act impose *different* obligations on social media platforms and thus merit *different* constitutional

analyses. *See Turner I*, 512 U.S. at 643 n.6 (remanding for specific consideration of provisions that the district did not analyze initially).

Second, the First Amendment's principles are enduring, yet its application depends on the actions being regulated and the medium in question. As the Supreme Court has long held, "[e]ach medium of expression . . . must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems." *Turner I*, 512 U.S. at 657. As even the District Court acknowledged, "it cannot be said that a social media platform, to whom most content is invisible to a substantial extent, is indistinguishable for First Amendment purposes from a newspaper or other traditional medium." App.1718 (Doc.113 at 23).

Accordingly, the Court must recognize that social media platforms are unique beasts, engaging in a dizzying array of distinct types of conduct. Typical platforms host users by providing them with usernames and pages. Users then post their own content, such as their photos, their videos, their music, and their commentary. As in most social settings where individuals decide with whom to interact, users are largely empowered to decide whose posts to view and who may view their posts. Like shopping malls, some platforms provide users the ability to open shops, sell wares, and make purchases. Like a job fair, some platforms invite employers to post job opportunities, accept applications, and even interview applicants. To assist in navigating the panoply of users and user content, many platforms also

algorithmically identify content that users might be interested in through news feeds and timelines.

Third, Plaintiffs bring a pre-enforcement overbreadth claim. In that context, the Court must construe the statute "to avoid constitutional concerns." *Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1276 (11th Cir. 2014). And only after that deferential interpretive step, consider whether the statute "reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494–95 (1982).

Thus, in undertaking a First Amendment analysis of the Act, the Court must (1) consider what each *individual* provision of the Act requires of social media platforms, (2) consider which of the many functions of social media platforms each provision regulates, and then (3) conduct its analysis in the deferential posture of pre-enforcement review, while adopting any permissible saving construction. In doing so, the Court will find that many of the provisions at issue in this appeal do not interfere with social media platforms' speech at all. Instead, these provisions regulate the conduct of social media platforms in hosting users and users' speech, *i.e.*, in providing a place for *others* to speak. And the provisions that potentially interfere with the platforms' own speech survive First Amendment scrutiny.

## A. The Act's hosting provisions do not trigger First Amendment scrutiny.

### 1. The First Amendment's protections do not depend on whether Plaintiffs' censorship decisions can be labeled as "editorial judgments."

As explained in Florida's Opening Brief, many of the Act's provisions regulate how social media platforms may decide to remove or restrict access to user-generated material. Opening Br. 20–21; *see* FLA. STAT. § 501.2041(2)(a), (b), (h), (j); *id.* § 106.072(2). These provisions regulate the manner in which platforms host, provide access, or make inaccessible users and user content. They do not implicate the platforms' First Amendment rights.

"[T]he degree to which the First Amendment protects private entities . . . from government legislation or regulation requiring those private entities to open their property for speech by others" is a "distinct question" from whether the government can itself dictate the content of a private entity's speech. *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1931 n.2 (2019) (cleaned up). As such, the Supreme Court has decided a distinct line of cases that guide the analysis when a government requires someone "to host or accommodate another speaker's message." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 63 (2006). These cases turn on whether hosting the third party's speech "sufficiently interfere[s]" with the host's own speech. *Id.* And to ascertain whether such "interference" has occurred, the Supreme Court looks at the three

8

considerations identified in Florida's opening brief: the continued ability for the host to speak and "disassociate" from hosted speech, "attribution" concerns based on the risk of listener confusion, and the "expressive quality" of the host's particular speech product. *Id.* at 63–65.

Plaintiffs ask the Court to toss all three considerations overboard and hold that the First Amendment categorically protects any activity that can be labeled an "editorial judgment." Plaintiffs' focus on "editorial judgments" is an effort to smooth out the significant differences between the activities of a newspaper and what social media platforms actually do. Plaintiffs seek to tie this case to *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), but they ignore the critical differences between newspapers and social media platforms identified in Florida's opening brief. *See* Opening Br. 24.

Plaintiffs walk a well-worn, if unsuccessful, path with their emphasis on editorial judgments. Compare their arguments to those made by the law schools in *FAIR*. There the law schools argued, "Just as the government may not force a newspaper to publish specified opinion pieces, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256–58 (1974), it cannot force a school to print specified recruiting messages." *Compare* Brief for the Respondents, *Rumsfeld v. Forum for Academic and Institutional Rights*, 2005 WL 2347175 *22 (U.S.) ("FAIR Respondents"), *with* Pls.' Br. 22. There the law schools claimed that *PruneYard* was just about shopping

malls. *Compare* FAIR Respondents at *23, *with* Pls.' Br. 32. There the law schools asserted that a "school has the right to make the *same editorial judgments* as to which messages it will facilitate and which it will resist." *Compare* FAIR Respondents at *27 (emphasis added), *with* Pls.' Br. 23–25. The law schools even claimed they "exercised their editorial function vigilantly—much more vigilantly than the St. Patrick's Day parade organizers" in *Hurley*. *Compare* FAIR Respondents at *28 (emphasis added), *with* Pls.' Br. 38. And, there the law schools claimed they engaged in these judgments because of their "normative" goals—their "obligation of community." *Compare* FAIR Respondents at *4, *28, *with* Pls.' Br. 2.

The Supreme Court *unanimously* rejected these arguments. *FAIR*, 547 U.S. at 70. That is because the constitutionality of requiring the hosting of third-party speech does not turn on whether the host labels its conduct as some form of "editorial judgment." Rather, the Court explained that "in *each* of [its] prior cases" a "compelled-speech violation . . . results from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Id.* at 64 (emphasis added). In reaching its decision in *FAIR*, the Court assessed whether the provision at issue "restrict[ed] what the law schools may say." *Id.* at 65. Relying explicitly on *PruneYard*, the Court considered the extent to which the law schools, like shopping malls, were "free to disassociate" from the hosted message and whether there was a substantial risk the "expressive activities would be identified

with the [host]." *Id.* at 65. And the Court explained that the inherently "expressive nature" or "expressive quality" of the communicative medium—whether "a parade, a newsletter, or the editorial page of a newspaper"—was "*central*" to its past analysis. *Id.* at 63, 64 (emphasis added). Put simply, the unanimous Supreme Court explicitly found controlling the three factors identified in Florida's opening brief.

*FAIR* did not break new ground. Instead, the Supreme Court synthesized its case law on compelled hosting of others' speech and reiterated the salient considerations. Plaintiffs' remarkable claim that Florida's reliance on these three considerations "misunderstand[s] the law," Pls.' Br. 33, cannot withstand even a casual review of the Supreme Court's precedents. *See, e.g.*, *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.* ("*AOSI II*"), 140 S. Ct. 2082, 2088 (2020) (noting the Court's focus on "misattribution" in cases where "the State forced one speaker to host another speaker's speech."); *id.* at 2098 (Breyer, J., dissenting) ("Requiring someone to host another person's speech is often a perfectly legitimate thing for the Government to do.").

## 2. The Act's hosting provisions do not interfere with social media platforms' speech.

Plaintiffs fare no better when they finally engage with the considerations that are relevant to whether the Act's hosting provisions sufficiently interfere with platforms' speech to trigger First Amendment scrutiny.

*Ability to speak*. Plaintiffs do not meaningfully contest a fundamental point: the Act's hosting provisions limit how platforms remove or restrict *user-generated* speech, but these provisions do nothing to restrict what the platforms themselves may say. For instance, Plaintiffs make zero argument that the Act's provision prohibiting the deplatforming of candidates restricts what platforms can say about candidates. Nor do any of the other hosting provisions regulate the views that platforms may express about journalistic enterprises or any other users.[1] It was important to the First Amendment analysis in *FAIR* that the law schools could comply with the Solomon Amendment and still say whatever they wished. So too here.

Plaintiffs do not dispute that they can dissociate from the speech they host; instead, they claim that "practical considerations" with respect to the ability to "dissociate" are irrelevant. Pls.' Br. 35. But the Supreme Court's precedents say otherwise. In *Hurley*, the Supreme Court stated that "there [was] no customary practice whereby private [parade] sponsors disavow 'any identity of viewpoint' between themselves and the selected participants. Practice follows practicability here, for such disclaimers would be quite curious in a moving parade." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 576–77 (1995).

---

[1] Plaintiffs argue that the notice and disclosure provisions interfere with social media platforms' speech. Yet these are not hosting provisions but rather are subject to a distinct *Zauderer* analysis. *See*, *infra*, at 23.

In this, *Hurley* contrasted the parade's medium and the (in)ability to dissociate with the very easy and practical means by which the "owner of [a] shopping mall 'can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand.'" *Id.* at 577 (quoting *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980)). The practical means of dissociation were critical in *Hurley*, and they are here too. As explained in our previous brief, social media platforms have ample means to distance themselves from user speech with which they disagree. *See* Opening Br. 26–27. Dissociation is, in fact, the social media platforms' customary way of doing business. *Id.* (collecting terms of service). Tellingly, Plaintiffs have no response to the fact that their members openly disavow responsibility for the user-generated content on their sites.

*Risk of Confusion*. Plaintiffs miss the mark by looking to *Wooley v. Maynard*, 430 U.S. 705 (1977), to argue that the risk of confusion or, as the Supreme Court recently termed it, the risk of "misattribution," is irrelevant. *AOSI II*, 140 S. Ct. at 2088. As the Supreme Court explained in *FAIR*, *Wooley* is a case about when a government tries to "tell[] people what they must say." 547 U.S. at 61. It held that New Hampshire could not require every licensed driver to proclaim "Live Free or Die" on their cars. *Id*. If the Act in this case required Facebook to issue a press release with the Florida state motto, then *Wooley* would be relevant. But, as discussed above, the Act's hosting provisions do not require social media platforms to say anything.

Rather, these provisions mandate that social media platforms "host or accommodate another speaker's message." *FAIR*, 547 U.S. at 63. Again, this is a "distinct question" from any issue decided in *Wooley*. *Manhattan Cmty. Access Corp.*, 139 S. Ct. at 1931 n.2. And the risk of misattribution is a salient consideration. *AOSI II*, 140 S. Ct. at 2088; *Wooley*, 430 U.S. at 717 n. 15.

Plaintiffs argue that the Act's hosting provisions create a risk of misattribution. But they fail to grapple with all the ways in which user speech is separately identified on a social media platform—usernames, profile photos, avatars, and logos being just some of the ways in which Plaintiffs' members make it quite clear *who* is speaking. Plaintiffs fall back on the argument that "they could be viewed as sending the message that they see nothing wrong" with speech they are required to host. *FAIR*, 547 U.S. at 64–65. But that is just a recycled version of the losing arguments the law schools made in *FAIR*. And the argument was rejected for good reason, as any "fear of a mistaken inference of endorsement . . . is largely self-imposed because" the platform "itself has control over any impressions it gives its" users and advertisers. *Bd. of Educ. of Westside Cmty. Schs. (Dist.66) v. Mergens*, 496 U.S. 226, 250 (1990) (plurality); *accord id.* at 268 (Marshall, J., concurring in judgment).

*Unified Speech Product*. Consider the very first point that the *Hurley* Court made in its legal analysis of the compelled hosting at issue in that case:

> If there were no reason for a group of people to march from here to there except to reach a destination, they could make the trip without expressing any message beyond the fact of the march itself. Some people might call such a procession a parade, but it would not be much of one . . . Hence, we use the word 'parade' to indicate marchers who are making *some sort of collective point*, not just to each other but to bystanders along the way.

*Hurley*, 515 U.S. at 568 (emphasis added). There is a difference between a group of people walking down the street and a parade. Or, as the *Hurley* Court explained elsewhere, there is a constitutionally significant distinction between a parade, in which "every participating unit affects the message conveyed," and other mediums like cable television, which consists of "individual, unrelated segments that happen to be transmitted together for individual selection by members of the audience." *Id.* at 572, 576. It is this analysis—call it determining whether the host presents a unified speech product, a speech product that "comports with" or "contributes something to a common theme," or "some sort of collective point," *Hurley*, 515 U.S. 568, 574, 576—that the *FAIR* Court considered "*central*" to the compelled hosting analysis. 547 U.S. at 63 (emphasis added).

This Court need not decide Plaintiffs' parade of hypotheticals and whether a compelled hosting regulation would trigger First Amendment scrutiny when applied to every conceivable medium. Pls.' Br. 37–38. It is enough to decide in this case that Plaintiffs—in their facial challenge—have failed to demonstrate that even a significant subset of covered social media platforms engages in conduct of the

"expressive quality" protected by *Hurley*. Plaintiffs only gesture in their briefs that platforms' content moderation decisions are "inherently expressive, conveying a message about the provider's values and the community it hopes to foster." Pls.' Br. 2. This amorphous community building is even less defined than what the law schools argued in *FAIR*: that their recruiting services developed the "normative . . . academy" that they sought to build for their "students" and "community." FAIR Respondents at *28.

At bottom, as the district court noted, "[s]omething well north of 99% of the content that makes it onto a social media site never gets reviewed"; most content is "invisible to a substantial extent" to the platforms themselves. App.1715, 1718 (Doc.113 at 20, 23). Platforms are not engaged in conduct of sufficient "expressive quality" when the conduct in question is the hosting of user speech that is more varied, more random, and more cacophonous than the sidewalks of a shopping mall or the tables of a law school job fair. The billions of users and their posts are but fellow travelers on the largest social media platforms, no different—no more cohesively expressive or unified—than a "group of people . . . march[ing] from here to there" on the road of life. *Hurley*, 515 U.S. at 568.

### 3. The Act's hosting provisions permissibly treat social media platforms as common carriers.

Plaintiffs argue that social media platforms should not be treated as common carriers because the platforms make "individualized" decisions about which user

speech to host. This argument proves too much. Even universally recognized common carriers make *some* individualized decisions. For instance, railroads were never required to provide passage to intoxicated or belligerent passengers. *See, e.g.*, *Holton v. Boston Elevated Ry. Co.*, 21 N.E.2d 251, 253 (Mass. 1939). Telegraph companies could refuse to "send horse race bets over [their] telegraphic lines," *State v. W. Union Tel. Co.*, 97 A.2d 480, 485 (N.J. 1953), or messages "obscene, profane, or clearly libelous," *Nye v. W. Union Tel. Co.*, 104 F. 628, 630 (C.C.D. Minn. 1900). And telephone companies have no common carrier obligation to provide access to individual numbers offering prerecorded sexually suggestive messages. *See Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1361 n.2 (11th Cir. 1986).

Social media platforms generally hold themselves out to the public and declare "a willingness to carry on the same terms and conditions any and all groups no matter who they might be." *Semon v. Royalty Indem. Co.*, 279 F.2d 737, 739 (5th Cir. 1960). That is enough to support the Act's common carrier designation regardless of whether the platforms' enforcement of their content moderation standards occasionally involves a measure of individualized judgment. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 525 F.2d 630, 641 (D.C. Cir. 1976); Christopher Yoo, *The First Amendment, Common Carriers, and Public Accommodations: Net Neutrality, Digital Platforms, and Privacy*, 1 J. FREE SPEECH

L. 463 (2021); Eugene Volokh, *Treating Social Media Platforms Like Common Carriers?*, 1 J. OF FREE SPEECH L. 377, 382 n.12 (2021).

Despite Plaintiffs' suggestions to the contrary, social media platforms routinely open themselves up to the public to deal, accepting user sign ups on a global scale—there is no "request for proposal" process to become a user of Facebook. And in their public dealings as hosts of user speech, social media platforms "merely facilitate the transmission of the speech of others rather than engage in speech in their own right." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 741 (D.C. Cir. 2016). After all, outside of this litigation, these platforms repeatedly tell courts and the world that the speech on their platforms is not their own. *See, infra*, 21.

Plaintiffs also argue that Florida's concerns about market power are irrelevant to common carrier status. Pls.' Br. 40. But even Plaintiffs' principal source for this proposition concedes that market power may, at the very least, have "some role to play" in determining whether common carrier status is appropriate. Yoo, *supra*, 468; *id.* at 466. Regardless, the Court need not decide who is right in that debate to recognize that "[c]ertain features of digital markets—such as network effects, switching costs, the self-reinforcing advantages of data, and increasing returns to scale—make them prone to winner-take-all economics." App.212 (Doc.106-1 at

123).[2] With those features and social media platforms' "enormous control over speech," *Biden v. Knight First Amendment Inst.*, 141 S. Ct. 1220, 1224 (2021) (Thomas, J., concurring), Florida could reasonably make the legislative judgment that the platforms required common carrier treatment, *cf. Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*") ("In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress." (quotation marks omitted)).

In attempting to resist common carrier status by comparing this case to *Tornillo*, Plaintiffs only highlight a key difference between newspapers and social media platforms. While the *Miami Herald* was highly selective in choosing which editorials to publish, a typical social media platform indiscriminately offers to host the speech of any member of the public who complies with its terms and conditions. That difference justifies common carrier treatment. *See Semon*, 279 F.2d at 739.

## 4. The Act's consistency provision permissibly regulates social media platforms' conduct.

As explained in Florida's opening brief, the Act's consistency standard is a conduct-regulating, content-neutral law that establishes a baseline equal treatment principle: *whatever* censorship policy social media platforms develop, they must

---

[2] The cited report was explicitly considered by the Florida Legislature. *See Senate Committee on Appropriations Meeting*, at 3:41:00–43:07, FLA. SENATE (Apr. 19, 2021), https://bit.ly/3vG24jm.

treat users consistently under it, *i.e.*, treat like cases alike. All the consistency provision asks of social media platforms is this: whatever rules of the road they create, always apply them alike to like users and like user content.

Plaintiffs make two principal arguments to invalidate this provision. First, Plaintiffs argue that it is a content-based restriction on social media platforms' speech. But the consistency provision is content agnostic—platforms can permit or censor any content they please so long as they do so consistently under pre-published rules. All the consistency provision does is require that platforms treat their users equally. That is a regulation of conduct, not speech, which is enough to dispatch Plaintiffs' claims of content targeting. *FAIR*, 547 U.S. at 62. But regardless, the consistency provision is *more permissive* than either of the regulations at issue in *PruneYard* and *FAIR*. Recall that the California rule at issue in *PruneYard* required the shopping mall to admit everyone, only subject to "reasonable regulations . . . to assure that [expressive] activities do not interfere with normal business operations." 447 U.S. at 78. That would be akin to a provision that required social media platforms to accept all users, all the time, subject only to harassment rules. But the consistency provision requires no such thing. Or consider in *FAIR* where the law schools had to accept (and treat equally) military recruiters. But here, under the consistency provision, platforms can ban military recruiting speech. All the consistency provision requires is that if a social media platform adopts such a rule,

it must not arbitrarily ban the military recruiting speech of one user but not another. The consistency provision is thus content-neutral and indifferent to whatever censorship policies a platform develops.

Nor can Plaintiffs turn the consistency provision's regulation of conduct into a regulation of speech by claiming that their algorithms are expressive. After all, social media platforms in other litigation have taken the position that they neither create nor develop any content through content moderation. *See* Brief for Def.-Appellee, *Force v. Facebook*, 2018 WL 4944738 \*22–23 (2d Cir. Oct. 3, 2018), ("[T]he algorithms at issue here, do not themselves create or alter content. Instead, they serve only to suggest, move, or re-post content created by others."). And courts have agreed. *Force v. Facebook, Inc.*, 934 F.3d 53, 70 (2d Cir. 2019); *Gonzalez v. Google LLC*, 2 F.4th 871, 914 (2021) (Berzon, J., concurring). This is yet another instance where the position of Plaintiffs in this case is impossible to square with what their members represent elsewhere. *See* Opening Br. 26–27. And regardless, to the extent the algorithms are expressive, their only expression is that they implement the platform's own rules, which the consistency provision takes as given.

Second, Plaintiffs assert that the consistency provision is "impermissibly vague." Pls.' Br. 28. The district court did not adopt that theory for good reason. To pass constitutional muster, an enactment need only "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and prevent

"arbitrary and discriminatory enforcement" by "provid[ing] explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The consistency provision does both.

Plaintiffs repeatedly object that the statute does not define "consistent manner." Pls.' Br. 11, 27. When a statute does not provide a definition, courts look to the ordinary meaning. *See Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc.*, 3 So.3d 1220, 1233 (Fla. 2009). Here "consistent" and "consistent manner" have the requisite ordinary meanings. *Cf. CIR v. Fink*, 483 U.S. 89, 104 (1987) (Scalia, J., concurring in the judgment) (discussing benefits of interpreting statutes "in a consistent manner"). "Consistent" is defined as "always behaving in the same way, or having the same opinions, standards, etc." *Consistent*, OXFORD LEARNERS' DICTIONARY ONLINE (December 2021). And the substantive guidance for determining whether social media platforms are acting consistently is *their own* announced content moderation standards. FLA. STAT. § 501.2041(2)(a). Courts are routinely called upon to decide whether like cases have been treated alike under a stated policy. *See, e.g.*, *Engquist v. Oregon Dept. of Agric.*, 553 U.S. 591, 602 (2008) (noting that "the Fourteenth Amendment 'requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed.' " (quoting *Hayes v. Missouri*,

120 U.S. 68, 71–72, (1887)); *cf. Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 768 (2019).

Accordingly, the consistency requirement is not unconstitutionally vague.

**B. The Act's notice and disclosure provisions are permissible under *Zauderer*.**

Plaintiffs do not contest that the appropriate standard for assessing the Act's notice and disclosure requirements under the First Amendment is found in *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985). The Act's disclosure requirements satisfy *Zauderer* because they mandate only the release of "purely factual and uncontroversial information" about social media platforms' conduct. *Id*. The Act does not compel the social media platforms "to disclose information about state-sponsored services," *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018), but rather to tell users about their *own* conduct and services. *Zauderer*'s "lower level of scrutiny" thus applies. *Id.*

Plaintiffs' only argument is that the provisions are "unduly burdensome." Pls.' Br. 44. Like the District Court before them, Plaintiffs are not clear which specific provisions they consider to be unduly burdensome or whether Plaintiffs consider them to be unduly burdensome individually or only collectively. *See* Opening Br. 47. But the crux of Plaintiffs' argument is that disclosure of censorship decisions— notice of when they occur and the rationale for them—would "chill" social media platforms' censorship. But there is no basis for Plaintiffs' assertions. The Act does not require *any* disclosure of "proprietary methodologies"—there is no provision for

social media platforms to reveal the code or mechanics behind their algorithms in the Act. *Contra* Pls.' Br. 44–45. And tellingly, Plaintiffs fail even to mention the Santa Clara Principles that many of Plaintiffs' own members have endorsed—industry-wide calls to "provide notice to each user whose content is taken down or account is suspended about the reason for the removal or suspension" and to offer "detailed guidance to the community about what content is prohibited." *See* Opening Br. 47. Disclosure practices that Facebook, Twitter, and YouTube support can hardly be considered so burdensome that they should be categorically enjoined in this facial pre-enforcement lawsuit.[3] Indeed, Plaintiffs' own declarations demonstrate that some Platforms can, and often do, already provide the notice envisioned by the Act. *E.g.*, Pls.' Suppl. App.53, ¶19 (Doc.25-1 at 7, ¶19).

## C. Plaintiffs' other arguments for the wholesale application of strict scrutiny fail.

This Court has made clear that "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015); *accord U.S. v. O'Brien*, 391 U.S. 367, 383 (1968).

---

[3] Plaintiffs also challenge FLA. STAT. § 106.072(4), which requires social media platforms to disclose to candidates any "willfully provide[d] free advertising." Plaintiffs do not dispute that this provision should be analyzed under *Zauderer*, and they make no specific argument that it impermissibly burdens social media platforms.

Plaintiffs' rhetoric does nothing to change the fundamental fact that "[w]e are governed by laws, not by the intentions of legislators." *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment). And, thus, even if legislators can be animated by what they believe to be a certain kind of unfair, one-sided activity, what matters is the manner in which the law regulates. As described above and in Florida's opening brief, the enacted provisions at issue here are constitutional and content-neutral, designed to "protect Floridians"—all of them, regardless of their views. S.B. 7072 § 1(11).

The Act also does not "impermissibly target[] a subset of disfavored speakers." Pls.' Br. 45–46. "It would be error to conclude . . . the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Turner I*, 512 U.S. at 660. "[H]eightened scrutiny is unwarranted when the differential treatment is justified by some special characteristic of the particular medium being regulated." *Id.* at 660–661 (quotation marks omitted)). In *Turner I*, the Supreme Court held that the must-carry provisions that applied to a subset of cable providers were justified by the "bottleneck monopoly" they possessed. *Id.*[4]

---

[4] Social media platforms' bottleneck position is also one of the key reasons why the Act's hosting provisions should be analyzed under intermediate rather than strict scrutiny to the extent that these provisions are deemed to implicate the platforms' First Amendment rights. *See Turner I*, 512 U.S. at 661. But the district

Contrary to Plaintiffs' assertion, Pls.' Br. 30, the characteristics that justified the targeted regulations in *Turner I* also apply to social media platforms regulated by the Act. As discussed above, features of digital markets, particularly network effects, create a "bottleneck" for expression on these platforms, especially those of the size that the Act regulates. The "special characteristic[s]" of the digital market *do* "suggest[]" the classification of covered platforms *is* "unrelated to suppression of expression." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983).

## III. Plaintiffs Lack All Other Prerequisites for a Preliminary Injunction.

The Court need not consider the other injunction factors because Plaintiffs have failed to show the Act's provisions are likely preempted or violate the First Amendment. *See Bloedorn v. Grube*, 631 F.3d 1218, 1242 (11th Cir. 2011). Yet Plaintiffs have failed to establish that the other factors justify an injunction in any event. Plaintiffs have failed to show irreparable harm, notwithstanding their purported concern for the "range of objectionable materials" that will suddenly appear on their platforms if the Act's provisions go into effect. Pls.' Br. 56. Under the Act, Plaintiffs may still monitor their platforms, while applying their own

court did not give Florida an opportunity to develop the factual record relevant to whether and how intermediate scrutiny should apply. Florida has not asked this Court to overturn the preliminary injunction based upon an application of intermediate scrutiny, and the Court should reject Plaintiffs' attempt to inject this issue into the appeal.

censorship policies in a consistent manner to screen content. What is more, even if the Act were construed to go further, no one disputes that it would be preempted as applied to a platform's good faith decision to take down content that is "obscene" or that fits into one of the other categories of speech identified in Section 230(c)(2)(A). Plaintiffs do not need an injunction that categorically prohibits all enforcement of the Act to avoid irreparable injury.

The balance of equities and public interest also tip in favor of Florida. "[*A*]*ny time* a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (emphasis added). Further, the public interest is harmed by disabling a law where the State has "tak[en] steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas." *Turner I*, 512 U.S. at 657.

## CONCLUSION

Apart from the portions of the preliminary injunction that prohibit enforcement of the Act's regulation of "post-prioritization," the preliminary injunction should be reversed.

Dated: December 20, 2021

Respectfully submitted,

Henry C. Whitaker
*Solicitor General*
Daniel W. Bell
*Chief Deputy Solicitor General*
Evan Ezray
*Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
Henry.Whitaker@myfloridalegal.com
Daniel.bell@myfloridalegal.com
Evan.Ezray@myfloridalegal.com

*Attorneys for Defendants-Appellants*
*Ashley Moody, in her official capacity*
*as Attorney General of Florida; Joni*
*Alexis Poitier, in her official capacity*
*as Commissioner of the Florida*
*Elections Commission; Jason Todd*
*Allen, in his official capacity as*
*Commissioner of the Florida Elections*
*Commission; John Martin Hayes, in*
*his official capacity as Commissioner*
*of the Florida Elections Commission;*
*and Kymberlee Curry Smith, in her*
*official capacity as Commissioner of*
*the Florida Elections Commission*

/s/Charles J. Cooper
Charles J. Cooper
David H. Thompson
Brian W. Barnes
Joseph O. Masterman
John W. Tienken
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jmasterman@cooperkirk.com
jtienken@cooperkirk.com

Raymond F. Treadwell
*Chief Deputy General Counsel*
EXECUTIVE OFFICE OF GOVERNOR RON
DESANTIS
Office of the General Counsel
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
Ray.Treadwell@eog.myflorida.com

*Attorneys for Defendant-Appellant*
*Patrick Gillespie, in his official*
*capacity as Deputy Secretary of*
*Business Operations of the Florida*
*Department of Management Services*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 6,500 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: December 20, 2021

/s/ Charles J. Cooper
Charles J. Cooper
*Counsel for Defendant-Appellant*
*Patrick Gillespie, in his official*
*capacity as Deputy Secretary of*
*Business Operations of the Florida*
*Department of Management Services*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on December 20, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 20, 2021                    /s/ Charles J. Cooper
                                            Charles J. Cooper
                                            *Counsel for Defendant-Appellant*
                                            *Patrick Gillespie, in his official*
                                            *capacity as Deputy Secretary of*
                                            *Business Operations of the Florida*
                                            *Department of Management Services*