# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 14, 2021

Charles J. Cooper
Cooper & Kirk, PLLC
1523 NEW HAMPSHIRE AVE NW
WASHINGTON, DC 20036

Appeal Number:  21-12355-GG
Case Style:  Netchoice LLC, et al v. Attorney General, State of Florida, et al
District Court Docket No:  4:21-cv-00220-RH-MAF

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.**

The referenced case has been docketed in this court. Please use the appellate docket number noted above when making inquiries.

Eleventh Circuit Rule 31-1 requires that APPELLANT'S BRIEF BE SERVED AND FILED ON OR BEFORE August 23, 2021. APPELLANT'S APPENDIX MUST BE SERVED AND FILED NO LATER THAN 7 DAYS AFTER FILING OF THE APPELLANT'S BRIEF. INCARCERATED PRO SE PARTIES ARE NOT REQUIRED TO FILE AN APPENDIX.

This is the only notice you will receive concerning the due date for filing briefs and appendices. See Fed.R.App.P. 28, 30, 31, 32, the corresponding circuit rules, General Order 39 and the Guide to Electronic Filing for further information. Pro se parties who are incarcerated are not required to file an appendix. (In cross-appeals pursuant to Fed.R.App.P. 28.1(b), the party who first files a notice of appeal is the appellant unless the parties otherwise agree.)

Every motion, petition, brief, answer, response and reply filed must contain a Certificate of Interested Persons and Corporate Disclosure Statement (CIP). Appellants/Petitioners must file a CIP within 14 days after the date the case or appeal is docketed in this court; Appellees/Respondents/Intervenors/Other Parties must file a CIP within 28 days after the case or appeal is docketed in this court, regardless of whether appellants/petitioners have filed a CIP. See FRAP 26.1 and 11th Cir. R. 26.1-1.

On the same day a party or amicus curiae first files its paper or e-filed CIP, that filer must also complete the court's web-based CIP at the Web-Based CIP link on the court's website. Pro se filers (except attorneys appearing in particular cases as pro se parties) are **not required or authorized** to complete the web-based CIP.

Attorneys who wish to participate in this appeal must be admitted to the bar of this Court, admitted for this particular proceeding pursuant to 11th Cir. R. 46-3, or admitted pro hac vice pursuant to 11th Cir. R. 46-4. In addition, all attorneys (except court-appointed counsel) who wish to participate in this appeal must file an Appearance of Counsel form within 14 days. The Application for Admission to the Bar and Appearance of Counsel Form are available at www.ca11.uscourts.gov. The clerk generally may not process filings from an attorney until that attorney files an appearance form. See 11th Cir. R. 46-6(b).

11th Cir. R. 33-1(a) requires appellant to file a Civil Appeal Statement in most civil appeals. You must file a completed Civil Appeal Statement, with service on all other parties, within 14 days from the date of this letter. Civil Appeal Statement forms are available on the Internet at www.ca11.uscourts.gov, and as provided by 11th Cir. R. 33-1(a).

MEDIATION. If a Civil Appeal Statement is required to be filed, your appeal and all related matters will be considered for mediation by the Kinnard Mediation Center. The mediation services are free and the mediation process is confidential. You may confidentially request mediation by calling the Kinnard Mediation Center at 404-335-6260 (Atlanta) or 305-714-1900 (Miami). See 11th Cir. R. 33-1.

Attorneys must file briefs electronically using the ECF system. Use of ECF does not modify the requirements of the circuit rules that counsel must also provide seven (7) paper copies of a brief to the court, nor does it modify the requirements of the circuit rules for the filing of appendices in a particular case.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Joseph Caruso, GG/la
Phone #: (404) 335-6177

DKT-7CIV Civil Early Briefing

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

NETCHOICE, LLC et al.,

                Plaintiffs,

v.

ASHLEY BROOKE MOODY et al.,

                Defendants.

CASE NO. 4:21-cv-00220-RH-MAF

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that all Defendants in the above-named action appeal to the United States Court of Appeals for the Eleventh Circuit from the Preliminary Injunction (Doc. 113), entered by this Court on June 30, 2021.

Dated: July 12, 2021

/s/Blaine H. Winship
Blaine H. Winship
Florida Bar No. 356913
Chief Assistant Attorney General
Complex Litigation Bureau

Daniel W. Bell
Florida Bar No. 1008587
Chief Deputy Solicitor General

Office of the Attorney General of
Florida
The Capitol, Suite PL-01

Respectfully submitted,

/s/Charles J. Cooper
Charles J. Cooper (248070DC)
David H. Thompson (450503DC)
Brian W. Barnes*
Joseph O. Masterman (Florida Bar
No. 1004179)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
ccooper@cooperkirk.com
dthompson@cooperkirk.com
bbarnes@cooperkirk.com

1

Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Blaine.winship@myfloridalegal.com
Daniel.bell@myfloridalegal.com

*Attorneys for Defendants Ashley
Moody, in her official capacity as
Attorney General of Florida; Joni
Alexis Poitier, in her official capacity
as Commissioner of the Florida
Elections Commission; Jason Todd
Allen, in his official capacity as
Commissioner of the Florida Elections
Commission; John Martin Hayes, in
his official capacity as Commissioner
of the Florida Elections Commission;
and Kymberlee Curry Smith, in her
official capacity as Commissioner of
the Florida Elections Commission*

jmasterman@cooperkirk.com
  *Admitted *pro hac vice*

James W. Uthmeier
Florida Bar No. 113156
General Counsel
Raymond F. Treadwell
Florida Bar No. 93834
Chief Deputy General Counsel
EXECUTIVE OFFICE OF GOVERNOR RON
DESANTIS
Office of the General Counsel
The Capitol, PL-05
Tallahassee, FL 32399
(850) 717-9310
James.Uthmeier@eog.myflorida.com
Ray.Treadwell@eog.myflorida.com

*Attorneys for Defendant Patrick
Gillespie, in his official capacity as
Deputy Secretary of Business
Operations of the Florida Department
of Management Services*

2

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 1 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 1 of 31

Page 1 of 31

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

NETCHOICE, LLC et al.,

      Plaintiffs,

v.                              CASE NO.  4:21cv220-RH-MAF

ASHLEY BROOKE MOODY et al.,

      Defendants.

_____/

## PRELIMINARY INJUNCTION

The State of Florida has adopted legislation that imposes sweeping requirements on some but not all social-media providers. The legislation applies only to large providers, not otherwise-identical but smaller providers, and explicitly exempts providers under common ownership with any large Florida theme park. The legislation compels providers to host speech that violates their standards—speech they otherwise would not host—and forbids providers from speaking as they otherwise would. The Governor's signing statement and numerous remarks of legislators show rather clearly that the legislation is viewpoint-based. And parts contravene a federal statute. This order preliminarily

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 2 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 2 of 31

Page 2 of 31

enjoins enforcement of the parts of the legislation that are preempted or violate the First Amendment.

I. The Lawsuit

The plaintiffs are NetChoice, LLC and Computer & Communications Industry Association. Both are trade associations whose members include social-media providers subject to the legislation at issue. The plaintiffs assert the rights of their affected members and have standing to do so. *See, e.g.*, *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977).

The defendants are the Attorney General of Florida, the members of the Florida Elections Commission, and a Deputy Secretary of the Florida Department of Management Services, all in their official capacities. The plaintiffs named the Deputy Secretary because the Secretary's position was vacant. Each of the defendants has a role in enforcement of the provisions at issue and is a proper defendant under *Ex parte Young*, 209 U.S. 123 (1908). For convenience, this order sometimes refers to the defendants simply as "the State."

The complaint challenges Senate Bill 7072 as adopted by the 2021 Florida Legislature ("the Act"). The Act created three new Florida statutes: § 106.072, § 287.137, and § 501.2041. The Act also included findings and a severability clause. The Act is scheduled to take effect on July 1, 2021.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 3 of 31
USCA11 Case: 21-12355    Date Filed: 07/13/2021    Page: 3 of 31

Page 3 of 31

Count 1 of the complaint alleges the Act violates the First Amendment's free-speech clause by interfering with the providers' editorial judgment, compelling speech, and prohibiting speech. Count 2 alleges the Act is vague in violation of the Fourteenth Amendment. Count 3 alleges the Act violates the Fourteenth Amendment's equal protection clause by impermissibly discriminating between providers that are or are not under common ownership with a large theme park and by discriminating between providers that do or do not meet the Act's size requirements. Count 4 alleges the Act violates the Constitution's dormant commerce clause. Count 5 alleges the Act is preempted by 47 U.S.C. § 230(e)(3), which, together with § 230(c)(2)(A), expressly prohibits imposition of liability on an interactive computer service—this includes a social-media provider—for action taken in good faith to restrict access to material the service finds objectionable.

The plaintiffs have moved for a preliminary injunction. The motion has been fully briefed and orally argued. Each side has submitted evidentiary material. The motion is ripe for a decision.

## II. Preliminary-Injunction Standard

As a prerequisite to a preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that the plaintiff will suffer irreparable injury if the injunction does not issue, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 4 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 4 of 31

Page 4 of 31

that the injunction will not be adverse to the public interest. *See*, *e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

This order addresses these prerequisites. The order addresses the merits because likelihood of success on the merits is one of the prerequisites. With further factual development, the analysis may change. Statements in this order about the facts should be understood to relate only to the current record and the properly considered material now available. Statements about the merits should be understood only as statements about the likelihood of success as viewed at this time.

III.  The Statutes

A. Terminology

Before setting out the substance of the challenged statutes, a word is in order about terminology. This order sometimes uses the term "social-media provider" to refer to what most people on the street would probably understand that term to mean—so YouTube, Facebook, Twitter, and dozens of smaller but similar providers. The distinguishing characteristic is perhaps this: the primary function of a social-media provider, or at least *a* primary function, is to receive content from users and in turn to make the content available to other users. This is hardly a precise definition, but none is needed; the term is used only for purposes of this

order. The term "social-media provider," as used in this order, is not limited to providers who are covered by the challenged statutes; the term is used instead to apply to all such entities, including those smaller than the providers covered by the statutes and those under common ownership with a large theme park.

The challenged statutes, in contrast, use a slightly different term, "social media *platform*." See Fla. Stat. § 501.2041(1)(g) (emphasis added). There is no significance to this order's use of "provider" to describe all social-media entities instead of "platform"—the word the statutes use to define the more limited set of entities covered by the statutes. The order just needs different terms to refer to the substantially different sets of entities.

When this order uses "social media platform"—the statutory term—with or without quotation marks, the reference ordinarily will be to an entity that both meets the statutory definition *and* is a social-media provider as described above. This order sometimes shortens the phrase to a single word: "platform." At least on its face, the statutory definition also applies to systems nobody would refer to as social media; the definition says nothing about sharing content with other users. The State says the definition should nonetheless be understood to be limited to providers of social media within the common understanding—the State says this comports with the statutory findings and the statutes' obvious purpose. The State may be correct. For present purposes it makes no difference.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 6 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 6 of 31

Page 6 of 31

B.  Removing Candidates

A social-media provider sometimes bars a specific user from posting on the provider's site. This can happen, for example, when a user violates the provider's standards by engaging in fraud, spreading a foreign government's disinformation, inciting a riot or insurrection, providing false medical or public-health information, or attempting to entice minors for sexual encounters.

Newly enacted Florida Statutes § 106.072 prohibits a social media platform from barring from its site any candidate for office—that is, any person who has filed qualification papers and subscribed to the candidate's oath. *See* Fla. Stat. § 106.011(3)(e). It is a low bar.

C.  Posts "By or About" a Candidate

A social-media provider sometimes takes down a user's post, sometimes restricts access to a post, and sometimes adds content to a post, saying, for example, that a post has been determined not to be true or that accurate information on the subject can be found at a specified location. And a social-media provider sometimes rearranges content on its site, including, for example, by making more readily available to a user content the provider believes the user will most wish to see. Social-media providers also often elevate content—make it more readily available to chosen users—when paid by advertisers to do so. Social-media providers routinely use algorithms as part of these processes.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 7 of 31
USCA11 Case: 21-12355    Date Filed: 07/13/2021    Page: 7 of 31

Page 7 of 31

Florida Statutes § 501.2041(2)(h) prohibits a social media platform from using "post-prioritization or shadow banning algorithms" for content "posted by or about a user" who is known by the platform to be a candidate for office. The statute does not define "about" a candidate. "Post-prioritization" means "action by a social media platform to place, feature, or prioritize certain content or material ahead of, below, or in a more or less prominent position than others in a newsfeed, a feed, a view, or in search results." Fla. Stat. § 501.2041(1)(e). But the term does not apply to ads—to content the platform is paid to carry. *Id*. "Shadow ban" means action by a social media platform "to limit or eliminate the exposure of a user or content or material posted by a user to other users of the social media platform." *Id*. § 501.2041(1)(f).

At least by its terms, § 501.2041(2)(h) apparently prohibits a social media platform from using an algorithm to put a candidate's post in the proper feeds—to put the post in the feed of a user who wishes to receive it or to exclude the candidate's post from the feed of a user who does not wish to receive it. Including a post in the feed of a user who wishes to receive it places the post ahead of and in a more prominent position that the many posts the user will not receive at all. Excluding a post from the feed of a user who does not wish to receive it will eliminate the user's exposure to the post.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 8 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 8 of 31

Page 8 of 31

In any event, the statute does not explain how, if the platform cannot use an algorithm "for content" by or about a candidate, the platform can know, before it has violated the statute by using an algorithm, whether a post is by or about a candidate.

The statute has a paid-content exception to the post-prioritization ban: post-prioritization of "certain content or material" from or about a candidate based on payments from the candidate or a third party is not a violation. The statute does not specify what "certain" refers to—if it just means all such paid content, the word "certain" is superfluous. But the whole paid-content exception may be superfluous anyway; the definition of post-prioritization has its own paid-content exception. *See id*. § 501.2041(1)(e).

D. Posts by a "Journalistic Enterprise"

Florida Statutes § 501.2041(2)(j) prohibits a social media platform from taking action to "censor, deplatform, or shadow ban" a "journalistic enterprise" based on the content of its publication or broadcast. "Censor" is broadly defined to include not just deleting content but *adding* content:

> "Censor" includes any action taken by a social media platform to delete, regulate, restrict, edit, alter, inhibit the publication or republication of, suspend a right to post, remove, or post an addendum to any content or material posted by a user. The term also includes actions to inhibit the ability of a user to be viewable by or to interact with another user of the social media platform.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 9 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 9 of 31

Page 9 of 31

Fla. Stat. § 501.2041(1)(b). "Deplatform" means to ban a user permanently or for longer than 14 days. *Id*. § 501.2041(1)(c). "Shadow ban" has the meaning set out above. *See id*. § 501.2041(1)(f).

The statute defines "journalistic enterprise" in a manner that covers many entities that are engaged in journalism but many that are not; any retailer who does business in Florida, has a website of substantial size, and fills 100,000 online orders per month apparently qualifies. A small newspaper, in contrast—one with fewer than 50,000 paid subscribers and fewer than 100,000 active monthly users— does not qualify, no matter how high its journalistic standards. The definition provides:

> "Journalistic enterprise" means an entity doing business in Florida that:
>
> 1. Publishes in excess of 100,000 words available online with at least 50,000 paid subscribers or 100,000 monthly active users;
>
> 2. Publishes 100 hours of audio or video available online with at least 100 million viewers annually;
>
> 3. Operates a cable channel that provides more than 40 hours of content per week to more than 100,000 cable television subscribers; or
>
> 4. Operates under a broadcast license issued by the Federal Communications Commission.

Fla. Stat. § 501.2041(1)(d).

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 10 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 10 of 31

Page 10 of 31

The restrictions on a platform's treatment of posts by journalistic enterprises have two exceptions: they do not apply to obscenity or paid content.

E.  Opting Out of Post-Prioritization and Shadow Banning

Florida Statutes § 501.2041(2)(f) requires a social media platform to "[c]ategorize" algorithms used for post-prioritization and shadow banning and to allow a "user" to "opt out of post-prioritization and shadow banning algorithm categories to allow sequential or chronological posts and content." On its face, this allows a user who posts content to insist it be shown to other users in chronological order—not in the order the recipient has otherwise specified or the order that, based on the recipient's profile and history, the social media platform believes would be most preferred by or useful to the recipient. It is not clear how a social media platform would display content posted by multiple users who all opt out—a wild west of content on which the platform would be prohibited from using an algorithm.

The State says, though, that "user" in § 501.2041(2)(f) means only a recipient of information, not a person who posts information. But "user" is explicitly defined in the statute to mean a person who resides or is domiciled in Florida and "has an account on a social media platform, regardless of whether the person posts or has posted content or material to the social media platform." *Id*. § 501.2041(1)(h). Those who post content have accounts, no less than those who

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 11 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 11 of 31

Page 11 of 31

receive content. And "user" is consistently used in other provisions to include those who post content, not just recipients. *See, e.g.*, *id*. § 501.2041(2)(d) (prohibiting a social media platform from censoring or shadow banning "a user's content" or deplatforming "a user" without meeting specific conditions); *id.* § 501.2041(2)(e) (allowing "a user" to request the number of participants "who were provided or shown *the user's content or posts*") (emphasis added); *id*. § 501.2041(2)(h) (restricting treatment of content "posted by . . . a *user*") (emphasis added); *see also id*. § 501.2041(2)(b), (c), (g) & (i).

F.  Consistent Application of Standards

Florida Statutes § 501.2041(2)(a) requires a social media platform to "publish the standards, including detailed definitions, it uses or has used for determining how to censor, deplatform, and shadow ban." And § 501.2041(2)(b) requires a social media platform to "apply censorship, deplatforming, and shadow banning standards in a consistent manner among its users on the platform." The State says "standards," in § 501.2041(2)(b), means the platform's own standards, as published under § 501.2041(2)(a). That is probably correct.

The statute does not define "consistent manner." And the statute does not address what a social media platform should do when the statute itself prohibits consistent application of the platform's standards—for example, when a candidate engages in conduct that would appropriately lead to deplatforming any other

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 12 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 12 of 31

Page 12 of 31

person, or when content "by or about" a candidate, if by or about anyone else, would be post-prioritized, or when a "journalistic enterprise" posts content that would otherwise be censored.

### G. Changing the Standards

Florida Statutes § 501.2041(2)(c) prohibits a social media platform from changing its "user rules, terms, and agreements"—this apparently includes the standards published under § 501.2041(2)(a)—more often than once every 30 days. The provision requires the social media platform to inform each user about any changes before they take effect.

### H. Information

Florida Statutes § 501.2041(2) includes additional provisions requiring social media platforms to provide information to users.

Under § 501.2042(2)(d), a platform must give notice to a user who is deplatformed or who posts content that is censored or shadow banned. Under § 501.2041(2)(i), the platform must allow a deplatformed user access to the user's content for 60 days after the notice. The notice for censored content must be especially detailed: it must include a "thorough rationale explaining the reason that the social media platform censored the user," § 501.2041(3)(c), and a "precise and thorough explanation of how the social media platform became aware of the censored content or material, including a thorough explanation of the algorithms

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 13 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 13 of 31

Page 13 of 31

used, if any, to identify or flag the user's content or material as objectionable." *Id*.

§ 501.2041(3)(d). The notice need not be given, however, for censored content that

is obscene. *Id*. § 501.2041(4).

Under § 501.2041(2)(e), a platform must, on request, tell a user how many

other participants were shown the user's posts or content.

Under § 501.2041(2)(g), a platform must provide users annual notice of

algorithms used for post-prioritization and shadow banning and of their right to opt

out of the use of those algorithms.

I.   Antitrust

Florida Statutes § 287.137 allows the State to debar from public contracting

a social media platform that has committed, or sometimes just been accused of, an

antitrust violation. The section raises issues under both state and federal law, but it

poses no threat of immediate, irreparable harm to social media platforms. The

statute is not further addressed in, or enjoined by, this order.

IV. Likelihood of Success on the Merits

A. 47 U.S.C. § 230

In *Stratton Oakmont, Inc. v. Prodigy Services Co.*, 1995 WL 323710, at

*3–4 (N.Y. Sup. Ct. May 24, 1995), an anonymous user posted allegedly

defamatory content on an electronic bulletin board—an earlier version of what

today might be called social media. The court said that if the provider of such a

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 14 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 14 of 31

Page 14 of 31

bulletin board did not undertake to review posted content—much as a librarian does not undertake to review all the books in a library—the provider would not be deemed the publisher of a defamatory post, absent sufficient actual knowledge of the defamatory nature of the content at issue. On the facts of that case, though, the provider undertook to screen the posted content—to maintain a "family oriented" site. The court held this subjected the provider to liability as a publisher of the content.

At least partly in response to that decision, which was deemed a threat to development of the internet, Congress enacted 47 U.S.C. § 230. Congress sought "to encourage service providers to self-regulate the dissemination of offensive material over their services," *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997), and to allow "computer service providers to establish standards of decency without risking liability for doing so," *Domen v. Vimeo, Inc.*, 991 F.3d 66, 73 (2d Cir. 2021).

Under § 230, a provider of interactive computer services—this includes, as things have evolved, a social-media provider—cannot be "held liable" for any action "taken in good faith to restrict access to or availability of material that the provider . . . considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." *Id*. § 230(c)(2). The statute says it does not prevent a state from enforcing any *consistent* state law—the federal statute thus

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 15 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 15 of 31

Page 15 of 31

does not preempt the field—but the statute does expressly preempt *inconsistent*

state laws: "No cause of action may be brought and no liability may be imposed

under any State or local law that is inconsistent with this section." *Id*. § 230(e)(3).

Florida Statutes § 106.072 prohibits a social media platform from

deplatforming a candidate for office and imposes substantial fines: $250,000 per

day for a statewide office and $25,000 per day for any other office. But

deplatforming a candidate restricts access to material the platform plainly

considers objectionable within the meaning of 47 U.S.C. § 230(c)(2). If this is done

in good faith—as can happen—the Florida provision imposing daily fines is

preempted by § 230(e)(3). Good faith, for this purpose, is determined by federal

law, not state law. Removing a candidate from a platform based on otherwise-

legitimate, generally applicable standards—those applicable to individuals who are

not candidates—easily meets the good-faith requirement. Indeed, even a mistaken

application of standards may occur in good faith.

The federal statute also preempts the parts of Florida Statutes § 501.2041

that purport to impose liability for other decisions to remove or restrict access to

content. *See* Fla. Stat. § 501.2041(6) (creating a private right of action for damages

for violations of § 501.2041(2)(b) and (2)(d)1; *id*. § 501.2041(2)(b) (requiring a

social media platform to apply censorship, deplatforming, and shadow banning

standards in a consistent manner); *id.* § 501.2041(2)(d)1 (prohibiting a social

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 16 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 16 of 31

Page 16 of 31

media platform from deplatforming a user or censoring or shadow banning a user's

content without notifying the user); § 501.2041(2) (making any violation of that

subsection an unfair or deceptive act or practice within the meaning of

§ 501.204—and thus providing a private right of action for damages under

§ 501.211).

Claims based on alleged inconsistency of a platform's removal of some

posts but not others are preempted. *See Domen*, 991 F.3d at 73.

In sum, the plaintiffs are likely to prevail on their challenge to the preempted

provisions—to those applicable to a social media platform's restriction of access to

posted material. This does not, however, invalidate other provisions; for those, the

plaintiffs' challenge must rise or fall with their constitutional claims.

## B. First Amendment

### 1. Application to Social-Media Providers

Although a primary function of social-media providers is to receive content

from users and in turn to make the content available to other users, the providers

routinely manage the content, allowing most, banning some, arranging content in

ways intended to make it more useful or desirable for users, sometimes adding the

providers' own content. The plaintiffs call this curating or moderating the content

posted by users. In the absence curation, a social-media site would soon become

unacceptable—and indeed useless—to most users.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 17 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 17 of 31

Page 17 of 31

The plaintiffs say—correctly—that they use editorial judgment in making these decisions, much as more traditional media providers use editorial judgment when choosing what to put in or leave out of a publication or broadcast. The legislative record is chock full of statements by state officials supporting the view that the providers do indeed use editorial judgment. A constant theme of legislators, as well as the Governor and Lieutenant Governor, was that the providers' decisions on what to leave in or take out and how to present the surviving material are ideologically biased and need to be reined in.

Where social media fit in traditional First Amendment jurisprudence is not settled. But three things are clear.

First, the State has asserted it is on the side of the First Amendment; the plaintiffs are not. It is perhaps a nice sound bite. But the assertion is wholly at odds with accepted constitutional principles. The First Amendment says "Congress" shall make no law abridging the freedom of speech or of the press. The Fourteenth Amendment extended this prohibition to state and local governments. The First Amendment does not restrict the rights of private entities not performing traditional, exclusive public functions. *See, e.g.*, *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1930 (2019). So whatever else may be said of the providers' actions, they do not violate the First Amendment.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 18 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 18 of 31

Page 18 of 31

Second, the First Amendment applies to speech over the internet, just as it applies to more traditional forms of communication. *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 870 (1997) (stating that prior cases, including those allowing greater regulation of broadcast media, "provide no basis for qualifying the level of First Amendment scrutiny that should be applied" to the internet).

Third, state authority to regulate speech has not increased even if, as Florida argued nearly 50 years ago and is again arguing today, one or a few powerful entities have gained a monopoly in the marketplace of ideas, reducing the means available to candidates or other individuals to communicate on matters of public interest. In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974), the Court rejected just such an argument, striking down a Florida statute requiring a newspaper to print a candidate's reply to the newspaper's unfavorable assertions. A similar argument about undue concentration of power was commonplace as the social-media restrictions now at issue advanced through the Florida Legislature. But here, as in *Tornillo*, the argument is wrong on the law; the concentration of market power among large social-media providers does not change the governing First Amendment principles. And the argument is also wrong on the facts. Whatever might be said of the largest providers' monopolistic conduct, the internet provides a greater opportunity for individuals to publish their views—and for candidates to communicate directly with voters—than existed before the internet

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 19 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 19 of 31

Page 19 of 31

arrived. To its credit, the State does not assert that the dominance of large

providers renders the First Amendment inapplicable.

That brings us to issues about First Amendment treatment of social-media

providers that are not so clearly settled. The plaintiffs say, in effect, that they

should be treated like any other speaker. The State says, in contrast, that social-

media providers are more like common carriers, transporting information from one

person to another much as a train transports people or products from one city to

another. The truth is in the middle.

More generally, the plaintiffs draw support from three Supreme Court

decisions in which a state mandate for a private entity to allow unwanted speech

was held unconstitutional. On the State's side are two Supreme Court decisions in

which a state or federal mandate for a private entity to allow unwanted speech was

held constitutional. Each side claims the cases on its side are dispositive, but this

case again falls in the middle. On balance, the decisions favor the plaintiffs.

The plaintiffs push hardest of *Tornillo*, which, as set out above, held

unconstitutional the Florida statute requiring a newspaper to allow a candidate to

reply to the newspaper's unfavorable statements. But newspapers, unlike social-

media providers, create or select all their content, including op-eds and letters to

the editor. Nothing makes it into the paper without substantive, discretionary

review, including for content and viewpoint; a newspaper is not a medium invisible

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 20 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 20 of 31

Page 20 of 31

to the provider. Moreover, the viewpoint that would be expressed in a reply would be at odds with the newspaper's own viewpoint. Social media providers, in contrast, routinely use algorithms to screen all content for unacceptable material but usually not for viewpoint, and the overwhelming majority of the material never gets reviewed except by algorithms. Something well north of 99% of the content that makes it onto a social media site never gets reviewed further. The content on a site is, to that extent, invisible to the provider.

Similarly, in *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U. S. 557 (1995), a state court ruled that the state's public-accommodation law required an association conducting a private parade to allow participation by an organization advocating gay rights. The parade association asserted the gay-rights group's participation would contravene what the association was attempting to communicate. The Supreme Court held the association had a First Amendment right to exclude the gay-rights group. Again, though, the parade involved a limited number of participants, all undoubtedly approved in the association's discretionary judgment, including for viewpoint. This was not an invisible-to-the-provider event.

The third case on the plaintiffs' side is *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986). There a public utility included in its billing envelopes its own viewpoint-laden newsletters. The state

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 21 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 21 of 31

Page 21 of 31

directed the utility to include in its billing envelopes four times per year a private watchdog organization's newsletters setting out a viewpoint with which the utility disagreed. The Supreme Court held this unconstitutional. The utility undoubtedly knew precisely what went into its billing envelopes and newsletters; as in *Tornillo* and *Hurley*, this was not an invisible-to-the-provider forum.

These three cases establish that a private party that creates or uses its editorial judgment to select content for publication cannot be required by the government to also publish other content in the same manner—in each of these instances, content with which the party disagreed. But social-media providers do not use editorial judgment in quite the same way. The content on their sites is, to a large extent, invisible to the provider.

Even so, the activities of social media platforms that are the focus of the statutes now at issue are not the routine posting of material without incident or the routine exclusion without incident of plainly unacceptable content. These statutes are concerned instead primarily with the ideologically sensitive cases. Those are the very cases on which the platforms are most likely to exercise editorial judgment. Indeed, the targets of the statutes at issue are the editorial judgments themselves. The State's announced purpose of balancing the discussion—reining in the ideology of the large social-media providers—is precisely the kind of state action held unconstitutional in *Tornillo*, *Hurley*, and *PG&E*.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 22 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 22 of 31

Page 22 of 31

On the other side, the State pushes hardest on *Rumsfeld v. FAIR*, 547 U.S. 47 (2006). There the Court upheld a federal statute conditioning law schools' receipt of federal funds on allowing military recruiters the same access as other recruiters to the school's facilities and students. The Court held this was, for the most part, conduct, not speech. Indeed, the schools objected not primarily because they disagreed with anything they expected the recruiters to do or say on campus, but because they disagreed with the government's policy on gays in the military. The statute did not require the schools to say anything at all, nor did the statute prohibit the schools from saying whatever they wished whenever and however they wished. It was unlikely anyone would conclude, from the military recruiters' presence, that the schools supported the military's policy.

Similarly, in *PruneYard Shopping Center v. Robins*, 447 U.S. 74 (1980), a shopping center refused to allow individuals to solicit petition signatures from members of the public at the shopping center. The California Supreme Court held the individuals had the right, under state law, to engage in the proposed activity. The ruling did not compel the shopping center to say anything at all, and the ruling did not prohibit the center from saying anything it wished, when and how it wished. The United States Supreme Court said it was unlikely anyone would attribute the solicitation activities to the shopping center and, with no state action

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 23 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 23 of 31

Page 23 of 31

compelling the center to speak or restricting it from doing so, there was no

violation of the First Amendment.

*FAIR* and *PruneYard* establish that compelling a person to allow a visitor

access to the person's property, for the purpose of speaking, is not a First

Amendment violation, so long as the person is not compelled to speak, the person

is not restricted from speaking, and the message of the visitor is not likely to be

attributed to the person. The Florida statutes now at issue, unlike the state actions

in *FAIR* and *PruneYard*, explicitly forbid social media platforms from appending

their own statements to posts by some users. And the statutes compel the platforms

to change their own speech in other respects, including, for example, by dictating

how the platforms may arrange speech on their sites. This is a far greater burden on

the platforms' own speech than was involved in *FAIR* or *PruneYard*.

In sum, it cannot be said that a social media platform, to whom most content

is invisible to a substantial extent, is indistinguishable for First Amendment

purposes from a newspaper or other traditional medium. But neither can it be said

that a platform engages only in conduct, not speech. The statutes at issue are

subject to First Amendment scrutiny.

### 2. Strict Scrutiny

Viewpoint- and content-based restrictions on speech are subject to strict

scrutiny. *See, e.g.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015). A law

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 24 of 31
USCA11 Case: 21-12355    Date Filed: 07/13/2021    Page: 24 of 31

Page 24 of 31

restricting speech is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 163 (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 563-64 (2011), *Carey v. Brown*, 447 U.S. 455, 462 (1980), and *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Laws that are facially content-neutral, but that cannot be justified without reference to the content of the regulated speech, or that were adopted because of disagreement with the speaker's message, also must satisfy strict scrutiny. *See Reed*, 576 U.S. at 164.

These principles plainly require strict scrutiny here. The Florida statutes at issue are about as content-based as it gets. Thus, for example, § 106.072 applies to deplatforming a candidate, not someone else; this is a content-based restriction. Similarly, § 501.2041(2)(h) imposes restrictions applicable only to material posted "by or about a candidate." This again is content-based. And § 501.2041(2)(j) prohibits a social media platform from taking action based on the "content" of a journalistic enterprise's post; prohibiting a platform from making a decision based on content is itself a content-based restriction. That the statutes are content-based in these and other respects triggers strict scrutiny.

The plaintiffs assert, too, with substantial factual support, that the actual motivation for this legislation was hostility to the social media platforms' perceived liberal viewpoint. Thus, for example, the Governor's signing statement quoted the bill's sponsor in the House of Representatives: "Day in and day out, our

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 25 of 31
USCA11 Case: 21-12355    Date Filed: 07/13/2021    Page: 25 of 31

Page 25 of 31

freedom of speech as conservatives is under attack by the 'big tech' oligarchs in

Silicon Valley. But in Florida, we said this egregious example of biased silencing

will not be tolerated." Similarly, in another passage quoted by the Governor, the

Lieutenant Governor said, "What we've been seeing across the U.S. is an effort to

silence, intimidate, and wipe out dissenting voices by the leftist media and big

corporations. . . . Thankfully in Florida we have a Governor that fights against big

tech oligarchs that contrive, manipulate, and censor if you voice views that run

contrary to their radical leftist narrative." This viewpoint-based motivation,

without more, subjects the legislation to strict scrutiny, root and branch. *See, e.g.*,

*Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)

("The government must abstain from regulating speech when the specific

motivating ideology or the opinion or perspective of the speaker is the rationale for

the restriction.") (citing *Perry Ed. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S.

37, 46 (1983)).

     Moreover, these statements are consistent with the statutory definition of

"social media platform," which extends only to, and thus makes the legislation

applicable only to, large entities—those with $100 million in revenues or 100

million monthly participants. As the Supreme Court has recognized, discrimination

between speakers is often a tell for content discrimination. *See, e.g.*, *Citizens*

*United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Speech restrictions

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 26 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 26 of 31

Page 26 of 31

based on the identity of the speaker are all too often simply a means to control

content."). That is the case here. The state has suggested no other basis for

imposing these restrictions only on the largest providers. And even without

evidence of an improper motive, the application of these requirements to only a

small subset of social-media entities would be sufficient, standing alone, to subject

these statutes to strict scrutiny. *See, e.g.*, *Minneapolis Star & Tribune Co. v.*

*Minnesota Comm'r of Revenue*, 460 U.S. 575, 591 (1983); *Arkansas Writers'*

*Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987).

Similar analysis applies to the treatment of "journalistic enterprises" in

§ 501.2041(2)(j). The statute affords their posts favored treatment—but to qualify,

an entity must meet the minimum size requirement of § 501.2041(1)(d).

Finally, the same is true of the exclusion for social-media providers under

common ownership with a large Florida theme park. The State asserted in its brief

that the provision could survive intermediate scrutiny, but the proper level of

scrutiny is strict, and in any event, when asked at oral argument, the State could

suggest no theory under which the exclusion could survive even intermediate

scrutiny. The State says this means only that the exclusion fails, but that is at least

questionable. Despite the obvious constitutional issue posed by the exclusion, the

Legislature adopted it, apparently unwilling to subject favored Florida businesses

to the statutes' onerous regulatory burdens. It is a stretch to say the severability

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 27 of 31
USCA11 Case: 21-12355    Date Filed: 07/13/2021    Page: 27 of 31

Page 27 of 31

clause allows a court to impose these burdens on the statutorily excluded entities when the Legislature has not passed, and the Governor has not signed, a statute subjecting these entities to these requirements.

To survive strict scrutiny, an infringement on speech must further a compelling state interest and must be narrowly tailored to achieve that interest. *See, e.g.*, *Reed*, 576 U.S. at 171. These statutes come nowhere close. Indeed, the State has advanced no argument suggesting the statutes can survive strict scrutiny. They plainly cannot. First, leveling the playing field—promoting speech on one side of an issue or restricting speech on the other—is not a legitimate state interest. *See, e.g.*, *Arizona Free Enter. Club v. Bennett*, 564 U.S. 721, 749-50 (2011). Whatever might be said of any other allegedly compelling state interest, these statutes are not narrowly tailored. Like prior First Amendment restrictions, this is an instance of burning the house to roast a pig. *See, e.g.*, *Reno v. ACLU*, 521 U.S. at 882; *Sable Commc'n of Cal., Inc. v. FCC*, 492 U.S. 115, 131 (1989).

The plaintiffs are likely to prevail on the merits of their claim that these statutes violate the First Amendment. There is nothing that could be severed and survive.

### 3. Intermediate Scrutiny

The result would be the same under intermediate scrutiny—the level of scrutiny that applies to some content-neutral regulations of speech. To survive

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 28 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 28 of 31

Page 28 of 31

intermediate scrutiny, a restriction on speech must further an important or

substantial governmental interest unrelated to the suppression of free expression,

and the restriction must be no greater than essential to further that interest. The

narrow tailoring requirement is satisfied so long as the governmental interest

would be achieved less effectively absent the restriction. *See Turner Broad. Sys.,*

*Inc. v. FCC*, 512 U.S. 622, 662 (1994).

The provisions at issue here do not meet the narrow-tailoring requirement.

Indeed, some of the disclosure provisions seem designed not to achieve any

governmental interest but to impose the maximum available burden on the social

media platforms.

Intermediate scrutiny does not apply because these statutes are not content-

or viewpoint-neutral. And the statutes would not survive intermediate scrutiny

even if it applied.

C. Vagueness

Florida Statutes § 501.2041 is riddled with imprecision and ambiguity. But

this, without more, does not render the statute unconstitutional. As the State

correctly notes, uncertainty about a statute's application to marginal cases—or

even to not-so-marginal cases—can be resolved through judicial construction. But

violations of this statute subject a social media platform to statutory damages that

seem more punitive than compensatory: up to $100,000 per claim.

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 29 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 29 of 31

Page 29 of 31

Two provisions are especially vague. First, § 501.2041(2)(b) requires a social media platform to apply its standards in a consistent manner, but as set out *supra* at 12, this requirement is itself inconsistent with other provisions. Second, § 501.2041(2)(h) imposes a requirement that, as set out *supra* at 7-8, is incomprehensible. Vagueness presents heightened concern in a statute that, like this one, trenches on First Amendment interests. *See, e.g.*, *Wollschlaeger v. Gov., Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017).

This order need not and does not decide whether vagueness would provide an independent ground for a preliminary injunction.

V. Other Prerequisites

The plaintiffs easily meet the other prerequisites to a preliminary injunction. If a preliminary injunction is not issued, the plaintiffs' members will sometimes be compelled to speak and will sometimes be forbidden from speaking, all in violation of their editorial judgment and the First Amendment. This is irreparable injury. The threatened injury outweighs whatever damage the injunction may cause the State. And the injunction will serve, not be adverse to, the public interest. When a plaintiff is likely to prevail on the merits of a First Amendment claim, these other prerequisites to a preliminary injunction are usually met. *See, e.g.*, *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020).

VI.  Conclusion

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 30 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 30 of 31

Page 30 of 31

The legislation now at issue was an effort to rein in social-media providers deemed too large and too liberal. Balancing the exchange of ideas among private speakers is not a legitimate governmental interest. And even aside from the actual motivation for this legislation, it is plainly content-based and subject to strict scrutiny. It is also subject to strict scrutiny because it discriminates on its face among otherwise-identical speakers: between social-media providers that do or do not meet the legislation's size requirements and are or are not under common ownership with a theme park. The legislation does not survive strict scrutiny. Parts also are expressly preempted by federal law.

For these reasons,

IT IS ORDERED:

1. The plaintiffs' motion for a preliminary injunction, ECF No. 22, is granted.

2. The defendants Ashley Brooke Moody, Joni Alexis Poitier, Jason Todd Allen, John Martin Hayes, Kymberlee Curry Smith, and Patrick Gillespie must take no steps to enforce Florida Statutes §§ 106.072 or 501.2041 until otherwise ordered. The preliminary injunction set out in this paragraph will take effect upon the posting of security in the amount of $1,000, or an undertaking to pay up to $1,000, for costs and damages sustained by a party found to have been wrongfully enjoined.  The preliminary injunction binds the defendants and their officers,

Case 4:21-cv-00220-RH-MAF   Document 113   Filed 06/30/21   Page 31 of 31
USCA11 Case: 21-12355   Date Filed: 07/13/2021   Page: 31 of 31

Page 31 of 31

agents, servants, employees, and attorneys—and others in active concert or

participation with any of them—who receive actual notice of this injunction by

personal service or otherwise.

SO ORDERED on June 30, 2021.

s/Robert L. Hinkle
United States District Judge